## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JEFFREY HUNT and
ALICE ULIBARRI,

      Plaintiffs,

vs.                                 No. CIV 11-1144 JB/WDS

CENTRAL CONSOLIDATED SCHOOL DISTRICT,
a municipal government agency, and HOSKIE BENALLY,
ED MARQUEZ, DON LEVINSKY, NANCY FRAZINNI,
MATTHEW TSO, SCOTT NICOLAY and PHIL
KASPAR, Individually,

      Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants' Motion to Dismiss for Failure to State a Claim for Relief and/or Qualified and Sovereign Immunity, filed October 15, 2012 (Doc. 27)("Motion to Dismiss").  The Court held a hearing on January 31, 2013.  The primary issues are: (i) whether Defendant Central Consolidated School District ("CCSD") is an improper party, because the CCSD School Board only, not the CCSD, can sue and be sued under New Mexico Law; (ii) whether Plaintiffs Jeffrey Hunt's and Alice Ulibarri's Second Amended Complaint for Damages and Declaratory Judgment, filed September 12, 2012 (Doc. 24)("Complaint"), asserts any claims based on Hunt's alleged disability; (iii) whether the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601-2654 ("FMLA"), permits the CCSD to require the Plaintiffs to use their FMLA leave concurrently with their paid sick leave; (iv) whether the Plaintiffs state a claim pursuant to 42 U.S.C. § 1983 against the CCSD, because the Complaint makes plausible that a CCSD policy or custom was the moving force behind an equal-protection violation when CCSD, as part of a pretextual CCSD restructuring, reassigned the Plaintiffs because they are Mormon or

Anglo; (v) whether the individual Defendants are plausibly liable under 42 U.S.C. § 1985(3) for conspiring to violate the Plaintiffs' Equal Protection Clause rights by discriminating against them because of their race or religion; (vi) whether the CCSD, and Defendants Ed Marquez, Don Levinski, and Nancy Frazzini, are plausibly liable under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e -17 ("Title VII"), based on theories of disparate impact or treatment, retaliation, hostile work environment, or constructive termination, because they discriminated against the Plaintiffs based on their race or religion; (vii) whether the CCSD is liable for breach of contract, and for the breach of the covenant of good faith and fair dealing, because it breached the Plaintiffs' employment contracts by allegedly demoting them because of their race or religion; (viii) whether the CCSD is liable for any alleged torts, including common-law conspiracy, tortious interference with contract, and negligent operation of a school building, because the factual allegations make plausible that the CCSD caused the Plaintiffs physical damage; (ix) whether the CCSD is liable to the Plaintiffs under the New Mexico Fraud Against Taxpayers Act, N.M.S.A. 1978, §§ 44-9-1 to -14 ("FATA"), because the FATA waives New Mexico's sovereign immunity, and because the Defendants plausibly violated the FATA; and (x) whether the alleged pretextual demotion by the CCSD, Frazzini, Marquez, and Levinski plausibly subjects them to liability under the New Mexico Human Rights Act, N.M.S.A. 1978, §§ 28-1-1 to -14 ("NMHRA"). The Court will grant in part and deny in part the Motion to Dismiss. The Court will dismiss Counts V, VI, VII, and IX, but will not dismiss Counts I, II, III, IV, VIII, or X. The Court concludes that CCSD is a proper party, and will not dismiss any claims against the CCSD or require the Plaintiffs to amend their Complaint to allege their claims against the CCSD School Board. Second, the Court concludes that there are no plausible disability claims alleged in the Complaint in any form, and that none of the causes of action are based upon Hunt's alleged

disability.   Third, the FMLA permits the CCSD, in accordance with their policies, to require the

Plaintiffs to take their paid leave concurrently with their FMLA leave.   In relation to the federal

causes of action, the Court concludes that the Plaintiffs plausibly state that, on the

disparate-treatment discrimination basis only, the CCSD violated Title VII by demoting them

because of Mormon religion.   Similarly, the Court concludes that the § 1983 claim against the

CCSD and § 1985(3) claim against all Defendants based on anti-Mormon discrimination is also

plausible.   The Court will dismiss Counts VI, and VII, and IX -- the tortious-interference claim,

the common-law-conspiracy claim, and the negligent-building-operation claim -- because they

sound in tort and, based on the Plaintiffs' allegations, the State of New Mexico has not waived tort

immunity for these claims.   The Court will also dismiss the FATA claim in Count V, because the

Plaintiffs' allegations do not plausibly show that FATA entitles them to relief.   The Court will

allow the Plaintiffs' NMHRA claim, like their Title VII, to proceed only on the disparate-treatment

discrimination basis.   Because the Court believes that the Plaintiffs can cure technical errors in

their Complaint to allege plausible claims to the extent that they are based on Anglo

discrimination, the Court will grant the Plaintiffs leave to amend the Complaint to make those

amendments.

## **FACTUAL BACKGROUND**

For purposes of the Motion to Dismiss, the Court and the Defendants take the Plaintiffs'

allegations in the Complaint as true.   The Defendants reserve the right, however, to challenge the

veracity of the Plaintiffs' allegations.   See Motion to Dismiss at 2 n.4.

This case involves an employment dispute arising out of an administrative restructuring of

CCSD, which is located in northwestern New Mexico, in San Juan County.   See Complaint ¶ 3, at

2.   Both Hunt and Ulibarri are Anglo and Mormon.   See Complaint ¶¶ 1-2, at 1-2.   Defendant

Phil Kasper is the CCSD Director of Human Resources.[1]   See Complaint ¶ 10, at 8-9.   The CCSD Board President is Matthew Tso.   See Complaint ¶ 7, at 5.   Defendant Scott Nicolay was a CCSD employee and Tso's campaign manager.   See Complaint ¶ 9, at 7-8.   Defendant Hoskie Benally is a CCSD Board member.   See Complaint ¶ 8, at 6.

Both Plaintiffs signed a one-year employment contract in July 2011.   See Complaint ¶ 38, at 23.   Hunt and Ulibarri were supervisory employees for the CCSD in July 2011, when they learned of the restructuring and that they were to be reassigned to different positions as a result of the restructuring.   See Complaint ¶ 17, at 12-13.   Hunt alleges that Defendants Acting Superintendent Don Levinski and Acting Operations Director Ed Marquez told him that he was to be reassigned from the position of Transportation Director to that of Transportation Coordinator. See Complaint ¶¶ 4-5, at 2-4; id. ¶¶ 16-17, at 12-13.   For disciplinary reasons, he was then assigned to a Grounds Maintenance worker position.   See Complaint ¶ 17, at 12-13.

As to Frazzini, the CCSD Human Resources Director, the Plaintiffs allege that "no one wanted to tell Plaintiff Ulibarri of the demotion, and that Defendant Frazzini had been selected to do so over her objection."   Complaint ¶ 30, at 19.   Frazzini told Ulibarri that her job as Custodial Supervisor was to be eliminated.   See Complaint ¶ 30, at 19.   Even though they were being assigned to different positions, their salaries would not be reduced for the duration of their current contract term.   See Complaint ¶¶ 17, 30, at 12-13, 19-20.   The Defendants allege that the CCSD restructuring disproportionately affected Mormon and Anglo supervisors. Out of ten director positions which were downgraded, four were held by Anglo Mormons, one by an American Indian Mormon, four by non-Mormon Anglos, and one by a non-Mormon Hispanic.   See Complaint ¶

---

[1] The Defendants note Frazzini's and Kasper's names are misspelled in the caption.   See Motion to Dismiss at 1 n.2.   The Court will leave the caption as it is in the Complaint, but will use the Defendants' spelling in the text.

18, at 13.

Hunt initially wanted to work in his newly assigned position, but changed his mind, because he was concerned about the physical stress negatively affecting his diabetes and neuropathy.  See Complaint ¶¶ 19-20, at 13-14.   He was concerned about the risks to his health that the "extremely physical position" caused, and believed that he was inexperienced and lacked training.  Complaint ¶¶ 20, at 13-14.   Immediately after the July 2011 meeting, Hunt took sick leave, never returning to work, because of stress related to the new job and his concerns about safety.  See Complaint ¶ 20, at 14.   Voicing his concerns about his position to Frazzini, Frazzini and Marquez told Hunt to take his accrued sick leave concurrently with his leave under the FMLA. See Complaint ¶¶ 21-22, at 14-15.   Hunt contends that this request was wrongful and deprived him of his accrued sick leave.  See Complaint ¶¶ 21-22, at 14-15.   Additionally, Hunt alleges, in paragraphs 24 and 25 of the Complaint, that on September 15, 2011, he informed the CCSD that he was entitled to "reasonable accommodation" and, on October 20, 2011, wrote again, asking that a reasonable accommodation negotiation be held.  Complaint ¶¶ 24-25, at 15-16.   Hunt resigned on February 24, 2012, without returning to work.  See Complaint ¶¶ 27-28, at 17-18.

After Frazzini notified Ulibarri that she was being reassigned from Custodial Supervisor, but before being assigned a permanent position, Ulibarri worked at temporary jobs with the CCSD. See Complaint ¶¶ 29-30, 33-34, at 18-19, 20-21.   After learning of her job reassignments, Ulibarri told Frazzini that she needed extensive dental surgery.  See Complaint ¶ 33, at 20.   They discussed Ulibarri taking sick and FMLA leave; during this discussion, Frazzini suggested that Ulibarri could take leave and then retire.  See Complaint ¶ 33, at 20-21.   Frazzini, and subsequently Marquez, told Ulibarri that she had to use her sick leave and FMLA leave concurrently, and that she could use only sixty days of her accrued sick leave.  See Complaint ¶

33, at 20-21.   Ulibarri was assigned to a permanent position as Payroll and Housing Clerk about three or four months after learning of the restructuring.   See Complaint ¶¶ 30, 33-34, at 19, 20-21. Ulibarri resigned effective February 24, 2012.   See Complaint ¶¶ 34, 37, at 21, 23.

At some point before August 19, 2011, the Farmington Daily Times news blog published anonymous, online comments disparaging and threatening Mormons; some of the persons commenting alleged that they were responsible for actions that the CCSD took against the Mormons.   See Complaint ¶ 43, at 27-28.   "One blog post even stated that white, Mormon administrators were being reassigned to positions 'less damaging', and that blog was posted before the plaintiffs' demotions occurred."   Complaint ¶ 43(a), at 27.   The Plaintiffs believe that "higher-levels CCSD employees," Tso and Nicolay, made "some" of the comments.   Complaint ¶ 43, at 28.   See id. ¶ 7(j), at 6; id. ¶ 9(j), at 8.

## PROCEDURAL BACKGROUND

The Plaintiffs filed their Complaint on September 19, 2012.   The forty-five page Complaint includes 109 numbered paragraphs, alleging, in essence, that the CCSD, a large rural school district, was restructured to discriminate against the Plaintiffs because of their Anglo race and Mormon religion.   The Plaintiffs bring suit based on the restructuring, arguing that the CCSD and the individual Defendants conspired to demote them and push them out of their jobs, failed to investigate their complaints, deprived them of due process, failed to "come forward and renounce the conspiracy, and constructively terminated both Plaintiffs because of their national origin, disability, and religion."   E.g., Complaint ¶ 4, at 3.   The Plaintiffs contend that these events are the basis for ten counts: (i) Breach of Contract; (ii) Breach of the Covenant of Good Faith and Fair Dealing; (iii) Section 1983 violations; (iv) Section 1985(3) violations; (v) Violation of the FATA; (vi) Tortious Interference with Contract and Perspective Contractual Relations; (vii) Common-law

conspiracy; (viii) Violations of the New Mexico Human Rights Act; (ix) Negligent Maintenance and Operation of a School Building; (x) Violation of Title VII.   Count III, alleging an equal-protection violation against the CCSD, also includes the allegation that the CCSD discriminated against Hurt on the basis of his "disability."   Complaint ¶ 59, at 32.   Despite references in the Complaint to FMLA leave, alleged disabilities, and requests for accommodations, however, the Plaintiffs do not assert a claim under the FMLA or any statute prohibiting discrimination.

The vast majority of the allegations reference the "Defendants" generally.   Paragraph 13 provides: "Whenever in this complaint reference is made to 'Defendants, and each of them,' such allegations shall be deemed to mean the act of Defendants acting individually, jointly, and/or severally."   Complaint ¶ 13, at 13.   In the factual allegations, however, while the Plaintiffs specifically allege Frazzini's and Marquez' conduct in discussing the Plaintiffs' leave time, the Complaint lacks any reference to any of Benally's, Tso's, Nicolay's, or Kasper's specific actions in the factual allegations.   Instead, the Complaint recites a similar factual allegation for each individual Defendant, alleging that, "upon information and belief," the particular Defendant "knowingly participated" in numerous generic wrongful acts, such as religion and racial discrimination, conspiracy, and denial of due process.   In relation to Tso, for example, the Plaintiffs' recitation is as follows:

> Plaintiffs, upon information and belief, allege that Defendant Tso is an individual who at all material times was a resident of the State of New Mexico. . . . Defendant Tso is alleged to have knowingly participated in:
>
>> a)      the discriminatory restructuring;
>
>> b)      the denial of plaintiffs' due process and contractual rights to a grievance procedure;
>
>> c)      the efforts to push the Plaintiffs out of their jobs related to the extra demotion of Plaintiff Hunt and the failure to provide Plaintiff Ulibarri with

replacement positions;

d)      the failure to provide required accommodation and a required accommodation negotiation to Plaintiff Hunt;

e)      the fraudulent attempt to deny Plaintiffs' sick leave and to alter their Family Medical Leave Act rights;

f)      the failure to investigate Plaintiff's [sic] complaints of discrimination, retaliation and fraud;

g)      an agreement among the Defendants to terminate Plaintiffs' employment and/or eliminate any supervisory authority of the Plaintiffs because of the discriminatory attitudes of the CCSD Board, themselves and the other individual defendants;

h)      the failure to come forward, and renounce the involved conspiracy;

i)      the constructive termination of the Plaintiffs due to all of the above;

j)      other discriminatory and retaliatory acts to be designated later following discovery.

Complaint ¶ 7, at 5-6.   The Complaint contains no specific allegations what each Defendant did to engage in such wrongful acts.

Although the Plaintiffs state that their contracts "explicitly make CCSD's policy manual part of the involved contract . . . and the involved policies are attached hereto and included by reference," they did not attach any of the policies.   Complaint ¶ 38, at 23-24.   Additionally, they allege that specific letters, which the Plaintiffs sent to the CCSD, provided notice of "discrimination, retaliation, and harassment," but did not attach the letters.   Complaint ¶ 43, at 27-28.   The Plaintiffs request "compensatory damages for all Counts, punitive damages, double damages and reasonable attorney fees, together with pre-judgment interest, post-judgment interests, costs, declaratory judgment declaring any contract provisions (specifically including Board Policies) that limit employee due process rights unconstitutionally unconstitutional [sic],

and such further relief as the Court deems proper."   Complaint at 45.

The Defendants filed their Motion to Dismiss on October 15, 2012, requesting that the Court grant the individual Defendants qualified immunity on all federal civil rights claims brought against them in their individual capacities under 42 U.S.C. §§ 1983 and 1985, dismiss the Title VII claims against the individuals, and dismiss the Complaint with prejudice.   See Motion to Dismiss at 1.   The Defendants contend that the Complaint is deficient under rule 12(b)(6) of the Federal Rules of Civil Procedure, because the Plaintiffs do not assert a plausible claim for relief for the federal and state violations in the Complaint.   In addition, the Defendants contend that the individual Defendants are entitled to qualified immunity for the claims asserted in Counts III, IV, and X, and that the doctrine of sovereign immunity bars Counts V, VI, VII, and IX.   The Defendants request that the Court exercise its discretion and decline to entertain the unnumbered claim for declaratory judgments.   Finally, the Defendants contend that any implied violations of the FMLA or any statute prohibiting disability- based discrimination lack a sound basis in the facts as a matter of law.   See Motion to Dismiss at 1-2.

The Defendants discuss first the Plaintiffs' federal claims: Counts III, IV, and X.   They assert that the § 1983 allegation in Count III "contains an ambiguity regarding Count III which must be addressed . . . : The caption of Count III indicates that it pertains to 'the CCSD Defendant Only (Not the Individuals).'"   Motion to Dismiss at 8-9.   The Defendants contend that the title creates the ambiguity, as the paragraphs within Count III "refer to the 'actions of the Defendants,' 'the actions of the Defendants listed above,' and the 'actions of the CCSD,' suggesting that Plaintiffs intend Count III to have broader applicability than the caption would suggest."   Motion to Dismiss at 9 (internal citations omitted)(quoting Complaint ¶¶ 58-59, at 32).   They assert that this ambiguity "highlights yet again the fundamental problem with the Complaint: It rarely, if ever,

- 9 -

identifies specifically 'who did what to whom' and thereby fails to contain an actionable cause of action under the United States Constitution."   Motion to Dismiss at 9.   The Defendants also contend that the Plaintiffs fail to state a claim against the CCSD,

> because a municipal agency "is liable only when the official policy is the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights."

Motion to Dismiss at 9 (quoting Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998)). They assert that the Plaintiffs do not identify any unconstitutional policy or practice, do not plead factual allegations that could support the conclusion that a policy or practice of discrimination exists, and fail to include any allegations that "could establish the requisite direct causal link between the unconstitutional policy or practice and any constitutional injuries suffered."   Motion to Dismiss at 10.

The Defendants also argue that Claim II fails to state a claim against the individual Defendants, either in their individual capacities or in their official capacities.   First, they assert that the pleading is not sufficient regardless whether the Equal Protection Clause violation in Claim III is alleged against the Defendants in either capacity, because the "Plaintiffs never specify 'who' did 'what,', [sic] and they fail to 'make a threshold showing that they were treated differently than others who were similarly situated to them."   Motion to Dismiss at 10 (quoting Barney v. Pulsipher, 143 F.3d at 1312).   They assert that, if the Plaintiffs' allegations in Claim III are against the individual Defendants in their official capacities, there are insufficient allegations to state a claim under "the Monell standard."   Motion to Dismiss at 10-11 (quoting Monell v. Dept. of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978)).   On the other hand, they assert,

the allegations also fail to state a claim against the individual Defendants in their individual capacities, because "[n]one of the allegations show any individual Defendant's personal participation in an equal protection or other constitutional violation."   Motion to Dismiss at 11-12 (citing Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996); Robbins v. Oklahoma, 519 F.3d 1242, 1249-50 (10th Cir. 2008)).   The Defendants contend that the Plaintiffs' failure to plead who did what to whom makes it "difficult to discern whether Plaintiffs allege that they were treated differently from others affected by restructuring or whether they alleged that all affected employees have an equal protection claim."   Motion to Dismiss at 12 (emphasis in original).   The Defendants also argue that, beyond the equal-protection claim based on the Plaintiffs' race or religion, "Hunt's allegation that he has an additional basis for relief under § 1983 for 'disability discrimination' is equally unsupportable."   Motion to Dismiss at 12.   They contend that, notwithstanding the Plaintiffs' failure to plead how the Defendants' actions in requiring Hunt to take his FMLA concurrently with his sick leave, allowable under FMLA, applied differently to him than other members of some unidentified class, "these still would not amount to a constitutional violation because the Equal Protection Clause of the U.S. Constitution does not prohibit discrimination on the basis of disability."   Motion to Dismiss at 12 (citing Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 365 (2001); Guttman v. Khalsa, 669 F.3d 1101 (10th Cir. 2012)).   The Defendants additionally contend that the Plaintiffs fail to allege any injury, as they concede that their employment continued for the remainder of their contract terms and that their pay remained the same.   See Motion to Dismiss at 13.   The Defendants assert that these concessions "nullify Plaintiffs' claims that they were discriminated against or that they experienced an unlawful hostile workplace," regardless whether pursued as a § 1983 claim, §

1985(3) claim, Title VII claim, or a claim under the NMHRA.   Motion to Dismiss at 13 (citing Gerald v. Locksley, 785 F. Supp. 2d 1074, 1107 (D.N.M. 2011)(Browning J.); Cates v. Regents of N.M. Inst. Of Mining & Tech., 1998-NMSC-002, 124 N.M. 633, 954 P.2d 65).   They argue: "Although these claims imply that Plaintiffs were disappointed by their new assignments and potentially concerned about the possibility of a cut in pay in the future, neither disappointment nor speculative concerns about pay cuts constitute an unlawfully hostile work environment amounting to a constructive termination."   Motion to Dismiss at 4.

In relation to the § 1985(3) claim that the Plaintiffs allege in Count IV, the Defendants contend that § 1985(3) applies only to "'class-based or racially discriminatory animus,'" and thus cannot, as a matter of law, apply to religious discrimination or disability discrimination.   Motion to Dismiss at 15 (quoting Bisbee v. Bey, 39 F.3d 1096, 1102 (10th Cir. 1994)).   They contend that, even if Anglos are a protected class, the Court should still dismiss Count IV, because the Plaintiffs do not plead sufficient facts to state a claim for conspiracy: "At best, Plaintiffs offer conclusory allegations that the Defendants entered into 'an agreement to eliminate Mormon and/or Anglo supervisors, and [took] specific actions in furtherance of the conspiracy.'"   Motion to Dismiss at 15 (alteration in original)(quoting Complaint ¶ 66, at 15).   The Defendants assert, however, that these specific actions are not alleged in the Complaint, neither are factual allegations about any Defendant entering into an agreement, nor are there any factual allegations about any acts that any Defendants took in furtherance of the conspiracy.   See Motion to Dismiss at 15-16. According to the Defendants:

> In fact, the Complaint contains no factual allegations to support Plaintiffs' assertion that the restructuring was the result of a conspiracy to discriminate against Anglos. Plaintiffs do not allege facts that would support their conclusion that any

defendant had discriminatory animus.  Plaintiffs allege that their right to equal protection was violated by this alleged conspiracy, [Complaint, ¶ 61, at 32], but even that is a conclusion without factual or legal support. As to allegations of conspiracy, no facts plead could establish the existence of a conspiracy, no stated facts indicate what was done in furtherance of the alleged conspiracy, or by whom such actions were taken and there are no allegations regarding the treatment of others similarly situated.

Motion to Dismiss at 16.  The Defendants assert that the intracorporate conspiracy doctrine also bars the Plaintiffs' § 1985(3) allegation, asserting that "'the officers, agents, and employees of a single corporate entity, each acting within the scope of [their] employment, are legally incapable of conspiring together.'"  Motion to Dismiss at 17 (alteration in original)(quoting Whitehurst v. 230 Fifth, Inc., No. 11 Civ. 0767 (CM), 2011 WL 3163495 (S.D.N.Y July 26, 2011)).

The Defendants point out that the Plaintiffs allege that the CCSD, Levinski, Marquez, and Frazzini violated Title VII, but assert that Title VII does not apply to Levinski, Marquez, and Frazzini, "because they are not the Defendants' 'employer.'"  Motion to Dismiss at 17 (quoting Ball v. Renner, 54 F.3d 664, 668 (10th Cir. 1995)).  The Defendants assert that, to prove a Title VII violation, the Plaintiffs must provide either

"direct evidence of discrimination or . . . follow[] the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . (1973). Under McDonnell Douglas, a three-step analysis requires the plaintiff first prove a prima facie case of discrimination.  To set forth a prima facie case of discrimination, a plaintiff must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class.  The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. If the defendant does so, the burden then shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext."

Motion to Dismiss at 18 (quoting Khalik v. United Air Lines, 671 F.3d 1188, 1192 (10th Cir. 2012)).  They contend that the Plaintiffs fail to adequately plead a prima facie case, as the

Complaint lacks factual allegations to support the conclusion that discrimination occurred, because the Plaintiffs do not allege any adverse employment action or that they were treated less favorably than others affected by the restructuring who were not Mormon or Anglo.   See Motion to Dismiss at 18.   The Defendants argue that, although monetary loss is not required to find an adverse employment action, "the Plaintiffs' allegations simply do not rise to the level of materiality required to constitute an adverse employment action."   Motion to Dismiss at 19 (citing Gerald v. Locksley, 785 F. Supp. 2d at 1100).

        In regard to disparate treatment and impact, the Defendants argue that the Complaint is insufficient to state a prima facie case, because, although the Plaintiffs allege that five out of ten positions downgraded were Mormon, they do not allege the other five directors' religion, and thus cannot show that Mormons were treated differently than any other religion.   See Motion to Dismiss at 19-20.   The Defendants assert that, additionally, although eight out of the ten directors allegedly downgraded were Anglo, the Defendants have not alleged that Anglo is a protected class, nor have they alleged generally that Anglos were demoted over Native Americans or Hispanics. See Motion to Dismiss at 20.   The Defendants also argue that the Court should dismiss the Plaintiffs' hostile-work-environment allegations, because the Plaintiffs do not plead factual allegations sufficient to demonstrate that "the workplace was permeated with discriminatory intimidation, ridicule, and insult, such that the workplace was abusive."   Motion to Dismiss at 20 (citing Morris v. City of Colo. Springs, 666 F.3d 654, 666 (10th Cir. 2012)).   The Defendants contend that the only allegations which may rise to the level of facilitating a hostile work place are the hate-speech blog comments, over which the Defendants contend they had no control, and that "the only tenuous linkage to the workplace is the conclusory allegations that it 'seems clear' that CCSD employees were involved and that there is 'a lot' of gossip, without stating why these

accusations are plausible."  Motion to Dismiss at 21.  As to the Plaintiffs' Title VII retaliation claims, the Defendants argue that the allegations cannot, as a matter of law, succeed, because "the only actions that might qualify as protected opposition to discrimination took place <u>after</u> the restructuring and after the issues regarding sick leave and FMLA leave emerged."  Motion to Dismiss at 22 (emphasis in original).

The individual Defendants argue that they are entitled to qualified immunity on the Plaintiffs' § 1983 and § 1985(3) claims, because, "[a]lthough Plaintiffs contend that their rights were violated as a result of the administrative restructuring and employment leave disputes (based on the FMLA and unspecified rights to be free from disability discrimination), they assert no clearly established constitutional or statutory violation."  Motion to Dismiss at 24.  The Defendants assert:

> Plaintiffs do not allege what each individual did to violate any clearly established right.  Even if Defendants Frazzini, Levinski, and Marquez misinterpreted district policy regarding the interplay among an employee's accrued sick leave, FMLA, and other statutes, absent proof of racially or religiously based animus, such a mistake does not constitute an equal protection violation or a conspiracy to violate the Equal Protection Clause.

Motion to Dismiss at 24.

In relation to the Plaintiffs' state-law claims, the Defendants argue that, of the seven claims, the Court should dismiss four under the New Mexico Tort Claims Act, N.M.S.A. 1978, §§ 41-4-1 to -30 ("NMTCA"), because the New Mexico Legislature has not waived the CCSD's sovereign immunity, and the Court should dismiss the other three, as the Plaintiffs fail to allege a cause of action.  <u>See</u> Motion to Dismiss at 25.  The Defendants assert that sovereign immunity bars the fraud-against-taxpayers, conspiracy, and tortious-interference claims that the Plaintiffs assert against the CCSD, and thus bars the Plaintiffs' Counts V, VI, and VII.  <u>See</u> Motion to Dismiss at 25-26.  The Defendants point out that public entities and employees are immune from

tort liability except as waived in the NMTCA, and the Plaintiffs have not pled, and cannot identify, any applicable wavier for their tort claims.  See Motion to Dismiss at 26.  In regard to the Plaintiffs' fraud-against-taxpayer claim, which the Defendants assert is premised on the Defendants' harassment, demotion, and commission of fraud against the Plaintiffs for their discrimination complaints, the Defendants contend that, "[e]ven if this theory made sense . . . FATA does not include an express waiver of sovereign immunity."  Motion to Dismiss at 27 (citing Martinez v. Kaune Corp., 106 N.M. 489, 491, 745 P.2d 714, 716 (1987), overruled on other grounds by Bober v. N.M. State Fair, 111 N.M. 644, 808 P.2d 614 (1991)).  Similarly, the Defendants assert that sovereign immunity bars the Plaintiffs' claim for tortious interference with contract.  See Motion to Dismiss at 26-27 (citing El Dorado Utilities, Inc. v. Eldorado Area Water & Sanitation Dist., 2005-NMCA-035, ¶ 25, 137 N.M. 217, 109 P.2d 305).  The Defendants also contend that sovereign immunity bars the Plaintiffs' common-law conspiracy claim, because there is no waiver for conspiracy claims, and contend that the "Plaintiffs cannot argue that Defendants' actions were outside the scope of their duty . . . .  The TCA 'clearly contemplates including employees who abuse their officially authorized duties, even to the extent of some tortious and criminal activity.'"  Motion to Dismiss at 28 (quoting Celaya v. Hall, 2004-NMSC-005, ¶ 25, 135 N.M. 115, 85 P.3d 239).

The Defendants argue that, although the NMTCA waives sovereign immunity "for 'damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in operation of maintenance of any building," the waiver does not apply.  Motion to Dismiss at 29 (quoting N.M.S.A. 1978, § 41-4-6(A)).  They assert that the wavier does not apply, because the "Plaintiffs do not allege that the general public was placed at risk, as required for the waiver to apply."

Motion to Dismiss at 29 (quoting Wright v. Bd. of Educ. for the Las Cruces Pub. Sch., No. 12-1305 BB/CG, slip op. at 4 (D.N.M. Sept. 13, 2012)(Black, J.)).   According to the Defendants, even if the Plaintiffs alleged that the Mormons or Anglos were at risk, which the Defendants assert the Plaintiffs do not factually allege, "the damages that allegedly flow from that hypothetical risk could not result from bodily injury," as "[b]odily injury 'unambiguously exclude[es] emotional injury.'"   Motion to Dismiss at 29 (quoting Hart v. State Farm Mut. Ins. Co., 2008-NMCA-132, ¶ 10, 145 N.M. 18, 193 P.3d 565; Econ. Preferred Ins. Co. v. Jia, 2004-NMCA-076, ¶ 8, 135 N.M. 706, 92 P.3d 1280).   The Defendants contend that, to the extent that any of the Plaintiffs' claims sound in contract, sovereign immunity bars those claims, because "'[g]overnmental entities are granted immunity from actions based on contract, except actions based on a valid written contract,'" which the Plaintiffs have not alleged.   Motion to Dismiss at 30 (quoting N.M.S.A. 1978, § 37-1-23).

The Defendants also argue that the Plaintiffs' state-law claims, substantively, fail to state a claim upon which the Court can grant relief.   As to Count I, the Plaintiffs' breach-of-contract claim, the Defendants assert that, although breach of contract is a question of fact, it may be addressed at the motion-to-dismiss stage in this case based on the contracts' plain language.   See Motion to Dismiss at 31.

> [T]here was no breach because the plain language of the employment contracts shows that the Superintendent (Levinski) had the contractual right to specify the Plaintiffs' duties.   Plaintiff Ulibarri's contract, for example, provides that "the employee shall present himself/herself for duty at such times and places as designated by the Superintendent or his or her authorized designee."   Similarly, Plaintiff Hunt's contract provides that he "shall . . . , administer the duties assigned by the Superintendent."   Both Hunt's and Ulibarri's contracts unambiguously incorporate the policies of the CCSD, which make clear that "[t]he Superintendent will determine all support staff assignments. Such assignments shall be based on the needs of the District" and that "[t]he transfer of support staff members will be based on the needs of the District.   Assignments may be changed to serve the best interests of the District." . . . .   Neither the restructuring nor the reassignments can

be a breach of contract.

Motion to Dismiss at 31 (internal citations omitted).   The Defendants contend that the Plaintiffs' breach claim based on the Defendants' failure to investigate "is equally meritless," because their contract required them to file a complaint with the CCSD School Board, which the Plaintiffs did not do.   Motion to Dismiss at 32 (citing Lucero v. Bd. of Regents of Univ. of N.M., 2012-NMCA-055, ¶ 16, 278 P.3d 1043, certiorari denied, 293 P.3d 886 (Apr 20, 2012)). According to the Defendants, the Plaintiffs do not allege that they incurred any lost wages or benefits as a result of the alleged breach of contract, and the claims therefore fail as a matter of law, as there are no damages.   See Motion to Dismiss at 32-33.   Similarly, with respect to the Plaintiffs' claim alleging that the Defendants breached the covenant of good faith and fair dealing, the Defendants assert that, beyond failing to allege any damages, the Plaintiffs have not alleged any facts to support the conclusion that the Defendants committed an act that "'will injure the rights of the other to receive the benefit of their agreement.'"   Motion to Dismiss at 33-34 (quoting Henning v. Rounds, 2007-NMCA-139, 142 N.M. 803, 171 P.3d 317).

The Defendants contend that the Plaintiffs' Count V -- alleging fraud against taxpayers under the FATA -- fails to state a claim, because, while the Plaintiffs may provide factual support for an inference that the Defendants' actions defrauded them, a claim under the FATA requires allegations of fraud against the state.   See Motion to Dismiss at 34.   The Defendants thus assert that the "FATA simply does not apply."   Motion to Dismiss at 34.   They contend that, even if it were possible to construe any of the Plaintiffs' claims as alleging fraud against the state, "[b]ecause the[] [Defendants'] complaints followed [any] so-called 'retaliatory' events, Plaintiffs cannot state a *prima facie* case for retaliation under FATA."   Motion to Dismiss at 35.   The Defendants argue that the Plaintiffs' FATA claim also fails on the grounds that they failed to

comply with the required prerequisites for bringing a FATA claim.  See Motion to Dismiss at 35-36.

On substantive grounds, the Defendants argue that the Court should dismiss the Plaintiffs' tortious-interference-with-contract claim, because the Plaintiffs' allegations that the Defendants "played a 'substantial, active part in securing the unilateral breaches' of their employment contract with CCSD . . . . are only formulaic conclusions unsupported by allegations of fact describing the alleged role the Defendants played in securing the 'breach' of Plaintiffs' contracts."  Motion to Dismiss at 36 (citing Ettenson v. Burke, 2001-NMCA-3, ¶ 14, 130 N.M. 67, 17 P.3d 440).   The Defendants also argue that the Court should dismiss the Plaintiffs' common-law conspiracy claim in Count VII, because, "[c]onsistent with the rest of the [Complaint], Plaintiffs fail to plead any allegations of fact that support their conclusion that a conspiracy existed . . . .   Plaintiffs have not and cannot identify any 'independent, unlawful act that causes harm.'"  Motion to Dismiss at 36-37 (quoting Ettenson v. Burke, 2001-NMCA-003, ¶ 12, 130 N.M. 67, 17 P.3d 440).

As to the Plaintiffs' NMHRA claim alleged in Count VIII, the Defendants first assert that the Plaintiffs did not follow proper procedures.  In relation to Tso, Benally, and Nicolay, the Defendants point out that the Plaintiffs did not charge these Defendants before the Human Rights Commission and that to the extent the claim is alleged against those defendants, the Court must dismiss it.  See Motion to Dismiss at 37 n.25.  In relation to CCSD, Levinski, Marquez, and Frazzini, the Defendants contend that the Plaintiffs failed to file a notice of appeal from the Notices of Non-Determination from the Human Rights Bureau ("HRB") and, therefore, the Court should dismiss the NMHRA claim.[2]  Motion to Dismiss at 37-38.  The Defendants point out that

---

[2] The New Mexico Legislature created the "'human rights commission,'" when it enacted the NMHRA.  N.M.S.A. § 1978, § 28-1-3(A).  Included within the Human Rights Commission's powers is the ability to hold hearings, subpoena witnesses, "hear complaints and issue orders,

Plaintiffs' claims are at least partially, if not totally, based on 2010 events, which they assert "[t]o

the extent these claims are based on discrete acts . . . they are limited by the 300-day limitation

period in the HRA."   Motion to Dismiss at 38 (citing N.M.S.A. 1978, § 28-1-10A; Ulibarri v.

State of N.M. Corr. Acad., 2006-NMCA-057, ¶ 11, 139 N.M. 193, 131 P.3d 43).

        The Defendants assert that the Plaintiffs do not state a claim for disparate impact and

treatment, because they do not identify a specific employment practice or policy which caused a

significant disparate impact on a protected group, and they do not allege how the administrative

restricting had a disparate impact on Anglos and Mormons.   See Motion to Dismiss at 39 (citing

Gonzales v. N.M. Dept. of Health, 2000-NMSC-029, ¶ 30, 129 N.M. 586, 11 P.3d 550).   The

Defendants also assert that the Plaintiffs have failed to state a claim for retaliation, because "[a]s

explained in the discussions of Title VII and FATA, all of the allegedly adverse actions occurred

before any protected activity by Plaintiffs."   Motion to Dismiss at 39 (emphasis in original)(citing

Juneau v. Intel Corp., 2006-NMSC-002, ¶ 11, 139 N.M. 12, 127 P.3d 548).   The Defendants

argue that the Plaintiffs also fail to state a claim for hostile work environment and constructive

termination.   The Defendants assert that the inquiry is "'not whether the working conditions were

merely difficult or unpleasant, but whether Defendant made Plaintiff[s'] working conditions so

---

including cease and desist orders concerning alleged unlawful discriminatory practice."
N.M.S.A. § 1978, § 28-1-4(A).   The Human Rights Commission is distinct, however, from the
labor department's "human rights division," with which persons file NMHRA complaints and
which investigates the complaints.   N.M.S.A. 1978, § 28-1-10(A).   Under the NHMRA, the
human rights division has informal enforcement powers, including the ability to receive and
investigate complaints, seek to eliminate discrimination though voluntary conferences between
parties, issue publications about its investigations, and "recommend application by the director to a
district court in the county where the violating party resides for specific performance of any
conciliation agreement or for enforcement of any order issued by the commission."   N.M.S.A.
1978, § 28-1-4(B).   The official name for the New Mexico Department of Workforce Solutions'
human rights division is the Human Rights Bureau.   See Information, N.M. Dep't of Workforce
Solutions,  http://www.dws.state.nm.us/LaborRelations/HumanRights/Information  (last  visited
May 29, 2013).

intolerable, when viewed objectively, that a reasonable person would be compelled to resign; essentially, that she had no other choice but to quit.'"   Motion to Dismiss at 40 (alteration in original)(quoting Charles v. Regents of N.M. State Univ., 2011-NMCA-057, ¶ 16, 150 N.M. 17, 256 P.3d 29).   The Defendants contend that the Plaintiffs' allegations fail to meet this standard, as, "[d]espite the change in their positions, Plaintiffs did not suffer a loss in pay.   Accordingly, no reasonable person would feel compelled to resign under the circumstances, particularly when the national economic climate of 2010 and 2011 is taken into consideration."   Motion to Dismiss at 40.   They assert that "the restructuring and work conditions at CCSD simply were not objectively intolerable such as to establish a plausible claim for a hostile work environment or constructive termination."   Motion to Dismiss at 41.   The Defendants argue that the Plaintiffs' Count IX -- negligent maintenance of a school building pursuant to N.M.S.A. 1978, § 41-4-6 -- fails to state a claim, because the Plaintiffs did not suffer any bodily injury, and none of the Defendants' alleged practices or policies posed a risk of harm to the general public.   See Motion to Dismiss at 41 (citing Econ Preferred Ins. Co. v. Jia, 2004 NMCA-076, 135 N.M. 706, 92 P.3d 1280).

The Defendants argue that the Court should dismiss any of the Plaintiffs' claims for punitive damages based on Title VII or any state law against CCSD, or against the individual Defendants in their official capacities, because punitive damages are unavailable for these claims. See Motion to Dismiss at 41-42 (citing Newport v. Fact Concerts, Inc., 453 U.S. 247, 258 (1981); N.M.S.A. 1978, § 41-4-19(C)).   The Defendants point out that the Plaintiffs appear to be requesting the Court to grant them declaratory judgment and "'declar[e] any contract provisions (specifically including Board Policies) that limit employee due process rights unconstitutionally unconstitutional [sic].'"   Motion to Dismiss at 42 (quoting Complaint at 45).   The Defendants argue that the Court should "exercise its sound discretion to decline to entertain Plaintiffs'

declaratory judgment action," because the Plaintiffs' improperly pled the claim by failing to attach the alleged unconstitutional policy.   Motion to Dismiss at 42.   The Defendants also contend that the Court should decline to entertain the request, because the Plaintiffs cannot demonstrate a good chance of being injured in the future, as they are no longer CCSD employees.   See Motion to Dismiss at 42-43 (quoting Barney v. Pulsipher, 143 F.3d at 1313 n.3).   Additionally, the Defendants assert that the Court should decline to grant declaratory judgment as to the Plaintiffs' contention that the policy should outline a procedure for the CCSD's alleged "'takings of constitutional property,'" because there is an alternative at law which is better and more effective: a lawsuit for damages.   Motion to Dismiss at 43 (citing State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983 (10th Cir. 1994)).   For these reasons, the Defendants ask the Court to dismiss the Complaint in its entirety.

On November 19, 2012, the Plaintiffs filed their Response to Defendants' Motion to Dismiss for Failure to State a Claim for Relief and/or Qualified and Sovereign Immunity.   See Doc. 32 ("Response").   The Plaintiffs assert that "[t]he Response will . . . attempt to focus the Court's attention on the actual words of the Complaint, and not the Motion's characterizations of those words."   Response at 1.   The Plaintiffs argue that, whereas the Defendants charge that the Plaintiffs' factual allegations are conclusory and without support, "[a]ll allegations (in any Complaint) are conclusory to one extent or another because they are made without any evidence offered to support them."   Response at 4.   According to the Plaintiffs, they

> have gone to great pains to provide a complaint, containing conspiracy allegations with a great amount of detail, taking some 28 pages to provide the factual predicates of their claims, in an effort to provide the Court and Defendants full and fair notice of their claims herein. . . .   Plaintiffs state affirmatively that they believe that any claim against any person for any act be 'without prejudice' so that Plaintiffs can continue to in good faith plead everything they believe they will be able to prove (when proving time arrives).   Plaintiffs insist that their claims are not just 'plausible' but likely, given the facts they have plead.

- 22 -

Motion to Dismiss at 4.   The Plaintiffs argue that they have adequately pled a municipal liability claim against the CCSD, under "both a direct proof and McDonnell-Douglas formulation case." Motion to Dismiss at 4-5.   The Plaintiffs refer the Court to paragraph 14 of their Complaint, asserting that, "[i]ndeed, the involved policy and many of the involved specific actions as well as the individuals who carried out the actions of CCSD are directly identified in this page-and-a-half long explanation of the policy, its confines, its function and its actions and the specifically relevant defendants."   Response at 6.   They note: "[T]hree of the named Defendants had little direct contact with Plaintiffs -- Defendants Tso, Nicolay and Benally.   Nevertheless, they are the prime movers of the explicit, blogged conspiracy to terminate Mormon/Anglo senior supervisors." Response at 6-7 (citing Complaint ¶ 43, at 27-28).   The Plaintiffs assert that their allegations about other CCSD's previous complaints, while "not guarantee[ing] the success of a claim against an employer," is factual support for the existence of such a discriminatory policy.   Response at 7-8.   The Plaintiffs assert:

> Benally's involvement (as all of the Defendants [sic] conduct is) is disclosed in Paragraph 8, and Benally's involvement in the direct employment problems addressed here is tangential, but/and Defendant Benally regularly worked on the School Board and participated directly in the harassment of Manning and Epperson by regularly attempting to secure an audit of his work as the District's Finance Director through legislative and administrative meetings without any reasonable basis for the audit throughout 2010 and 2011, and with the offending audit turning up no mishandling of District funds.   Defendant Benally is the first actor of the involved conspiracy, and was instrumental in securing the election of Tso, and is alleged to have participated in the planning and accomplishment of the goals of the conspiracy.

Response at 8.   According to the Plaintiffs, "[a]ll of the named parties, as pled, are responsible for the acts of the others because of the conspiracy, their true agreement to accomplish an illegal goal through mutual cooperation, and plaintiffs will subsequently prove the existence of the conspiracy."   Response at 8 (emphasis in original).   Additionally, the Plaintiffs assert that the

"Defendants seem to believe that the allegations of direct evidence and allegations fitting the McDonnell-Douglas formulation of indirect proof are not enough to state claims."   Response at 9. The Plaintiffs assert that, whereas the Defendants repeatedly argue that the Plaintiffs have not adequately pled their Title VII or the NMHRA claims, because they do not allege that they were treated differently than similarly situated persons, "the 'similarly-situated' analysis is a related, alternative means of proof, and not strictly required in pleading.   Plaintiffs have pled they can prove intentional discrimination and McDonnell-Douglas formulation, and both or either suffice here."   Response at 9.   They add: "If this pleading is insufficient, pursuant [to] the Court's decision, a simple good faith amendment of the pleading will easily set it right."   Response at 9. The Plaintiffs contend that "nothing about N.M.S.A. 1978, § 22-5-4(E) reflects any limitation upon suing a New Mexico School District directly, it merely gives local Boards of Education the ability to sue or be sued."   Response at 9 (citing Williams v. Cent. Consol. Sch. Dist., 1998-NMCA-006, 124 N.M. 488, 952 P.3d 978; Cent. Consol. Sch. Dist., No. 22 v. N.M. Env't Dept., 123 N.M. 386, 940 P.2d 1181 (1997)(table)).   In relation to the § 1983 municipal liability claim, the Plaintiffs contend that the" claim is properly-pled as the intentional proof and McDonnell-Douglas formulations are both accepted pursuant to equal-protection claims.   See Response at 10.   The Plaintiffs state that they "are not attempting to sue the Individuals for Section 1983 claims."   Response at 12.   The Plaintiffs note that "[t]he Section 1983 claim stated and pursued is against Defendant CCSD alone, and arises from the adoption of the motivating, clearly illegal policy."   Response at 12.

The Plaintiffs argue that the breach-of-contract claim is adequately pled, as the Superintendent of Schools does not have the presumptive right to cancel administrators' contracts without meeting certain conditions precedent, which the Plaintiffs assert that they explicitly

alleged were not met here. <u>See</u> Response at 10-11 (citing Complaint ¶ 43, at 27-28). The Plaintiffs contend:

> Over-riding . . . is the fact that the involved contracts be interpreted and performed in accordance with State and Federal law, and Mormon/Anglo discrimination is not in accordance with the law. Thus, even if Defendants could prove the conditions precedent for the Superintendent's cancellation of the involved contracts, and the Plaintiffs could prove that the actions were taken . . . precisely because of discriminatory animus, the involved conditions precedent would not over-ride the prohibition of discrimination.

Response at 11. The Plaintiffs assert that, because Hunt could not physically work in the position which the CCSD offered to him, never worked in the position, and because CCSD did not offer a reasonable accommodation, the CCSD constructively terminated him. <u>See</u> Response at 12-13 (quoting Complaint ¶¶ 27-28, at 17-18). The Plaintiffs assert that their Complaint adequately pleads the factors laid out in <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296 (3d Cir. 1998), for "a claim of bad faith failure to participate" in the accommodation process. Response at 14.

The Plaintiffs argue that Ulibarri's constructive termination allegations are adequate, because she alleges that she was not given a reasonable replacement position for at least three months, she had been repeatedly urged to resign, her complaints were not investigated, previous complaints had not been investigated or remedied, her leave rights were "artificially curtailed," she had watched all other Anglo/Mormon senior supervisors be terminated, demoted or forced to resign, her contract was repeatedly breached, and she gave the CCSD some six months to take remedial action. Response at 15-16 (citing Complaint ¶ 36, at 22-23). According to the Plaintiffs, the allegations contained in paragraph 36 of their Complaint also suffice to state a workplace harassment claim. <u>See</u> Response at 16-17 (citing <u>Charles v. Regents of N.M. State Univ.</u>, 2011-NMCA-057, ¶ 16, 150 N.M. 17, 256 P.3d 29). They also contend that the Defendants' citation to 29 C.F.R. § 825.207(A) for the proposition that employers are allowed to

require employees to take leave under the FMLA concurrently with accrued paid leave is inaccurate, asserting: "Instead it states the opposite, '[g]enerally FMLA is unpaid leave.'" Response at 17 (quoting 29 C.F.R. § 825.207(A)).   They assert that the regulation leaves the substitution at the employee's discretion, and the Plaintiffs never requested to use the FMLA leave instead of their accrued paid leave.   See Response at 17 (citing Complaint ¶¶ 23-24, 27(f), 33-34, 36(e), at 15-16, 18, 20-22).   The Defendants point out that the CCSD's sick leave policy does not provide that the "CCSD or its employees may require paid leave and FMLA run concurrently." Response at 18 (citing Complaint ¶ 41, at 25-26).   The Defendants "object to the oft-asserted characterization of their Complaint as not containing assertions of discriminatory animus," and argue that discriminatory animus, "specifically Mormon/Anglo animus," is repeatedly pled. Response at 18-19 (citing Complaint ¶¶ 14, 38, 45, 86, at 10, 23-24, 29, 28-29).

The Defendants contend that "a demotion and promised loss of pay is a materially adverse employment action pursuant [to] standing Tenth Circuit precedent." Response at 19-21 (citing Jones v. Oklahoma City Pub. Sch., 617 F.3d 1273, 1279-80 (10th Cir. 2010)).   They contend that "it is clear that the pled demotions, loss of prestige, promise of lost future pay, as well as their different treatment pursuant an already-discriminatory 'restructuring,' inducements to resign and threats of lost accrued leave suffice as adverse employment actions pursuant Plaintiffs' discrimination and equal protection claims."   Response at 21 (citing Jones v. Oklahoma City Pub. Sch., 617 F.3d at 1279-80).   Responding to the Defendants' assertions that the Plaintiffs have no damages, the Plaintiffs state: "[A]ny an all argument that Plaintiffs were only subjected to 'emotional distress' or have only plead cognizable emotion distress claims with regards to the Title VII, NMHRA, Federal Equal Protection Clause claims and the State claims as well are unavailing."   Response at 22.

- 26 -

The Plaintiffs argue that their § 1985(3) claim is sufficiently pled, because race and religion discrimination is actionable under § 1985(3).  See Response at 22-23.  The Plaintiffs contend that they "have pled Mormon/Anglo discrimination throughout the Charge-filing and Federal Complaint process, and the discrimination is repeatedly referred to as racial and color discrimination therein," and that "the Tenth Circuit has recognized religion as a basis for Section 1985 claims."  Response at 22 (citing Taylor v. Gillmartin, 686 F.2d 1346, 1360 (1982)).

The Plaintiffs also argue that "[i]t is longstanding law in New Mexico that the personnel manuals or personnel regulations of state agencies are implied-in-fact contracts which may be sued upon by terminated state employees, despite N.M.S.A. 1978, § 37-1-23, because the manual or regulations supply the necessary writing."  Response at 23 (citing Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶¶ 15-17, 121 N.M. 728, 918 P.2d 7).  The Plaintiffs assert that their Complaint alleges facts about the School Board regulations being part of the contract. They contend that the duty of good faith and fair dealing thus applies, and that the Supreme Court of New Mexico has found that school boards are subject to liability for these implied contracts. See Response at 23-25 (citing Handmaker v. Henney, 1999-NMSC-043, ¶ 19 n.2, 128 N.M. 328, 992 P.2d 879).  According to the Plaintiffs, "[h]ere there is a written contract [in which the law implies a covenant of good faith and fair dealing], and that written contract allows suit pursuant [to] N.M.S.A. 1978, § 37-1-23."  Response at 25.

The Plaintiffs argue: "Contrary to the Motion [to Dismiss], the FATA statute provides two distinct and separate claims: the first the FATA claim proper, the second a general retaliation claim available to state employees, and a waiver of sovereign immunity."  Response at 25-26.  They assert that the Defendants' argument that the FATA should be interpreted parallel to the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 ("FFCA"), misconstrues the law's plain language and

the legislature's intent.   Response at 27-29 (comparing 31 U.S.C. § 3730 (h)(1) with N.M.S.A. 1978, § 44-9-11(B)).

The Plaintiffs additionally argue that "existing precedent compels this Court to recognize that a discriminatory and retaliatory conspiracy operating in a state building fits under N.M.S.A. 1978, § 41-4-6's tort claims waiver for operation of a building, and thus Plaintiffs' claims sounding in tort should not be dismissed."   Response at 29.   The Plaintiffs contend that they allege a conspiracy which "[u]nder existing precedent . . . represents an unsafe, known condition in a public building for a specifically-identified group of the general public -- any complaining . . . employees -- in violation of regulation or rules made or adopted by the State."   Response at 30. In relation to the requirement that "[t]he involved dangerous condition must present a danger to the public in general or a specific subset of the public," the Plaintiffs contend that there was an "on-going danger to Mormon/Anglo supervisors [that] was never addressed in any way." Response at 31-32 (citing C.H. v. Los Lunas Sch. Bd. of Educ., 852 F. Supp. 2d 1344, 1363-64 (D.N.M. 2012)(Browning, J.)).   The Plaintiffs finally respond to the Defendants' contention that "the failure to designate the [administrative exhaustion allegations] as a 'Notice of Appeal' renders the NMHRA claim ineffective," by asserting that the failure is de minimus, as it is reasonable to infer from the allegations that the Plaintiffs exhausted all their administrative remedies. Response at 34-35 (citing Complaint ¶¶ 26, 35, 39, at 16-17, 21-22, 24-25).

On, January 4, 2013, the Defendants filed the Defendants' Reply in Support of Motion to Dismiss for Failure to State a Claim for Relief and/or Qualified and Sovereign Immunity.   See Doc. 37 ("Reply").   The Defendants assert that the Plaintiffs' Response "is as illuminating for what it does not address as for what it does address."   Reply at 1.   According to the Defendants, the

> Plaintiffs completely fail to address Defendants' arguments that (1) Plaintiffs' §1985(3) claims against the individual defendants are barred by qualified immunity; (2) Title VII claims cannot be brought against individuals; (3) disability discrimination cannot be the basis for an equal protection claim; (4) they did not properly plead a "continuing violation" under Title VII or the New Mexico Human Rights Act; (5) they did not state a *prima facie* claim for common law conspiracy; (6) sovereign immunity bars their tortious interference with contract and common law conspiracy claims; (7) the timing of their complaints to agencies does not support the Fraud Against Taxpayers Act retaliation claim; and (8) there is judgment contained in the Second Amended Complaint.   Accordingly, Counts V, VI and VII should be dismissed in their entirety with prejudice; all claims against the individual defendants contained in Count X should be dismissed with prejudice and the individual defendants should be granted qualified immunity on the §1985 claims against them in their individual capacities.

Reply at 1-2.   The Defendants also assert that the Court should dismiss the Plaintiffs' other claims with prejudice, reiterating their argument that the Complaint "lacks the requisite factual specificity and fails to contain sufficient allegations to . . . . show that their claims are plausible."   Complaint at 2.

The Defendants argue that the CCSD is not a proper party to any of the claims, because a school district is a geographic area; "the correct entity defendant is the Board of Education for the Central Consolidated Schools."   Reply at 3.   They therefore assert: "CCSD should be dismissed from this case, as there is no authority for bringing suit against it."   Reply at 3.

The Defendants argue that the Plaintiffs' contention in their Response that they adequately pled municipal liability under § 1983 under either the direct proof or burden-shifting method "fails to cure the problem," because the Plaintiffs have not met their burden to allege facts sufficient to state all the elements of municipal liability.   Reply at 3-4 (citing Gerald v. Locksley, 785 F. Supp. 2d at 1098).   The Defendants contend that the Plaintiffs' reference to paragraph 14 in their Complaint is unavailing, because the paragraph "contains neither specific factual allegations regarding the conduct of any specific defendant nor any factual allegations to establish liability based on an unconstitutional policy."   Reply at 4 (citing Carney v. City and Cnty. Of Denver, 534

F.3d 1269, 1274 (10th Cir. 2008)).   The Defendants point out that, while the Plaintiffs contend

that there was an unconstitutional policy of discrimination amongst the higher-up named

individual Defendants, "there are no factual allegations to support the conclusory statements

contained in paragraph 7(j) and 9(j) of the Complaint attributing the blogs to defendants Tso and

Nicolay," and "[t]here are no factual allegations linking the anonymous comments to these

defendants, showing how anonymous comments can create Board liability under § 1983, or

explaining how blog postings on a newspaper website reflect Board policy or custom."   Reply at

4.   The Defendants argue that, because law requires at least three or four members to set school

board policy, even if Tso and Benally attempted to set an unconstitutional discrimination policy at

the CCSD School Board, they could not have done so.   See Reply at 5-6.   The Defendants assert:

> Similarly, while Plaintiffs make identical allegations against each defendant,
> asserting that defendants failed to investigate complaints of discrimination, denied
> Plaintiffs various rights, refused to accommodate or negotiate accommodations
> with Plaintiff Hunt, "fraudulently" attempted to deny Plaintiffs sick leave and
> FMLA leave, and participated in a variety of other alleged wrongs, the SAC lacks
> specific factual support for these allegations as it contains no allegations stating
> exactly what each defendant did, and as noted above, contains no factual
> allegations establishing that the Board even knew of any of these matters.
> Moreover, the Plaintiffs' Response never points to facts supporting any allegation
> that the CCSD was the "moving force" behind Plaintiffs' alleged injuries or that
> there was a direct causal link between the restructuring and the deprivation of
> federal rights.

Reply at 6 (citing Complaint ¶¶ 4-10, at 2-9; Shaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d

1052, 1062-63 (D.N.M 2010)(Browning, J.)).

The Defendants assert that, whereas, "[i]n Section IX of the Response, Plaintiffs argue that

they 'repeatedly' pled discriminatory animus," and then proceed to count the number of times that

the Complaint uses "the words 'Mormon,' 'Anglo,' and 'discriminate,'" "[n]o matter how many

times Plaintiffs repeat their conclusions of discrimination, without supporting factual allegations,

Plaintiffs' claims should not survive Defendants' Motion."   Reply at 8.   The Defendants also

argue that the Plaintiffs' argument about the Superintendent's lack of unilateral power to cancel administrators' contracts are inapposite to any matter before the Court on the Motion to Dismiss, because there are no allegations about the contracts being cancelled, but rather only about reassignment.   See Reply at 8-9.   The Defendants also assert that the Plaintiffs' Response, which argues that a discriminatory conspiracy led to their constructive termination and created a hostile work environment, also lacks specific allegations sufficient "to establish discrimination or retaliation and there are insufficient allegations to support either constructive termination or hostile work environment."   Reply at 9-10.   In relation to Hunt's assertion, claiming constructive termination resulting from Defendants' alleged refusal to engage in reasonable accommodation negotiations, the Defendants assert:

> To the extent Plaintiff Hunt asserts failure to accommodate or negotiate in support of his claims of discrimination under Title VII or the New Mexico Human Rights Act, such claims must fail because he never alleges that others, similarly situated, were accommodated or that he "could have been accommodated," as required to state a claim.

Reply at 10 (citing Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1264 (10th Cir. 2009)).   Similarly, the Defendants contend that "assertions that Plaintiff Hunt 'can perform any administrative work' and that the CCSD has 1100 positions, do not establish that accommodation was possible or that failure to accommodate was discriminatory or retaliatory."   Reply at 10 (quoting Complaint ¶ 25, at 16).   With respect to Ulibarri, the Defendants assert that the arguments supporting her claims of constructive termination and hostile work environment are also insufficient, because "[s]he re-hashes the conclusory allegations of discrimination while conceding that she had some choice in her new position and used sick leave while she had dental surgery."   Reply at 10.   They assert that the Plaintiffs do "not link the job assignment or alleged denial of accommodation or negotiation to any factual allegations of conspiracy or to any

protected activity." Reply at 10-11.   The Defendants argue that, in light of existing law, the Complaint's failure to plead anything rising to the level of pervasive harassment, and allegations of only speculative future monetary losses, "[f]inding a hostile work environment or constructive termination under these circumstances would require a significant extension of existing law." Reply at 12.

In response to the Plaintiffs' arguments about the FMLA, the Defendants assert that there are no claims or allegations in the Complaint which find support in the FMLA:

> Given that the first numbered paragraph of the [Complaint] states that Plaintiff Hunt "suffers from the serious medical conditions of diabetes, anxiety and depression, and neuropathy, [Doc. 24, ¶ 1] and that Plaintiff Ulibarri herself raised the need for "extensive dental surgery," [Id. ¶ 33] it is disingenuous for Plaintiffs to allege that they were damaged because defendants raised FMLA coverage issues.

Reply at 13 (citing Complaint ¶¶ 1, 33, at 1-2, 20-21).   As to the adverse-employment-action allegations supporting the Plaintiffs' Title VII and NMHRA claims, the Defendants contend that there are no allegations sufficient to state a claim for an adverse employment action, because, "[u]ntil the Plaintiffs chose to resign, they enjoyed the most basic condition of their employment -- full salary."   Reply at 13 (citing Ulibarri v. State of N.M. Corr. Acad., 2006-NMSC-009, ¶ 16, 1139 N.M. 193, 131 P.3d 43).   The Defendants' contend that the Plaintiffs' argument "that denial of a property right, by itself, is an adverse employment action . . . . ignores the applicable law." Reply at 14 (citing Lucero v. N.M. Lottery, 685 F. Supp. 2d 1165, 1172 (D.N.M. 2009)(Herrera, J.).

The Defendants reiterate that: "Plaintiffs have failed to plead sufficient facts to establish a conspiracy in violation of 42 U.S.C. § 1985.   None of the allegations against any of the individual defendants specifically identify what each defendant did in furtherance of any conspiracy to deprive Plaintiffs of any of their rights to Equal Protection."   Reply at 14 (citing Martinez v.

Martinez, No. CIV 09-0281 JB/KMBM, 2010 WL 1608884 (D.N.M. Mar. 30, 2010)(Browning, J.)). As to the argument in the Plaintiffs' Response about Count II, the Plaintiffs' claim for violation of the implied covenant of good faith and fair dealing, the Defendants assert: "As the Plaintiffs never allege that there is a term in the policies or elsewhere that precludes reassignment, this argument is not relevant." Reply at 15. According to the Defendants, "[f]urther, the implied covenant of good faith and fair dealing is breached only when a party seeks to prevent the contract's performance or to withhold its benefits from the other party,'" about which they assert there are no allegations in the Complaint. Reply at 15 (quoting Sanders v. FedEx Ground Package Sys., Inc., 2008-NMSC-40, ¶ 8, 144 N.M. 449, 188 P.3d 1200). In relation the Plaintiffs' FATA argument, the "Defendants submit . . . that Plaintiffs are construing the statute far more broadly than is necessary or appropriate." Reply at 15. The proper construction, according to the Defendants, is to construe the statute, which is designed to protect whistleblowers, "to protect from retaliation private employees who disclose information about a fraud against the government." Reply at 15. The Defendants assert that, regardless whether the Court accepts the Plaintiffs' proffered construction, there is still no waiver of sovereign immunity under FATA. See Reply at 16.

The Defendants argue that N.M.S.A. 1978, § 41-4-6, which waives sovereign immunity for negligent operation and maintenance of a building, does not apply to this case. See Reply at 16. They contend that application of § 41-4-6 would "radically" extend the law, as the Plaintiffs have not pointed the Court to any authority that "a conspiracy is a condition, much less an 'unsafe' condition," as the state requires for the immunity waiver. Reply at 17 (quoting N.M.S.A. 1978, § 41-4-6). In relation to what the Defendants term the miscellaneous issues surrounding Count VIII and others, the Defendants assert:

Whether or not Plaintiffs believe their failure to exhaust their administrative remedies is de minimus and "nonsense," these procedures must be observed. Moreover, even if Plaintiffs are correct and these procedures are meaningless for any reason, their claims for the alleged Human Rights Act violations (Count VIII) must be dismissed as a substantive matter as shown in the Motion to Dismiss. Finally, Plaintiffs are not entitled to punitive damages on any of their state law claims or their federal claims against the Board.

Reply at 17.   The Defendants therefore ask the Court to dismiss the Complaint with prejudice. Reply at 18.

On January 31, 2013, the Court held a hearing on the Motion to Dismiss.   The Defendants opened by asserting: "In short, with respect to the federal claims, defendants assert that the plaintiffs have not stated with sufficient particularity the specific basis of their claims.   The . . . Complaint does not identify who did what to whom[,] . . . . [and thus] does not meet the plausibility standard" set forth in Robbins v. Oklahoma.   Transcript of Hearing at 7:17-24 (taken Jan. 31, 2013)(German)("Tr.").[3]   The Defendants asserted that Robbins v. Oklahoma is on point and shows that the Complaint fails to state a claim on any of the federal causes of action.   See Tr. at 8:5-23 (Tr.).

The Plaintiffs, by way of introduction, pointed out that they are first alleging disparate impact, based on the CCSD's restructuring, as it impacted Anglos and Mormons across the district at a disproportionate level.   See Tr. at 9:18-10:15 (Geran).   The Plaintiffs asserted that they can point to "specific meetings if that's necessary to do in order to set up a conspiracy claim.   There have been ongoing claims in the district."   Tr. at 11:15-17 (Geran).   They noted that "a definite problem here was everybody . . . signed their contracts for the coming year the month before, so that the contracts were already signed by the time of the meeting.   Our stance is that they had the

_____

[3] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

contractual right to work in these positions."   Tr. at 12:17-21 (Geran).   The Defendants pointed

out that facts which the Plaintiffs added in their Response about Epperson and Manning are not

alleged in the Complaint, and so any connection that the Plaintiffs may try to make to the any

actions the Defendants took with respect to Manning or Epperson cannot be included in any

analysis of the claims as the Complaint exists now.   See Tr. at 14:7-15:4 (German).   The

Defendants asserted that, because Nicolay is alleged only to be Tso's campaign manager, the

Court should dismiss any of the claims against him, as any alleged position as a campaign manager

is insufficient to find that he is a state actor.   See Tr. at 16:4-22 (German).   The Defendants also

asserted that the factual allegations are insufficient to state any claim under Monell v. Dept. of Soc.

Servs. of City of N.Y., 436 U.S. at 658, as there are no factual allegations that a group of

non-Anglo/non-Mormons were treated better in the restructuring.   See Tr. at 17:3-8 (German).

The Defendants noted that they could not glean from the Complaint or the Response "whether

plaintiffs are alleging that the discrimination was against those who were both Anglo and Mormon

or if they were alleging it was against Anglos and also against Mormons."   Tr. at 17:9-14

(German).

     Moving to the equal-protection claim, the Defendants noted that the CCSD is not a proper

party to the case, as it cannot be sued, and that the proper party is the CCSD School Board.   See

Tr. at 19:5-10 (German).   The Defendants asserted that the Complaint refers to an "informal"

policy of discrimination, but does not state specific, non-conclusory factual allegations in support

of the discrimination policy.   Tr. at 19:20-23 (German).   The Defendants contended that it is

circular to allege that the restructuring was part of the discrimination policy and then use the

restructuring as the only factual support for the existence of this policy.   See Tr. at 19:23-24

(German).   The Defendants contended that there are no allegations which would establish an

adverse employment action in relation to either of the Plaintiffs.   See Tr. at 20:3-9 (German).   In response to the Court's question whether the Plaintiffs are alleging a class-of-one equal-protection claim, the Plaintiffs responded that they could not ascertain from the Complaint if the Plaintiffs are pursuing a class-of-one claim or are alleging that there is a larger class.   See Tr. at 20:10-23 (Court, German).   The Court asked whether an adverse employment action is the same for § 1983 purposes as it is for Title VII purposes.   See Tr. at 21:7-9 (Court).   The Defendants responded that an adverse employment action is the same for both claims.   See Tr. at 21:13-24 (Court, German).   The Defendants asserted that there is no conduct that rises to the level of an adverse employment action: "Arguably, there's a speculative adverse employment action in the future if, in fact, salaries were reduced, but even then," the possible future reduction is "not sufficient to support a constructive discharge claim."   Tr. at 22:7-13 (German).   The Defendants also contended that any adverse employment action is speculative at best, because the Plaintiffs were told that they were going to continue to be fully paid for the remainder of the year, and that they would likely, not definitely, face a decrease in their pay in the future.   See Tr. at 22:14-20 (German).   The Court asked whether the Defendants would agree that, if the Defendants had lowered the salary on the same day that the CCSD changed the Plaintiffs' titles and responsibilities, rather than one year later, such circumstances would constitute an adverse employment action.   See Tr. at 22:21-25 (Court).   The Defendants responded that the combination of those three circumstances would likely constitute an adverse employment action, but not in all circumstances.   See Tr. at 23:4-7 (German).   The Court asked whether it is undisputed that both of the Plaintiffs' job responsibilities changed during the restructuring.   See Tr. at 23:8-10 (Court).   The Defendants responded that it is contested that Ulibarri's responsibilities changed, because her oversight of the district's custodians was delegated to the

principal at each of the schools.   See Tr. at 23:14-22 (German).   They also pointed out that, under

New Mexico law, which was incorporated into both Plaintiffs' contracts, the superintendent has

the power to hire, fire, and reassign employees.   See Tr. at 24:4-7 (German).   The Court asked

whether, if these three events occurred at the same time -- the reassignments to lower positions, the

change in title, and the decreases in salary -- rather than the loss of salary occurring one year after

the restructuring, the three events "would at least perhaps create a genuine issue of material fact . .

. whether there was an adverse employment action."   Tr. at 24:13-19 (Court).   The Defendants

asserted that the one-year time lapse in the salary change matters when the Plaintiffs were both

administrators, because, while teachers have automatic contract renewal after three years, there is

no automatic contract renewal for administrators.   See Tr. at 24:24-25:14 (German).

        The Defendants added that, whereas the "Plaintiff[s] had asserted in response [that]

paragraph 14 of the Complaint met the standard to plead specific allegations in support of the equal

protection claims or the federal civil rights claims":

>       this is a perfect example of how the Complaint does not meet that standard, because
>       if you look at paragraph 14 of the Second Amended Complaint each statement in
>       there is a very general conclusory statement.  It says all defendants had notice of
>       the informal policy of discrimination and harassment with the specific goal of
>       eliminating Mormon Anglo supervisors, but there's no allegations saying how they
>       had notice or what it is that provides a basis for that assertion.  It says all
>       defendants enforced and conspired to enforce a formal policy custody practice or
>       pattern of Mormon Anglo discrimination, but there are no allegations in the
>       Complaint saying what each defendant did in furtherance of that conspiracy or
>       what any defendant did to enforce such an informal policy[,] that hasn't been
>       articulated.

Tr. at 26:7-21 (German).   The Defendants contended that, "[a]s far as equal protection, there are

no specific allegations of similarly situated individuals who were treated differently, so there's no

[factual allegations] to support a disparate treatment claim."   Tr. at 27:7-10 (German).   The

Defendants argued that the Complaint also fails to state a claim for the CCSD School Board's

liability under § 1983, because any school board action by law requires at least three school board members to act, and there are only two members named as Defendants in this case.   See Tr. at 28:2-14 (German).   In relation to the Plaintiffs' contentions that the alleged blog posts support finding that discriminatory intent exists, the Defendants argued:

> [T]here's nothing in the Complaint that says why plaintiffs assert -- or the basis for their assertion that either of these defendants engaged that blogging nor are there specific allegations of what the hate blogging is or how that could be attributed even if they did participate in such inappropriate hateful conduct, how that would be evidence of a custom or practice of the school board.

Tr. at 28:22-29:3 (German).   The Defendants noted that the factual allegations about each of the individual Defendants are "nearly identical" except for subjection j, and are all conclusory.   See Tr. at 29:6-13 (German).

The Plaintiffs responded first by addressing the Complaint's paragraph 14.   The Plaintiffs noted that the paragraph alleges that "all defendants had actual/or constructive notice of the unofficial but well-known practice or pattern of Anglo and Mormon discrimination, including the ongoing harassment of Mormon executive director of finance and operations . . . Manning, the [discriminatory] termination of Anglo then-superintendent Epperson," and that paragraph 14 should have alleged that as well.   Tr. at 30:3-17 (Geran).   The Plaintiffs noted, with respect to the Defendants' comments that some of the facts relating to Manning and Epperson are absent from the Complaint and the Response, that omission may be the case and an oversight, as the Plaintiffs' counsel has "been dealing with this for about a year and a half."   Tr. at 31:9-13 (Geran).   The Plaintiffs stated: "Nevertheless, the facts are pled.   With regard to disparate impact it's pled twice. It says at 18 and 19 the involved restructuring affected more [Mormon] and Anglo supervisors . . . disproportionately."   Tr. at 31:14-20 (Geran).   The Plaintiffs also asserted that their discrimination claim is not alleging a class-of-one equal-protection claim.   See Tr. at 32:4-11

- 38 -

(Geran).   The Plaintiffs argued that the Defendants did not brief any contention that the Plaintiffs, as supervisors, were in a different category in the contract.   See Tr. at 32:12-24 (Geran).   In response to the Court's inquiry whether the Plaintiffs have in their Complaint that both Plaintiffs' responsibilities were diminished, the Plaintiffs stated that they break down this information in paragraph 17 by alleging that Hunt was told in the meeting that he was being demoted to a "ground maintenance worker position," and that he was going to lose $50,000.00 salary beginning the following year.   Tr. at 33:24-35:9 (Geran).   In relation to Ulibarri, the Plaintiffs noted that paragraph 21 explains that after returning from leave, Ulibarri did not have a job assignment and she was told that she also was going to lose salary in the upcoming year.   See Tr. at 36:5-24 (Geran).   In response to the Court's inquiry whether the administrators' year-to-year contract makes a difference, the Plaintiffs referred the Court to Jones v. Oklahoma City Pub. Sch., 617 F.3d at 1273, asserting that hiring year to year does not "cut off the fact that if you make an employment decision on . . . a forbidden basis it's illegal in this country, and that's whether you're Mormon or Anglo or Native American or disabled or anything."   Tr. at 37:5-13 (Geran).

The Defendants responded by adding that any contentions about the Defendants' failure to accommodate Hunt or failure to negotiate accommodation, and accordingly his inability to perform the new job in light of a disability, are inapposite, because there is no claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 - 12213 ("ADA"), in this lawsuit.   See Tr. at 40:11-16 (German).   They added that there are no allegations about disparate impact relating to any accommodations, as there are no facts about accommodating or failing to accommodate anyone other than Hunt.   See Tr. at 40:20-24 (German).   The Defendants stated that they "agree . . . that if employment decisions were made . . . based on protected categories, that that's unlawful, but there's no -- there aren't specific allegations in the Complaint to state that's what happened."

- 39 -

Tr. at 42:2-5 (German).   They also asserted that, in relation to all of the Plaintiffs' claims based on any alleged adverse employment actions, "[a]ny potential loss of pay was purely speculative. Both plaintiffs resigned before they were offered a contract with a lower pay in it, so we don't know if they would have suffered any actual damages."   Tr. at 42:16-19 (German).   The Defendants noted: "[T]o the extent this turns into an ADA claim, the allegations are that Mr. Hunt could not perform the job. . . .   So I think that would fail a motion to dismiss under an[] ADA claim."   Tr. at 43:5-10 (German).

As to the Plaintiffs' § 1985(3) claim, which the Defendants understand is brought against some of the Individual Defendants, the Defendants argued that the Plaintiffs failed to state a claim, because there are no factual allegations about an agreement to conspire, there are no alleged acts done in furtherance of the conspiracy, and the Plaintiffs were not injured.   See Tr. at 43:13-44:17 (German).   According to the Defendants, based on the allegations in the pleadings, and the Plaintiffs' failure to address this argument in the Response, "all of the individual defendants are entitled to qualified immunity on the 1985 claim."   Tr. at 44:21-25 (German).   The Defendants asserted that the intracorporate conspiracy doctrine prevents any § 1985 claim, and noted that the Plaintiffs failed to address the intracorporate conspiracy in their Response as well.   See Tr. at 45:6-10 (German).

The Plaintiffs responded that, "with regard to the conspiracy, these people are all operating together," which, they asserted, finds support in paragraph 21 of the Complaint, as Martinez and Frazzini told the Plaintiffs that they would have to use their FMLA leave concurrently with their accrued leave.   Tr. at 46:21-47:16 (Geran).   In response to the Court's inquiry whether the intracorporate conspiracy theory protects against application of § 1985, the Plaintiffs contended that it does not apply, because the Defendant is a school board, not a corporation, and because the

- 40 -

Defendants' discrimination took them outside the scope of employment.   See Tr. at 48:2-25

(Geran, German).   The Plaintiffs referred the Court to Jones v. Oklahoma City Pub. Sch., 617

F.3d at 1273, as being "on all fours with this case" and supporting their conclusion that § 1985

applies.   See Tr. at 50:13-20 (Geran).   The Defendants, in response, asserted:

> [A] [§] 1985 conspiracy claim would not apply to allegations relating to a
> conspiracy to deprive someone of their FMLA leave or their sick leave unless
> somehow there were also allegations that said the conspirators conspired to deprive
> Anglos and Mormons from FMLA or sick leave.   But there's nothing . . . that says
> that in the Complaint.

Tr. at 52:12-20 (German).   The Defendants pointed out that the regulation which the Plaintiffs

cite in their Response -- 29 C.F.R. § 825.207 -- gives the employer the choice to substitute accrued

leave for FMLA leave, but requires the employer to notify the employee if it makes that decision.

See Tr. at 52:24-53:12 (German).   In response to the Plaintiffs' contention that the intracorporate

conspiracy doctrine does not apply to their § 1985 claim, the Defendants contended that the

doctrine applies, because all the Defendants were employees of the same entity, whether a

corporation or a public entity, and because discrimination does not take the employees' conduct

outside of the scope of their employment.   See Tr. at 53:18-54:11 (German)(citing Celaya v. Hall,

2004-NMSC-005, 135 N.M. 116, 85 P.3d 239).

The Defendants next discussed the Plaintiffs' Title VII claim, first contending that the

Court should dismiss any Title VII claims against the individual Defendants, because employers

only, and not individuals, are subject to liability under Title VII.   See Tr. at 55:10-17 (German).

The Defendants asserted that the legal standards for the Title VII claim are the same as the

standards for the § 1983 equal-protection claim, and asserted that the Plaintiffs have similarly

failed to sufficiently allege disparate treatment for Title VII purposes.   See Tr. at 55:18-23

(German).   The Defendants argued that the Plaintiffs' allegations also fail to sufficiently allege

constructive discharge, as the factual allegations, even if taken as true and construed in the Plaintiffs' favor, do not rise to the level at which a reasonable person would have felt compelled to resign.   See Tr. at 56:1-15 (German)(citing Charles v. Regents of N.M. State Univ., 2011-NMCA-057, ¶ 16, 150 N.M. 17, 256 P.2d 29).   The Plaintiffs, in response to the Court's inquiry whether they were alleging the class against which there was discrimination was Mormon or Anglo, or persons who were both Mormon and Anglo, asserted: "[T]here were four or five Mormon[-]Anglo directors, there were four or five Anglo Directors who were not Mormon, and there was a Hispanic.   All those people were treated differently than every other . . . class," and those demoted and fired were "replaced by Native Americans."   Tr. at 57:8-24 (Court, Geran). The Plaintiffs stated: "[W]hat we would propose to compare, just as we did in the Complaint, is the treatment of Mormons, the treatment of Anglos, the treatment of Mormon/Anglos, and other races, specifically Native Americans."   Tr. at 57:25-58:4 (Geran).   The Plaintiffs contended that there is a materially adverse employment action, because the Defendants told the Plaintiffs that they would lose half of their pay in eleven months when they informed the Plaintiffs about the restructuring.   See Tr. at 58:7-18 (Geran).   The Plaintiffs argued that the Defendants' substitution of the FMLA leave goes to the adverse employment action, because the FMLA regulation allows for employees only, not the employer, to substitute the FMLA leave for accrued leave.   See Tr. at 60:6-23 (Geran).   In relation to the factors for determining constructive discharge in Charles v. Regents of N.M. State Univ., the Plaintiffs asserted that the hate-speech blogging goes to intentional harassment and that they are alleging Tso was the author of the discriminatory comments.   See Tr. at 61:4-15 (Geran).   Another factor important for constructive discharge is that the Defendants continually pressured the Plaintiffs to resign in lieu of taking positions which they did not want, and in lieu of renewing their contracts for less pay at the end of

the year.   See Tr. at 62:8-18 (Geran).   The Plaintiffs noted that, if the Court dismisses the federal claims for failure to state a claim at this stage in the case, they ask the Court to grant them leave to amend their Complaint and provide more specificity in their allegations.   See Tr. at 64:10-21 (Geran).   The Defendants responded that, while it may have been prudent for the school board to publicly speak out against the hate-blogging, regardless who wrote the comments, neither Title VII nor the Constitution makes imperative that the School District do so.   See Tr. at 67:5-9 (German). The Defendants also pointed out that, with respect to the Defendants allegedly pressuring the Plaintiffs to resign by forcing them to work in the new positions, there are no factual allegations that Hunt told any supervisors about his alleged disabilities or requirements for accommodation; the allegations only state that months later, George Geran, the Plaintiffs' counsel, sent a letter to CCSD about Hunt's disabilities.   See Tr. at 66:24-67:4 (German).

Moving to the state-law claims, the Defendants argued that the Plaintiffs' claim under the NMHRA "suffers from the same flaws as the Plaintiffs' Title VII claims.   They do not sufficiently state a [disparate impact] or a [disparate] treatment claim.   There are insufficient allegations of intentional discrimination. And again we assert no . . . adverse action has been served."   Tr. at 67:20-25 (German).   The Defendants asserted that the alleged constructive-discharge claim, like the Title VII claim, fails, as a reasonable person would not feel that they had no choice but to resign.   See Tr. at 68:2-6 (German).   In relation to the retaliation claim under the NMHRA, the Defendants stated:

> [T]he timing on that is backwards.   He stopped coming to work in July of -- I'm sorry, in July of 2011 he received notice of the reassignment.   Also in July he advised the school that he would not comply with their leave policies and did not return to work after that.
>
> He filed his Human Rights Act charge in December of 2011, and he resigned in February of 2011. So there are no allegation[s] . . . of any adverse employment action taken after he filed his Human Rights Act charge in December.

> And there's no other protected activity that I could discern that [is] alleged in the Complaint.

Tr. at 68:8-18 (German).   In relation to the Plaintiffs' breach-of-contract claim, the Defendants asserted that the Plaintiffs cannot state a claim for breach of contract, because their contract provided for employment at a paid salary for one year -- the 2011 to 2012 school year -- which the restructuring did not affect.   See Tr. at 68:23-69:14 (German).

The Plaintiffs asserted that their allegations are sufficient to state a claim for adverse employment action and discrimination, as there was ongoing harassment and the FMLA leave was used as a vehicle for the discrimination and harassment.   See Tr. at 69:18-70:3 (Geran).   The Plaintiffs also stated: "[T]he fact is that the failure to accommodate him is absolutely part of the retaliation claim, and it only makes . . . sense that way."   Tr. at 70:3-5 (Geran).   In response to the Court's inquiry how the Plaintiffs intend to use the Defendants' failure to provide Hunt reasonable accommodation, as they do not have any claim under the ADA or for disability discrimination under the NMHRA, the Plaintiffs responded that the failure to accommodate is evidence of the Defendants' discrimination pattern.   See Tr. at 70:10-25 (Court, Geran).   The Court asked how the Plaintiffs respond to the Defendants' contention that there are no factual allegations that accommodation was possible, or that the Defendants provided accommodations to persons of other races or religions.   See Tr. at 71:7-9 (Court).   The Plaintiffs responded that the Complaint alleges that Hunt can work administrative jobs and that the Defendants "were told that."   Tr. at 71:10-12 (Geran).   The Plaintiffs contended that it is important to note that the Defendants did not pick a job that was related to jobs that he had performed in the past, and "[s]o what they did was, they assigned him to a position that conceivably they knew he couldn't do, and then refused to accommodate him."   Tr. at 71:13-72:5 (Geran).   They also pointed out that paragraph 25 says "'upon information and belief suitable positions for [P]laintiff [H]unt have opened up as [P]laintiff

[H]unt can perform any administrative work.'"   Tr. at 72:15-17 (Geran).   Mr. Geran conceded

that, "with regard to the timing, there is no question that . . . I complained first for Mr. Manning but

. . . then shortly thereafter I wrote a letter for Mr. Hunt and requested the reasonable

accommodation negotiation . . . and nobody responded in any way, shape or form."   Tr. at

72:20-73:5 (Geran).    As to the breach-of-contract claim, the Plaintiffs noted that the

superintendent has the ability to transfer employees, but only upon the happening of some events,

and argued that they "need discovery to show them.   One is a decrease in funding.   One is a

change in curriculum, and one is a change in enrollment."   Tr. at 74:4-15 (Geran).   In response to

the inquiry about what the Plaintiffs were alleging in relation to Levinski's conduct, the Plaintiffs

stated that they are alleging that Levinksi "was specifically running the conspiracy" with Marquez

and Frazzini, and was their point of contact in the conspiracy.   Tr. at 77:4-8 (Geran).   The

Defendants asserted that the only allegations about Levinski are contained in the Complaint's

paragraph 4, "which is a duplicate of the allegations against all the other named defendants with

exception of [Tso] and [Nicolay], who are also accus[ed] [in a] conclusory fashion of participating

in the hate speech blogging."   Tr. at 78:15-21 (German).   The Defendants reiterated that there

was no contract breach in this case, because the contracts incorporate the CCSD's policy that the

superintendent may reassign the administrators' job positions, and that there is no guarantee, for

administrators, of reemployment unless given notice that the contract will be renewed within

fourteen days of its expiration.   See Tr. at 78:22-80:9 (German).

    With regard to the FATA claim, the Defendants asserted that the FATA is analogous to the

federal *qui tam* statute, and "the whole point of it is to protect the state from fraud."   Tr. at

81:14-16 (German).   They noted that the FATA prohibits retaliation by an employer against an

employee who acts in furtherance of a fraud against taxpayers, but they point out that "nothing in

the Complaint indicates that either Mr. Hunt or Ms. Ulibarri were acting in any way in furtherance of a fraud against taxpayers claim." Tr. at 81:24-82:3 (German). The Defendants also noted their contention that "there is no . . . waiver of immunity in the [FATA]." Tr. at 82:15-19 (German). The Plaintiffs responded that, in paragraph 25, the Complaint alleges that Hunt requested a new position and that the CCSD continually refused him one. See Tr. at 83:4-14 (Geran). The Plaintiffs responded that the FATA's plain language supports finding that the CCSD's actions violated the FATA and that the Plaintiffs may properly assert a cause of action under the FATA. See Tr. at 83:20-84:19 (Geran). The Plaintiffs also asserted that N.M.S.A. 1978, § 44-9-11(A)'s plain language waives the CCSD's sovereign immunity. See Tr. at 86:15-87:11 (Geran). The Plaintiffs additionally contended that the FATA is not analogous to the federal *qui tam* statute, because there is no analogous provision in the FATA. See Tr. at 87:23-88:7 (Geran). They asserted that the statute's plain language clearly covers a private action to redress retaliation against employees by employers, including political subdivisions. See Tr. at 88:17-23 (Geran). The Defendants responded that § 44-9-11 is not a stand-alone provision, but provides a cause of action only for retaliation against employees for reporting specific fraudulent actions which § 44-9-3 sets forth. See Tr. at 89:4-18 (German). The Defendants asserted: "Even using plaintiffs' interpretation of the statute there's no allegations in the Complaint that either plaintiff disclosed any information to a Government or law enforcement agency, and there are no allegation[s] . . . that either of them acted in furtherance of a fraud against taxpayers action." Tr. at 89:23-90:4 (German). The Defendants also noted that case law is clear that punitive damages are not available in a state-law cause of action against the CCSD, so to the extent the Court allows the Plaintiffs to go forward with the FATA claim or any of the other state-law claims, the Court should dismiss any claim for punitive damages. See Tr. at 90:17-25 (German).

The Defendants next argued that the waiver of liability under the NMTCA for negligent management of a building in N.M.S.A. 1978, § 41-4-6 does not apply to the facts of the case.   <u>See</u> Tr. at 91:4-11 (German).   The Defendants asserted that § 41-4-6 waives immunity for property damage or personal injury, which the Plaintiffs are not alleging.   <u>See</u> Tr. at 91:12-21 (German). The Plaintiffs responded that their Complaint at paragraph 67 asserts that the Plaintiffs "have suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.   That's property damage."   Tr. at 92:5-12 (Geran). The Court asked the Plaintiffs whether they agree that the Court can consider the letters and the CCSD policies that they reference in their Complaint.   <u>See</u> Tr. at 93:4-8 (Court).   The Plaintiffs agreed with the Court that the Complaint incorporates by reference the letters and the policies, but noted that they do not want to convert the Motion to Dismiss into a summary judgment motion.   <u>See</u> Tr. at 93:15-52 (Geran). The Defendants also agreed that the Court can consider the incorporated materials in deciding the Motion to Dismiss.   <u>See</u> Tr. at 94:23-95:4 (German).   The Defendants asserted: "As far as the remaining portions of the defendants' motion, defendants assert that there's no waiver of immunity for any of plaintiffs' other state tort claims, including tortious interference of a contract claim or the [common-law] conspiracy claim."   Tr. at 95:13-20 (German).

## <u>LAW REGARDING RULE(12)(b)(6)</u>

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."   <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).   The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the

light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)("To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face.").  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus,

the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).

   The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination." Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010).

> "[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).   In the employment-discrimination context, the Tenth Circuit has suggested that plausibility may require less specific pleadings than in the 42 U.S.C. § 1983 context, "because in employment discrimination cases where the employers are large corporations, the employee may not know who actually fired her or for what reason." Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012).

   A plaintiff alleging employment discrimination, therefore, to withstand a rule 12(b)(6) motion to dismiss, need not plead facts sufficient to establish a prima facie case. See Khalik v. United Air Lines, 671 F.3d at 1192 ("[T]he 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint.")(citing Swierkiewicz v. Sorema N.A., 534 U.S 506, 515 (2002)).   Nevertheless, the Tenth Circuit has recognized that the McDonnell Douglas Corp. v. Green prima facie case "elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." Khalik v. United Air Lines, 671 F.3d at 1192.

"[G]eneral assertions of discrimination . . . without any details whatsoever of events leading up to [the adverse employment action], are insufficient to survive a motion to dismiss." Khalik v. United Air Lines, 671 F.3d at 1193.  "While 'specific facts are not necessary,' some facts are." Khalik v. United Air Lines, 671 F.3d at 1193 (alteration omitted)(quoting Erickson v. Pardus, 551 U.S. 89, 93 (2007)(citing Bell Atl. v. Twombly, 550 U.S. at 555)).

## RELEVANT LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or federal statute.  See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights.").  Rather, 42 U.S.C. § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Aikins, 487 U.S. 42, 48 (1988).  Broken down differently, a plaintiff

> must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. Mar. 30,

2010)(Browning, J.)(quoting <u>Summum v. City of Ogden</u>, 297 F.3d 995, 1000 (10th Cir. 2002)). Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal judiciary to displace state law through the creation of a body of general federal tort law. <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); <u>Griffin v. Breckenridge</u>, 403 U.S. 88, 101-102 (1971)(civil-rights statute).

The Supreme Court of the United States has made clear that there is no respondeat superior liability under § 1983. <u>See</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997). An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. <u>See</u> <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658, 689 (1978). It can be held liable only for its own unconstitutional or illegal policies, and not for the tortious acts of their employees.

Liability requires a showing that such policies were a "deliberate or conscious choice." <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations and internal quotations omitted). <u>See</u> <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)). These standards apply for allegations of liability based on failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons. <u>Barney v. Pulsipher</u>, 143 F.3d at 1367, 1309 n.8. "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately

chooses to disregard the risk of harm," it is liable.   Barney v. Pulsipher, 143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08.   Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations."   Barney v. Pulsipher, 143 F.3d at 1308.

## RELEVANT LAW REGARDING 42 U.S.C. § 1985(3)

Claims under 42 U.S.C. § 1985 are less common than claims under § 1983.   Section 1985 pertains to the prohibition of conspiracies which interfere with civil rights.   See 42 U.S.C. § 1985. The Supreme Court recognizes "five broad classes of conspiratorial activity" that § 1985 prohibits. Kush v. Rutledge, 460 U.S. 719, 724 (1983).   "Three of the five broad categories . . . relate to institutions and processes of the Federal Government."   Kush v. Rutledge, 460 U.S. at 724.   The fourth and fifth classes of § 1985 claims apply to conspiracies to "obstruct the course of justice in state courts" and to "go in disguise on the highway or in the premises of another."   Kush v. Rutledge, 460 U.S. at 724 (internal quotation marks omitted).   Both of these latter categories require an "intent to deprive their victims of the equal protections of the laws," which means that there must be some "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspiratorial action."   Kush v. Rutledge, 460 U.S. at 724, 726 (internal quotation marks omitted).   See Campbell v. Amax Coal Co., 610 F.2d 701, 702 (10th Cir. 1979)("[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985.").

To succeed on a § 1985 claim, a plaintiff must prove a conspiracy.   See Dixon v. City of

Lawton, Okla., 898 F.2d 1443, 1447 (10th Cir. 1990).   To state a valid claim for conspiracy, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants."   Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998)(discussing conspiracy under § 1983).   "[M]ere conclusory allegations with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action."   Sooner Prods. Co. v. McBride, 708 F.2d 510, 512 (10th Cir. 1983)(discussing conspiracy under § 1983).

The Tenth Circuit has held that it is error to "precondition consideration of a plaintiff's § 1985(3) claim upon the finding of § 1983 liability."   Dixon v. City of Lawton, Okla., 898 F.2d at 1447 (10th Cir. 1990).

> Although neither § 1983 nor § 1985(3) create any substantive rights, a § 1983 claim generally describes a substantive violation of a right secured by the Constitution or laws, whereas a § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws or equal privileges and immunities under the laws.

Dixon v. City of Lawton, Okla., 898 F.2d at 1447.

To state a claim under § 1985(3), a plaintiff must show: (i) a conspiracy, motivated by racially discriminatory animus; (ii) to deprive the plaintiff of equal protection or equal protections of the laws; (iii) an act in furtherance of the conspiracy; and (iv) an injury or deprivation resulting therefrom.   See Paris v. Sw. Bell Tel. Co., 94 F. App'x 810, 815 (10th Cir. 2004)(unpublished); Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993).[4]   "Conclusory allegations that the

---

[4] Paris v. Sw. Bell Tel. Co. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for

defendants acted in concert or conspired, without specific factual allegations to support such assertions, are insufficient to state a claim under § 1985(3)."   Martinez v. Martinez, 2010 WL 1608884, at *12 (citing Merritt v. Hawk, 153 F. Supp. 2d 1216, 1225 (D. Colo. 2001)).

The Tenth Circuit has stated that § 1985(3) was intended "to provide redress for victims of conspiracies impelled by a commingling of racial and political motives."   Brown v. Reardon, 770 F.2d 896, 907 (10th Cir. 1985).   "[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985."   Campbell v. Amax Coal Co., 610 F.2d 701, 702 (10th Cir. 1979).   The Tenth Circuit has consistently dismissed § 1985(3) claims devoid of racial, discriminatory animus.   For example, in Paris v. Sw. Bell Tel. Co., the Tenth Circuit held that the plaintiff's hostile-work-environment claim failed, because she did not show racial discriminatory animus on the part of the alleged conspirators.   See 94 F. App'x at 815.

In Martinez v. Martinez, the plaintiff alleged that M. Martinez, her ex-husband, Lynda Latta, her ex-husband's attorney, and the Honorable Elizabeth Whitefield, the judge who presided over the Martinezes' divorce in state court, conspired against her to deprive her of her rights guaranteed under the Equal Protection Clause.   See 2010 WL 1608884, at *1, *26.   The Court noted:

---

their persuasive value.").   The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .   However, if an unpublished opinion . . .  has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."   United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court finds that Paris v. Sw. Bell Tel. Co., and the other unpublished Tenth Circuit opinions on which the Court relies in this Memorandum Opinion and Order, have persuasive value with respect to material issues, and that they will assist the Court in its disposition of this Memorandum Opinion and Order.

The entirety of the constitutional claims appear to be these:

14. In the Court's Defendant 4's [i.e., Judge Whitefield's] ruling to dismiss this case against Plaintiff first of all is a violation of Federal Rule 60(b)(4) because the Court lacked jurisdiction over the subject matter and that dismissal, for lack of prosecution, which conduct was done as a state actor under color of law by [Judge Whitefield] and in conspiracy with [Ms. Latta] on behalf of [M. Martinez], to achieve these ends.   [Ms. Latta] is included in this legal process, entered into knowingly and fraudulently to achieve the illegitimate end of depriving Plaintiff of her due civil rights by [Judge Whitefield's] void ruling, which rights are afforded by USC 42 §§ 1983 and 1985(3) to a fair hearing of the property as she has attempted to litigate for these last years.

15. [Ms. Latta and Judge Whitefield] are participants with [M. Martinez] and have conspired to keep Plaintiff at bay in obtaining her rights to this undivided property by engaging improper courts and attempts to harass and exhaust Plaintiff of her financial resources . . . .

17. The Fourteenth Amendment states thus: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law . . . And further in the Fifth Amendment "the Bill of Rights protects against abuse of government -- the 'double jeopardy' clause seems to be applied here, because Plaintiff's same former case 95-2963 was voluntarily dismissed by Plaintiff without prejudice in 2003, and resurrected from the dead improperly by [M. Martinez, Ms. Latta, and Judge Whitefield] on August 28, 2007 by Motion . . . .

18. [Judge Whitefield] attempts to adjudicate a new dismissal of this same closed case by dismissing it again against Plaintiff for lack of prosecution and would attempt by doing so, to take away her right to adjudicate it elsewhere -- this would be a gross violation for Plaintiff from [Judge Whitefield] and finds into the double jeopardy type of thinking easily -- a double dismissal, one legitimate by Plaintiff and one illegitimate (reopened by Defendants by Motion) after this dismissal, and done (the second) with intention by [M. Martinez and Ms. Latta] and especially with the power of [Judge Whitefield], to attempt to deprive Plaintiff of her due process rights of hearing and eliminating her possibility to adjudicate her claim because [Judge Whitefield's] ruling would then be the second dismissal on the basis

> of lack of prosecution which then adjudicates a case and it could not be
> brought again by this Plaintiff.

2010 WL 1608884, at **24-25 (alterations in original).   The Court dismissed the § 1985 claim,

reasoning that the plaintiff "makes no allegation of discriminatory animus by [the defendants]"

and that "there is nothing more than a conclusory allegation of conspiracy, lacking any underlying

facts."   2010 WL 1608884, at *27.   The Court noted that "[n]o alleged facts touch on any

individual's race, political or religious affiliation, or any other categorization against which the

Defendants might hold a discriminate animus."   2010 WL 1608884, at *27.

### LAW REGARDING TITLE VII EMPLOYMENT DISCRIMINATION CASES

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on

race, color, religion, sex, or national origin."   Brown v. Gen. Servs. Admin., 425 U.S. 820, 825

(1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).   The Court has noted that Title VII generally

protects individuals from employers' improperly motivated adverse treatment in the workplace:

> Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or
> refusing to hire or discharging any individual, or otherwise discriminating against
> any individual with respect to his compensation, terms, conditions, or privileges of
> employment, because of such individual's race, color, religion, sex, or national
> origin.

Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31,

2007)(Browning, J.)(quoting 42 U.S.C. § 2000e-2(a)(1))(internal quotes and alterations omitted).

With the 1972 amendments to the statute, Title VII's protections apply to federal and private

employees.   See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)).

At the motion-to-dismiss stage, the plaintiff need not plead facts to state a prima facie case

under McDonnell Douglas Corp. v. Green to state a plausible claim for relief:

> [A]lthough the plaintiff need not plead facts that constitute a prima facie case under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . (1973), in order to survive a motion to dismiss, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-15 . . . (2002), a civil rights plaintiff retains the burden of alleging facts sufficient to state a claim entitling her to relief.

Harman v. Unisys Corp., 356 F. App'x 638, 640 (D.C. Cir. 2009)(citing Jordan v. Alternative Res. Corp., 458 F.3d 332, 346-47 (4th Cir. 2006)).   See Gerald v. Locksley, 849 F. Supp. 2d 1190, 1221 (D.N.M. 2011)(Browning, J.)("A civil rights plaintiff need not plead facts that constitute a prima facie case under the framework of McDonnell Douglas Corp. v. Green . . . to survive a motion to dismiss.   Nevertheless, the plaintiff retains the burden to allege facts sufficient to state all the elements of her claim.")(internal quotations and original alterations omitted)(quoting Prince-Garrison v. Md. Dep't of Health and Mental Hygiene, 317 F. App'x 351, 353 (4th Cir. 2009)).   See also Messina v. Kroblin Transp. Sys., Inc., 903 F.2d 1306, 1308 (10th Cir. 1990)("McDonnell Douglas inferences provide assistance to a judge as he addresses motions to dismiss, for summary judgment, and for directed verdict.").

## 1.   Reverse Discrimination.

Title VII "proscribe[s] racial discrimination . . . against whites on the same terms as racial discrimination against nonwhites."   McDonald v. Santa Fe. Trail Transp. Co., 427 U.S. 273, 279-80 (1976).   In these reverse discrimination cases, the protected-class requirement for a prima facie case under McDonnell Douglas Corp. v. Green is substituted for the requirement that the plaintiff show facts to support an inference that "the defendant is one of those unusual employers who discriminates against the majority."   Notari v. Denver Water Dept., 971 F.2d 585, 589 (10th Cir. 1992).   See Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1149 (10th Cir.

2008)("When plaintiff is a member of a historically favored group, by contrast, an inference of invidious intent is warranted only when 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'")(quoting Notari v. Denver Water Dept., 971 F.2d at 589).

> **2.      Law on Claims for a Hostile Work Environment.**

"To establish a prima facie case of hostile work environment harassment, a plaintiff must show that 'under the totality of circumstances [(i)] the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and [(ii)] the harassment was racial or stemmed from racial animus.'"  Bloomer v. United Parcel Serv., Inc., 94 F. App'x 820, 825 (10th Cir. 2004)(quoting Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998)).  See Carter v. Mineta, 125 F. App'x 231, 238 (10th Cir. 2005); Mitchell v. City and Cnty. of Denver, 112 F. App'x 662, 671 (10th Cir. 2004).  To establish a hostile-work-environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998)(internal citations and quotations omitted).  "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for her to continue."  Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir. 1996)(holding that a work environment did not contain "pervasive" harassment when the plaintiff made general allegations of frequent "sexual slurs" and the only specific incident cited involved a co-worker grabbing the plaintiff).

"The mere utterance of a statement which 'engenders offensive feelings in an employee' would not affect the conditions of employment to a sufficient[ly] significant degree to violate Title

VII.'"   Gross v. Burggraf Construction Co., 53 F.3d 1531, 1537 (10th Cir. 1995)(alteration in the

original)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).   A plaintiff must

allege more than "'a few isolated incidents of racial enmity' or 'sporadic racial slurs.'"   Chavez v.

New Mexico, 397 F.3d 826, 832 (10th Cir. 2005)(quoting Bolden v. PRC, Inc., 43 F.3d 545, 551

(10th Cir. 1994)(internal citation omitted)).   "Instead, 'there must be a steady barrage of

opprobrious racial comments.'"   Chavez v. Mexico, 397 F.3d at 832 (quoting Bolden v. PRC,

Inc., 43 F.3d at 551).

The Tenth Circuit has stated that "[p]ervasiveness and severity are independent and equal

grounds" upon which a plaintiff may establish this element of a hostile-work-environment claim.

Witt v. Roadway Express, 136 F.3d at 1432 (addressing a hostile-work-environment claim under

42 U.S.C. § 1981).   See also Aramburu v. Boeing Co., 112 F.3d 1398, 1410 (10th Cir. 1997)

(citing Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994), for the proposition that

"standards and burdens under § 1981 are the same as those under Title VII").   Moreover, the

plaintiff must demonstrate that the work environment was objectively and subjectively offensive,

but need "not demonstrate psychological harm, nor . . . show that her work suffered as a result of

the harassment."   Walker v. United Parcel Serv. of Am., 76 F. App'x 881, 885 (10th Cir. 2003).

In addition to all the circumstances, relevant considerations to determine if an environment is

objectively hostile include: "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance."   Faragher v. City of Boca Raton, 524 U.S. 775,

787-88 (1998)(quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21)(internal citations and

quotations omitted).

### 3.   Disparate Treatment Discrimination.

"To prevail on a disparate treatment claim under Title VII of the Civil Rights Act, a plaintiff must show that [the] employer intentionally discriminated against [the plaintiff] for a reason prohibited by the statute." Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1306 (10th Cir. 2005). To do so, courts apply the burden-shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), which initially places the burden on the plaintiff to prove a prima facie case of discrimination. See, e.g., E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 800-01 (10th Cir. 2007).

The elements laid out in McDonnell Douglas Corp. v. Green to prove a prima facie disparate treatment prima facie case addressed only a refusal to rehire. Accordingly, the articulation of a plaintiff's prima facie case "varies depending on the type of adverse action the employee alleges was discriminatory." E.E.O.C. v. PVNF, L.L.C., 487 F.3d at 800 (citing Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005)). See 1 Lex K. Larson, Employment Discrimination § 8.08[1], at 8-103 (2d ed. 2012) ("[C]ourts have applied the McDonnell Douglas prima facie case, sometimes modifying the proof requirements to fit the specific facts of the case, to cases involving promotion, discharge, demotion, discipline, layoffs, and other types of employer actions."). Generally, to prove a disparate-treatment discrimination claim at the summary-judgment stage, "a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." E.E.O.C. v. PVNF, L.L.C., 487 F.3d at 800. See Sorbo v. United Parcel Serv., 432 F.3d 1169, 1173 (10th Cir. 2005)(holding that a "prima facie case for discrimination" requires the "plaintiff to show that (1) he belongs to the protected age group; (2) his job performance was satisfactory; (3) adverse employment action was taken against him; . . . . [in (4)] 'circumstances

giving rise to an inference of discrimination.'")(quoting Salguero v. City of Clovis, 366 F.3d 1168,

1175 (10th Cir. 2004)(citing Plotke v. White, 405 F.3d at 1101; Hysten v. Burlington N. & Santa

Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002)); Jones v. Denver Post Corp., 203 F.3d 748, 753

(10th Cir. 2000)("A prima facie case of disparate discipline may be established if the plaintiff

proves by a preponderance of the evidence that (1) the plaintiff is a racial minority, (2) the plaintiff

was disciplined by the employer, and (3) the employer imposed the discipline under circumstances

giving rise to an inference of racial discrimination.").   Cf. Mathews v. Denver Newspaper Agency

LLP, 649 F.3d 1199, 1208 (10th Cir. 2011)("[The plaintiff] bears the initial burden of . . .

presenting evidence that (i) he is a member of a protected class, (ii) he was qualified for the job as

Unit Supervisor, (iii) he was demoted from that job, and (iv) the position was not

eliminated.")(citing Jones v. Denver Post Corp., 203 F.3d at 753).[5]

---

[5] The Court has previously written: "To establish a prima-facie case of discrimination, a plaintiff must demonstrate that: (i) she is a member of a protected class; (ii) she suffered an adverse-employment action, and (iii) similarly situated employees were treated differently." Gerald v. Locksley, 785 F. Supp. 2d at 1099.   The Court cited to the Tenth Circuit's August, 2005 decision in Orr v. City of Albuquerque, in which the Tenth Circuit stated: "To make out a prima facie case of discrimination, the female Plaintiffs must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."   Orr v. City Of Albuquerque, 417 F.3d at 1149.   Only a few months after Orr v. City Of Albuquerque, in December, 2005, the Tenth Circuit held that the district court's inclusion in the plaintiff's prima facie case of showing "comparable employees who were not in a protected class did not receive comparable adverse employment action" was the "recitation of an outmoded prima facie case test" and that showing disparate treatment of similarly situated individuals is only one way to prove the third McDonnell Douglas element.   Sorbo v. United Parcel Serv., 432 F.3d at 1173.   The Tenth Circuit recognized that the proper third element is -- and had been since at least 1999 -- the broader prima facie requirement that the defendant took the adverse employment action under "circumstances giving rise to an inference of discrimination."   Sorbo v. United Parcel Serv., 432 F.3d at 1173 (citing Perry v. Woodward, 199 F.3d 1126, 1135-40 (1999); Salguero v. City of Clovis, 366 F.3d at 1175; Plotke v. White, 405 F.3d at 1101; Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d at 1181; Jones v. Denver Post Corp., 203 F.3d at 753). It noted that, "[w]hile this broader requirement may be (and often is) satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie

4.        **Disparate Impact Discrimination.**

"Title VII forbids not only intentional discrimination based on disparate treatment but also 'practices that are fair in form, but discriminatory in operation,' most often referred to as 'disparate impact' discrimination."   Tabor v. Hilti, Inc., 703 F.3d 1206, 1220 (10th Cir. 2013)(citing Lewis v. City of Chicago, 130 S. Ct. 2191, 2197 (2010)).   More specifically, disparate impact cases "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."   Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

"'The first step in raising a disparate-impact claim is to identify the specific employment practice allegedly causing the discriminatory impact.'"   Tabor v. Hilti, Inc., 703 F.3d at 1221 (quoting Carpenter v. Boeing Co., 456 F.3d 1183, 1193 (10th Cir. 2006)).   To succeed in a

case."   432 F.3d at 1173.   At the same time, the Tenth Circuit pointed out that its precedent has been inconsistent on whether a prima facie discrimination case requires showing similarly situated individuals were treated more favorably: "As noted in Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1307 n.1 (10th Cir. 2005), this court's own jurisprudence has not been entirely consistent in this regard."   Sorbo v. United Postal Serv., 432 F.3d at 1173 n.4 (citing, as an e.g. cite MacKenzie v. City & Cnty. of Denver, 414 F.3d at 1277).

Similarly, in the context of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), which also applies the McDonnell Douglas Corp. v. Green prima facie case framework, the Supreme Court declared: "Because it lacks probative value, the fact that a[] . . . plaintiff was replaced by someone outside the protected class is not a proper element of the McDonnell Douglas prima facie case."   O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996).   The Supreme Court held that "the proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'"   517 U.S. at 312-13 (emphasis in original)(quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)).   The Court therefore concludes that its articulation of the McDonnell Douglas Corp. v. Green prima facie case elements for discrimination in Gerald v. Locksley, based on the Tenth Circuit's decision in Orr v. City Of Albuquerque, which was among the Tenth Circuit's jurisprudence "not . . . entirely consistent in this regard," Sorbo v. United Postal Serv., 432 F.3d at 1173 n.4, is not the best statement of the law.

disparate impact claim, a plaintiff must prove the existence of employment practices "that are fair in form, but discriminatory in operation."   Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971). See Carpenter v. Boeing Co., 456 F.3d at 1187 ("A plaintiff may establish a prima facie case of disparate impact discrimination by showing that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group.")(quoting Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1312 (10th Cir. 1999)).   Consequently, in disparate impact cases, unlike disparate treatment cases, proof of discriminatory motive is irrelevant.   See Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1242 (10th Cir. 1991).

The Supreme Court has held that statistical evidence alone is sufficient to establish a prima facie case of disparate impact discrimination.   See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-08 (1977)("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); Tabor v. Hilti, Inc., 703 F.3d at 1222 ("'Statistical evidence is an acceptable, and common, means of proving disparate impact.'")(quoting Carpenter v. Boeing Co., 456 F.3d at 1202).   Statistics are not irrefutable, however, and any proffered statistical analysis "must involve the appropriate comparables, and must 'cross a threshold of reliability before it can establish even a prima facie case of disparate impact.'"   Ortega v. Safeway Stores, Inc., 943 F.2d at 1243 (internal citation omitted)(quoting   Allen v. Seidman, 881 F.2d 375, 378 (7th Cir. 1989)).   See Int'l Bhd. of Teamsters v. United States, 431 U.S. at 340 (noting statistics "come in infinite variety and, like any other kind of evidence, they may be rebutted").

"[F]or statistical evidence to create an inference of discrimination, the statistics must . . . eliminate nondiscriminatory explanations for the disparity."   Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir. 1994)(quoting Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th

Cir. 1991)).   See Martinez v. Wyoming, 218 F.3d at 1139; Doan v. Seagate Tech., Inc., 82 F.3d

974, 979 (10th Cir. 1996).   "[S]tatistical evidence . . . may be diluted by factors such as an

inadequate sample size and failure to consider similarly situated individuals."   Ram v. N.M. Dep't

of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *9 (D.N.M. Dec. 15, 2006)(citing

Mayor of Philadelphia v. Educ. Equal. League, 415 U.S. 605, 621 (1974); Martinez v. Wyoming,

218 F.3d 1133, 1138-39 (10th Cir. 2000)).   As a threshold matter, therefore, "[t]he statistics must

. . . relate to the proper population.   For example, when the claim is disparate impact in hiring, the

statistics should be based on data with respect to persons qualified for the job."   Carpenter v.

Boeing Co., 456 F.3d at 1196.   The Tenth Circuit has explained that the statistical data must

concern those people subjected to the challenged employment action:

> After specifying the employment practice allegedly responsible for excluding
> members of their protected class from a benefit, plaintiffs must identify the correct
> population for analysis.   In the typical disparate impact case the proper population
> for analysis is the applicant pool or the eligible labor pool.   The composition of
> this population is compared to the composition of the employer's workforce in a
> relevant manner, depending on the nature of the benefit sought.

Carpenter v. Boeing Co., 456 F.3d at 1196 (quoting Smith v. Xerox Corp., 196 F.3d 358, 368 (2d

Cir. 1999)).

Assuming that the statistical evidence concerns the correct population, the Tenth Circuit

recently laid out a three-element analysis for a disparate-impact prima facie case, holding that the

district court must analyze three issues: (i) the size of the disparity between those with the status

allegedly discriminated against and those without the status; (ii) the statistical significance of the

disparity, measured by standard error rate or standard deviation; and (iii) whether statistical

evidence effectively isolates the challenged employment action.   See Tabor v. Hilti, Inc., 703

F.3d 1222 (stating that, for a prima facie case of disparate impact against women, "we are

- 64 -

concerned with three issues: (1) the size of the disparity between male and female promotions; (2) the statistical significance of the disparity, measured by standard error rate or standard deviation; and (3) whether the statistical evidence effectively isolates the challenged employment practice"). In relation to the first issue, the size of the disparity between those with the status alleged to be the basis of the alleged disparate impact versus those without the status must be at least twenty percent.   See Tabor v. Hilti, Inc., 703 F.3d at 1222 (noting that the EEOC "guidelines provide that a disparity of 20% or more in selection rate will be considered evidence of adverse impact in a disparate impact claim" and that "[a]lthough not controlling on courts, this guideline is persuasive").   As to the statistical significance of the disparity, the Tenth Circuit has noted that "'[t]he Supreme Court has recognized that a disparity of more than two or three standard deviations in a large sample makes 'suspect' the contention that the differential occurs randomly.'"   Tabor v. Hilti, Inc., 703 F.3d at 1223 (holding that "Ms. Tabor's evidence was statistically significant at 2.777 standard errors," as to which the plaintiff's expert concluded "the probability is less than 0.006 that a disparity at least as large as this could occur solely as the result of chance factors, if promotions were unrelated to sex")(quoting Carpenter v. Boeing Co., 456 F.3d at 1195).   The third issue -- whether the statistical evidence isolates the challenged adverse employment practice or action -- means that the plaintiff must "isolate[] the specific employment practice by controlling for key factors outside the challenged practice that could potentially cause or contribute to the disparity."   Tabor v. Hilti, Inc., 703 F.3d at 1223 (citing Carpenter v. Boeing Co., 456 F.3d at 1196).   The Tenth Circuit has explained that this third element is "important because it goes directly to causation" and that an employer will not be liable for disparate impact which is caused by circumstances outside of the employer's control.   Tabor v. Hilti, Inc., 703 F.3d at 1223-24 ("An employer will not, for example, be liable for a gender imbalance in its work force

that 'is due to a dearth of qualified [female] applicants (for reasons that are not [the employer's] fault).'")(quoting Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 651 (1989), superseded by statute on other grounds by 42 U.S.C. § 2000e–2(k)).

###    4.    Title VII Retaliation.

To establish a prima facie case of retaliation, a plaintiff must show: "(1) that he [or she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."   Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202).   "To establish that a causal connection exists," a plaintiff "may proffer 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006)).   Generally speaking, if this temporal proximity between the protected activity and the adverse action are not "very close in time," the plaintiff "must offer additional evidence to establish causation."   Proctor v. United Parcel Serv., 502 F.3d at 1209 (internal quotations omitted)(quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d at 1228).

###    5.    Materially Adverse Employment Action.

The Tenth Circuit liberally defines what constitutes an adverse employment action.   See Orr v. City of Albuquerque, 417 F.3d at 1150 ("Because of the remedial nature of Title VII lawsuits, we broadly define adverse employment action.").   As the Tenth Circuit has stated:

> Such actions are not simply limited to monetary losses in the form of wages or benefits.   Instead, we take a case-by-case approach; examining the unique factors relevant to the situation at hand.   Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action.

Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998)(internal quotation marks and citations omitted).   See Proctor v. United Parcel Serv., 502 F.3d at 1208.   An adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).   "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010)(quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68)(internal quotation marks omitted).   "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."   Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms.").   "We construe the phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of wages or benefits.'"   Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 (quoting Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004)).   Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although "a mere inconvenience or an alteration of job responsibilities will not suffice." Annett v. Univ. of Kan., 371 F.3d at 1239 (internal quotation marks and citation omitted).

In Anderson v. Clovis Mun. Sch., 265 F. App'x 699 (10th Cir. 2008), the Tenth Circuit, in an unpublished opinion, addressed the requirement of an adverse employment action in the context of a disparate-treatment claim where an employee, who had been placed on a growth plan, alleged other harsh treatment and a written reprimand in support of his claim that he suffered a hostile

work environment.   Relying on Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999), the

plaintiff, Anderson, argued that the growth plan and formal reprimand rose to the level of an

adverse employment action under Tenth Circuit law.   In discussing Anderson v. Clovis Mun.

Sch.'s reliance on Schuler v. City of Boulder, the Tenth Circuit stated: "While adverse

employment actions extend beyond readily quantifiable losses, not everything that makes an

employee unhappy is an actionable adverse action.   Otherwise, minor and even trivial

employment actions . . . would form the basis of a discrimination suit."   MacKenzie v. City and

Cnty. of Domier, 414 F.3d 1266, 1279 (10th Cir. 2005).   See Heno v. Sprint/United Mgmt. Co.,

208 F.3d 847, 857 (10th Cir. 2007)(explaining that Title VII proscribes only discriminatory

conduct that "alters the employee's compensation, terms, conditions, or privileges of employment,

or adversely affects [the employee's] status as an employee")(quotations omitted).   "Only acts

that constitute a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits will rise to the level of an adverse employment action."   Robinson v. Cavalry

Portfolio Serv., LLC, 365 F. App'x 104, 114 (10th Cir. 2010)(unpublished)(quoting Haynes v.

Level 3 Commc'ns, 456 F.3d at 1218-19).

## LAW REGARDING EQUAL-PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no states

shall . . . deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const.

amend. XIV, § 1.   "The Equal Protection Clause 'keeps governmental decision makers from

treating differently persons who are in all relevant respects alike.'"   Soskin v. Reinertson, 353

F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).   See

Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1233 (10th Cir. 2009)("Equal protection

'is essentially a direction that all persons similarly situated should be treated alike.'")(quoting <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985)).

       **1.**    **Equal-Protection Claims in the Employment Context.**

      To state an equal-protection claim against a municipality in the employment context, the plaintiff must show that the defendant's conduct, taken under color of law: (i) constitutes "an adverse employment action"; (ii) was motivated by a discriminatory intent; and (iii) was pursuant to the defendant's "policy or custom." <u>Gerald v. Locksley</u>, 785 F. Supp. 2d at 1106 (internal quotations omitted)(quoting <u>Lewallen v. City of Beaumont</u>, 394 F. App'x 38, 42-43 (5th Cir. 2010)). Where a state employee undertakes the conduct, the plaintiff

> must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority. To subject a governmental entity to liability, "a municipal policy must be a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers.'" Absent such an official policy, a municipality may also be held liable if the discriminatory practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law."

<u>Murrell v. Sch. Dist. No. 1</u>, 186 F.3d 1238, 1249 (10th Cir. 1999)(internal citations omitted). Nevertheless, the Tenth Circuit has stated that "a failure to prevent sexual harassment by a student <u>before it occurs</u> does not violate . . . the Fourteenth Amendment absent a showing of an institutional policy of indifference. However, a refusal to remedy known sexual harassment is actionable." <u>Murrell v. Sch. Dist. No. 1</u>, 186 F.3d at 1250 n.9 (emphasis in original).

      Because a plaintiff must show that he or she was subjected to an adverse employment action to prevail on an Equal Protection claim, "[c]ourts use the same standard for adverse employment actions under Equal Protection claims and Title VII claims." <u>Gerald v. Locksley</u>, 785 F. Supp. 2d at 1107. <u>Accord Etsitty v. Utah Transit Auth.</u>, 502 F.3d 1215, 1227 (10th Cir.

2007)("'In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII.'")(quoting Maldonado v. City of Altus, 433 F.3d 1294, 1307 (10th Cir.2006), overruled on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 53).   For example, in McCrary v. Aurora Pub. Sch., after the Tenth Circuit held that a plaintiff's ADEA and ADA claims failed because she failed to show that she was subject to an adverse employment action, the Tenth Circuit summarily dismissed her Equal Protection claim:

> As to Ms. McCrary's claim that her right to equal protection was violated when she was not considered for a fourth-grade classroom position and instead was transferred to a CST position, we have already concluded that neither of those actions constituted an adverse employment action [under the ADA or the ADEA], and Ms. McCrary has not otherwise shown that they gave rise to an injury for purposes of § 1983.

57 F. App'x 362, 373 (10th Cir. 2003).   See, e.g., Williams v. New York City Hous. Auth., 335 F. App'x. 108, 110 (2d Cir. 2009)(affirming dismissal of plaintiff's Equal-Protection claim, stating: "Neither NYCHA's denial of Williams's request for a leave of absence, nor its deduction of a small amount from her salary, nor its issuance of two counseling memoranda constituted an adverse employment action.")(citing Weeks v. N.Y. State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001)(addressing adverse employment actions in the Title VII context), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108-14 (2002); Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000)(noting that the alleged adverse action in ADEA case must result in a "change in responsibilities so significant as to constitute a setback to plaintiff's career")); Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008)("These elements also apply to a [Equal Protection] claim of race discrimination under § 1983 because the analysis of

disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."); Watson v. City of Cleveland, 202 F. App'x 844, 856 (6th Cir. 2006)(employing the same adverse-employment-action standard for Title VII and Equal Protection claims, stating: "Proving intentional discrimination for an equal protection claim brought under § 1983 requires the plaintiff to make the same showing required to prove a violation of Title VII.")(citing Gutzwiller v. Fenik, 860 F.2d 1317, 1325 (6th Cir. 1988)); Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)(noting that substantive standards for claims under Title VII also apply to discrimination claims under the Equal Protection Clause); Herts v. Smith, 345 F.3d 581, 588 (8th Cir. 2003)("To make out a prima facie case of discrimination under the Equal Protection Clause of the Fourteenth Amendment, or under Title VII, a plaintiff need show only that she is a member of a protected class, was qualified for her position, and suffered an adverse employment action.").   See also McPhaul v. Bd. of Comm'rs of Madison Cnty., 226 F.3d 558, 566 n.6 (7th Cir. 2000)("Because section 1983 claims generally follow 'the contours of Title VII claims,' we will apply the same 'hostile environment' standard that is applied in Title VII cases."  (citing King v. Bd of Regents of Univ. of Wis. Sys., 898 F.2d 533, 537 (7th Cir. 1990))).

### 2.     The Similarly Situated Individual Pleading Requirement for Class-of-One Claims or Claims Based on Membership in a Non-Protected Class.

"Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens."   Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215-16 (10th Cir. 2011).  A plaintiff alleging disparate-treatment discrimination based on membership in a non-protected class or in a class of one must therefore allege in the complaint that similarly situated persons were treated differently.  See Brown v.

Montoya, 662 F.3d 1152, 1173 (10th Cir. 2011)("The pleading requirement of an allegation that a similarly situated person was treated differently applies both when the plaintiff challenges a government action that discriminates based on membership in a non-protected class, or membership in a 'class of one.'")(internal citations omitted)(citing Price-Cornelison v. Brooks, 524 F.3d 1103, 1120 (10th Cir. 2008); Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1216). As the Supreme Court set forth in Village of Willowbrook v. Olech, 528 U.S. 562 (2000), however, a plaintiff may also bring a class-of-one equal-protection claim, alleging that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."   528 U.S. at 564 (citing Sioux City Bridge Co. v. Dakota Cnty., 260 U.S. 441 (1923); Allegheny Pittsburgh Coal Co. v. Cnty. Comm'n of Webster Cnty., 488 U.S. 336 (1989)).   Similarly, discrimination against members of a non-protected class, such as White-Anglos, violates equal protection.   See McDonald v. Santa Fe. Trail Transp. Co., 427 U.S. 273, 279-80 (1976)(holding that Title VII "proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites."); Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C., 462 U.S. 669, 676 (1983)(extending this proposition to Equal Protection Clause violations); Reynolds v. Sch. Dist. No. 1, Denver, 69 F.3d 1523, 1532 & n.10 (10th Cir. 1995)(recognizing that the Equal Protection Clause proscribes discrimination against White-Anglos).

The Tent Circuit has noted: "'The paradigmatic 'class of one' case, sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a

hapless private citizen.'" <u>Kansas Penn Gaming, LLC v. Collins</u>, 656 F.3d at 1216 (internal

alteration omitted)(quoting <u>Lauth v. McCollum</u>, 424 F.3d 631, 633 (7th Cir. 2005)).   "Successful

claims have arisen from unfavorable zoning decisions, withholding of permits, and selective

regulatory enforcement." <u>Kansas Penn Gaming, LLC v. Collins</u>, 656 F.3d at 1216 (internal

citations omitted).   The Supreme Court has held, however, that "the class-of-one theory of equal

protection has no application in the public employment context."   <u>Engquist v. Or. Dep't of Agric.</u>,

553 U.S. 591, 607-08 (2008)(reasoning that "an allegation of arbitrary differential treatment could

be made in nearly every instance" of a personnel decision by the government, and "government

offices could not function if every employment decision became a constitutional matter").   <u>See</u>

<u>Kelley v. City of Albuquerque</u>, 542 F.3d 802, 821 (10th Cir. 2008)( "[T]he class-of-one theory is

not legally cognizable where . . . a public employee claims that she has been treated differently

than other employees."); <u>Duprey v. Twelfth Judicial Dist. Court</u>, No. CIV 08-0756 JB, 2009 WL

2105955, at *5 (D.N.M. June 22, 2009)(Browning, J.)("In this case, Duprey, who is a public

employee, is alleging that she was denied a promotion and was demoted. Because her lawsuit

arises in the public-employee context, she cannot proceed on the class-of-one theory.").

        Moreover, in these class-of-one claims, where discrimination is not alleged against a class

of persons, "[t]he allegation that a plaintiff was treated differently from those similarly situated is

an essential element of an equal protection action."   <u>Hennigh v. City of Shawnee</u>, 155 F.3d 1249,

1257 (10th Cir. 1998)(holding that the plaintiff who alleged he "was subjected to discipline and a

disciplinary proceeding <u>not applicable to any other police officer</u> under the Collective Bargaining

Agreement," but not alleging any class-based discrimination, failed to state a claim, as the

"Plaintiff did not show how he was treated differently from others similarly situated" (emphasis added))(citing Norton v. Vill. of Corrales, 103 F.3d 928, 933 (10th Cir. 1996)).   In Norton v. Vill. of Corrales, for instance, where the Tenth Circuit found that "it is clear that they are not claiming unequal treatment on the basis of race, sex or other classifications which require heightened scrutiny," the Tenth Circuit dismissed the complaint, noting that the "Plaintiffs did not explicitly allege they were treated differently from similarly situated persons or corporations."   103 F.3d at 933 (emphasis added).

The Court has quoted this proposition of law -- "[t]he allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action," Hennigh v. City of Shawnee, 155 F.3d 1249 -- in the § 1983 employment-discrimination context where the plaintiff alleged that the defendant discriminated against him based on his race.   See Gerald v. Locksley, 785 F. Supp. 2d at 1085, 1133.   The Court in that case had before it an equal protection claim which was, at least in part, a class-of-one equal protection claims, and the cases upon which the Court relied were limited to class-of-one equal-protection claims. See Gerald v. Locksley, 785 F. Supp. 2d at 1133 ("Gerald's failure to allege that he was treated differently than others similarly situated also defeats his Equal-Protection claim.")(citing Marino v. Mayger, 118 F. App'x 393, 299 (10th Cir. 2004)(unpublished)(upholding court's dismissal of the plaintiffs' class-of-one claim for the plaintiffs' failure to "specifically allege that the sheriff treated them differently from similarly situated landowners" by refusing to "enforce the restraining orders" against the defendants); Jennings v. City of Stillwater, 383 F.3d 1199, 1213 (10th Cir. 2004)(upholding summary judgment in favor of defendants on the plaintiff's class-of-one

equal-protection claim, noting that "she failed to make an adequate showing that similarly situated individuals were treated differently")).

The Tenth Circuit has adhered to the proposition that, at the summary judgment stage, class-based disparate-treatment discrimination claims are subject to the same legal analysis whether based on an equal-protection violation or Title VII violation.   See e.g., Etsitty v. Utah Transit Auth., 502 F.3d at 1227 ("In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII.")(quoting Maldonado v. City of Altus, 433 F.3d at 1307).   Showing disparate treatment of similarly situated individuals, while necessary for class-of-one claims and claims where the plaintiff is not a protected-class member, and while sufficient evidence of discrimination to meet the McDonnell Douglas Corp. v. Green class-based prima facie case, is not necessary for class-based equal protection claims.   See Sorbo v. United Parcel Serv., 432 F.3d at 1173 (noting that the McDonnell Douglass Cor. v. Green class-based prima facie case requirement that the adverse action be taken in circumstances giving rise to an inference of discrimination "may be (and often is) satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case").   Accordingly, it is also not necessary, for a plaintiff in a protected class pleading a class-based equal protection claim, to allege that similarly situated individuals were treated differently.

## LAW REGARDING THE NMHRA

The NMHRA makes it an unlawful discriminatory practice for

an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age; or, if the employer has fifteen or more employees, to discriminate against an employee based upon the employee's sexual orientation or gender identity[.]

N.M.S.A. 1978, § 28-1-7A.   The NMHRA allows individuals to bring a lawsuit in the appropriate district court after exhausting their administrative remedies.   See Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994).   The NMHRA provides:

A person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the [New Mexico Human Rights] commission's order.

N.M.S.A. 1978, § 28-1-13A.   Cf. Bates v. N.M. Corr. Dep't, No. CIV 08-1013, 2010 WL 4339367, at *7 (D.N.M. Sept. 30, 2010)(Browning, J.)("NMHRA claims must be administratively exhausted before being brought in federal court.").

The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green "[w]hen considering a violation of the NMHRA." Juneau v. Intel Corp., 139 N.M. 12, 15, 127 P.3d 548, 551 (2005). The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA. Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." Ocana v. Am. Furniture Co.,

2004--NMSC-018, ¶ 23, 135 N.M. 539, 91 P.3d 58 (internal quotation marks omitted)(citations omitted).

While New Mexico uses federal law to interpret the NMHRA, there may be two ways in which the NMHRA is broader than federal law.   First, as this Court has previously acknowledged, the Supreme Court of New Mexico allows for personal liability under the NMHRA.   See Duprey v. Twelfth Judicial Dist. Court, No. 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28, 2009)(Browning, J.). The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer."   N.M.S.A. 1978, § 28-1-2B.   While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA."   Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 130 N.M. 238, 22 P.3d 1188.   In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that employees cannot sue the owner of a corporation in the owner's individual capacity under the NMHRA.   See 2001-NMSC-015, ¶ 13, 130 N.M. 238, 22 P.3d 1188.   Although it held that the defendant could not be held personally liable, given that the plaintiff had failed to exhaust administrative remedies, the Supreme Court of New Mexico declined to close the door on individual liability under the NMHRA.   See 2001-NMSC-015, ¶ 13, 130 N.M. 238, 22 P.3d 1188.   The Supreme Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for discrimination claims.   Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994)(affirming the dismissal of individual defendants because the plaintiff failed to exhaust administrative remedies against them); Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski). As Plaintiff suggests, the potential for individual liability for discrimination claims is rooted in the language of the NMHRA itself, which forbids "any person" from supporting a discriminatory practice.   Section 28-1-7(i); see N.M.S.A. 1978, §

28-1-2(A) (1993) (including within its definition of "person" for purposes of the NMHRA, "one or more individuals").

2001-NMSC-015, ¶ 12, 130 N.M. 238, 22 P.3d 1188.   Second, the language of "serious medical condition" in the NMHRA, N.M.S.A. 1978, § 28-1-7, may be broader in scope than the term disability in the ADA.   See Clayton v. Pioneer Bank, No. 07-0680, 2008 WL 5787472, at **17-18 (D.N.M. Dec. 31, 2008)(Browning, J.)(recognizing that, although "the terms 'medical condition' under the NMHRA, and 'disability,' under the ADA, may be interchangeable in some cases[,]" they may not be the same in others).

## LAW REGARDING ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."   U.S. Const. amend. XI.   The Supreme Court has construed the immunity articulated in the Eleventh Amendment to prohibit federal courts from entertaining suits against states brought by their own citizens or citizens of another state without their consent.   See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990).   State agencies and state officials are likewise provided immunity as "an arm of the state."   Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 280-81 (1977).

Exceptions to a state's Eleventh Amendment immunity are few.   A state may, however, voluntarily waive its immunity.   See Edelman v. Jordan, 415 U.S. 651, 673 (1974).   Congress may also abrogate Eleventh Amendment immunity pursuant to section 5 of the Fourteenth Amendment to the Constitution of the United States, where the statute explicitly manifests

Congress' intent to do so.   See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).   Congress did not, however, abrogate Eleventh Amendment immunity when enacting 42 U.S.C. § 1983.   See Quern v. Jordan, 440 U.S. 332, 340 (1979).   Consequently, Eleventh Amendment immunity extends to defendants under that statute, and claims pursuant thereto in the federal courts are barred as a matter of law.

Although not properly characterized as an exception to a state's Eleventh Amendment immunity, the doctrine announced in Ex parte Young, 209 U.S. 123 (1908),  allows for suits against state officials under certain circumstances.   See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d 602, 607-08 (10th Cir. 1998)("The Ex parte Young doctrine is not actually an exception to Eleventh Amendment state immunity because it applies only when the lawsuit involves an action against state officials, not against the state.").   In Ex parte Young, the Supreme Court held that the Eleventh Amendment bar generally does not apply to state officials defending suit in federal court which seeks only prospective relief from violations of federal law. The Ex parte Young doctrine allows suit to proceed against defendant state officials if the following requirements are met: (i) the plaintiffs are suing state officials rather the state itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the state treasury; and (iv) the suit does not implicate special sovereignty interests.   See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609 (10th Cir. 1998).

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent

unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity."  N.M.S.A. 1978, § 41-4-2(A).  The New Mexico Legislature also recognized that "the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done." N.M.S.A. 1978, § 41-4-2(A).   As a result, the New Mexico Legislature declared that New Mexico public policy rendered governmental entities and public employees liable only within the NMTCA's limitations and in accordance with the principles which that act establishes.  See N.M.S.A. 1978, § 41-4-2(A).  The NMTCA is the only remedy against a governmental entity or public employee for any tort for which the NMTCA waives immunity.  See N.M.S.A. 1978, § 41-4-17(A).   "[N]o other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against a public employee or his estate whose act or omission gave rise to the suit or claim."  N.M.S.A. 1978, § 41-4-17(A).   A plaintiff may not sue a governmental entity of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions listed in the NMTCA.   See Begay v. New Mexico, 104 N.M. 483, 486, 723 P.2d 252, 255 (Ct. App. 1985)("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (1986).

The NMTCA is based on traditional tort concepts of duty and a reasonably prudent person's standard of care while performing that duty.  See N.M.S.A. 1978, § 41-4-2(B).  The NMTCA's § 41-4-6 exempts from immunity "liability damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting

within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."   N.M.S.A. 1978, § 41-4-6.   This exception balances the principle that "government should not have the duty to do everything that might be done," with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care."   Cabos v. Doña Ana Cnty. Hous. Auth., 1998-NMSC-049, ¶ 6, 126 N.M. 418, 970 P.2d 1143 (citations omitted)(internal quotation marks omitted).   To resolve the tension between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general immunity from tort liability . . . [and] waive[s] that immunity in certain defined circumstances." Cabos v. Doña Ana Cnty. Hous. Auth., 1998-NMSC-049, ¶ 6, 126 N.M. 418, 970 P.2d 1143.   The Supreme Court of New Mexico has explained that "the liability envisioned by [§ 41-4-6] is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal."   Cabos v. Doña Ana Cnty. Hous. Auth., 1998-NMSC-049, ¶ 9, 126 N.M. 418, 970 P.2d 1143.   Section 41-4-6 "contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government."   Bober v. N.M. State Fair, 111 N.M. 644, 653, 808 P.2d 614, 623 (1991)(citations omitted)(internal quotation marks omitted).   New Mexico courts have found that the waiver of immunity in § 41-4-6 does not extend to negligent supervision, see Pemberton v. Cordova, 105 N.M. 476, 478, 734 P.2d 254, 256 (Ct. App. 1987)(holding that the NMTCA did not waive the school board's immunity under the NMTCA where there was a claim only of negligent supervision and when a fight between students, not a physical defect of the premises, caused the injury), negligent design, see Rivera v.

King, 108 N.M. 5, 12, 765 P.2d 1187, 1184 (Ct. App. 1988), or negligent inspection, see Martinez v. Kaune, 106 N.M. 489, 491-92, 745 P.2d 714, 716-17 (Ct. App. 1987).   The Supreme Court of New Mexico, in Bober v. N.M. State Fair, declined to restrict liability under § 41-4-6 to injuries which resulted from a premises' physical defect, as the Court of Appeals of New Mexico did in Pemberton v. Cordova.   See Bober v. N.M. State Fair, 111 N.M. at 652-53, 808 P.2d at 622-23. For the waiver to apply, the negligent operation or maintenance must create a dangerous condition that threatens the general public or a class of building users, and must not just be a claim of negligent supervision, as the claims were in Pemberton v. Cordova.   See Espinoza v. Town of Taos, 120 N.M. 680, 683, 905 P.2d 718, 721 (Ct. App. 1995).   The Supreme Court of New Mexico has held that a school district's "failure to follow safety policies in place for all at-risk students appears to fall comfortably within the Section 41-4-6 waiver for 'operation or maintenance' of a public building."   See Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 13, 140 N.M. 205, 141 P.3d 1259 (finding that "a school simply cannot operate in a safe, reasonable, and prudent manner without affording, at the very least, the health and safety services that students have been promised, and upon which parents have relied").

In Leithead v. City of Santa Fe, 1997-NMCA-041, 123 N.M. 353, 940 P.2d 459, parents sued the City of Santa Fe on behalf of their daughter when she nearly drowned in a city pool.   See 1997-NMCA-041, ¶ 4, 123 N.M. 353, 940 P.2d 459.   Lifeguards failed to ask for children's ages and heights, even though regulations at the pool required adult supervision for children younger than seven and shorter than forty-eight inches.   See 1997-NMCA-041, ¶ 2, 123 N.M. 353, 940 P.2d 459.   The Court of Appeals of New Mexico held that the "Plaintiffs' complaint was not

restricted to a claim of negligent supervision," and found that the plaintiffs' complaint "correctly argue[d] that when City lifeguards did not adequately perform duties that were essential to public safety, they negligently underlined(operated) the swimming pool and thereby created a condition on the premises that was dangerous to [the child] and the general public."   1997-NMCA-041, ¶ 8, 123 N.M. 353, 940 P.2d 459 (emphasis added).

The Supreme Court of New Mexico, in Upton v. Clovis Mun. Sch. Dist., held that "'a claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created by Section 41-4-6.'"   2006-NMSC-040, ¶ 16, 140 N.M. 205, 141 P.3d 1259 (quoting Leithead v. City of Santa Fe, 1997-NMCA-041, ¶ 8, 123 N.M. 353, 940 P.2d 459).   In Upton v. Clovis Mun. Sch. Dist., the plaintiffs -- the parents of a deceased student, who collapsed and died from an asthma attack after a substitute physical education teacher required her to continue exercising -- appealed from the district court's grant of summary judgment in the school's favor.   See 2006-NMSC-040, ¶ 6, 140 N.M. 205, 141 P.3d 1259.   The Supreme Court of New Mexico held that, "[i]f the only alleged misconduct toward Sarah had been the substitute P.E. teacher failing to watch her while she participated in physical exercise, the Upton's claim . . . would be practically identical to the single claim of negligent supervision we found inadequate in Espinoza."   2006-NMSC-040, ¶ 21, 140 N.M. 205, 141 P.3d 1259.   It found, however, that the school's conduct went beyond negligent supervision, because: (i) the school ignored information that the plaintiffs provided them; (ii) the school failed to warn the substitute teacher about the student's condition; and (iii) the school failed to follow through with the proper emergency procedures.   See 2006-NMSC-040, ¶¶ 21-22, 140 N.M. 205, 141 P.3d 1259.   "These actions and

- 83 -

omissions combined to create the dangerous conditions, placing Sarah in a far worse position than reasonable and expected risks of [school] life."   2006-NMSC-040, ¶ 21, 140 N.M. 205, 141 P.3d 1259 (internal quotation marks omitted)(alteration in original).   The Supreme Court of New Mexico also held that, "[s]imilar to Leithead, the School District's alleged failure to follow procedures established for at-risk students appears to fall comfortably within the Section 41-4-6 waiver for operation or maintenance of a public building."   2006-NMSC-040, ¶ 13, 140 N.M. 205, 141 P.3d 1259. (internal quotation marks omitted)(emphasis added).   It noted that "the reference to the 'general public' . . . does not mean a condition that must be dangerous to the entire public, but rather, at least potentially, to the particular class of people that use the building or facility in question."   Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040, ¶ 23, 140 N.M. 205, 141 P.3d 1259. (citing Espinoza v. Town of Taos, 120 N.M. at 683, 905 P.2d at 721)(internal quotation marks omitted).   Although only one child died in Upton v. Clovis Mun. Sch. Dist., the school's failures created a dangerous condition for "all special-needs children, and with regard to emergency responsiveness, for every student at the school."   2006-NMSC-040, ¶ 24, 140 N.M. 205, 141 P.3d 1259.

In contrast, in Espinoza v. Town of Taos, the Supreme Court of New Mexico held that NMTCA immunity was not waived where a plaintiff's allegations concerned an inadequate number of day-camp personnel supervising children at a city playground.   See 120 N.M. at 684, 905 P.2d at 722.   It noted that the playground itself was safe, there were no gangs threatening the children, no roaming dogs, no influx of traffic, and no improperly maintained equipment.   See 120 N.M. at 684, 905 P.2d at 722.   It found that the Town of Taos did not waive immunity,

because it was the day-camp undertaking that gave rise to a duty of care to the children, and not the existence of the playground itself.   See 120 N.M. at 684, 905 P.2d at 722.

Additionally, in Archibeque v. Moya, the Supreme Court of New Mexico found no waiver of immunity under § 41-4-6.   See 116 N.M. 616, 866 P.2d 344 (1993).   There, an inmate at the Central New Mexico Correctional Facility was transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico.   See 116 N.M. at 618, 866 P.2d at 346.   Before he was released into the prison's general population, Archibeque informed a prison intake officer that another prisoner was an enemy of his.   See 116 N.M. at 618, 866 P.2d at 346.   Nevertheless, the plaintiff was released into the general population, and the other prisoner assaulted him that night.   See 116 N.M. at 618, 866 P.2d at 346.   Archibeque sued the intake officer, other corrections officers, and the New Mexico Department of Corrections in federal court for violations of 42 U.S.C. § 1983 and the NMTCA.   See 116 N.M. at 618, 866 P.2d at 346.   The Supreme Court of New Mexico found that the misclassification was a discrete administrative decision which did not waive immunity.   See Archibeque v. Moya, 116 N.M. at 619, 866 P.2d at 348.   Furthermore, the Supreme Court of New Mexico explained that, while the misclassification put Archibeque at risk, "[t]he negligence did not create an unsafe condition on the prison premises as to the general prison population" and that "[r]eading Section 41-4-6 to waive immunity every time a public employee's negligence creates a risk of harm for a single individual would subvert the purpose of the Tort Claims Act."   116 N.M. at 620, 866 P.2d at 348.   The Honorable Richard E. Ransom, Chief Justice of the Supreme Court of New Mexico, further opined, in his concurring opinion, that an inmate's classification did not change a condition of the premises and that the plaintiff's injury arose from the classification itself.

- 85 -

See 116 N.M. at 622, 866 P.2d at 350 (Ransom, C.J., concurring).

In Lymon v. Aramark Corp. the plaintiff alleged that the defendant "negligently misclassified him for work in the prison kitchen contrary to his medically ordered restriction prohibiting heavy lifting." 728 F. Supp. 2d at 1266. This Court, following Chief Justice Ransom's concurrence in Archibeque v. Moya, held that the plaintiff's allegations that other inmates had been misclassified were insufficient to waive immunity under § 41-4-6. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. It stated that, to fall within Chief Justice Ransom's concurrence, a misclassification "must raise security risks, not health risks." 728 F. Supp. 2d at 1266. The Court found that the plaintiff's "threadbare allegations" that other inmates were misclassified did not rise "to the level of a dangerous condition on the premises of the penitentiary," because no other inmate was alleged to have been injured as a result of misclassification. 728 F. Supp. 2d at 1267 (internal quotation marks omitted).

The Court has also addressed waiver of NMTCA immunity in several other opinions. In Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d 1145 (D.N.M. 2011)(Browning, J.), the Court held that immunity was not waived under § 41-4-6 for the plaintiffs ingress and egress from a waste transfer facility, because, although New Mexico is liberal in protecting people traveling on public land, such a duty would be without limits. See 805 F. Supp. 2d at 1177. The Court found that the plaintiff's injuries, in that case, did not arise from an unsafe, dangerous, or defective condition of the defendant's property. See Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d at 1182. In Trujillo v. Salazar, No. CIV 04-0689 JB/WDS (D.N.M. Mar. 1, 2006)(Browning, J.), the Court found that immunity was not waived

- 86 -

under § 41-4-6, because "the gravamen of the negligent operation claim against Salazar was not

that Salazar himself ha[d] committed negligence by showing up to work every day, but that

CNMCF negligently operated the facility by allowing Salazar to continue working at the facility."

2006 WL 1228827, at *9 (emphasis omitted).   The Court further held that, "[t]o the extent that

Trujillo may be arguing that Salazar negligently operated CNMCF by carrying on his employment

at CNMCF after the first two alleged incidents, his decision to persist in his job was not a condition

on the premises."   Trujillo v. Salazar, 2006 WL 1228827, at *9.

## NEW MEXICO LAW REGARDING BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The general rule in New Mexico "'is that an employment contract is for an indefinite

period and is terminable at the will of either party unless the contract is supported by consideration

beyond the performance of duties and payment of wages or there is an express contractual

provision stating otherwise.'"   Chaara v. Intel Corp., No. CIV 05-0278 JB/RLP, 2006 WL

4079031, at *9 (D.N.M. May 31, 2006)(Browning, J.), aff'd, 245 F. App'x 784 (10th Cir.

2007)(quoting Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)).

"Breach of contract is a question of fact . . . ."   Collado v. City of Albuquerque, 2002-NMCA-048,

¶ 15, 132 N.M. 133, 45 P.3d 73.   Interpretation of an unambiguous contract, on the other hand, is

a question of law.   See Campbell v. Millennium Ventures, LLC, 2002-NMCA-101, ¶ 15, 132

N.M. 733, 55 P.3d 429 ("'Interpretation of an unambiguous contract is a question of law which we

review de novo.'")(quoting Nearburg v. Yates Petroleum Corp., 1997-NMCA-069, ¶ 7, 123 N.M.

526, 943 P.2d 560).   New Mexico courts "consider the documents as a whole to determine how

they should be interpreted," and "can consider the circumstances surrounding the creation of the

contract as well as the contract itself." <u>Campbell v. Millennium Ventures, LLC,</u> 2002-NMCA-101, ¶ 15, 132 N.M. 733, 55 P.3d 429 (citing <u>Nearburg v. Yates Petroleum Corp.,</u> 1997-NMCA-069, ¶ 7, 123 N.M. 526, 943 P.2d 560; <u>Ponder v. State Farm Mut. Auto. Ins. Co.,</u> 2000-NMSC-033, ¶ 13, 129 N.M. 698, 12 P.3d 960).

"Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract." <u>WXI/Z Sw. Malls v. Mueller,</u> 2005-NMCA-046, ¶ 25, 137 N.M. 343, 110 P.3d 1080. "[T]he implied covenant of good faith and fair dealing requires only that neither party injure the rights of the other party to receive the benefit of their agreement." <u>Smoot v. Physicians Life Ins. Co.,</u> 2004-NMCA-027 ¶ 13, 135 N.M. 265, 87 P.3d 545. A cause of action for breach of an implied covenant of good faith and fair dealing cannot prevail without showing that "a party seeks to prevent the contract's performance or to withhold its benefits from the other party." <u>Azar v. Prudential Ins. Co. of Am.,</u> 2003-NMCA-062, ¶ 51, 133 N.M. 669, 68 P.3d 909. <u>See</u> <u>Brock v. Presbyterian Healthcare Servs., Inc.</u> 220 F. App'x. 842, 846 (10th Cir. 2007)(unpublished). "[T]he implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship." <u>Azar v. Prudential Ins. Co. of Am.,</u> 2003-NMCA-062, ¶ 53, 133 N.M. 669, 68 P.3d 909. Moreover, "[t]he breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." <u>WXI/Z Sw. Malls v. Mueller,</u> 2005-NMCA-046, ¶ 25, 137 N.M. 343, 110 P.3d 1080.

> The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract.

Planning and Design Solutions v. City of Santa Fe, 118 N.M. 707, 714, 885 P.2d 628, 635 (1994).

## ANALYSIS

The Plaintiffs' claims fall into two general categories: the federal claims against the CCSD and the individual Defendants, and the state law claims against some or all of the Defendants.   As a preliminary matter, the Court concludes that the CCSD is a proper party, and will not dismiss any claims against the CCSD or require the Plaintiffs to amend their Complaint to allege their claims against the CCSD School Board.   Second, the Court concludes that there are no plausible disability claims alleged in the Complaint in any form, nor does any disability underlie any of the Plaintiffs' causes of action.   Third, the FMLA permits the CCSD, in accordance with its policies, to require the Plaintiffs to take their paid leave concurrently with their FMLA leave.

The Plaintiffs assert three federal claims, alleging that: (i) pursuant to 42 U.S.C. § 1983, the CCSD violated their constitutional right to equal protection; (ii) pursuant to 42 U.S.C. § 1985(3), the Defendants engaged in a conspiracy to deprive them of their constitutional rights; and (iii) the CCSD, Levinski, Marquez, and Frazzini violated Title VII by engaging in disparate treatment and retaliation of the Plaintiffs, creating a hostile work environment, constructively terminating the Plaintiffs, and by restructuring the CCSD, as it had a disparate impact on Anglos and Mormons. The Court concludes that the Plaintiffs plausibly state that the CCSD is liable under § 1983 for demoting them because of their Mormon religion.   Similarly, the Court concludes that the § 1985(3) claim against all Defendants based on discrimination is also plausible.   The Title VII claim is also plausible, but only to the extent that the Plaintiffs assert it against the CCSD and only on the disparate-treatment discrimination basis because of their Mormon religion.

The Plaintiffs assert seven state law counts against the Defendants. The Court will dismiss three of these state law claims -- the tortious-interference claim, the common-law-conspiracy claim, and the negligent-building-operation claim -- because they sound in tort and, based on the Plaintiffs' allegations, the State of New Mexico has not waived tort immunity for these claims. The Court will also dismiss the FATA claim in Count V, because the Plaintiffs' allegations do not plausibly show that FATA entitles them to relief. The Court will allow the Plaintiffs' NMHRA claim, like their Title VII, to proceed only on the disparate-treatment discrimination basis.

## I.    THE CCSD IS A PROPER PARTY.

The Defendants assert: "CCSD is not a proper party. Rather, the local school board should be named as the defendant[] party." Motion to Dismiss at 1 n.1 (citing N.M.S.A. 1978, § 22-5-4(E)). The Plaintiffs contend that "nothing about N.M.S.A. § 1978, § 22-5-4(E) reflects any limitation upon suing a New Mexico School District directly, it merely gives local Boards of Education the ability to sue or be sued." Response at 9. The Plaintiffs add that "[t]he statute has never been utilized in a recorded case to defeat any suit against an involved district directly, and Michie's Statutes Annotated contains as many cases against Districts directly as against School Boards." Response at 9 (citing Williams v. Cent. Consol. Sch. Dist., 1998-NMCA-006, 124 N.M. 488, 952 P.2d 978; Cent. Consol. Sch. Dist., No. 22 v. N.M. Envtl. Dep't, 123 N.M. at 386). The Court agrees with the Plaintiffs. Because New Mexico school districts are political subdivisions of the state, which may be sued in some circumstances, the CCSD may be subject to suit.

The parties do not cite, and the Court in its research could not find, a case deciding whether

a New Mexico school district may sue or be sued. Section 22-5-4(E) of the New Mexico Statutes Annotated provides that a local school board has the "capacity to sue and be sued." N.M.S.A. § 1978, § 22-5-4(E). This section is silent, however, about school districts, and their ability to sue or be sued. Section 22-1-2 of the New Mexico Statutes Annotated defines both "local school board" and "school district": "'[L]ocal school board' means the policy-setting body of a school district; . . . 'school district' means an area of land established as a political subdivision of the state for the administration of public schools and segregated geographically for taxation and bonding purposes . . . ." N.M.S.A. § 22-1-2. Although nowhere in the New Mexico Public School Act did the New Mexico Legislature provide explicitly for school districts' ability to sue or be sued, it also did not prohibit school districts' ability to sue or be sued. Indeed, the New Mexico Constitution specifically provides that a "judgment rendered against . . . any . . . school district or board of education" is to be paid out of "the proceeds of a tax levy." N.M. Const. art. VIII, § 7. This provision's plain language contemplates that a party may sue either the school district or the district's board.

Although a state and its political subdivisions are generally immune from liability in civil suits that private parties bring, see, e.g., Pub. Emps. Retirement Ass'n of N.M. v. Clearland Sec., No. CIV 11-0931 JB/WDS, 2012 WL 2574819, at *19 (D.N.M. June 29, 2012)("The federal courts have broadly construed the Eleventh Amendment to render states immune from suits that private parties bring in federal court.")(citing Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996)), the State of New Mexico has waived its sovereign immunity in these suits for limited purposes, such as particular tort suits, see C.H. v. Los Lunas Sch. Bd. of Educ., 852 F. Supp. 2d at

1351 (recognizing that "the New Mexico Legislature declared that New Mexico public policy rendered governmental entities and public employees liable only within the NMTCA's limitations and in accordance with the principles established in that act")(citing N.M.S.A. 1978, § 41-4-2(A)). In the NMTCA, the Legislature waived sovereign immunity for "governmental entities." N.M.S.A. 1978, § 41-4-2(A).   The NMTCA defines a "'governmental entity,'" as "the state or any local public body," N.M.S.A. 1978, § 41-4-3(B), and provides that "'local public body' means all political subdivisions of the state and their agencies," N.M.S.A. 1978, § 41-4-3(C).   Thus, the NMTCA provides limited immunity waivers, which allow private parties to sue, among others, "political subdivisions of the state."   N.M.S.A. 1978, § 41-4-3(C).   Because the Legislature defines "school district" in the New Mexico Statutes Annotated as "a political subdivision of the state," N.M.S.A. § 22-1-2, the Court concludes that New Mexico school districts, just like any other of the state's political subdivisions, are subject to a private party's lawsuit to the same extent as that to which the law subjects other New Mexico political subdivisions.   See Montell v. Orndorff, 67 N.M. 156, 166, 353 P.2d 680, 686 (1960)("Unless there is some controlling consideration otherwise, we must assume that the legislature chose its words carefully to say exactly what it meant, and to accomplish the ends desired by it.").   Cf. Corley v. United States, 556 U.S. 303, 314 (2009)("'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'")(quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004)); TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001)("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or

insignificant.'")(quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001)).

While the Defendants' argument -- that allowing school district's to be subject to lawsuits would make the Legislature's providing for school boards' ability to sue or be sued superfluous, given that the school board acts for the school district -- is compelling, it can be explained by Eleventh Amendment jurisprudence.   The Tenth Circuit has recognized that "Eleventh Amendment immunity . . . 'extends only to the states and governmental entities that are arms of the state.'"   <u>Duke v. Grady Mun. Sch.</u>, 127 F.3d 972, 974 (10th Cir. 1997)(quoting <u>Watson v. Univ. of Utah Med. Ctr.</u>, 75 F.3d 569, 574 (10th Cir. 1996)).   While the question whether a school district or school board is an arm of the state "must . . . be determined in each case on the basis of the individual state laws involved," <u>Duke v. Grady Mun. Sch.</u>, 127 F.3d at 975 (internal quotations omitted), the Supreme Court has noted that one factor important for determining whether an entity is an arm of the state is whether the entity "may sue or be sued," <u>Moor v. Alameda Cnty.</u>, 411 U.S. 693, 719 (1973). <u>See</u> <u>Cowles v. Mercer Cnty.</u>, 74 U.S. 118, 120 (1868).   The New Mexico Legislature in providing that school boards can sue or be sued was likely exercising "its power to create and establish a corporate body with such powers and liabilities as it chooses to give," including the "right . . . to sue or be sued."   <u>Cowles v. Mercer Cnty.</u>, 74 U.S. at 120. Nevertheless, whether school districts are also political subdivisions, as opposed to arms of the state, must be answered separately.   <u>See</u> <u>Duke v. Grady Mun. Sch.</u>, 127 F.3d at 975 ("[W]hile we have noted that most courts considering the issue since <u>Mount Healthy[ City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977) ]have held that local school districts <u>or</u> boards are not entitled to Eleventh Amendment immunity, the question must nonetheless 'be determined in each

- 93 -

case on the basis of the individual state laws involved.'" (emphasis added))(quoting Ambus v. Granite Bd. of Educ., 995 F.2d 992, 994 (10th Cir. 1993)(en banc)).   Because a school district is a "political subdivision of the state," N.M.S.A. 1978, § 22-1-2(R), and because the New Mexico Constitution contemplates that judgment may be entered against school districts, the Court concludes that school districts, like the state's other political subdivisions -- including School Boards -- are subject to suit under New Mexico law where the New Mexico Legislature has waived sovereign immunity.   Accord Duke v. Grady Mun. Sch., 127 F.3d at 981 ("[W]e hold that school districts and their governing boards in New Mexico are not arms of the state, and they are accordingly not shielded by the Eleventh Amendment from liability for a § 1983 action in federal court." (emphasis added)); Daddow v. Carlsbad Mun. Sch. Dist., 120 N.M. 97, 105, 898 P.2d 1235, 1243 (1995)("Our analysis of the three Mt. Healthy factors leads to the conclusion that New Mexico school districts and their boards are political subdivisions and not 'arms of the state.'"). The Court therefore concludes that CCSD is a proper party in the case.

## II.   THERE ARE NO DISABILITY CLAIMS IN THIS COMPLAINT.

Hunt alleges, in paragraphs 24 and 25 of the Complaint, that on September 15, 2011, he informed CCSD that he was entitled to "reasonable accommodation," and on October 20, 2011, wrote again, asking that a reasonable accommodation negotiation be held.   Complaint ¶¶ 24-25, at 15-16.   Nowhere in the Complaint, however, do the Plaintiffs reference or cite the ADA, or reference the NMHRA in relation to any disability.   At the Court's hearing on the Motion to Dismiss, the Plaintiffs clarified that they do not have any claim under the ADA or for disability discrimination under the NMHRA, but rather intend to use the Defendants' failure to provide Hunt

reasonable accommodation as evidence of the Defendants' discrimination pattern.  See Tr. at 70:10-25 (Court, Geran).   The Court therefore concludes that there are no disability claims in the Complaint.

### III.   THE CCSD HAD THE RIGHT TO REQUIRE THE PLAINTIFFS TO TAKE PAID SICK LEAVE CONCURRENTLY WITH THE FMLA LEAVE.

The Defendants point out that the Plaintiffs complain throughout their Complaint that the CCSD required the Plaintiffs "to go out on [FMLA] . . . leave, at the same time as [they were] using [their] accrued sick leave."   Complaint ¶ 21, at 15.  See Complaint ¶ 33, at 20-21.   The Defendants assert that "[a]n employer may require an employee to take FMLA leave concurrently with accrued sick leave."   Motion to Dismiss at 34 n.23 (citing 29 C.F.R. § 825.207(a)).   The Plaintiffs contend that "29 C.F.R. § 825.207(a) does not allow employers to require FMLA and accrued paid leave to be taken concurrently.   Instead, . . . . it limits those circumstances to employee requests for concurrent leave . . . and to those situations where the employer requires it." Response at 17.   They assert: "There is no policy that provides that CCSD or its employees may require paid leave and FMLA run concurrently."   Response at 18.   The Court disagrees.   The CCSD School Board's policies, which are central to the Plaintiffs' claims, require that FMLA and sick leave run concurrently.

The FMLA provides that an employer subject to FMLA has two leave policy options when an employee has both paid leave and unpaid FMLA leave: "[T]he employer may either permit the employee to use his FMLA leave and paid sick leave sequentially, or the employer may require that the employee use his FMLA leave entitlement and his paid sick leave concurrently." Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1205 (11th Cir.

2001). The United States Court of Appeals for the Sixth Circuit has recognized that 29 C.F.R. §

825.207(a) allows employers to run paid leave and FMLA concurrently:

> The FMLA regulations clarify an employee's rights and responsibilities under the Act, including an allowance for employers to run paid leave programs concurrent with unpaid FMLA leave:
>
>> Generally, FMLA leave is unpaid leave.  However, under the circumstances described in this section, FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave.  If an employee does not choose to substitute accrued paid leave, the employer may require the employee to substitute accrued paid leave for unpaid FMLA leave.  The term "substitute" means that the paid leave provided by the employer, and accrued pursuant to established policies of the employer, will run concurrently with the unpaid leave.  Accordingly, the employee receives pay pursuant to the employer's applicable paid leave policy during the period of otherwise unpaid FMLA leave. An employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employers [sic] normal leave policy. When an employee chooses, or an employer requires, substitution of accrued paid leave, the employer must inform the employee that the employee must satisfy any procedural requirements of the paid leave policy only in connection with the receipt of such payment. See § 825.300(c).  If an employee does not comply with the additional requirements in an employer's paid leave policy, the employee is not entitled to substitute accrued paid leave, but the employee remains entitled to take unpaid FMLA leave.  Employers may not discriminate against employees on FMLA leave in the administration of their paid leave policies.
>
> 29 C.F.R. § 825.207(a) (emphasis added). This Court, albeit in an unpublished opinion, recognized that § 825.207(a) allows employers to run paid leave and unpaid FMLA leave concurrently.  See Hicks v. Leroy's Jewelers, Inc., 2000 WL 1033029, *4 (6th Cir. July 17, 2000)(". . . the regulations clearly provide that an employee's FMLA leave may run concurrently with paid medical or sick leave").

Allen v. Butler Cnty. Comm'rs, 331 F. App'x 389, 393 (6th Cir. 2009)(emphasis in original).

The Plaintiffs refer the Court to the Complaint's paragraph 41, in which the Plaintiffs lay out a factual allegation about the CCSD's leave policy.   See Response at 17-18.   In paragraph 41, the Plaintiffs reference the CCSD Board Policy G-2900, stating: "G-2900 provides the ability for special arrangements to be made where support staff personnel can take up to one year off without pay, even when the employee has no accrued sick leave or vacation remaining."   Complaint ¶ 41, at 25.   The Defendants point out that the CCSD Board Policy G-2900 is a much more extensive policy, and provides, among other things, that "[a]n employee's accrued sick, vacation, personal, or other applicable leave shall run concurrently with FMLA leave."   CCSD School District Policy G-2900 at 4, filed October 12, 2012 (Doc. 27-4).

"A court must convert a motion to dismiss into a motion for summary judgment if 'matters outside the pleading are presented to and not excluded by the court,' and '[a]ll parties are given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" Sawyer v. USAA Ins. Co., No. CIV 11-0523 JB/CG, 2012 WL 6005766, at *10 (D.N.M. Nov. 9, 2012)(Browning, J.)(quoting Fed. R. Civ. P. 12(d)).   See GFF Corp. v. Assoc.'d Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)(same).   Although the procedural posture here is a motion to dismiss, not a motion for summary judgment, without converting the motion to one for summary judgment, the Court may consider additional documents, including any attachments to the Complaint, see Oxendine v. Kaplan, 241 F.3d 1272, 1275 (10th Cir. 2001)("[I]n deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may look both to the complaint itself and to any documents attached as exhibits to the complaint.")(citing Fed. R. Civ. P. 10(c)), documents incorporated into the Complaint by reference, and any document which "is referred to in the

complaint and is central the . . . claim," <u>Duncan v. Citibank (South Dakota), N.A.</u>, No. CIV 06-246 JB/KBM, 2006 WL 4063023, at *2 (D.N.M. June 30, 2006)(Browning, J.)(citing <u>GFF Corp. v. Assoc.'d Wholesale Grocers, Inc.</u>, 130 F.3d at 1384).   The Tenth Circuit has noted: "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied."   <u>GFF Corp. v. Assoc.'d Wholesale Grocers, Inc.</u>, 130 F.3d at 1385.   The Plaintiffs' note in the Complaint that their employment "contracts explicitly make CCSD's policy manual part of the involved contract." Complaint ¶ 38, at 23.   And while they attach and include "by reference" the "involved CCSD School Board Policies," they do not attach them all.   Complaint ¶ 38, at 23.   Nevertheless, as evidenced by the Plaintiffs' discussion in the Complaint of the CCSD School Board Policies, spanning over five pages, they are central the Plaintiffs' claims -- both to their federal claims relying in part on the FMLA allegations and on the state claims relying on the Plaintiffs' employment contracts.   The Court may thus consider the Defendants' copy of the CCSD School Board Policy G-2900.   <u>See</u> <u>GFF Corp. v. Assoc.'d Wholesale Grocers, Inc.</u>, 130 F.3d at 1384 ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an . . .   authentic copy to the court to be considered on a motion to dismiss.").

The Plaintiffs have not argued or asserted that the Defendants' copy of the CCSD School Board Policy G-2900 is not authentic, or argued that the Sixth Circuit's explanation of the FMLA in <u>Allen v. Butler Cnty. Comm'rs</u> is not the law in the Tenth Circuit.   The Court agrees with the Sixth Circuit's construction of 29 C.F.R. § 825.207(a) and the FMLA generally.   An employer

may run paid sick leave and FMLA leave concurrently, as long as the employer provides the employee adequate notice of its policy to do so.

Whereas the Tenth Circuit reasoned in GFF Corp. v. Assoc.'d Wholesale Grocers, Inc. that to not allow a district court to consider a document referenced in plaintiff's complaint and central to the plaintiff's claim would allow "a plaintiff with a deficient claim . . . [to] survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied," given that the Plaintiffs rely heavily on the CCSD School District's policies, and rely specifically on Policy G-2900, to only consider the portion of the policy upon which the Plaintiffs relied, would not further the policy underlying converting a motion to dismiss to a summary judgment motion. GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d at 1385.   See id. ("When a complaint refers to a document and the document is central to the plaintiff's claim, the plaintiff is obviously on notice of the document's contents, and this rationale for conversion to summary judgment dissipates.").   Thus, given that the CCSD Board Policy G-2900 provides CCSD employees notice that the CCSD requires FMLA leave and sick leave to run concurrently, and given that this accords with FMLA law, the Court concludes that the Defendants' "citation to E.E.O.C. regulation is []accurate," Response at 17, and that this requirement was "part of the involved contract at Paragraph 2 of each contract," Complaint ¶ 38, at 23.   The Defendants did not, therefore, violate the FMLA by requiring the Plaintiffs to use their paid sick leave and the FMLA leave concurrently.

## IV.   THE COURT WILL NOT DISMISS ALL THE FEDERAL CLAIMS.

The Plaintiffs attempt to assert three federal claims, alleging that: (i) the CCSD, Levinski,

Marquez, and Frazzini violated Title VII by engaging in disparate treatment of and retaliating against the Plaintiffs, creating a hostile work environment and constructively terminating the Plaintiffs, and by restructuring the CCSD, as it disparately impacted Mormons and Anglos; (ii) the CCSD violated their constitutional right to equal protection, protected under 42 U.S.C. § 1983; and (iii) the Defendants engaged in a conspiracy to deprive them of their constitutional rights under 42 U.S.C. § 1985(3).   The Court concludes that the Plaintiffs' Complaint makes plausible the Title VII disparate-treatment discrimination claim and their § 1983 claim against the CCSD, as well as the § 1985(3) claim against all Defendants, based on their Mormon religion.

A.   **THE PLAINTIFFS' COMPLAINT STATES A PLAUSIBLE CLAIM FOR DISPARATE TREATMENT IN VIOLATION OF TITLE VII AGAINST THE CCSD BASED ON THE PLAINTIFFS' MORMON RELIGION.**

The Plaintiffs' allege Title VII claims against the CCSD, Levinski, Marquez, and Frazzini, based on "Disparate Impact and Treatment Discrimination, Retaliation, Hostile Work Environment and Constructive Discharge."   Complaint at 43.   The Defendants assert that the individual Defendants should be dismissed from Count X, because they are not an employer for Title VII purposes.   See Motion to Dismiss at 17.   The Defendants argue that the allegations fail to state a disparate-impact or disparate-treatment claim, because the Plaintiffs "offer no factual allegations showing that they were treated differently."   Motion to Dismiss at 19.   In relation to the hostile work environment and constructive-discharge claims, the Defendants argue that the Complaint falls short of plausibly alleging that any harassment was "pervasive or severe" enough to state a claim under either theory.   Motion to Dismiss at 20.   The Defendants assert that the Plaintiffs' have no grounds on which to assert a retaliation claim, because the alleged protected

activity took place after the Defendants' alleged retaliatory acts.   First, the Court finds that Levinski, Marquez, and Frazzini are not individually liable under Title VII, and dismisses Count X to the extent the Plaintiffs assert it against them in their individual capacities.   Second, the Court concludes that Plaintiffs' Complaint plausibly states a disparate-treatment discrimination claim based on the Plaintiffs' Mormon religion only.   The Court will, however, grant the Plaintiffs leave to amend their Complaint to allege more factual allegations to support a disparate-treatment discrimination claim based on the Plaintiffs' Anglo race.   Third, the Court concludes that the Complaint fails to provide sufficient information from which the Court can plausibly infer that the Plaintiffs state a disparate-impact discrimination claim.   The Court will also grant the Plaintiffs leave to amend the allegations underlying their disparate impact claims.   Fourth, the Complaint's factual allegations fail to state a claim for hostile work environment or constructive termination, because the factual allegations do not show that discriminatory intimidation, ridicule, or insult permeated the Plaintiffs' workplace.   Finally, the Plaintiffs cannot make out a Title VII retaliation claim as a matter of law, because the alleged retaliation took place before any alleged protected activities.   So the Title VII claim will go forward only against CCSD on the basis of disparate-treatment discrimination because of the Plaintiffs' Religion.

### 1.    The Plaintiffs Cannot Hold Levinski, Marquez, and Frazzini Liable Under Title VII in Their Individual Capacities.

Title VII makes it unlawful for an employer or employer's agent "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   While an individual employee "who serves

in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment," may qualify as an employer for Title VII purposes, because "the individual operates as the alter ego of the employer," a plaintiff can only sue that individual in his or her official capacity.   Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996)(quoting Sauers v. Salt Lake Cnty., 1 F.3d 1122 (10th Cir.1993))(internal quotations omitted).   As the Tenth Circuit has noted, "personal capacity suits against individual supervisors are inappropriate under Title VII." Haynes v. Williams, 88 F.3d at 901.   Thus, "[u]nder long-standing Tenth Circuit precedent, supervisors and other employees may not be held personally liable under Title VII."   Campos v. Las Cruces Nursing Ctr., 828 F. Supp. 2d 1256, 1268 (D.N.M. 2011)(Browning, J.) (quoting Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1083 n.1 (10th Cir. 2007)(internal quotations and alterations omitted)).   See Gerald v. Locksley, 849 F. Supp. 2d at 1223 ("'The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act..'")(quoting Busby v. City of Orlando, 931 F. 2d 764, 772 (11th Cir. 1991)). Accordingly, because individual capacity suits are inappropriate under Title VII, the Court will dismiss Count X against Levinski, Marquez, and Frazzini in their individual capacities with prejudice.

### 2.   The Complaint States a Plausible Claim for Disparate-Treatment Discrimination Based on the Plaintiffs' Mormon Religion.

"[T]he 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint."   Khalik v. United Air Lines, 671 F.3d at 1192 (citing Swierkiewicz v. Sorema N.A., 534 U.S 506, 515 (2002)).   Nevertheless, the Tenth Circuit has recognized that the McDonnell Douglas Corp. v. Green prima facie case "elements of each alleged cause of action help to

determine whether Plaintiff has set forth a plausible claim."   Khalik v. United Air Lines, 671 F.3d at 1192.   "[G]eneral assertions of discrimination . . . without any details whatsoever of events leading up to [the adverse employment action], are insufficient to survive a motion to dismiss." Khalik v. United Air Lines, 671 F.3d at 1193.   "While 'specific facts are not necessary,' some facts are."   Khalik v. United Air Lines, 671 F.3d at 1193 (alteration omitted)(quoting Erickson v. Pardus, 551 U.S. 89, 93 (2007)(citing Bell Atl. v. Twombly, 550 U.S. at 555)).

The elements that a plaintiff alleging a disparate-treatment discrimination claim under Title VII must prove at trial are that the employer intentionally discriminated against them because of their protected status.   In other words, a plaintiff must allege that the plaintiff's protected status was a determinative factor in the adverse employment action.   Cf. Khalik v. United Air Lines, 671 F.3d at 1192 (noting that, to win a disparate-treatment discrimination claim, the plaintiff's final burden under "the burden-shifting framework of McDonnell Douglas" is to show that the plaintiff's "protected status was a determinative factor in the employment decision or that the employer's explanation is pretext"); Third Circuit Model Civil Jury Instructions § 5.1.2, at 15 (2012 ed.)(stating that the plaintiff must prove by a preponderance of the evidence that the "[Defendant] . . . [demoted [plaintiff]] . . .; and . . . [Plaintiff's] [protected status] was a determinative factor in [defendant's] decision"); Ninth Circuit Model Civil Jury Instructions § 10.1C (2012)(stating that the plaintiff must prove by a preponderance of the evidence that "1. the plaintiff was . . . [demoted][*state other adverse action*] by the defendant; and 2. The plaintiff's [[race] . . . [religion] . . .] was a motivating factor in the defendant's decision . . . .").   Given that the Plaintiffs need not establish a prima facie case of discrimination in their Complaint, the

Plaintiffs need only plead sufficient background facts to make plausible that the CCSD took an adverse employment action against the Plaintiffs, and that the Plaintiffs' Anglo or Mormon status was a determinative factor in the decision to take the action.   The Court concludes that the Plaintiffs Complaint makes plausible that the CCSD took an adverse employment action against them, and that their Mormon religion was the determinative factor behind the CCSD's action. The Complaint fails, however, to allege sufficient background facts to make plausible that their Anglo race was the determinative factor.   Because the Court believes that the Complaint's failure in relation to the Anglo basis of the claim was technical error, the Court will grant the Plaintiffs leave to amend.

> **a.      The Complaint Makes Plausible that the CCSD Subjected the Plaintiffs to an Adverse Employment Action.**

The Plaintiffs do not articulate a particular underlying adverse employment action in the Complaint, such as demotion or termination, to which they allege they were subjected.   The Plaintiffs rather complain that the CCSD's discriminatory conduct stems from their reassignment, which was part of a CCSD restructuring, in which ten Director positions were downgraded to coordinators, and in which the Plaintiffs were downgraded to a worker and a clerk position.   See Complaint ¶ 18, 31, at 13, 20.   The Defendants contend that, because the Plaintiffs were reassigned as part of a district-wide restructuring and were promised that they would be paid according to their existing contracts, the Plaintiffs were not demoted, terminated, or subjected to immediate monetary losses, and there was no adverse employment action.   The Court concludes that the Plaintiffs' reassignments, which significantly changed their job titles and responsibilities, and also promised future salary cuts, were adverse employment actions.

The Tenth Circuit broadly construes an adverse employment action.  An adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 64.  "'Reassignment of job duties is not automatically actionable.' . . .  An adverse employment action is a 'significant change in employment status, such as a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  Daniels v. United Parcel Serv., Inc., 701 F.3d 620, 635 (10th Cir. 2012)(emphasis in original)(quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 71; Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007)).  See Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 ("We construe the phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of wages or benefits.'")(quoting Annett v. Univ. of Kan., 371 F.3d at 1239).  As the Tenth Circuit has stated:

> Such actions are not simply limited to monetary losses in the form of wages or benefits.  Instead, we take a case-by-case approach; examining the unique factors relevant to the situation at hand.  Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action.

Sanchez v. Denver Pub. Sch., 164 F.3d at 532 (internal quotation marks and citations omitted).

Trivial losses or harms will not suffice for an adverse employment action.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms.").  Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although "a mere inconvenience or an alteration of job

responsibilities will not suffice."   Annett v. Univ. of Kan., 371 F.3d at 1239 (internal quotation marks and citation omitted).

The Tenth Circuit has held that reassigning an employee from a "cover shift," meaning that she filled in for absences or vacancies during the defendant company's three different shifts, to a permanent night shift, was not an adverse employment action for Title VII purposes, because the plaintiff's "job classification did not change . . . nor was her salary decreased," and she did not "introduce any evidence showing the dispatch duties differed significantly" from her previous position.   Daniels v. United Parcel Serv., Inc., 701 F.3d at 636.   The Tenth Circuit noted that the plaintiff proved the night shift was a less desirable shift than the day or the twilight shift, but concluded that was not sufficient to find that the reassignment was an adverse employment action. See 701 F.3d at 635-36.   In Jones v. Oklahoma City Pub. Sch., on the other hand, the Tenth Circuit held that a reassignment from director of curriculum and instruction within a school district to an elementary school principal, along with a "$17,000 decrease in salary" to take place one year following a teacher's reassignment, the "lost professional prestige," and falling to "a lower position in the district's organizational hierarchy," constituted an adverse employment action even though the teacher was not technically demoted.   617 F.3d at 1279-80.

The Plaintiffs complain here that their reassignment into new positions changed their titles, changed significantly their job responsibilities, and promised future monetary losses in the form of pay cuts.   The Plaintiffs allege that a "known practice or pattern of Anglo and Mormon discrimination" led to "the demotion of Plaintiff Hunt and Plaintiff Ulibarri (which were included under the mass demotion, but were significantly unjustified by the mass demotion)."   Complaint ¶

14, at 11.   As to Hunt, the Plaintiffs allege that, in July 2011, he was demoted, given a job with different -- and dangerous -- responsibilities, and told that he faced a $50,000.00 pay cut upon renewal of his contract for the 2012-2013 school year.   See Complaint ¶¶ 16-17, 20, at 12-14. The Plaintiffs allege that Ulibarri, in July 2011, was demoted, offered only temporary positions until October, 2011, when she was provided a job with different responsibilities, and was told that she would face a $30,000.00 pay cut when her contract was renewed for the 2012-2013 school year.   See Complaint ¶¶ 29-30, 34, at 19, 21.

The Plaintiffs' changes in titles, changes in job responsibilities, and the promise that CCSD would reduce their salaries dramatically, makes plausible that they were subject to an adverse employment action.    The Supreme Court recently pointed out that Title VII violations involve "'a tangible employment action, . . . such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 75-76 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).   Along these lines, the Tenth Circuit in Daniels v. United Parcel Serv., Inc. held that a reassignment to a less favorable night shift, without any proof of a significant change in job responsibilities, and no change in job classification or salary, did not constitute an adverse employment action.    Here, on the other hand, just like the Tenth Circuit held that plaintiff reassigned from a district-wide director of curriculum and instruction to principal at one school, with a promised future salary loss was subjected to an adverse employment action in Jones v. v. Oklahoma City Pub. Sch., both Plaintiffs' responsibilities differ significantly from their old assignments, and the CCSD promised future salary loss at the end of their current contract.

Hunt was given significantly different responsibilities when the CCSD demoted him from Transportation Director, where he "supervised the bus and transportation needs . . . including maintenance of the District's approximately 130 vehicles," and reassigned him to "Grounds Maintenance Worker," where he was given much less responsibility.   Complaint ¶¶ 19-20, at 13-14.   Importantly, the CCSD changed even more significantly Ulibarri's job responsibilities with the July 2011 restructuring: they did not give her any new permanent job for months. Moreover, when the CCSD provided her a new job in October, 2011, she had gone from the supervisor role as Custodial Supervisor to a clerical position: "Payroll and Housing Clerk." Complaint ¶ 24, at 21.   The CCSD's reclassification of Hunt and Ulibarri thus affected their conditions of employment.   The reclassification also resulted in monetary losses in the form of salary cuts.   As to Hunt, his terms and conditions of employment changed substantially, as his duties and responsibilities went from supervisory to labor intensive, and he was promised a substantial $50,000.00 per-year cut, although the cut would come only after his current contract ended.   Similarly, Ulibarri's terms and conditions of employment changed substantially, as she was initially without a permanent position, and then reassigned as a clerk, and she, like Hunt, was promised a $30,000.00 per year cut in salary at the end of her current contract.   Given the Supreme Court's guidance that an adverse employment action "is not limited to discriminatory actions that affect the terms and conditions of employment," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 64, and the contrast of the facts the Plaintiffs allege here with those of Daniels v. United Parcel Serv., Inc., the Plaintiffs' reassignments were adverse employment actions. Moreover, the Tenth Circuit's recognition in Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ. that

adverse employment action should be construed "liberally and . . . not limit[ed] . . . to 'monetary losses in the form of wages or benefits,'" 595 F.3d at 1133, counsels that the Plaintiffs' reassignments, in which they were promised future monetary losses in wages, is sufficient to find an adverse employment action.

The Defendants contend that the Plaintiffs' salary loss at the end of their contract is prospective, and should not play into the Court's calculus whether there was an adverse employment action.   The Tenth Circuit has foreclosed the Defendants' position.   Two years ago, in Jones v. Oklahoma City Pub. Sch., the Tenth Circuit held that a teacher's reassignment with a "$17,000 decrease in salary" to take place one year following a teacher's reassignment constituted an adverse employment action notwithstanding that the teacher was not demoted.   617 F.3d at 1279-80.   The Tenth Circuit relied on the fact that "Jones' reassignment letter specifically stated that her salary level would remain the same for the ensuing school year only, and Jones suffered a $17,000 decrease in salary the following year."   617 F.3d at 1279.   While there may be situations in which a later monetary loss should not weigh into the calculus whether an employer's action was an adverse employment action, both the time and future loss were definite under the allegations here.   The Plaintiffs' future loss was not merely a possibility or even a probability; it was a sure thing.   And the future loss was not small.   The CCSD told the Plaintiffs that they would lose a specific, and large, amount of their salary at the end of their current contract -- within a year.   Construing the well-pled factual allegations in the Plaintiffs' favor, and "examining the unique factors relevant to the situation at hand," Sanchez v. Denver Pub. Sch., 164 F.3d at 532, in July 2011, the CCSD's decision resulted in a substantial change to the Plaintiffs' job

responsibilities, a substantial change in their titles -- from director and supervisor to "worker" and "clerk" -- and a substantial monetary loss going forward.   The CCSD's decision thus subjected the Plaintiffs to adverse employment actions.

> **b.** **The Court will Dismiss the Plaintiffs' Title VII Disparate-Treatment Discrimination Claims to the Extent that They are Based on Discrimination Against Anglos Without Prejudice for Failure to State a Claim, Because the Plaintiffs do not Provide Circumstances to Make Plausible that the CCSD is an <u>Employer That Would Discriminate Against Anglos</u>.**

The Defendants suggest that there is a question whether "Anglos (presumably meaning non-Hispanic Caucasians) are a protected class," for purposes of the Plaintiffs' § 1983, § 1985(3), and Title VII claims.   Motion to Dismiss at 15.   Anglos are a historically favored group and are not a protected group for purposes of disparate-treatment discrimination cases.   <u>See</u> <u>Notari v. Denver Water Dep't</u>, 971 F.2d 585, 588-89 (10th Cir. 1992)(holding that a white male is not in a "protected class" for purposes of his discrimination claim, because a white male is not "'a member of an historically favored group'")(quoting <u>Livingston v. Roadway Express Inc.</u>, 802 F.2d 1250, 1252 (10th Cir. 1986)).   That the Plaintiffs' are not members of a protected class for race discrimination purposes does not, however, end the inquiry whether they can state a discrimination claim, because Title VII, and by analogy § 1983 or § 1985(3) in the equal protection context, "proscribe racial discrimination . . . against whites on the same terms as racial discrimination against nonwhites."   <u>McDonald v. Santa Fe. Trail Transp. Co.</u>, 427 U.S. at 279-80.

In reverse discrimination disparate treatment cases, for the first <u>McDonnell Douglas Corp. v. Green</u> prima facie case element at summary judgment -- that the plaintiff is a member of a protected class -- the Tenth Circuit substitutes the requirement that the plaintiff provide facts to

support an inference that "the defendant is one of those unusual employers who discriminates against the majority."   Notari v. Denver Water Dept., 971 F.2d 585, 589 (10th Cir. 1992).   See Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1149 (10th Cir. 2008)("When plaintiff is a member of a historically favored group . . . an inference of invidious intent is warranted only when 'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'")(quoting Notari v. Denver Water Dep't, 971 F.2d at 589).   While the Court recognizes that the Plaintiffs need not establish a prima facie case to overcome the Defendants' Motion to Dismiss the disparate-treatment claim, given the Tenth Circuit's recent guidance that the "elements of [the] alleged cause of action help to determine whether Plaintiff has set forth a plausible claim," Khalik v. United Air Lines, 671 F.3d at 1192, some additional factual background making plausible that the CCSD is an employer that discriminates against the traditional majority Anglo race is required here.   The Plaintiffs' Complaint, to state a plausible claim for disparate-treatment discrimination based on the Plaintiffs' racial status as Anglos, must therefore provide some "'background circumstances [to] support the suspicion that the [CCSD] is that unusual employer who discriminates against the majority.'" Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d at 1149 (quoting Notari v. Denver Water Dep't, 971 F.2d at 589).

The Complaint does not provide the required background circumstances.   The Plaintiffs' single factual allegation about the CCSD provides no circumstances from which the Court may gain insight why the CCSD would want to discriminate against the majority:

> The Defendant Central Consolidated School District (hereinafter "CCSD"), is an independent government agency with its principal place of business in San

Juan County, State of New Mexico, operating with independent judgment, employees and management, and the regulatory control of the Public Education Department.  CCSD is tasked with providing government-funded schooling for the citizens of San Juan County, and is elected by the voters of that County.   CCSD employs over 1100 employees, and engages in business throughout and beyond the borders of the State of New Mexico.

Complaint ¶ 3, at 2.   Even though the Plaintiffs need not plead a prima facie case of disparate-treatment discrimination, the Plaintiffs' non-conclusory factual allegations do not provide enough background explanation for the Court to infer the required circumstances.

The Plaintiffs also allege that, out of ten demoted directors, eight of those -- eighty percent -- were Anglo.   See Complaint ¶¶ 18, 31, at 13, 20.   While this number in the abstract may seem large enough to infer that it was plausibly a CCSD policy to discriminate against Anglos, the problem with the Plaintiffs' alleged numbers is that there is point of comparison about how these numbers stack up against the larger pool of   CCSD directors, supervisors, managers, the CCSD's employee pool generally, or the demographics of the CCSD's geographical boundaries.   And these numbers mean nothing without some point of comparison.   For example, if ninety percent of the CCSD's employee population, or ninety percent of the CCSD's managers and supervisors, are Anglo, that eighty percent of those demoted are Anglo does not lead to an inference of intentional discrimination against Anglos.   This problem -- the problem with alleging disparate treatment based on a demographic which is in the majority in the United States of America -- explains at least in part why, when a plaintiff outside of any protected class wants to prove disparate treatment, the plaintiff must show "'background circumstances [which] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d at 1149.   The Supreme Court has

made plain that "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557).   The percentage of Anglo Directors reassigned, with no comparison to the general demographics of the public at large, or, here, the CCSD Directors, may be as consistent with a reassignment targeted at restructuring the director positions -- the class of which was eighty percent Anglo -- as with a reassignment targeted at removing Anglos and Mormons specifically from the director positions. Without this background information why the CCSD is an unusual employer that would discriminate against Anglos, the Plaintiffs' general assertions of the CCSD's "unofficial, but well-known practice or pattern of Anglo . . . discrimination" behind the Plaintiffs' reassignments, Complaint ¶ 14, at 10-11, are insufficient to survive a motion to dismiss.   See Khalik v. United Air Lines, 671 F.3d at 1193 ("Plaintiff's general assertions of discrimination and retaliation, without any details whatsoever of events leading up to her termination, are insufficient to survive a motion to dismiss. While '[s]pecific facts are not necessary,' some facts are.")(quoting Erickson v. Pardus, 551 U.S. at 93 (citing Bell Atl. v. Twombly, 550 U.S. at 555)).   The Court therefore concludes that the Complaint fails to allege sufficient factual allegations to make plausible that discrimination against Anglos was the moving force behind the Plaintiffs' reassignments.

Nevertheless, the Court believes it possible that the lack of background information was an oversight, and that the Plaintiffs can fix this error if provided the opportunity.   The Court's belief that the Plaintiffs' failure to plead this background information in the Complaint is an oversight is founded on how easily the parties supplied -- uncontested -- the background information at the

hearing.   The Plaintiffs made plain enough in oral argument that they are alleging that the CCSD's discrimination against Anglos stems from the background demographics of the CCSD as a Native American majority school district: "I understand the idea of Native American self-governments.   It doesn't apply to public schools using New Mexico state funds, however." Tr. at 10:1-3 (Geran).   But for some reason, they did not plainly state this theory anywhere in their Complaint.

During oral argument on the Motion to Dismiss, the Defendants found no trouble supplying background information from which a district court may be able to infer that the CCSD is a unique employer who may choose to discriminate against Anglos, pointing out that the CCSD's boundaries in New Mexico cover a diverse population, including Indian reservation land, and that Tso's election to the CCSD School Board made the board a majority Navajo.   See Tr. at 4:1-12 (German).   Moreover, in a quick internet query, the Court was able to find that, during the 2007-2008 school year, "[t]he racial makeup of the district was 89.22% Native American [and] 8.29% White."   Central Consolidated Schools, Wikipedia.org, https://en.wikipedia.org/wiki/ Central_Consolidated_Schools (last visited June 4, 2013).   Although notice pleading may not require pleading facts this specific, the Plaintiffs' Complaint wholly omits any facts about the CCSD's demographics being a majority Native American.   If the Plaintiffs plead the facts in the last two paragraphs, it will provide enough information to state the necessary background facts from which a reasonable person could infer that the CCSD may be the unique employer who would discriminate against Anglos.   The Court will therefore dismiss the Plaintiffs' §§ 1983 and 1985(3) disparate-treatment discrimination claims to the extent they are based on Anglo

discrimination without prejudice to the Plaintiffs' amendment of the claims, and provide the Plaintiffs leave to amend their Complaint on this ground.   See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)("We reiterate that the district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim.").

> **c.   The Court will Not Dismiss the Plaintiffs' Title VII Disparate Treatment Discrimination Claims to the Extent that They are Based on Discrimination Against Mormons, Because the Plaintiffs Provide Circumstances to Make Plausible that the Plaintiffs' Mormon Religion was a Determinative Factor in the CCSD's Adverse Actions.**

The Plaintiffs' disparate-treatment discrimination claim based on their Mormon status is on a separate footing.   The Defendants do not dispute that the Mormon religion is a protected class and not a historically-favored class.   The Plaintiffs, to state a claim for disparate treatment discrimination based on the Mormon religion, therefore, as compared to discrimination against Anglos, are not subjected to the additional need to provide background information about the CCSD.

The Tenth Circuit has noted that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context.'"   Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011).   In the employment discrimination context, "because in employment discrimination cases where the employers are large corporations, the employee may not know who actually fired her or for what reason," allegations in this context need not be as specific.   Khalik v. United Air Lines, 671 F.3d at 1190 (quoting).   The Complaint, however, needs "at least some relevant information to make the claims plausible on their face."   Khalik v. United Air Lines, 671

F.3d at 1190.  Although the Plaintiffs need not plead a prima facie case of discrimination, the Tenth Circuit has noted that the elements are a good reference point in analyzing whether a claim is plausible on its face.  See Khalik v. United Air Lines, 671 F.3d at 1192 ("While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements . . . help to determine whether Plaintiff has set forth a plausible claim.").   Given the Plaintiffs' status in a protected group as Mormons, and given the Court's conclusion that the Defendants' actions in the restructuring were, as pled, adverse employment actions, the Plaintiffs need to provide only "some facts" from which the Court can plausibly infer that the challenged adverse action took place under circumstances giving rise to an inference of discrimination. Khalik v. United Air Lines, 671 F.3d at 1193.   Cf. E.E.O.C. v. PVNF, L.L.C., 487 F.3d at 800 ("[A] prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.").

The Complaint provides sufficient relevant factual allegations about Mormon-based discrimination related to the Defendants, and circumstances around the CCSD's restructuring, to make plausible that the adverse action took place under circumstances giving rise to an inference of discrimination against Mormons.   First, the Plaintiffs allege that Tso, the CCSD School Board President, and Nicolay, at least, were involved in the hate-speech blogging "denouncing 'Mormon Devils' and 'Mormon Thieves,'" and which predicted that "Mormon administrators were being reassigned to positions 'less damaging,'" which, the Plaintiffs allege, "cannot be blamed on change."  Complaint ¶ 43, at 27.   Second, even if these incidences alone may not give rise to the

inference that the Plaintiffs' Mormon religion was a determinative factor in the CCSD's decision to reassign the Plaintiffs, the Plaintiffs provide details about events leading up to the restructuring, where they allege that the CCSD "chose this restructuring (demotion of Directors and Assistant Superintendents) specifically because of its disparate impact," and explain that "[t]he demotion of all senior supervisors of an agency is a radical and unusual action, and no studies of other methods of cost-cutting were conducted by Defendants, nor were studies of other structural changes conducted by Defendants."   Complaint ¶ 38, at 23.   Thus, whereas the Tenth Circuit noted in Khalik v. United Air Lines, that "general assertions of discrimination . . . , without any details whatsoever of events leading up to [the adverse action], are insufficient to survive a motion to dismiss," the Plaintiffs provide the requisite details.

The disparity between the plaintiff's complaint that the Tenth Circuit held failed to state a claim under rule 12(b)(6) in Khalik v. United Air Lines and Plaintiffs' Complaint also supports finding that the Plaintiffs plead adequate factual information.   The Tenth Circuit noted in Khalik v. United Air Lines that "assertions of discrimination . . . without any details whatsoever of events leading up to" the alleged adverse employment action "are insufficient to survive a motion to dismiss" and, accordingly, upheld the complaint's dismissal where "[t]here [we]re no facts relating to the alleged discrimination."   671 F.3d at 1193.   The plaintiff, an Islamic Arab-American woman born in Kuwait to Palestinian parents, alleged that she was "targeted because of her race, religion, national origin, and ethnic heritage," and "was subjected to a false investigation and false criticism," and "termination."   671 F.3d at 1189-91.   The only factual, non-conclusory allegations provided no details about events leading up to the alleged

discrimination which might lead to an inference that the investigation, criticism, or termination were in some way linked to a discriminatory motive:

> Striking th[e] conclusory allegations leaves us with the following facts, which we take as true: (1) Plaintiff is an Arab–American who was born in Kuwait; (2) Plaintiff's religion is Islam; (3) Plaintiff performed her job well; (4) Plaintiff was grabbed by the arm in the office; (5) Plaintiff complained internally about discrimination; (6) Plaintiff also complained internally about being denied FMLA leave; (7) Plaintiff complained about an email that described a criminal act; and (8) Defendant terminated Plaintiff's employment position.

Khalik v. United Air Lines, 671 F.3d at 1193-94 (citing Ashcroft v. Iqbal, 556 U.S. at 680-82). The Plaintiffs' Complaint, spanning forty-five pages with 109 individually numbered paragraphs, and factual allegations about hate-speech blog comments about Mormons, in which the Complaint alleges two of the individual Defendants participated -- one of whom was a CCSD Board member -- is not a complaint providing no facts related to the alleged discrimination. Rather, the Plaintiffs' Complaint provides "at least some relevant information to make the claims plausible on their face." Khalik v. United Air Lines, 671 F.3d at 1190. The Court therefore concludes that the Plaintiffs allege a plausible disparate-treatment discrimination claim against the CCSD based on their Mormon status.

### 3. The Court will Dismiss Without Prejudice the Plaintiffs' Disparate-Impact Discrimination Claims.

The Plaintiffs allege that "[t]he aforementioned actions of the Defendant CCSD and its employees constitute unlawful disparate treatment and impact discrimination on the basis of Mormon religion and Anglo race . . . in violation of Title VII, as amended." Complaint ¶ 105, at 44. The Defendants respond that the Complaint's allegations are insufficient to support a disparate impact claim "on either religion or race," because the Plaintiffs do not provide sufficient

- 118 -

facts about the affected individuals or individuals who were not reassigned.   Motion to Dismiss at 19-20.   The Court agrees with the Defendants that the allegations as they stand now are insufficient to state a facially plausible disparate impact claim.

The Plaintiffs fail to provide sufficient factual information about their statistical evidence to eliminate nondiscriminatory explanations for the disparity.   The Plaintiffs allege that the restructuring had a disparate impact, because "[t]he involved ten director positions were held by four Anglo Mormons and one Native American Mormon.   Four other positions downgraded were held by non-Mormon Anglos.   The final position was held by a Hispanic, non-Mormon." Complaint ¶ 18, 31, at 13, 20.   Whereas the Court has noted that "statistical evidence . . . may be diluted by factors such as an inadequate sample size and failure to consider similarly situated individuals," Ram v. N.M. Dep't of Env't, 2006 WL 4079623, at *9, the Plaintiffs' inconsistencies throughout their pleadings about who was affected by the restructuring undercuts the Court's ability to know the sample size or reasonably infer who may be similarly situated individuals. First, presenting the statistical evidence, the Plaintiffs allege that "ten Director positions were downgraded."   Complaint ¶ 18, 31, at 13, 20.   Earlier in the Complaint, however, in paragraph 14, the Plaintiffs allege that the "mass demotion" affected "most Department directors." Complaint ¶ 14, at 11 (emphasis added).   And then they later allege that the restructuring was "a . . . reorganization that demoted all Directors to Coordinators." Complaint ¶ 30, at 19 (emphasis added).   Given these inconsistencies, the Court cannot discern from the Plaintiffs' allegations whether the statistics relate to the "proper population," as the Court cannot understand whether the Plaintiffs are alleging that, as a result of the alleged discriminatory employment practice, all or

some directors were reassigned, or whether all or some supervisors were reassigned.   Carpenter v. Boeing Co., 456 F.3d at 1196 ("The statistics must . . . relate to the proper population.   For example, when the claim is disparate impact in hiring, the statistics should be based on data with respect to persons qualified for the job.").

Moreover, although Plaintiffs allege that the other five directors were non-Anglo, they do not allege that they were also of a different religion.   If, for example, the "non-Mormon Anglos" and the "Hispanic non-Mormon" Complaint ¶ 18, 31, at 13, 20, were all Presbyterian, then the impact on the Mormon Directors would not have been any greater than the impact on the Presbyterian Directors.   Absent this information, the Plaintiffs do not demonstrate the disparity between the Plaintiffs' Mormon religion, which they allege the restructuring disparately impacted, and other religions.   Cf. Tabor v. Hilti, Inc., 703 F.3d 1222 (noting that two of the elements for a prima facie case of disparate impact against women are "(1) the size of the disparity between male and female promotions;" and "(2) the statistical significance of the disparity").   With regard to disparate impact on Anglos, the Plaintiffs allege only that eight Anglos were demoted.   While this seventy-five percent disparity between Anglos and non-Anglos appears significant, the failure to allege any other information about other individuals, and the inconsistencies about whether all or some directors or supervisors were demoted, takes away any statistical significance.   If all directors were demoted, then the fact that eighty percent of those demoted were Anglo appears to be a disparate impact based on circumstances beyond the CCSD's control and not an impact cause by discrimination.   Cf. Tabor v. Hilti, Inc., 703 F.3d at 1223-24 ("An employer will not, for example, be liable for a gender imbalance in its work force that 'is due to a dearth of qualified

[female] applicants (for reasons that are not [the employer's] fault)'")(quoting Wards Cove Packing Co. v. Atonio, 490 U.S. at 651). Without this factual information in the Complaint, the Plaintiffs' allegations do not make facially plausible either their race-based or religion-based disparate impact claims. Because the Plaintiffs may be able to provide this information, however, the Court will dismiss the Plaintiffs' disparate-impact discrimination claims without prejudice to them clarifying which CCSD employees were affected and supplying the additional background information about the other employees' religion and race.

### 4.    The Complaint Fails to State a Claim for Hostile Work Environment or Constructive Discharge.

"To establish a prima facie case of hostile work environment harassment, a plaintiff must show that 'under the totality of circumstances (i) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (ii) the harassment was racial or stemmed from racial animus." Gerald v. Locksley, 785 F. Supp. 2d at 1098 (quoting Bloomer v. United Parcel Serv., Inc., 94 F. App'x at 825).   "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for her to continue." Creamer v. Laidlaw Transit, Inc., 86 F.3d at 170.   "[A] plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d at 1341 (internal citations and quotations omitted).

The Tenth Circuit has stated that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim. Witt

v. Roadway Express, 136 F.3d at 1432.   Moreover, the plaintiff must demonstrate that the work environment was objectively and subjectively offensive, but need "not demonstrate psychological harm, nor . . . show that her work suffered as a result of the harassment."   Walker v. United Parcel Serv. of Am., 76 F. App'x at 885.   In addition to all the circumstances, relevant considerations for determining if an environment is objectively hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. at 787-88 (quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21)(internal citations and quotations omitted).

The Plaintiffs' Complaint fails to allege factual allegations on which a "rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   Davis v. U.S. Postal Serv., 142 F.3d at 1341 (internal citations and quotations omitted).   The narrative that the Plaintiffs present in their Complaint is more one in which the restructuring and the Plaintiffs' reassignment blindsided Ulibarri and Hunt.   The Plaintiffs allege that Hunt generally had successful job performance reviews, and at the time he was "told he was being demoted because of an unspecified disciplinary issue or issues," he "had worked some 8 years without any discipline."   Complaint ¶¶ 17-18, at 12.   As to Ulibarri, the Plaintiffs similarly allege that, in her twenty-five years working for the CCSD, she "worked her way up from food service worker, and was eventually promoted to Custodial Supervisor in 2004," a position which appears to have been created for her "to provide central management of the

cleanliness and safety of the CCSD schools."   Complaint ¶ 29, at 18-19.   Both of the Complaint's

sections laying out the facts relevant to the particular Plaintiff lack any facts about discriminatory

comments, or other discriminatory harassment relating to the Plaintiffs' "race, color, religion, sex,

or national origin."   42 U.S.C. § 2000e-2(a)(1).   See Complaint ¶¶ 17-37, at 12-23.   The Tenth

Circuit has noted that a plaintiff must allege more than "'a few isolated incidents of racial enmity'

or 'sporadic racial slurs.'"   Chavez v. New Mexico, 397 F.3d at 832 (10th Cir. 2005)(quoting

Bolden v. PRC, Inc., 43 F.3d at 551). "Instead, 'there must be a steady barrage of opprobrious

racial comments.'"   Chavez v. Mexico, 397 F.3d at 832 (quoting Bolden v. PRC, Inc., 43 F.3d

at 551).   Because the Complaint's factual allegations relating to the Plaintiffs lack facts about any

such comments or incidents, the Court will dismiss the hostile work environment basis for the Title

VII claim.   Similarly, given that the Court has recognized that, without sufficient grounds to find

a hostile work environment, a constructive-termination claim also fails, the Court will also dismiss

the constructive termination basis for the Title VII claim.   See Gerald v. Locksley, 785 F. Supp.

2d at 1119 ("Because Gerald has failed to allege the requisite level of severe working conditions

required to make out a constructive termination claim, he cannot rely on such allegations to satisfy

the adverse employment action requirement."); Venezia v. Gottlieb Mem'l Hosp., Inc., 421 F.3d

468, 473 (7th Cir. 2005)("A hostile work environment can become so severe that it gives rise to a

constructive discharge, which is an adverse employment action."(citing Pa. State Police v. Suders,

542 U.S. 129, 147 n.9 (2004); EEOC v. Univ. of Chicago Hosp., 276 F.3d 326, 331 (7th Cir.

2002); Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004)).

### 5.      The Complaint Fails to State a Claim for Retaliation.

To establish a prima facie case of retaliation, a plaintiff must show that: (i) the plaintiff engaged in protected opposition to discrimination; (ii) a reasonable employee would have found the challenged action materially adverse; and (iii) a causal connection existed between the protected activity and the materially adverse action.  See Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202).

The Plaintiffs' Complaint states: "Defendants, through their agents and/or supervisors, engaged in unlawful retaliation in violation of Title VII, as amended.   The retaliation consisted of the acts specifically alleged above."   Complaint ¶ 106, at 44.   Notwithstanding how difficult the incorporation of the Complaint's preceding 105 paragraphs makes determining what the alleged retaliatory action is, the Court believes the reasonable possibilities are the reassignments, including the future salary cuts, and the Defendants' actions in relation to the FMLA and sick leave.   Regardless which action is allegedly retaliatory, the Plaintiffs' Complaint does not make plausible that "'a causal connection existed between the protected activity and the materially adverse action.'"   Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202).   The Plaintiffs engaged in the protected activity -- filing a Charge of Discrimination with the New Mexico Human Rights Bureau -- in December 2011.   See Complaint ¶¶ 26, 35, at 16, 21.   The alleged retaliatory acts, however, took place in July and August 2011.   See Complaint ¶¶ 17, 30, at 12, 19 (noting that the meetings about the Plaintiffs' reassignments took place around mid-July, 2011); id. at ¶ 34, at 21 (noting that the sick-leave-versus-FMLA-leave dispute had taken place "before the end of August 2011").   The Court therefore concludes that the Plaintiffs' Complaint, even when taken as true and with all reasonable

inferences made in the Plaintiffs' favor, cannot plausibly state a Title VII retaliation claim.   The

Court will therefore dismiss the retaliation basis for the Title VII claim.

**B.     THE COURT WILL NOT DISMISS THE § 1983 DISCRIMINATION CLAIM AGAINST THE CCSD BASED ON THE PLAINTIFFS' MORMON RELIGION, BECAUSE THE PLAINTIFFS' COMPLAINT MAKES PLAUSIBLE THAT A CCSD POLICY OR CUSTOM OF MORMON DISCRIMINATION WAS THE MOVING FORCE BEHIND THEIR REASSIGNMENTS.**

The Plaintiffs allege that "[t]he actions of CCSD were part of an informal, official custom,

policy and practice of discrimination against Mormon and Anglo supervisors," and that the

"actions . . . alleged herein constitute unlawful discrimination on the basis of race, religion, and

disability in violation of the Equal Protection Clause of the Fourteenth Amendment."   Complaint

¶¶ 58-59, at 32-33.   The Defendants argue that the Plaintiffs' allegations fail to state a claim under

§§ 1983, because the Complaint

> does not identify any unconstitutional policy or practice, contains no factual allegations that could support the conclusion that any policy or practice of discrimination existed and fails to include allegations of fact that could establish the requisite direct causal link between the unconstitutional policy or practice and any constitutional injuries suffered by Plaintiffs.

Motion to Dismiss at 10.   The Defendants additionally contend that the Court should dismiss the §

1983 claim, as the claim is wholly ambiguous, because the caption alleges that the action is against

the CCSD only, but the allegations therein refer to the "Defendants."   Motion to Dismiss at 9.

The Court concludes that, reading the Plaintiffs' well-pleaded allegations in a light most favorable

to the Plaintiffs, and making all reasonable inferences in their favor, the Plaintiffs state a plausible

equal-protection claim in violation of § 1983 against the CCSD based on their Mormon status,

because their Complaint makes plausible that a CCSD policy of discrimination against Mormons

was the moving force behind their reassignments.   The Court will thus not dismiss the Plaintiffs'

§ 1983 claims entirely.   Additionally, the failure to plead background information about the

CCSD sufficient to raise an inference that it is an employer that may, as an unofficial policy,

discriminate against Anglo supervisors appears to be largely a technical error, and the Plaintiffs

assert that they can cure this error.   The Court agrees that the Plaintiffs will probably be able to

cure this error by amending their Complaint to clarify inconsistencies and supply the additional

necessary facts.   The Court will therefore dismiss the § 1983 equal protection claims on the basis

of discrimination against Anglos without prejudice and will grant the Plaintiffs leave to amend

their Complaint.

### 1.   The Plaintiffs' § 1983 Claim is Alleged Against the CCSD Only.

In the caption of the Plaintiffs' Count III, alleging the § 1983 violation, the Plaintiffs state

that both Plaintiffs are alleging violation of "42 U.S.C. § 1983 Against the CCSD Defendant Only

(Not the Individuals)."   Complaint at 32.   Nevertheless, the Defendants argue that ambiguity

arises about whom the Plaintiffs are alleging the claim against, because the allegations in Count III

refer to the "actions of the Defendants," Complaint ¶¶ 58-59, at 32, and the Complaint's paragraph

13 states that, "[w]henever in this complaint reference is made to 'Defendants, and each of them,'

such allegation shall be deemed to mean the acts of Defendants acting individually, jointly, and/or

severally," Complaint ¶ 13, at 10.   The Defendants assert that paragraph 13 effectively makes all

references to the "Defendants" interchangeable with the individual Defendants, all of the

Defendants, and the CCSD.   Motion to Dismiss at 9.   In their Response, however, the Plaintiffs

informed the Court that they are alleging their § 1983 claim against the CCSD only: "The[]

[Plaintiffs] are looking to avoid an intervening trip to Denver on a sovereign immunity appeal with regards to the 'ambiguity' perceived by Defendants . . . .   The Section 1983 claim stated and pursued is against Defendants [sic] CCSD alone, and arises from the adoption of the motivating, clearly illegal policy."   Response at 12.   The § 1983 claim against the CCSD stands on its own, and is sufficiently pled against the CCSD without the Plaintiffs' clarification.

In Peña v. Greffet, No. CIV 12-0710 JB/WDS, 2013 WL 500211 (D.N.M. Jan. 28, 2013), the employer-defendant, Corrections Corporation of America ("CCA"), sought dismissal of a respondeat-superior claim for an alleged rape of the plaintiff, Peña, which occurred at the New Mexico Women's Correctional Facility ("NMWCF") in Grants, New Mexico, asserting that the complaint failed to provide adequate notice to CCA that Peña sought to hold the CCA liable for the alleged rape at NMWCF.   2013 WL 500211, at *55.   The Court concluded that, although Peña provided factual allegations about the alleged NMWCF rape elsewhere in the complaint, and incorporated by reference all of the complaint's factual allegations into the contested complaint, because the claim's caption specifically stated that it sought liability based upon the other two alleged rapes only, and the factual allegations within that claim referenced the other two alleged rapes only, the complaint failed to state a claim against CCA based on the alleged NMWCF rape. See 2013 WL 500211, at *55.   The Court stated:

> The title of Count V in Peña's Complaint, in which she alleges that CCA is liable for Greffet's intentional torts, alleges that she seeks to hold CCA liable for only the Albuquerque and Alamogordo rapes: "Count V -- Intentional Tort (Battery) Against Defendant Greffet for the Albuquerque and Alamogordo Rapes." Complaint at 13.   Although the first paragraph in Count V incorporates all of the above paragraphs in the Complaint, including those allegations providing the circumstances of the alleged NMWCF sexual assault, even construing the complaint in the light most favorable to Peña, the reasonable inference is that, for

some unknown reason, Peña seeks to impose vicarious liability on CCA for only the Albuquerque and Alamogordo rapes.  Moreover, the specific allegations within Count V refer only to the alleged incidents in Albuquerque and Alamogordo, and fail to mention Greffet's alleged sexual assault of Peña inside NMWCF.  See Complaint ¶ 82, at 13 ("Greffet repeatedly had sex with Plaintiff . . . in Alamogordo and Albuquerque . . . ."); id. ¶ 83, at 13 ("Greffet's rapes . . . in Alamogordo and Albuquerque constituted the intentional torts of battery and rape."); id. ¶ 86, at 14 ("Under the doctrine of 'respondeat superior,' the Corporation is legally liable for the tortious conduct of . . . Greffet.").  Although Robbins v. Oklahoma dismissed a § 1983 claim, it specifically pointed out that it was relying on the same general standard of dismissals.  See 519 F.3d at 1249 ("[W]e apply 'the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally . . . .'")(quoting Shero v. City of Grove, Okla., 510 F.3d at 1200).  Moreover, even if the dismissal standard articulated in Ashcroft v. Iqbal and Bell Atl. Corp. v. Twombly has more "bite" in qualified immunity cases than in general cases, 519 F.3d at 1249, Robbins v. Oklahoma's policy for requiring more specific pleadings so that each defendant may know the "isolate[d] . . . allegedly unconstitutional act" for which he or she is being sued, 519 F.3d at 1250, appears equally relevant in Peña's case, where she is suing multiple defendants and here is seeking to hold CCA liable for another defendant's acts.  While Peña's Complaint in Count V alleges who did what to whom in regards to Greffet's alleged Albuquerque and Alamogordo assaults, it fails to allege any such factual allegations in Count V as to the alleged NMWCF sexual assault.  Thus, like the complaint in Robbins v. Oklahoma, Count V, asserting that CCA is liable under respondeat superior, fails to isolate the alleged unconstitutional acts at NMWCF on which it seeks to hold CCA liable and "thereby does not provide adequate notice as to the nature of the claims against" CCA. 519 F.3d at 1250.  Without allegations about the events in the NMWCF, Count V does not provide adequate notice on what grounds Peña seeks to hold CCA liable.

Pena v. Greffet, 2013 WL 500211, at *55.

Whatever ambiguity may arise elsewhere in the Complaint about paragraph 13, given Count III's caption and the allegations within Count III, Count III provides reasonable notice to CCSD that the § 1983 action is alleged against CCSD only.   In Peña v. Greffet, Count V's caption provided the CCA notice that it was seeking to hold them liable only "for the Albuquerque and Alamogordo Rapes."  2013 WL 500211, at *55.  In light of this caption, "even construing the complaint in the light most favorable to Peña," and taking into consideration that preceding factual

allegations about the NMWCF were incorporated by reference into Count V, the Court concluded that "the reasonable inference is that, for some unknown reason, Peña seeks to impose vicarious liability on CCA for only the Albuquerque and Alamogordo rapes," and not for the NMWCF rapes.   2013 WL 500211, at *55.   The Court thus relied on the notice that the specific claim's caption provided to the defendant.   This reliance on the claim's caption is reasonable.   The Tenth Circuit has acknowledged that the Supreme Court's pleading standards, as articulated in Bell Atl. Corp. v. Twombly and Ashcroft v. Iqbal, are "less than pellucid."   Robbins v. Oklahoma, 519 F.3d at 1248 (citing Iqbal v. Hasty, 490 F.3d 143, 157 (2d Cir. 2007); Phillips v. Cnty. of Allegheny, 515 F.3d 224, 230-31 (3d Cir. 2008)).   Given that a plaintiff must provide in the complaint sufficient "'factual matter (taken as true) to suggest' that he or she is entitled to relief[,] . . . . 'enough [factual matter] to raise a right to relief above the speculative level,'" Robbins v. Oklahoma, 519 F.3d at 1247 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56), it is often difficult to balance giving sufficient factual matter about the circumstances involved in the case, and at the same time, "mak[ing] clear exactly who is alleged to have done what to whom," Robbins v. Oklahoma, 519 F.3d at 1250 (emphasis in original).   There is no rule that requires a plaintiff to provide headings for each of the complaint's separate counts, and the Court is not requiring that parties do so.   Cf. Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and each defense other than a denial--must be stated in a separate count or defense.").   Given, however, that the purpose of a complaint is to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and in light of the Tenth Circuit's construction of that rule, at least in the § 1983 context,

- 129 -

one reasonable way -- possibly the best way -- to make clear who is alleged to have done what to whom is to state it in each claim's heading or caption.   That approach is what the Plaintiffs have taken here by stating in Count III's heading that the claim is "Against the CCSD Defendant Only (Not the Individuals)."   Complaint at 32.

Moreover, unlike Peña v. Greffet, where "the specific allegations within Count V refer only to the alleged incidents in Albuquerque and Alamogordo, and fail to mention Greffet's alleged sexual assault of Peña inside NMWCF," 2013 WL 500211, at *55, the Plaintiffs here provide allegations about the CCSD within Count III's factual allegations.   See Complaint ¶ 58, at 32.   Mentioning the CCSD in the factual allegations and Count III's heading therefore places this case opposite Count V in Peña v. Greffet, and indeed stands as support for finding that Claim III is asserted against CCSD only.   While perhaps the Plaintiffs' "short and plain statement" in Count III's caption as to who the Plaintiffs are alleging violated the rights protected by § 1983 is not necessary to meet the rule 8's pleading requirement, and perhaps not by itself sufficient, the Plaintiffs' Count III is asserted against CCSD only and "make[s] clear exactly who is alleged to have done what to whom."   Robbins v. Oklahoma, 519 F.3d at 1250 (emphasis in original).

Finally, the claim in Count III is against the CCSD: an entity.   Entities can act only through their employee-agents.   That the allegations within Count II thus discuss the Defendants does not mean that it is against all of the Defendants or the Individual Defendants.   The allegations referring to the Defendants may be necessary to allege the claim against the CCSD, as they show the acts that the CCSD's employees took in furtherance of the CCSD's policy.

<strong>2.      The Plaintiffs' Complaint Adequately States a Claim for an Equal Protection Violation Based on the Plaintiffs' Mormon Religion,</strong>

**Because it Alleges Sufficient Factual Allegations to Make Plausible That the CCSD's Discriminatory Policy or Custom Against Mormons was the Moving Force Behind the Plaintiffs' Reassignment.**

To state an equal-protection claim against a municipality based on discrimination in the employment context, the Plaintiffs' Complaint must make plausible that (i) the CCSD's discriminatory "policy or custom" was the moving force behind (ii) the discriminatory adverse employment action or practice to which the plaintiffs were subjected, (iii) which was taken because of their protected status.   Gerald v. Locksley, 785 F. Supp. 2d at 1106 (internal quotations omitted)(quoting Lewallen v. City of Beaumont, 394 F. App'x at 42-43).   The Court concludes that, in relation to the second factor, because the Plaintiffs' § 1983 equal-protection claim is based on the same alleged factual circumstances as their Title VII claims, the analyses are parallel, and the Complaint adequately alleges that they were subjected to disparate-treatment discrimination based on their Mormon status.   The Court also concludes that the factual allegations in the Plaintiffs' Complaint make plausible that the CCSD's discriminatory policy or custom was the moving force behind the Plaintiffs' reassignments.

       a.      **An Employment Discrimination Claim, Whether Alleged to Violate Title VII or the Equal Protection Clause, is Subject to the Same Rule 12(b)(6) Analysis, and the Plaintiffs Complaint Therefore Adequately Alleges the Second Required Element -- That the Restructuring was a Discriminatory Adverse Employment Action Taken Because of The Plaintiffs' Religion.**

The elements of a plaintiff's case in disparate-treatment discrimination suits, whether based on an equal-protection violation and brought under §§ 1983 or 1985, or based on a Title VII violation, for the prima facie case at summary judgment stage, are the same.   See Etsitty v. Utah Transit Auth., 502 F.3d at 1227 ("In disparate-treatment discrimination suits, the elements of a

plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII.")(quoting Maldonado v. City of Altus, 433 F.3d at 1307); Drake v. City of Fort Collins, 927 F.2d at 1162 ("[I]n racial discrimination suits, the elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in McDonnell Douglas, whether that case is brought under §§ 1981 or 1983 or Title VII.")(citing Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1285-86 (4th Cir. 1985). The Tenth Circuit has "emphasize[d] that the basis of a § 1983 claim may be independent of Title VII even if the claims arise from the same factual allegations and even if the conduct alleged in the § 1983 claim also violates Title VII." Notari v. Denver Water Dep't, 971 F.2d at 587. Thus, when a plaintiff brings a claim under §§ 1983 or 1985 alleging that the defendant's employment discrimination violates the Equal Protection Clause, the McDonnell Douglas Corp. v. Green framework for summary judgment applies to plaintiff's case. Cf. Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989)(applying the McDonnell Douglas prima facie case framework to claims under 42 U.S.C. § 1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n.1 (1993)(assuming that "the McDonnell Douglas framework is fully applicable to racial-discrimination-in- employment claims under 42 U.S.C. § 1983."). Similarly, the same legal analysis thus applies at the rule 12(b)(6) stage to determine whether a plaintiff has sufficiently pled disparate-treatment discrimination claims under Title VII, § 1983, and § 1985.

The Plaintiffs' § 1983 and § 1985(3) claims, alleging that the Defendants discriminated against them in violation of the Equal Protection Clause, are based on the same factual circumstances underlying the alleged equal-protection violations. The Plaintiffs' § 1983 claim is premised on the theory that "[t]he actions of CCSD were part of an informal, official custom,

policy and practice of discrimination against Mormon and Anglo supervisors," and that the "actions . . . alleged herein constitute unlawful discrimination on the basis of race, religion, and disability in violation of the Equal Protection Clause of the Fourteenth Amendment."  Complaint ¶¶ 58-59, at 32-33.   Their § 1985(3) claim is also premised upon the same acts, as they allege that "[e]ach Defendant . . . participated in an agreement to eliminate Mormon and/or Anglo supervisors, and . . .[took] specific actions in furtherance of that conspiracy," which acts, they assert, "constitute unlawful discrimination on the basis of race, religion, and disability in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and in violation of Title VII of the Civil Rights Act of 1964."  Complaint ¶¶ 65-66, at 34.  Finally, the Title VII claims are based upon the allegation that "[t]he aforementioned actions of the Defendant CCSD and its employees constitute unlawful disparate treatment and disparate impact discrimination on the basis of Mormon Religion and Anglo race, creating a hostile work environment . . . . [,  and] engag[ing] in retaliation in violation of Title VII."  Complaint ¶¶ 105-106, at 44.   The Court has concluded that the Complaint makes plausible the Plaintiffs' Title VII disparate-treatment discrimination claim based on the Plaintiffs' Mormon status, but not their Anglo status.[6]   The Complaint thus also states a plausible disparate-treatment discrimination basis

---

[6] The Court concluded, in analyzing the Plaintiffs' Title VII claims, that the Plaintiffs failed to nudge their disparate-treatment discrimination claims based on the Plaintiffs' Anglo status into the plausibility realm, because they do not provide background facts from which the Court may draw an inference that the CCSD "'is that unusual employer who discriminates against the majority.'"  Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d at 1149 (quoting Notari v. Denver Water Dep't, 971 F.2d at 589).   Given that the same standards apply here to the §§ 1983 and 1985 disparate-treatment discrimination claims as apply to the Title VII claims, any amendment to the Plaintiffs' Complaint to cure their Title VII claims for Anglo-discrimination purposes will probably allow them to also state, based on their Anglo status, a plausible

for an equal-protection violation.   See Drake v. City of Fort Collins, 927 F.2d at 1162 ("[I]n . . .

discrimination suits, the elements of a plaintiff's case are the same, based on the disparate

treatment elements outlined in McDonnell Douglas, whether that case is brought under §§ 1981 or

1983 or Title VII.").   The Court therefore finds that the Plaintiffs' Complaint plausibly alleges the

second required element for an equal-protection employment-discrimination claim -- that they

were subjected to a discriminatory adverse employment action because of their religion.

The Defendants assert, however, that the Plaintiffs cannot, as a matter of law, state an

equal-protection claim, because they "fail to 'make a threshold showing that they were treated

differently from others who were similarly situated to them.'"   Motion to Dismiss at 10 (quoting

Barney v. Pulsipher, 143 F.3d at 1312).   The Plaintiffs cite to the Tenth Circuit's opinions in

Barney v. Pulsipher and Brown v. Montoya, 662 F.3d 1152 (10th Cir. 2011), in support of this

proposition.   First, in Barney v. Pulsipher, the Tenth Circuit held that, at the summary judgment

stage, "to assert a viable equal protection claim, the plaintiffs must first make a threshold showing

that they were treated differently from others who were similarly situated to them." 143 F.3d at

1312 (emphasis added).   The Court agrees that, to withstand summary judgment on their

equal-protection claims, the Plaintiffs must show that the CCSD treated them differently than

others similarly situated because of their Mormon -- or perhaps, after their amendments, Anglo --

status.   Just as the Plaintiffs need not allege a prima facie case of discrimination in their

Complaint to withstand a rule 12(b)(6) motion for failure to state a claim on their Title VII claims,

the plaintiffs need not allege everything that they will need to show to withstand summary

equal-protection claim under §§ 1983 and 1985.

judgment in the Equal Protection Clause context.  Rather, they need allege sufficient facts to make "plausible" as opposed to "possib[le]" what they will have to prove at trial to win on their disparate-treatment discrimination claim. Ashcroft v. Iqbal, 556 U.S. at 678, 679.  Thus, they need sufficient allegations only to make plausible that the Plaintiffs' Mormon religion was a determinative factor in the CCSD's decision to reassign them.  Cf. Khalik v. United Air Lines, 671 F.3d at 1192 (noting that, to win a disparate-treatment discrimination claim, the plaintiff must show that the plaintiff's "protected status was a determinative factor in the employment decision or that the employer's explanation is pretext").

Second, although the Tenth Circuit in Brown v. Montoya noted that "[t]he pleading requirement of an allegation that a similarly situated person was treated differently applies both when the plaintiff challenges a government action that discriminates based on membership in a non-protected class, or membership in a 'class of one,'" 662 F.3d at 1173 (internal citations omitted)(citing Price-Cornelison v. Brooks, 524 F.3d at 1120; Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1216), the Tenth Circuit also pointed out that "[d]ifferent types of equal protection claims call for different forms of review," 662 F.3d at 1173.  Because the plaintiff was alleging a class-of-one claim -- "that he was treated differently from others who had been 'convicted of crimes involving no sexual act, motive, or purpose,'" 662 F.3d at 1173 -- the failure to allege similarly situated individuals was fatal.  Here, on the other hand, the Plaintiffs are alleging that the Defendants discriminated against them because of their Mormon religion, which is a protected class, and they stated unequivocally at the hearing that they are not alleging a class-of-one claim.   The Tenth Circuit has held that allegations about similarly situated

individuals are required in two types equal protection claims: class-of-one equal protection claims and claims where the plaintiff is not a member of a protected class, both of which are subject to rational-basis review only.   Because religion-based discrimination is subject to strict-scrutiny review, and given the Tenth Circuit's recognition in <u>Brown v. Montoya</u> that "[d]ifferent types of equal protection claims call for different forms of review," 662 F.3d at 1173, the Plaintiffs' omission of allegations about similarly situated individuals does not preclude, as a matter of law, their ability to state a plausible equal protection claim.[7]   The Court therefore concludes that the Plaintiffs Complaint makes plausible that the Plaintiffs were subject to discriminatory adverse employment actions because of their Mormon status.

> **b.**      **The Complaint Makes Plausible that the Alleged CCSD Policy or Custom of Discrimination Against Mormons was the Moving Force Behind the Discriminatory Adverse Employment Actions.**

The CCSD may be held liable under 42 U.S.C. § 1983 only "for its own unconstitutional or illegal policies and not for . . . acts of its employees." <u>Barney v. Pulsipher</u>, 143 F.3d at 1307.   To prove that the CCSD's policy violated the Plaintiffs' equal-protection rights, the Plaintiffs must show that the CCSD's policy was the "'moving force'" behind the equal-protection violation, and

---

[7]  In relation to the Plaintiffs' equal-protection discrimination claims based on their Anglo status, however, the failure to plead information about similarly situated individuals treated more favorably precludes, as a matter of law, the claims from going forward, as Anglos are not a protected class.   <u>See, e.g.</u>, <u>Notari v. Denver Water Dept.</u>, 971 F.2d at 58.   Thus, although the Court has already concluded that the Plaintiffs failed to allege sufficient factual allegations to state a disparate-treatment discrimination claim based on this status under Title VII, this pleading requirement presents another pleading hurdle for them to overcome in the context of the Equal Protection Clause under §§ 1983 and 1985.   When the Plaintiffs amend their Complaint to add information about the Defendants' alleged discrimination against Anglos, they also "must allege facts to show that an otherwise similarly situated person was treated differently than [they] w[ere]."   662 F.3d at 1173.

- 136 -

must show that the CCSD's "'action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights.'" Barney v. Pulsipher, 143 F.3d at 1307 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404). Because the Plaintiffs are alleging that an informal, as opposed to an official, policy exists, the Court must apply "'rigorous standards of culpability and causation'" to "'ensure that the municipality is not held liable solely for the actions of its employee.'"   Barney v. Pulsipher, 143 F.3d at 1307 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 405).

As the Defendants correctly point, much of the Plaintiffs' allegations are conclusory, formulaic recitations of a conspiracy claim's elements, and are not entitled to the presumption of truth.   The Plaintiffs allege that the CCSD's policy or custom of "discrimination and harassment" had, as a "specific goal," the "eliminat[ion] [of] Mormon[] supervisors from the higher levels of Defendant CCSD."   Complaint ¶ 14, at 10.   They further allege:

> [T]he Defendants had actual and/or constructive notice of the unofficial, but well-known practice or pattern of Anglo and Mormon discrimination, including . . . a mass demotion of most Department Directors to Coordinators (with all but one director being Mormon or Anglo or both) and specifically the demotion of Plaintiff Hunt and Plaintiff Ulibarri (which were included under the mass demotion, but were significantly unjustified by the mass demotion, as Plaintiff Hunt's demotion was not to Transportation Coordinator, but to a maintenance position and has been termed a 'disciplinary demotion,' and Plaintiff Ulibarri was demoted pursuant to a plan to demote all Directors, when she was a supervisor and not a director).

Complaint ¶ 14, at 11.   These "bare assertions" that the Defendants had actual and/or constructive notice of the unofficial, but well-known practice or pattern, and that the practice was Mormon discrimination, "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" in the § 1983 and § 1985(3) contexts, which are not entitled to

a presumption of truth, and thus do not factor into the Complaint's plausibility.   Ashcroft v. Iqbal, 556 U.S. at 681.

The Complaint provides, however, sufficient non-conclusory allegations about the CCSD School Board members and the CCSD's inaction surrounding the alleged discriminatory conduct to nudge the Plaintiffs' claim that a policy or custom of CCSD to discriminate against Mormons was a moving force behind the Plaintiffs' reassignments from possible to plausible.   While a number of the Plaintiffs' 109 allegations are "formulaic recitation of the elements," a number are also well-pleaded factual allegations, and are sufficient to make plausible that a CCSD policy was behind the alleged adverse employment actions.   The Plaintiffs allege that Tso and Nicolay, at least, were involved in the hate-speech blogging, see Complaint ¶¶ 7(j), 9(j), at 6, 8, in which they "denounce[ed] 'Mormon Devils' and 'Mormon Thieves,'" and predicted that "white, Mormon administrators were being reassigned to positions 'less damaging,'" which "cannot be blamed on chance."   Complaint ¶ 43, at 27.   The Plaintiffs add the following about the blog, which they attribute to Tso, Nicolay and other "higher-level CCSD employees":

> a)      The blog has constantly attacked their religion and their association with it in the most vile and despicable terms. . . .
>
> b)      One blog post, posted twice, went so far as to tell Mr. Manning that he should put a gun in his mouth and blow his brains out as it would be best for everybody.   Others requested that Mr. Manning [the Mormon Executive Director of Finance and Operations at CCSD] should drink the Jim Jones' Kool-aid and go out of the picture.
>
> c)      While the Blog comments are made anonymously, it seems clear that some of them were made by higher-level CCSD employees.

> d)      Further, the involved comments receive a lot of attention by the CCSD employees, and are the subject of a lot of interest, concern and gossip.   The comments, and the level of hatred, both scares and offends plaintiffs and most of the Mormon community.

> Yet no senior CCSD supervisor or Board Member, specifically including the individual Defendants and CCSD, has spoken out against the hate speech on the Blog, or instructed the community (or even the CCSD employees) that the involved hate speech is inappropriate, and ultimately an incitement to violence. . . .   The involved hate speech involves both first-person and third person religious discrimination and harassment, and Defendants have not taken reasonable efforts to stop it.

Complaint ¶ 43, at 27-28.   On the one hand, the Complaint is susceptible to criticism that it alleges that Tso and Nicolay engaged in the hate-speech blogging generally, not that they authored the particular comments alleged in paragraph 43 specifically.   In addition, the Defendants point out that Nicolay is not a CCSD Board Member, but rather alleged to be a CCSD employee and Tso's campaign manager.   These particular allegations cut both ways, however.

If Nicolay, as Tso's campaign manager, had discriminatory animus against Mormons, and incited this discrimination via these blog comments, it makes plausible that once the public elected Tso CCSD President, after his campaign for President, that the CCSD had an unofficial discriminatory policy against Mormons.   Moreover, the Supreme Court has noted that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" and, while it "demands more than unadorned, the-defendant-unlawfully-harmed-me accusation[s]," it needs only "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"   Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).   That the newly elected CCSD School Board President and his campaign manager engaged in blogging on a blog "that has constantly attacked [the Plaintiffs' Mormon] religion and their

- 139 -

association with it in the most vile and despicable terms," and that an author took credit for the demotion of CCSD supervisors in hate-speech comments about Mormons, Complaint ¶ 43, at 27-28, paired with a restructuring in which the Plaintiffs were amongst ten demoted directors, 50% of whom were Mormon, makes plausible that the CCSD had an unofficial policy of anti-Mormon discrimination, and that this policy was, as the blog allegedly asserted, the moving factor behind the Plaintiffs' reassignments in the pretextual restructuring.

The Plaintiffs also allege that it seems clear "higher-level CCSD employees" wrote these anti-Mormon blog comments, and that "the involved comments receive a lot of attention by the CCSD employees, and [that they] are the subject of a lot of interest, concern and gossip," in the CCSD community.   Complaint ¶ 43, at 28.   These allegations, when paired with the allegations that the CCSD has not denounced the comments, and the allegations that there was no study about the mass demotion, add to the plausibility of the CCSD's unofficial anti-Mormon discrimination policy.   The Plaintiffs also allege that the Defendants made no investigation into the Plaintiffs' complaints and allegations about discrimination even after the Plaintiffs' attorney sent letters listing their complaints and concerns, and after the New Mexico Human Rights Bureau issued a letter of non-determination. See Complaint ¶¶ 27(d), at 17 (alleging that Hunt's "complaints of discrimination and retaliation had fallen on the deaf ears of the CCSD and the individual defendants, and those defendants had made no efforts to cure the discriminatory demotion"); id. 27(e), at 18 ("[S]imilarly, CCSD and the individual defendants made no effort to investigate those complaints."); id. ¶ 36(c), (d), at 22 (alleging the same in relation to Ulibarri).   The Supreme Court in Bell Atl. Corp. v. Twombly noted that a complaint alleging conspiracy needed sufficient

factual allegations to give rise to "a plausible suggestion of conspiracy."  550 U.S. at 566.

"Acknowledging that parallel conduct was consistent with an unlawful agreement," the Supreme

Court concluded that the complaint in that case "did not plausibly suggest an illicit accord because

it was not only compatible with, but indeed was more likely explained by, lawful,

unchoreographed free-market behavior."  Ashcroft v. Iqbal, 556 U.S. at 680.

There are here, of course, as in both Bell Atl. Corp. v. Twombly and Ashcroft v. Iqbal,

plausible lawful explanations for the restructuring -- that it was a money-saving measure or that the

current directors' performance was inadequate.  Given, however, the totality of the facts in the

Complaint about the demoted CCSD Directors and the restructuring, as it stands now, making all

reasonable inferences in the Plaintiffs' favor, the conduct was not "more likely explained by,

lawful, unchoreographed . . . behavior."  Ashcroft v. Iqbal, 556 U.S. at 680 (citing Bell Atl. Corp.

v. Twombly, 550 U.S. at 567).  A mass demotion of ten directors, where fifty percent of those

directors were Mormon, taken together with the allegation that the Plaintiffs' after-the-fact

"complaints of discrimination and retaliation had fallen on the deaf ears of CCSD . . . , [as] those

defendants had made no efforts to cure the discriminatory demotion," Complaint ¶¶ 27(e), 36(c), at

17, 22, and the allegations that there was "no study, analysis or discussion that justified the

involved re-structuring" before the CCSD took the action, Complaint ¶ 32, at 20, read against the

background of the allegations that the hate-speech blogging received significant attention in the

CCSD community, paints a picture of an unlawful situation in which "a series of decisions by a

subordinate official manifested a 'custom or usage' of which [CCSD] must have been aware," City

of St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988).  While that picture may change after the

Plaintiffs receive their discovery, taking the Plaintiffs' allegations as true now, the Complaint makes plausible that the CCSD's discriminatory policy or custom was the moving force behind the discriminatory adverse employment actions to which the Plaintiffs were subjected.   The Plaintiffs' non-conclusory factual allegations about the circumstances surrounding the Plaintiffs' unanswered reports about the alleged discriminatory restructuring thus gives rise to a plausible suggestion that the CCSD's "'action was taken with the requisite degree of culpability," and "demonstrates a direct causal link between the municipal action and deprivation of [the Plaintiffs'] federal rights'" because of their Mormon status.   Barney v. Pulsipher, 143 F.3d at 1307 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404).   See Ashcroft v. Iqbal, 556 U.S. at 680 (noting that the complaint the Supreme Court dismissed did not give "rise to the plausible suggestion of conspiracy").   The Plaintiffs' well-pleaded allegations about the circumstances surrounding the new elected CCSD Board and the Plaintiffs' unaddressed complaints about the restructuring, presumed true and taken as a whole, lead to the reasonable inference that there was an illicit accord, more plausibly explained by an unlawful agreement among CCSD policymakers to push out Mormon supervisors than by unchoreographed, legal behavior.

The Defendants' alleged illicit accord and unlawful agreement, which took the form of the restructuring, is attributable to a CCSD official policy, as the CCSD officially sanctioned or ordered the restructuring.   The Court has noted that the Supreme Court has imposed municipal liability for a single official's decision, recognizing that, "if an official, who possesses final policymaking authority in a certain area, makes a decision -- even if it is specific to a particular situation -- that decision constitutes municipal policy for § 1983 purposes."   Kerns v. Bd. of

- 142 -

Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d 1190, 1269 (D.N.M. 2010)(Browning, J.)(citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)), rev'd in part on other grounds, vacated in part sub nom., Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011).   Hence, such an act can be understood as an act 'of the municipality' which the municipality 'officially sanctioned or ordered.'"   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d at 1269.   Although there may be instances in which an employee's termination or demotion would likely not be fairly attributable to an entity's policy or custom apart from the particular employee or a group of employees responsible for the demotion or termination, "a mass demotion of most Department Directors to Coordinators" that the CCSD employed, Complaint ¶ 14, at 11, was almost certainly because of a decision of an official with "final policymaking authority in a certain area," Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d at 1269.

Finally, the restructuring and failure to investigate the Plaintiffs' discrimination complaints is plausibly one of those "narrow range of circumstances" in which "deliberate indifference may be found absent a pattern of unconstitutional behavior," because, given the alleged notoriety of the Farmington Daily Times blog postings about Mormons at the CCSD, the demotion of ten Directors, fifty percent of whom were Mormon, makes "a violation of federal rights . . . a 'highly predictable' or 'plainly obvious' consequence of [the CCSD's] action or inaction." Barney v. Pulsipher, 143 F.3d at 1307-08 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 398).   The Plaintiffs were not low-level school employees at schools within the CCSD or low-level maintenance workers or bus drivers within the CCSD.   Rather, the Plaintiffs allege that they were both high-level Supervisors or Directors, whose reassignment would not likely go unnoticed by

the CCSD.   See Complaint ¶¶ 1-2, at 1-2.   The Plaintiffs' reassignments, therefore, are attributable to the CCSD's official policy, as they are "an act . . . which the municipality 'officially sanctioned or ordered.'"   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 707 F. Supp. 2d at 1269 (quoting Pembaur v. City of Cincinnati, 475 U.S. at 480).   The Court therefore concludes that the Plaintiffs' have stated a plausible § 1983 claim against the CCSD based on its violation of their Equal Protection Clause rights.

### C.   THE PLAINTIFFS ALLEGE A PLAUSIBLE § 1985(3) CLAIM AGAINST ALL OF THE DEFENDANTS.

The Plaintiffs allege that "[e]ach Defendant . . . participated in an agreement to eliminate Mormon and/or Anglo supervisors, and . . . [took] specific actions in furtherance of that conspiracy" in violation of § 1985(3).   Complaint ¶ 66, at 34.   The Defendants contend that, assuming that the Plaintiffs adequately state a claim for an equal-protection violation, they "do not plead any plausible allegations supporting a conspiracy."   Motion to Dismiss at 15.   The Court concludes that the Plaintiffs state a plausible § 1985(3) claim, as they allege that the Defendants conspired to remove Mormon supervisors within the CCSD and plausibly allege who of the Individual Defendants performed which acts in furtherance of that conspiracy, thus providing sufficient individual notice to the Defendants of the basis of their claims against them.   The Court also concludes that the individual Defendants are not entitled to qualified immunity.

### 1.   The Tenth Circuit Rejects Application of the Intracorporate Conspiracy Doctrine in Civil Rights Cases.

The Defendants argue that the intracorporate conspiracy doctrine bars the Plaintiffs' § 1985(3) claim.   See Motion to Dismiss at 17 (citing Whitehurst v. 230 Fifth, Inc., No. 11 Civ.

0767 (CM), 2011 WL 3163495 (S.D.N.Y July 26, 2011)).   The Tenth Circuit rejected, however,

fifteen years ago, the intracorporate conspiracy's application in civil rights cases:

> Defendants invoke the "intracorporate conspiracy doctrine," asserting that Ms.
> Pitts failed to allege a conspiracy because a corporation cannot conspire with its
> corporate agents.   This doctrine was first developed in the antitrust context, and we
> subsequently applied it to related civil conspiracies.   We have yet to determine
> whether the doctrine precludes intracorporate conspiracies in civil rights actions.
> A majority of other circuits have addressed the issue with divergent results.   Five
> circuits have extended the intracorporate conspiracy doctrine to actions under
> sections 1983 and 1985, while four others have severely limited or questioned the
> applicability of the doctrine in the civil rights context.   We agree with the latter
> group of courts that the doctrine, designed to allow one corporation to take actions
> that two corporations could not agree to do, should not be construed to permit the
> same corporation and its employees to engage in civil rights violations.   "In these
> situations, the action by an incorporated collection of individuals creates the 'group
> danger' at which conspiracy liability is aimed, and the view of the corporation as a
> single legal actor becomes a fiction without a purpose."

Brever v. Rockwell Int'l Corp., 40 F.3d 1119, 1126-27 (10th Cir. 1994)(internal citations and

footnotes omitted).   The intracorporate conspiracy does not, therefore, offer the Defendants any

help here.

### 2.      The Plaintiffs State a Plausible § 1985(3) Claim Against All Defendants.

To state a claim under § 1985(3), a plaintiff must show: (i) a conspiracy, motivated by

racially discriminatory animus; (ii) to deprive the plaintiff of equal protection or equal protections

of the laws; (iii) an act in furtherance of the conspiracy; and (iv) an injury or deprivation resulting

therefrom.   See Paris v. Sw. Bell Tel. Co., 94 F. App'x at 815; Tilton v. Richardson, 6 F.3d at 686.

"Conclusory allegations that the defendants acted in concert or conspired, without specific factual

allegations to support such assertions, are insufficient to state a claim under § 1985(3)."   Martinez

v. Martinez, 2010 WL 1608884, at *12 (citing Merritt v. Hawk, 153 F. Supp. 2d at 1225).

Additionally, it is error to precondition consideration of a plaintiff's § 1985(3) claim upon the finding of § 1983 liability:

> Although neither § 1983 nor § 1985(3) create any substantive rights, a § 1983 claim generally describes a substantive violation of a right secured by the Constitution or laws, whereas a § 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws or equal privileges and immunities under the laws.

Dixon v. City of Lawton, Okla., 898 F.2d at 1447.

"[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." Campbell v. Amax Coal Co., 610 F.2d at 702. The Tenth Circuit has consistently dismissed § 1985(3) claims devoid of racial discriminatory animus. For example, in Paris v. Sw. Bell Tel. Co., the Tenth Circuit held that the plaintiff's hostile-work-environment claim failed because she did not show racial discriminatory animus on the part of the alleged conspirators. See 94 F. App'x at 815.

In regard to the first factor, the Plaintiffs' factual allegations plausibly show "a conspiracy, motivated by racially-discriminatory animus." Paris v. Sw. Bell Tel. Co., 94 F. App'x at 815. In contrast to the allegations in Martinez v. Martinez, which never "touch[ed] on any individual's race, political or religious affiliation, or any other categorization against which the Defendants might hold a discriminate animus," 2010 WL 1608884, at *27, "the word 'Mormon' appears in the Complaint 47 times; the word 'Anglo' appears 36 times, and the word 'discriminate' in its various forms appears 104 times." Response at 19. Additionally, paragraph 86 alleges the CCSD's discriminatory animus: "Plaintiffs were employed by CCSD which directly and intentionally discriminated against them on the basis of their status as Mormons and Anglos in the terms and

conditions of their employment."   Complaint ¶ 86, at 39.   Moreover, the Plaintiffs allege that "[a]ll Defendants enforced and conspired to enforce an informal policy . . . or practice of Mormon/Anglo discrimination . . . . with the specific goal of eliminating Mormon/Anglo supervisors from the higher levels of CCSD; ignored the complaints of the official, but informal practice; and retaliated against those who brought such complaints."   Complaint ¶ 14, at 10. Moreover, the factual background that the Plaintiffs allege in Paragraph 43 about the "messages published on the Farmington Daily Times New Blog denouncing 'Mormon Devils' and 'Mormon Thieves,'" which the Plaintiffs allege "receive[d] a lot of attention by the CCSD employees, and [we]re the subject of a lot of interest, concern, and gossip," Complaint ¶ 43, at 27-28, makes facially plausible that a conspiracy, motivated by discriminatory animus, existed.   This case is thus not one in which there is an "absence of allegations of . . . racial discriminatory animus." Campbell v. Amax Coal Co., 610 F.2d at 702.

The second factor requires the Plaintiffs' allegations to make plausible that the conspiracy was one designed "to deprive [the Plaintiffs] of equal protection of the laws."   Paris v. Sw. Bell Tel. Co., 94 F. App'x at 815.   The Court has found that the Plaintiffs' Complaint states a plausible § 1983 equal-protection claim for a discriminatory adverse employment action taken against them based on their religion, meaning that the Plaintiffs' factual allegations -- at least in relation to the CCSD -- make plausible that the CCSD's actions constituted adverse employment actions, motivated by a discriminatory intent, and were taken pursuant to the CCSD's "policy or custom." Gerald v. Locksley, 785 F. Supp. 2d at 1106.   Nonetheless, the Tenth Circuit has pointed out that the Court's finding that the CCSD's actions plausibly deprived the Plaintiffs of equal protection of

the laws does not equate to finding that the Plaintiffs have alleged a plausible § 1985(3) violation, as a "§ 1985(3) claim generally describes a conspiracy of two or more persons for the purpose of depriving of another of equal protection of the laws."   Dixon v. City of Lawton., 898 F.2d at 1447.

The Plaintiffs' allegations here meet that additional burden, as they provide specific allegations about actions that each individual Defendant took in furtherance of the Conspiracy. Specifically, they allege that: (i) they were "steered toward resignation through acts directly performed by Defendant HR Directors Frazzini and Kasper, but serviced by Defendants Marquez and Levinski," Complaint ¶ 14, at 11; and (ii) allege that Benally and Tso, as the CCSD's School Board members, Nicolay as "an employee and/or agent of the Defendant CCSD," and Frazzini, Kasper, Marquez, and Levinski all knowingly participated in "an agreement among the Defendants to terminate the Plaintiffs' employment and/or eliminate any supervisory authority of the Plaintiffs because of the discriminatory attitudes of the CCSD Board," Complaint ¶¶ 4(g), 5(g), 6(g), 7(g), 8(g), 9, 9(g), at 3, 4, 5, 6, 7, 8.   The Complaint therefore meets the second factor, as they plausibly allege that the conspiracy, which was directed towards pushing out Mormon and Anglo supervisors, and which led to the Plaintiffs' discriminatory adverse employment actions, consisted of two or more persons.

The Plaintiffs meet the third § 1985(3) element, because they plead multiple acts in furtherance of the discriminatory conspiracy.   The primary acts were the Plaintiffs' reassignments.   The Defendants argue, however, that the allegations fail to make a facially plausible claim against any of the Defendants.   They assert that, in relation to the individual Defendants, because paragraph 13 provides that, "[w]henever in this complaint reference is made

to 'Defendants, and each of them,' such allegations shall be deemed to mean the act of Defendants acting individually, jointly, and/or severally," and many of their factual allegations -- and the allegations which are recitations of the necessary elements -- refer generally to the "Defendants," the Complaint fails to adequately allege "who did what to whom."   Motion to Dismiss at 9.   See Robbins v. Oklahoma, 519 F.3d at 1250 (noting that, in the face of qualified immunity, "it is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom")(emphasis in original).   The Plaintiffs make sufficiently clear who did what to whom, however, in their preliminary allegations about each individual Defendant. They allege, individually, that Levinski, see Complaint ¶ 4, at 2-3, Marquez, see Complaint ¶ 5, at 3-4, Frazzini, see Complaint ¶ 6, at 4-5, Tso, see Complaint ¶ 7, at 5-6, Benally, see Complaint ¶ 8, at 6-7, and Nicolay, see Complaint ¶ 9, at 7-8, and Kasper, see Complaint ¶ 10, at 8-9, all took multiple acts in furtherance of the conspiracy.   Among these alleged acts are each individual's "knowing[] participat[ion]" in "the discriminatory restructuring," "the efforts to push the Plaintiffs out of their jobs related to the extra demotion of Plaintiff Hunt and the failure to provide Plaintiff Ulibarri with replacement positions," and "the failure to investigate Plaintiff's complaints of discrimination, retaliation and fraud."   E.g., Complaint ¶ 10, at 9.   Taken with the following thirty-four factual allegations, spanning almost eight pages, which include the allegations about Frazzini's, Marquez', Kasper's, and Levinski's participation in discussions with the Plaintiffs about their demotions, Benally's and Tso's status as CCSD School Board members, and Nicolay's involvement in Tso's campaign as the manager, and that he is a CCSD employee, the Complaint provides each Defendant notice that the Plaintiffs' "basis of the claims against him or her, as

distinguished from collective allegations against the state," <u>Robbins v. Oklahoma</u>, 519 F.3d at 1250, rests on their alleged personal participation in the conspiracy to create and further the CCSD's anti-Mormon policy or custom, or on their participation in the furtherance of that conspiracy in their direct actions regarding the Plaintiffs' demotions.   Because all of the factual allegations are all incorporated by reference in each Count, including Count IV -- the Plaintiffs' § 1985(3) claim -- the Plaintiffs provide the Individual Defendants sufficient factual allegations about "who had . . . direct contact" with the Plaintiffs, "who" created the CCSD's policy, and "who" acted in furtherance of the reassignment by ordering the restructuring, and thus "how they might be individually liable for the deprivation of [the Plaintiffs'] rights."   <u>Robbins v. Oklahoma</u>, 519 F.3d at 1250.

While the Court finds that the Plaintiffs' well-pleaded factual allegations, read in a light most favorable to them, with all reasonable inferences made in their favor, have nudged their allegations that the restructuring, pursuant to which the Plaintiffs were reassigned, was plausibly, rather than merely possibly, pretext for a discriminatory conspiracy to deprive the Plaintiffs of their civil rights, it is early in litigation, and these allegations may turn out not to be the reality. Restructurings have become commonplace in today's economic environment, and they appear reasonably necessary for many entities' survival.   The reassignments in these restructurings that take place as a matter of course in the business world would not constitute acts in furtherance of a discriminatory conspiracy.   Indeed, after the Plaintiffs perform discovery, this general principle may prove fatal at the summary-judgment stage.   <u>Cf.</u> <u>United States v. Hopkins</u>, No. CIV 11-0416 JB/WPL, 2013 WL 684652, at *30 (D.N.M. Feb. 14, 2013)(Browning, J.)("'In responding to a

motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'")(quoting Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)).   The factual allegations in the Complaint, which the Court must accept as true at this stage in the litigation, show, however, that, if the restructuring was pretext for the Defendants' conspiracy to replace the Mormon and Anglo CCSD Supervisors with non-Mormon, non-Anglos, the Plaintiffs' reassignments because of the restructuring were acts in furtherance of the Defendants' conspiracy.   Additional acts in furtherance of the conspiracy include the Defendants' "failure to investigate the Plaintiff's complaints of discrimination, retaliation and fraud," the "failure to come forward, and denounce the involved conspiracy," and the alleged "hate speech-blogging."   E.g., Complaint ¶ 7, at 5-6.

The Defendants contend that "the link between anonymous on-line postings on a general-circulation newspaper's website and specific discriminatory animus is tenuous at best." Motion to Dismiss at 16 n.12.   The Court generally agrees.   In the age of digital news media, and given how readily accessible that news media is in this nation's connected society, anonymous comments on websites have become a well-noted issue.   See, e.g., Brooke Magnanti, Why Trolls Matter, Huffington Post UK (May 10, 2013 12:00 AM), http://www.huffingtonpost.co.uk/ dr-brooke-magnanti/trolls-why-they-matter_b_3245091.html?utm_hp_ref=uk ("No doubt you've heard by now that anonymous commenters who are destroying the web, vicious trolls who are gleefully trampling on the virtual communities that other people have calmly and carefully built

from the electronic ground up."[8]).   The link between the specific online postings alleged in the Complaint -- the "hate-speech blogging" -- and the Defendants, however, is not tenuous.   The Plaintiffs represent, subject to rule 11 of the Federal Rules of Civil Procedure, that at least Tso and Nicolay participated in the hate-speech blogging on the <u>Farmington Daily Times</u>' website, and that these comments included the anonymous authors taking credit for the reassignment of CCSD supervisors.[9]   <u>See</u> Complaint ¶¶ 7(j), 9(j), at 5, 8.   Under the circumstances, these postings evince the conspiracy's existence and are plausibly actions in furtherance of the conspiracy.   The Plaintiffs' Complaint thus alleges multiple acts in furtherance of the conspiracy.

The Plaintiffs also sufficiently plead the fourth § 1985(3) element -- "a deprivation of rights resulting therefrom."   <u>Paris v. Sw. Bell Tel. Co.</u>, 94 F. App'x at 815.   The Plaintiffs allege that the restructuring, and that their reassignments and future salary cuts, resulted from the

---

[8] The reference to a "troll" is "[i]nternet slang" for "someone who posts inflammatory, extraneous, or off-topic messages in an online community, such as a forum chat room, or blog, with the primary intent of provoking readers to an emotional response or of otherwise disrupting normal on-topic discussion."   <u>Troll (Internet)</u>, Wikipedia.org, http://en.wikipedia.org/ Troll_(Internet) (last visited May 22, 2013).

[9] Rule 11 provides in part:

By presenting to the court a pleading, written motion, or other paper -- whether by signing, filing, submitting, or later advocating it -- an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

. . .

 **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11.

Defendants' conspiracy to replace the CCSD's Mormon supervisors.   The Court therefore concludes that the Plaintiffs' § 1985(3) claim is plausible.

### 3.   Qualified Immunity Does Not Protect the Individual Defendants.

Above and beyond stating a plausible claim against the Individual Defendants, "[t]o survive a post-Twombly motion to dismiss in the context of qualified immunity, a plaintiff must 'nudge . . . claims across the line from conceivable to plausible' by alleging facts sufficient to meet his burden under both prongs of the qualified immunity analysis."  Gerald v. Locksley, 785 F. Supp. 2d at 1129.   The defense of qualified immunity "protects a government official from personal liability and the burden of having to go to trial unless he violated clearly established . . . constitutional rights of which a reasonable person would have known."   Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1184 (10th Cir. 2010).   To defeat the defense of qualified immunity, the Plaintiffs must show the Defendants' alleged actions (i) "violated a constitutional or statutory right" and (ii) the right the defendants violated was "clearly established at the time of the conduct at issue."   602 F.3d at 1184 (citations and quotations omitted).   "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."   Anderson v. Creighton, 483 U.S. at 640.   See Walker v. City of Orem, 451 F.3d at 1151.   "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."   Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).   See Hannula v. Lakewood, 907

F.2d 129, 131 (10th Cir. 1990) ("We do not require government officials to predict future legal developments.").

The Court's analysis shows that the Complaint makes plausible that the Defendants' actions and their individual, knowing participation in the conspiracy violated the Plaintiffs' clearly established constitutional right to equal protection under the laws, via the discriminatory adverse employment action of demoting the Plaintiffs to their respective positions and the promises to cut their future salary based on the Plaintiffs' Mormon religion.   Importantly, the deprivation of the Plaintiffs' Equal Protection Clause rights stems from the Individual Defendants' conspiracy to deprive the Plaintiffs of their rights to equal protection under the laws by demoting them because of their Mormon status.   The question is thus not whether the alleged employment actions were adverse employment actions, or whether there is a case on point in relation to any McDonnell Douglas Corp. v. Green prima facie case elements, but rather whether the individuals violated the Plaintiffs' constitutional rights, and whether those rights were clearly established.

In relation to the first qualified immunity factor, the Defendants "violated a constitutional [and] statutory right" by allegedly participating in a conspiracy to demote the Plaintiffs because of their religion.   Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d at 1184 (citations and quotations omitted).   First, Title VII proscribes any "unlawful employment practice," which includes "any employment practice" in which the Plaintiffs' "religion . . . was a motivating factor for" that practice.   42 U.S.C. § 2000e-2(m).   According to the Complaint, the Defendants violated that statutory right by allegedly reassigning the Plaintiffs to lower coordinator and clerical positions, with the promise that their salaries would be cut in half at the end of their contracts,

because of their Mormon religion.  They violated the Plaintiffs' constitutional right to equal protection of the laws under the Equal Protection Clause with the same conduct when, as pleaded, it was not based on any compelling interest.   See, e.g., Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1257-58 (10th Cir. 2008)(holding that discrimination based on religion is subjected to strict scrutiny whether a claim "arises under" the "Establishment Clause . . . the Free Exercise Clause [or] Equal Protection Clause")(citing, among others, Locke v. Davey, 540 U.S. 712, 720 n.3 (2004)).

In relation to whether the right that the Defendants violated was "clearly established at the time of the conduct at issue," Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d at 1184 (citations and quotations omitted), it is beyond question that, regardless what form that discrimination takes, or what acts are done in furtherance of a conspiracy to discriminate against employees because of their race, the right to be free from discrimination in the workplace -- unless the discrimination meets strict scrutiny -- is clearly defined.   See, e.g., Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 338-39 (1987)(recognizing that "discriminating among religions" in the workplace is "subject to strict scrutiny")(citing Larson v. Valente, 456 U.S. 228, 246 (1982)).   Because the right here is to be free from an alleged discriminatory conspiracy to demote employees based on their religion, the particular adverse employment action does not appear important to the analysis whether the right to be free from workplace discrimination based on religion is clearly established.   Nevertheless, the Tenth Circuit in August, 2010, found a reassignment, with significantly less monetary loss, and less of a demotion in job title and responsibilities, qualified as an adverse employment action for

- 155 -

disparate-treatment discrimination purposes.   See Jones v. Oklahoma City Pub. Sch., 617 F.3d at 1279-80 (holding that a teacher's reassignment with a "$17,000 decrease in salary" to take place one year following a teacher's reassignment constituted an adverse employment action notwithstanding that the teacher was not demoted).   Thus, notwithstanding that the right to be free from a conspiracy for deprivation of civil rights based on religion has been enshrined in the United States Constitution for many years, the alleged chosen form of discrimination was clearly established as conduct on which an equal-protection claim could be premised at least a year before the Defendants' alleged pretextual reassignment of the Plaintiffs.

While it is difficult to find a Tenth Circuit or Supreme Court case precisely like this one, the case involves not some novel application of the Fourteenth Amendment to a particular set of facts, but a basic American proposition -- the government may not discriminate against its employees and demote its employees based on their religion without a compelling interest.   No compelling interest appears on the face of the Complaint, and the Defendants have not asserted any compelling interest.   The Court therefore concludes that the individual Defendants' participation in the conspiracy which resulted in the violation of the Plaintiffs' Equal Protection Clause rights are not immune from this lawsuit.

## V.   THE COURT WILL NOT DISMISS ALL OF THE PLAINTIFFS' STATE-LAW CLAIMS.

The Plaintiffs assert seven state law counts against the Defendants.   The Court will dismiss three of these -- the tortious-interference claim, the common-law-conspiracy claim, and the negligent-building-operation claim -- because they sound in tort and, based on the Plaintiffs' allegations, the State of New Mexico has not waived tort immunity for these claims.   The Court

will also dismiss the FATA claim in Count V, because the Plaintiffs' allegations do not plausibly show that FATA entitles them to relief.   The Court will allow the Plaintiffs' NMHRA claim, like their Title VII, to proceed only on the disparate-treatment discrimination basis.

### A.   THE COURT WILL NOT DISMISS THE BREACH-OF-CONTRACT CLAIMS AGAINST CCSD.

The Plaintiffs allege that the CCSD "breached its expressed and implied contractual commitments to Plaintiffs" by demoting them without proper cause, failing to provide them hearings, failing to investigate their complaints of discrimination, retaliation and fraud, and making misrepresentations of material fact about the basis for demoting Plaintiffs.   Complaint ¶ 47, at 29-30.   The Defendants assert that there cannot be a breach of a contract in this case, because Levinski had the contractual right to specify the Plaintiffs' duties, the Plaintiffs allegations do not sufficiently make plausible that they followed the procedures required for an investigation into any alleged discrimination, and they did not suffer damages.   See Motion to Dismiss at 32.   The Court concludes that, because the Plaintiffs have plausibly alleged that religious discrimination was the deciding factor in their demotions, they state a plausible claim that the CCSD breached their employment contracts.   In a light most favorable to the Plaintiffs, the CCSD may be liable for compensatory damages, but not for emotional distress or punitive damages.

The general rule in New Mexico "'is that an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise.'"   Chaara v. Intel Corp., 2006 WL 4079031, at *9.   "Breach of

contract is a question of fact . . . ."   Collado v. City of Albuquerque, 2002-NMCA-048, ¶ 15, 132

N.M. 133, 45 P.3d 73.   Interpretation of an unambiguous contract, on the other hand, is a question

of law.   See Campbell v. Millennium Ventures, LLC, 2002-NMCA-101, ¶ 15, 132 N.M. 733, 55

P.3d 429 ("'Interpretation of an unambiguous contract is a question of law which we review de

novo.'" (quoting Nearburg v. Yates Petroleum Corp., 1997-NMCA-069, ¶ 7, 123 N.M. 526, 943

P.2d 560).   New Mexico courts "consider the documents as a whole to determine how they should

be interpreted" and "can consider the circumstances surrounding the creation of the contract as

well as the contract itself."   Campbell v. Millennium Ventures, LLC, 2002-NMCA-101, ¶ 15, 132

N.M. 733, 55 P.3d 429 (citing Nearburg v. Yates Petroleum Corp., 1997-NMCA-069, ¶ 7, 123

N.M. 526, 943 P.2d 560; Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, ¶ 13, 129

N.M. 698, 12 P.3d 960).

The Plaintiffs allege that, at the time of their reassignment, they both had a contractual

relationship with the CCSD, and they attach their employment contracts to the Complaint.[10]   The

_____

[10] The Plaintiffs attached both Hunt's and Ulibarri's employment contracts for the
2011-2012 school year to the Complaint.   See School Year 2011-2012 Contracts at 1, filed
September 12, 2012 (Doc. 24-1)("Ulibarri Contract"); School Year 2011-2012 Contracts at 2, filed
September 12, 2012 (Doc. 24-1)("Hunt Contract").   The Court can therefore consider these
contracts as part of the Complaint in deciding the Motion to Dismiss.   See Fed. R. Civ. P. 10(c)
("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all
purposes.").   The Plaintiffs' documents as scanned are difficult to read.   The Defendants,
recognizing this problem, attached copies of the Plaintiffs' employment contracts to their Motion
to Dismiss.   See Motion to Dismiss at 31, n.19 (noting that the Plaintiffs' "copies as scanned and
filed in the Court are difficult to read.   Accordingly, Defendants attach hereto copies of these
same contracts . . . ."); School Year 2011-2012 Administrator/Director/Coordinator Contract at 1,
filed October 15, 2012 (Doc. 27-8); School Year 2011-2012 Non-Exempt Employee Contract at 1,
filed October 15, 2012 (Doc. 27-9).   A brief inspection of the four documents shows, however,
that the contracts the Defendants attached to their motion are not in fact the same.   The contracts
that the Plaintiffs attached are for the 2011-2012 school year and were signed by Levinski; the

- 158 -

first contract provision important for purposes of the Motion to Dismiss is the Hunt Contract

paragraph 3, which is identical to paragraphs 4 and 5 in the Ulibarri Contract:

> This contract and the parties hereto are and shall continue to be subject to applicable laws of the State of New Mexico and the rules and regulations of the Public Education Department and the policies of the Local Board of Education, as they may exist.  This contract may be canceled by the Superintendent for cause, including unsatisfactory work performance, incompetence, insubordination, physical or mental inability to perform the required duties or for any other good and just cause, provided that any such cancellation may be effected only in accordance with New Mexico statutes and any applicable rules and regulations of the Public Education Department or the policies of the Local Board of Education.

Hunt Contract ¶ 3, at 1; Ulibarri Contract ¶¶ 4-5, at 1.   The other important contract provision is

the Hunt Contract's paragraph 4, identical to the Ulibarri Contract's paragraph 6, which provides

for the conditions precedent to the Superintendent's ability to cancel the contracts without cause:

> This contract may be canceled by the Superintendent for cause not personal to the Employee when a reduction in personnel is required as a result of decreased enrollment, or a decrease or revision in educational programs, or insufficient legislative appropriation, or authorization being made by the State and/or Federal Government for the performance of this contract in accordance with New Mexico Statutes and any applicable rules and regulations of the Public Education Department and the policies of the Local Board of Education, provided there is no other position for which the Employee is qualified, consistent with the academic necessities of the school district.

Hunt Contract ¶ 4, at 1; Ulibarri ¶ 6, at 1.   The Plaintiffs allege that School Board Policy G-0200

"outlaws discrimination of any kind, specifically including discrimination based on religion, race,

and disability."   Complaint ¶ 39, at 24.

---

contracts that the Defendants attached are for the 2010-2011 school year.  Nevertheless, aside from the blanks completed at the time of signing to reflect the year, the Plaintiffs' information, and job titles, the 2010-2011 and 2011-2012 contracts appear identical.   The Court will thus primarily rely on and consider the contracts that the Plaintiffs provided -- the Ulibarri Contract and the Hunt Contract.  Where the Court cannot read the contracts, however, the Court will then look to the 2010-2011 contracts that the Defendants attached to the Motion to Dismiss.

Both Plaintiffs' contracts provide the employment contracts for the Plaintiffs' employment in their respective positions before the reassignment, and impose upon the parties the duty to act pursuant to applicable laws and the CCSD School Board's policies.   As the Plaintiffs allege, the School Board has a policy against discrimination of any kind, including based on religion and race. The contractual provision prohibiting the CCSD from discriminating based on religion and race distinguishes the Plaintiffs' employment contracts from a contract that the United States Court of Appeal for the Sixth Circuit held could not be breached by the defendant's alleged disability discrimination, because it provided that the defendant "will comply with the provisions of any Federal, State, or Local law prohibiting discrimination in housing on the grounds of race, color, sex, creed, or national origin," but was silent about disability.   Capital Park Ltd. Dividend Housing Ass'n v. Jackson, 202 F. App'x 873, 878 (6th Cir. 2006)(unpublished).   Because the Plaintiffs' demotions were pursuant to the reassignment, which was plausibly done pursuant to the CCSD's policy or custom of discrimination against Mormons, which the Plaintiffs' employment contracts specifically prohibited, it is plausible that CCSD breached the Plaintiffs' employment contract.   If the Plaintiffs can prove that the reassignment was discriminatory, and thus their demotions were also discriminatory, because of the CCSD's policy of religious discrimination, the CCSD's reassignment of them breached the Plaintiffs' contracts.   The Plaintiffs thus state a plausible breach-of-contract claim.[11]

---

[11]   Although the Court only addresses the religious-based discrimination in relation to the state-law claims, it does not preclude any action based on their racial discrimination claims.   If, when the Plaintiffs amend their Complaint to allege a plausible discrimination claim on the basis of their White-Anglo status, they plausibly allege that the CCSD reassigned them because of their race in addition to their religion, this analysis applies equally to, and they may also have a

The Defendants contend that the Plaintiffs suffered no damages, because they "acknowledge that they would be paid the salaries stated in the contracts."   Motion to Dismiss at 32 (citing Complaint ¶¶ 17, 30, at 12-13, 19-20).   In a light most favorable to the Plaintiffs, when the CCSD reassigned and demoted the Plaintiffs in violation of their employment contracts' terms, the CCSD breached the contract.   The Plaintiffs were at that point discharged from performance.   See Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp., 25 F.3d 1493, 1501 (10th Cir. 1994)("A material failure of performance constitutes a breach that discharges the injured party from performance.")(citing Restatement (Second) Contracts §§ 225(2), 237; 4 Arthur L. Corbin, Corbin on Contracts § 946 (1951)).   The Supreme Court of New Mexico has recognized that, where the defendant breached a teacher's contract by wrongfully terminating the teacher, the burden was on the defendant to prove a failure to mitigate damages and evidence of employment skills was insufficient to prove this failure to mitigate:

> The burden was on Honeywell to prove by substantial evidence that McGinnis's damages would be alleviated by future employment opportunities.   While there was ample evidence before the jury that McGinnis had good employment skills and qualifications, there was no evidence that those skills and qualifications would lead to any specific kind of employment within any specific period of time.

McGinnis v. Honeywell, Inc., 110 N.M. 1, 7, 791 P.2d 452, 458 (1990)(citing Hansen v. Skate Ranch, Inc., 97 N.M. 486, 490, 641 P.2d 517, 521 (Ct.App.1982))(internal citations omitted).   See Hickey v. Griggs, 106 N.M. 27, 29, 738 P.2d 899, 902 (1987)("Mitigation of damages is an affirmative defense and its burden of proof is on the defaulting party.")(quoting Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1 v. Jennings, 102 N.M. 762, 701 P.2d 361 (1985)).   Thus,

---

breach-of-contract claim on, that basis as well.

although the Defendants can assert that the Plaintiffs failed to mitigate their damages after the CCSD's plausible breach of contract, they may do so later as an affirmative defense.   The burden of pleading affirmative defenses is the Defendants' to bear.   See Fed. R. Civ. P. 8(c) (requiring the defendant to plead any "matter constituting an avoidance or affirmative defense"); Gomez v. Toledo, 446 U.S. 635, 640 (1980)("Since qualified immunity is a defense, the burden of pleading it rests with the defendant.").

The Defendants are correct, however, that the Plaintiffs are not entitled to emotional-distress damages on their breach-of-contract claims.   Under New Mexico law, "damages for emotional distress are not recoverable in an action for breach of an employment contract, whether express or implied, in the absence of a showing the parties contemplated such damages at the time the contract was made."   Martinez v. N. Rio Arriba Elec. Co-op., Inc., 2002-NMCA-083, ¶ 23, 132 N.M. 510, 51 P.3d 1164.   See Bell v. Bd. of Educ. of Albuquerque Pub. Sch., 652 F. Supp. 2d 1211, 1216 (D.N.M. 2008)(Browning, J.)("[E]motional distress damages in contract actions are recoverable in the limited situation where the specialized nature of the contract naturally contemplated that reasonable care would be taken to avoid the infliction of severe emotional distress.")(citing Akutagawa v. Laflin, Pick & Heer, P.A., 2005-NMCA-132, ¶ 21, 138 N.M. 774, 126 P.3d 1138).   Although the Plaintiffs allege that present and emotional distress damages were within "the reasonable contemplation of the parties," Complaint ¶ 48, at 30, that allegation is "'a formulaic recitation of the elements of a cause of   action'" for emotional damages for breach of contract, and "'will not do.'"   Ashcroft v. Iqbal, 556 U.S. at 678.   The Complaint lacks any non-conclusory factual allegations about this contemplation.   Without providing any factual

allegations on which the Court may find it plausible that the parties contemplated emotional distress damages would flow from a breach of the Plaintiffs' contracts, the Court will dismiss the Plaintiffs' claim for these damages.   See Robbins v. Oklahoma, 519 F.3d at 1247 ("The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.")(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).   As the Court of Appeals of New Mexico has noted: "If we were to allow emotional distress awards in a garden-variety employment contract case, we would undercut the fundamental limitation on awards for contractual breach; namely, what is reasonably within the contemplation of the parties to the contract."   Martinez v. N. Rio Arriba Elec. Co-op., Inc., 2002-NMCA-083, ¶ 23, 132 N.M. 510, 51 P.3d 1164.   Finally, although the Court is allowing the Plaintiffs' breach-of-contract claim to proceed based on a plausible breach, which the CCSD's alleged discriminatory policy motivated and caused, the Court will dismiss the Plaintiffs' punitive-damages claim for the breach, as they are not available in a lawsuit against a governmental entity.   See Torrance Cnty. Mental Health Program, Inc. v. N.M. Health & Env't Dep't, 113 N.M. 593, 601, 830 P.2d 145, 153 (1992)("[P]unitive damages are not recoverable from a governmental entity which is liable for breach of contract.").   Cf. Bates v. New Mexico Corr. Dep't, No. CIV 08-1013 JB/RLP, 2010 WL 4339367, at *20 (D.N.M. Sept. 30, 2010)(Browning, J.)("A plaintiff may not, however, recover punitive damages from a government, government agency or political subdivision." (internal citations and quotations omitted)).

> **B.**   **THE COURT WILL NOT DISMISS THE PLAINTIFFS' CLAIMS AGAINST THE CCSD FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

"Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract." WXI/Z Sw. Malls v. Mueller, 2005-NMCA-046, ¶ 25, 137 N.M. 343, 110 P.3d 1080. "[T]he implied covenant of good faith and fair dealing requires only that neither party injure the rights of the other party to receive the benefit of their agreement." Smoot v. Physicians Life Ins. Co., 2004 -NMCA-027, ¶ 13, 135 N.M. 265, 87 P.3d 545. A cause of action for breach of an implied covenant of good faith and fair dealing cannot prevail without showing that "a party seeks to prevent the contract's performance or to withhold its benefits from the other party." Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 51, 133 N.M. 669, 68 P.3d 909. See Brock v. Presbyterian Healthcare Servs., Inc. 220 F. App'x at 846 (same). "[T]he implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship." Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 53, 133 N.M. 669, 68 P.3d 909. Moreover, "[t]he breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." WXI/Z Sw. Malls v. Mueller, 2005-NMCA-046, ¶ 25, 137 N.M. 343, 110 P.3d 1080.

The Plaintiffs allege that the Defendants breached the implied covenant of good faith and fair dealing, among other things, "by making material misrepresentations about the basis for demoting each Plaintiff." Complaint ¶ 53, at 31. Again, although this allegation alone is conclusory, and although the Plaintiffs do not point the Court to the misrepresentations about which they complain in this paragraph, in light of the Plaintiffs' incorporation of all prior allegations into this claim, and construing the Complaint in its entirety in the light most favorable

to the Plaintiffs, the Court concludes that the Plaintiffs are referring to the Defendants' representations about the reassignment. Taken together with the Plaintiffs' other factual allegations about Levinski, Marquez, and Frazzini's representations about why the Plaintiffs were being demoted, and the Court's finding that the Plaintiffs plausibly allege that the reasons about the reassignment were pretext for the CCSD's discriminatory reasons behind the demotions, the Plaintiffs are alleging that these false representations in bad faith prevented the Plaintiffs from seeking the benefits of their contract, namely, in Hunt's case, working as Transportation Director, see Hunt Contract ¶ 1, at 1, and in Ulibarri's case, working as Custodial Supervisor, see Ulibarri Contract at 1. Although the covenant requires that neither party, in "bad faith," do anything that will injure the rights of the other to receive the benefit of their agreement, the Plaintiffs' alleged demotion, a part of a mass employee demotion in furtherance of a conspiracy to discriminate against Mormon employees, based on an unconstitutional discriminatory policy, is an act done in bad faith, and shows that the discriminating party "wrongfully and intentionally used the contract to the detriment of the other party." WXI/Z Sw. Malls v. Mueller, 2005-NMCA-046, ¶ 25, 137 N.M. 343, 110 P.3d 1080. The demotion, then, if proven, as the Plaintiffs allege, to be based on discrimination, denied the Plaintiffs their rights to the benefit of their employment contracts in contravention of the covenant of good faith and fair dealing, and "denying a party its rights to those benefits will breach the duty of good faith implicit in the contract." Planning and Design Solutions v. City of Santa Fe, 118 N.M. at 714, 885 P.2d at 635. The Plaintiffs thus make plausible that the CCSD breached the covenant of good faith and fair dealing. The Court will therefore not dismiss the Plaintiffs' Count II.

**A.    THE COURT WILL DISMISS COUNTS VI, VII, AND IX, BECAUSE THE DEFENDANTS HAVE NOT WAIVED THEIR IMMUNITY FROM TORT SUITS.**

The Defendants assert that sovereign immunity granted to state entities and employees acting in their official duties bars: (i) the tortious-interference-with-contract claim in Count VI; (ii) the common-law conspiracy claim in Count VII; and (iii) the negligent-maintenance claim in Count IX.   See Motion to Dismiss at 25 (citing N.M.S.A. 1978, § 41-4-4 (2011)).   The Defendants assert that, to state a claim against any state employee or state entity, the Plaintiffs must specifically identify a waiver of sovereign immunity for the particular claim and the claim must stem from bodily injury.   They contend that the Plaintiffs can meet neither of these prongs. See Motion to Dismiss at 26.   The Plaintiffs respond that the State of New Mexico waived its sovereign immunity for the Plaintiffs' claims in N.M.S.A. 1978, § 41-4-6.   The Court concludes that N.M.S.A. 1978, § 41-4-6 does not apply, because the Plaintiffs' well-pleaded allegations do not allege any physical harm or damage, and concludes that there is no other applicable waiver in the NMTCA.   Accordingly, the Court will dismiss Counts VI, VII, and IX.

The New Mexico Legislature declared that New Mexico public policy rendered governmental entities and public employees liable only within the NMTCA's limitations and in accordance with the principles that act establishes.   See N.M.S.A. 1978, § 41-4-2(A).   The NMTCA is the only remedy against a governmental entity or public employee for any tort for which the NMTCA waives immunity.   See N.M.S.A. 1978, § 41-4-17(A).   "[N]o other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against a public employee or his estate whose act or omission gave rise to

the suit or claim."   N.M.S.A. 1978, § 41-4-17(A).   A plaintiff may not sue a governmental entity

of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of

the exceptions listed in the NMTCA.   See Begay v. New Mexico, 104 N.M. at 486, 723 P.2d at

255 ("Consent to be sued may not be implied, but must come within one of the exceptions to

immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 104 N.M.

375, 721 P.2d 1306 (1986).

The NMTCA's § 41-4-6 exempts from immunity "liability damages resulting from bodily

injury, wrongful death or property damage caused by the negligence of public employees while

acting within the scope of their duties in the operation or maintenance of any building, public park,

machinery, equipment or furnishings."   N.M.S.A. 1978, § 41-4-6.   This exception balances the

principle that "government should not have the duty to do everything that might be done" with the

desire "to compensate those injured by the negligence of public employees and to impose duties of

reasonable care."   Cabos v. Doña Ana Cnty. Hous. Auth., 1998-NMSC-049, ¶ 6, 126 N.M. 418,

970 P.2d 1143 (citations omitted)(internal quotation marks omitted).   To resolve the tension

between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general

immunity from tort liability, [and] waive[s] that immunity in certain defined circumstances."

Cabos v. Doña Ana Cnty. Hous. Auth., 1998-NMSC-049, ¶ 6, 126 N.M. 418, 970 P2d 1143.   The

Supreme Court of New Mexico has explained that "the liability envisioned by [§ 41-4-6] is not

limited to claims caused by injuries occurring on or off certain 'premises,' as the words

'machinery' and 'equipment' reveal."   Cabos v. Doña Ana Cnty. Hous. Auth., 1998-NMSC-049,

¶ 9, 126 N.M. 418, 970 P.2d 1143.   Section 41-4-6 "contemplates waiver of immunity where due

to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." Bober v. N.M. State Fair, 111 N.M. at 653, 808 P.2d at 623 (citations omitted)(internal quotation marks omitted).

Although no New Mexico state court or federal court appears to have addressed whether N.M.S.A. 1978, § 41-4-6(A)'s sovereign immunity waiver applies to physical property damage only, New Mexico case law supports finding that physical damage is required for the waiver to apply. Federal courts must determine what a state's Supreme Court would do if confronted with the same issue. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). The Court of Appeals of New Mexico three years ago, in Holguin v. Tsay Corp., addressing a similar sovereign immunity waiver, held that "the words 'bodily injury' and 'property damage' unambiguously require physical damage to a . . . person or property." 2009-NMCA-056, ¶ 10, 146 N.M. 346, 210 P.3d 243 (emphasis added). Although the Court of Appeals of New Mexico was not considering N.M.S.A. 1978, § 41-4-6(A), as it was construing the Tribal-State Class III Gaming Compact between the State of New Mexico and the Ohkay Owingeh Nation, the two waivers both compensate for bodily injury and property damage. Compare 2009-NMCA- 056, ¶ 6, 146 N.M. 346, 210 P.3d 243 (quoting the tribal waiver: "[T]he Tribe . . . waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage . . ."), and N.M.S.A. 1978, § 41-4-6(A) (waiving immunity for "damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings"). The case in which that provision was originally construed, R & R Deli, Inc. v. Santa Ana Star Casino, stated that the waiver's use of the phrase "property damage" indicates that it is intended to cover physical harms, especially in light

- 168 -

the word safety's inclusion in another subsection of the compact:

> Section 8 consistently uses the phrase "bodily injury" in conjunction with the phrase "property damage."   The juxtaposition of these terms indicates that the drafters of the gaming compact were referring to <u>physical harms to persons or property</u>.   Second, Section 8(A) begins by referencing the importance of "the safety and protection" of visitors.   The use of the word "safety" again indicates that the drafters were referring to <u>physical damage</u> to persons or property when they worded the waiver.

<u>R & R Deli, Inc. v. Santa Ana Star Casino</u>, 2006-NMCA-020, ¶ 21, 139 N.M. 85, 128 P.3d 513 (emphasis added).  The Supreme Court of New Mexico has held that "[s]ection 41–4–6 . . . contemplates waiver of immunity where due to the alleged negligence of public employees an injury arises from an <u>unsafe</u>, <u>dangerous</u>, or defective condition on property owned and operated by the government."   <u>Castillo v. Santa Fe Cnty.</u>, 107 N.M. 204, 205, 755 P.2d 48, 49 (1988)(emphasis added).   These cases thus support finding that § 41-4-6(A)'s sovereign immunity waiver applies only in cases of physical "property damage."   N.M.S.A. 1978, § 41-4-6(A).   This conclusion also finds support in the facts of this case, where, if the Plaintiffs' allegations prove true, and their reassignments were based on the CCSD's discriminatory policy or custom, they will be compensated for any "property damage" -- <u>i.e.</u>, the lost guaranteed salary under the contract -- by means of their breach-of-contract claim.

    All of the Plaintiffs' well-pleaded, non-conclusory allegations about their damages relate to compensatory, emotional, or physical damages stemming from their decision to leave the CCSD's employment after the reassignment and issues flowing from that reassignment.   For example, in Count IX, the Defendants allege a tort in which "[t]he actions, as well as the inactions, of CCSD, as well as the Individual Defendants, compromised negligence . . ., and a breach of the defendants' duty to provide a safe work environment . . . by adequately ensuring the safe maintenance and operation of the plaintiff's work facilitates on the CCSD property."   Complaint

¶ 94, at 40.   They allege:

> As a direct and proximate result of CCSD's actions, Plaintiffs have suffered and will continue to endure pain and suffering, <u>economic injury</u> and extreme and severe mental anguish and emotional distress; they have incurred and will incur medical expenses in the future for treatment by psychotherapists and other health professionals, and for other incidental expenses; and he [sic] will suffer a loss of earnings and other employment benefits and job opportunities.   Plaintiffs are therefore entitled to general, compensatory and punitive damages in amounts to be proven at trial.

Complaint ¶ 101, at 43 (emphasis added).   Although the Plaintiffs allege in paragraph 99 that the "CCSD's retention of the individual defendants and its failure to act to train, investigate, and supervise them affirmatively and proximately cause each Plaintiff physical and emotional injury," because there are no other factual allegations about either of the Plaintiffs suffering emotional or physical injuries, paragraph 99 is a bare assertion which amounts to nothing more than a formulaic recitation of N.M.S.A. 1978, § 44-1-6(A)'s requirement that there must be a physical injury.   As such, it is not entitled to the assumption of truth.   See <u>Ashcroft v. Iqbal</u>, 556 U.S. at 681 ("These bare assertions, much like the pleading of conspiracy in <u>Twombly</u>, amount to nothing more than a 'formulaic recitation of the elements' of  . . . [the] claim.   As such, the allegations are conclusory and not entitled to be assumed true.")(quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555). Because the Plaintiffs' well-pleaded factual allegations do not plausibly allege that the persons or property were physically damaged as a result of any alleged tort, New Mexico has not waived the CCSD's sovereign immunity for any of the Plaintiffs' tort claims.   The Court will therefore dismiss the Plaintiffs' Counts VI -- tortious interference with contract -- Count VII -- common-law conspiracy -- and Count IX -- negligent operation of a school building.

>  **D.   THE COURT WILL DISMISS THE PLAINTIFFS' FATA CLAIM IN COUNT V, BECAUSE THEY DO NOT PLAUSIBLY ALLEGE THAT THE DEFENDANTS RETALIATED AGAINST THEM FOR ANY PROTECTED DISCLOSURE.**

The Plaintiffs allege that the Defendants

knowingly harassed, demoted committed attempted fraud against Plaintiffs, and eventually constructively terminated Plaintiffs specifically because of their lawful actions in disclosing the information contained in their various complaints to government agencies including the New Mexico Human Rights Division, the New Mexico Public Education Department, and the Federal Equal Employment Opportunity Commission.

Complaint ¶ 71, at 35.   The Defendants contend that the Plaintiffs fail to state a claim for two reasons. First, they assert that the NMTCA prevents the Plaintiffs' claim, because no express immunity waiver applies.   Second, they assert that the Plaintiffs' contention that N.M.S.A. 1978, § 44-9-11 creates a stand-alone private cause of action construes the statute too broadly, and that "this strained reading of FATA cannot employ a waiver of sovereign immunity."   Reply at 15-16. The Court agrees with the Defendants that no express sovereign immunity waiver in the NMTCA applies to the alleged retaliation but concludes that FATA waives sovereign immunity. Nevertheless, as the Court concluded in relation to the Plaintiffs' Title VII retaliation claim in Part III(C)(3) above, the sequence of events does not make plausible that any act of the Defendants was retaliatory.   The Court will therefore dismiss Count V.

### 1.    The FATA Section 11 Waives Sovereign Immunity for Private Retaliation Claims.

No state or federal court has discussed or cited the FATA's retaliation provision in N.M.S.A. 1978, § 44-9-11.   Although the NMTCA generally immunizes the state and public employees from tort liability unless it specifically waives it for certain tort claims, the Supreme Court of New Mexico has recognized that the state may waive tort immunity under other state laws.   See Luboyeski v. Hill, 117 N.M. 380, 384, 872 P.2d 353, 357 (1994).   The Court find that the FATA is one such law and that the state waives its sovereign immunity for retaliation claims

under § 44-9-11.

The NMTCA provides that "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by the New Mexico Religious Freedom Restoration Act and by Sections 41-4-5 through 41-4-12 NMSA 1978," N.M.S.A. 1978, § 41-4-(A), and, moreover, includes an exclusive-remedy provision:

> The Tort Claims Act . . . shall be the exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M.S.A. 1978, § 41-4-17(A).   The Supreme Court of New Mexico has nevertheless interpreted § 41-4-17(A) as not foreclosing the legislature's ability to waive immunity under other acts.   See Luboyeski v. Hill, 117 N.M. at 384, 872 P.2d at 357 ("[T]he language of the exclusive-remedy provision of the Tort Claims Act, which states that the Act provides the exclusive remedy 'for any tort for which immunity has been waived under the Tort Claims Act' does not foreclose the possibility that the legislature also waived immunity under another act . . . .")(emphasis in original).

In Luboyeski v. Hill, the Supreme Court of New Mexico held that the State of New Mexico waived its sovereign immunity in the NMHRA, when, after the NMTCA was already in effect, the Legislature enacted a provision for attorney's fees, which provided that "the state shall be liable to the same extent as a private person." 117 N.M. at 383, 872 P.2d at 356 (quoting N.M.S.A. 1978, § 28-1-13(D))(emphasis and quotations omitted).   The Supreme Court of New Mexico noted: "We think it reasonable to presume that the legislature was aware of a law as important and pervasive as is the Tort Claims Act, especially in light of the fact that it amended the Act in 1981, 1982, and

1983," and given that the Legislature enacted the NMHRA provision in 1983.   117 N.M. at 384, 872 P.2d at 357.   Because the Legislature is presumed to know of other statutes in existence at the time it enacts a law, and because courts "must read different legislative enactments as harmonious instead of contradicting one another," the Supreme Court of New Mexico concluded "that sovereign immunity has been waived by the Human Rights Act to the extent needed to permit recovery under the Act against the state and its political subdivisions."   117 N.M. at 384-85, 872 P.2d at 357-58.

The New Mexico legislature in 2007 created a private right of action against employers for retaliation in the FATA at § 44-9-11.   See 2007 N.M. Laws Ch. 40, § 11(C) (H.B. 770) (codified at N.M.S.A. 1978, § 44-9-11(C)).   That law provides in part: "An employer that violates Subsection B of this section shall be liable to the employee for all relief necessary to make the employee whole . . . ."   N.M.S.A. 1978, § 44-9-11(C).   The Legislature's definition of "employers" for FATA purposes includes governmental entities: "'employer' includes an individual, corporation, firm, association, business, partnership, organization, trust and the state and any of its agencies, institutions or political subdivisions."   N.M.S.A. 1978, § 44-9-2(B) (emphasis added).   The FATA defines "state" to mean "the state of New Mexico or any of its branches, agencies, departments, boards, commissions, officers, institutions or instrumentalities, including the New Mexico finance authority, the New Mexico mortgage finance authority and the New Mexico lottery authority."   N.M.S.A. 1978, § 44-9-2(E).

The Legislature's inclusion of the "state" in the FATA's definition of employer waives the state's sovereign immunity to the same extent necessary to hold employers liable under the FATA. Just as the Legislature held the state liable for attorney's fees in the NMHRA while the NMTCA was in effect, so here in the FATA, the Legislature in § 44-9-11(C) imposed liability on any

employer and included within employer's definition "the state and any of its agencies, institutions or political subdivisions."   N.M.S.A. 1978, § 44-9-2(B).   Moreover, the other definitions provided in the FATA's definitions section -- N.M.S.A. 1978, § 44-9-2 -- provide support for finding that the Legislature intended to hold the state and its governmental entities liable to the same extent as other employers under the act.   The Legislature's inclusion of § 44-9-2(E), which specifically defines "state" in the FATA, especially juxtaposed with subsection D's definition of "person," § 44-9-2(D), which omits the state from its definition, shows that the Legislature was careful in the FATA's definitions, and intended to include the state as an employer.   Just as the Supreme Court of New Mexico in Luboyeski v. Hill concluded that affirmatively imposing liability in the NMHRA waived sovereign immunity "to the extent needed to permit recovery under the Act against the state and its political subdivisions," 117 N.M. at 384-85, 872 P.2d at 357-58, the FATA § 11(C) thus also waives sovereign immunity to the extent necessary to permit recovery under § 44-9-11(C) against the state and any of its agencies, institutions or political subdivisions.

If the Court were to conclude otherwise, it would not be effectuating the Legislature's clear intent.   While the Legislature should either repeal the NMTCA's exclusive remedy provision or, when proposing a new waiver, expressly reference the NMTCA's exclusive remedy provision and say clearly that the new statute is another exception, legislation is not usually drafted so neatly. The NMTCA's intent is to protect the state from trial lawyers creating new torts, and it is clear here that Legislature enacting the FATA, not trial lawyers, created the cause of action.   If the Court were to conclude that this cause of action did not waive the "state['s]" immunity, it would not be giving any meaning to the word "state" in § 44-9-2(B).   The Court therefore concludes that the Defendants are not immune from the Plaintiffs' FATA retaliation claim.

2.        **The Plaintiffs' Complaint Fails to State a FATA Retaliation Claim**.

The Supreme Court of New Mexico has recognized that the FATA, like "most states' false-claims statutes passed in recent years, spurred by Congress' 'financial incentive for states to pass FCAs that mirror the federal FCA,'" was "enacted in 2007 and tracks closely the longstanding federal False Claims Act (FCA)."   State ex rel. Foy v. Austin Capital Mgmt., Ltd., 2013-NMCA-043, ¶ 7, 297 P.3d 357, cert. granted, No. 34,013, 2013 WL 1506707 (N.M. Mar. 15, 2013)(quoting Pamela Bucy et al., States, Statutes, and Fraud: A Study of Emerging State Efforts to Combat White Collar Crime, 31 Cardozo L. Rev. 1523, 1535 (2010)).   "FATA prohibits the acts of knowingly presenting a false claim for payment from the State, presenting false records to obtain payment from the State, and making false statements to obtain payment."   State ex rel. Foy v. Austin Capital Mgmt., Ltd., 2013-NMCA-043, ¶ 7, 297 P.3d 357 (citing N.M.S.A. 1978, § 44-9-3).   The FATA, like its federal analogue, "allow[s] a private individual, rather than the . . . government itself, to bring a qui tam action on behalf of the government," and to sue any person for an alleged fraud under the FATA.   State ex rel. Foy v. Austin Capital Mgmt., Ltd., 2013-NMCA-043, ¶ 7, 297 P.3d 357.   See N.M.S.A. 1978, § 44-9-5.   The FATA section 11 creates a private cause of action for any employee whose employer in any way prevents an employee from disclosing a fraud or retaliates against an employee for doing so:

> A. An employer shall not make, adopt or enforce a rule, regulation or policy preventing an employee from disclosing information to a government or law enforcement agency or from acting in furtherance of a fraud against taxpayers action, including investigating, initiating, testifying or assisting in an action filed or to be filed pursuant to the Fraud Against Taxpayers Act.
>
> B. An employer shall not discharge, demote, suspend, threaten, harass, deny promotion to or in any other manner discriminate against an employee in the terms and conditions of employment because of the lawful acts of the employee on behalf of the employee or others in disclosing information to a government or law enforcement agency or in furthering a fraud against taxpayers action, including

investigating, initiating, testifying or assisting in an action filed or to be filed pursuant to the Fraud Against Taxpayers Act.

C. An employer that violates Subsection B of this section shall be liable to the employee for all relief necessary to make the employee whole, including reinstatement with the same seniority status that the employee would have had but for the violation, two times the amount of back pay with interest on the back pay, compensation for any special damage sustained as a result of the violation and, if appropriate, punitive damages.   In addition, an employer shall be required to pay the litigation costs and reasonable attorney fees of the employee.   An employee may bring an action pursuant to this section in any court of competent jurisdiction.

N.M.S.A. 1978, § 44-9-11.

The Plaintiffs do not plausibly allege that they made a protected FATA disclosure, or that any CCSD policy prevented them from disclosing or acting in furtherance of a fraud against taxpayers action.   Although no court has determined the extent of frauds covered under the FATA, the FCA "at the time of the Act's original enactment in 1863   . . . was intended to reach all types of fraud, without qualification, that result in financial loss to the Government."   United States v. Fowler, 282 F. Supp. 1, 2 (E.D.N.Y. 1968)(emphasis added)(citing United States v. Neifert-White Co., 390 U.S. 228 (1968).   Nowhere in the Plaintiffs' Complaint, however, are there facts from which the Court could plausibly conclude that the Plaintiffs disclosed information or otherwise furthered the government's interest in a FATA action.   See N.M.S.A. 1978, § 44-9-11 (B).

The Plaintiffs' allegations within Count V allege that the Plaintiffs "complained repeatedly in attempting to halt the discriminatory, retaliatory, harassing and fraudulent atmosphere at CCSD, including specifically interdepartmental complaints and promises to file NMHRD Charges of Discrimination," and that the "Defendants, and each of them, enforced policies and procedures against Plaintiffs which were not enforced against others, and which were enforced in a discriminatory and retaliatory fashion."   Complaint ¶ 70, at 35.   Notwithstanding

the lack of a causal connection in this paragraph, this statement is possibly an attempt to allege, under N.M.S.A. 1978, § 44-9-11(A), that the CCSD had a "policy preventing an employee from disclosing information to a government or law enforcement agency or from acting in furtherance of a fraud against taxpayers action."   The plaintiffs do not allege what policies and procedures were enforced against them but not others, or who the others are.   Without those facts, these allegations are formulaic recitations a retaliation's claim's elements, not entitled to the presumption of truth, and do not fit into the plausibility calculus.   See Ashcroft v. Iqbal, 556 U.S. at 681.   These allegations thus fail to nudge any FATA retaliation claim beyond a possibility and fail to state any claim upon which relief can be granted under FATA.

The Plaintiffs also allege:

> Defendants knowingly harassed, demoted, committed attempted fraud against Plaintiffs, and eventually constructively terminated Plaintiffs specifically because of their lawful actions in disclosing the information contained in their various complaints to government agencies including the New Mexico Human Rights Division, the New Mexico Public Education Department, and the Federal Equal Employment Opportunity Commission.

Complaint ¶ 71, at 35.   They also allege that "[t]he complaints proximately caused the retaliatory actions, specifically because of the illegal motivations and propensities of the Defendants." Complaint ¶ 72, at 35.   These two paragraphs fall more in line with the FATA's language, and are likely directed at N.M.S.A. 1978, § 44-9-11 (B)'s whistleblower protection provision.   These allegations also fail, however, to state a claim showing that the Plaintiffs could plausibly, or, in this case, even possibly, be entitled to relief.   The alleged disclosures of information to the New Mexico state agencies and the EEOC -- not alleged in Count V, but which the Court found elsewhere in the Complaint -- were made after any alleged retaliatory acts.   As the Court already noted in relation to the Plaintiffs' Title VII claim, the Plaintiffs' alleged disclosures happened in

late-August and December, 2011.  See Complaint ¶¶ 26, 35, at 16, 21.  The alleged retaliatory acts, however, took place in July, 2011, before the August and December disclosures.  See Complaint ¶¶ 17, 30, at 12, 19 (noting that the meetings about the Plaintiffs' reassignments took place around mid-July 2011).  The Court therefore concludes that the Plaintiffs cannot plead any set of facts on which they would be entitled to relief under the FATA, and therefore dismisses Count V with prejudice.

### E.   THE COURT WILL ALLOW THE NMHRA CLAIM IN COUNT VII TO PROCEED ON THE DISPARATE-TREATMENT DISCRIMINATION BASIS ONLY.

The Plaintiffs allege NMHRA claims against the CCSD, Levinski, Marquez, and Frazzini based on "Disparate Impact and Treatment Discrimination, Retaliation, Hostile Work Environment and Constructive Discharge."[12]  Complaint at 38.  The Defendants contend that the Court should dismiss Count IX, because they were required to file a notice of appeal with the Human Rights Commission within ninety days of receiving their nondetermination orders, but "[n]othing in the [Complaint] indicates that Plaintiffs complied with these requirements."  Motion to Dismiss at 38.  The Defendants also contend that the Court should dismiss the NMHRA claims, asserting arguments identical to those in relation to the Title VII claims.  The Court, similarly, finds that the Plaintiffs' Complaint alleges a plausible disparate-treatment discrimination claim under the NMHRA on the basis of their Mormon religion.  Although the Plaintiffs did not

---

[12]  In the caption to Count VIII, the Plaintiffs indicate that their NMHRA claims are limited to the CCSD, Marquez, Levinski, and Frazzini.   In Paragraph 90, the Plaintiffs imply that they are asserting NMHRA claims against Tso, Benally, and Nicolay.   Nevertheless, the Plaintiffs admit that they failed to file charges against Tso, Benally, or Nicolay with the Human Rights Commission.  See Complaint ¶¶ 26, 35, at 16, 21.  The Court will thus dismiss any claim under Count VIII against Tso, Benally, and Nicolay for their failure to exhaust administrative remedies. Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 20, 127 N.M. 282, 980 P.2d 65.

specifically allege that they complied with the ninety-day-appeal-notice requirement in their Complaint, because they attached the Notices of Non-Determination to the Complaint, and told the Court at the hearing that they properly filed notice with the Human Rights Commission, the Court will not dismiss their claims on that ground.    The Court will therefore allow the NMHRA claim to go forward on the disparate-treatment basis only.

> **1.      Although the Plaintiffs Fail to Specifically Allege Compliance with the NMHRA's Requirement to File a Notice of Appeal Within Ninety Days, Because a Plaintiff Need Only Allege Facts Essential to Jurisdiction, the Court will not Dismiss the NMHRA Claims on This Basis.**

"NMHRA claims must be administratively exhausted before being brought in federal court."    Bates v. N.M. Corr. Dep't, 2010 WL 4339367, at *7.    "[T]he exhaustion of administrative remedies is a prerequisite to suit under the NMHRA, and a failure to exhaust may mean that the district court lacks subject matter jurisdiction."    Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 20, 127 N.M. 282, 980 P.2d 65 (internal citations omitted).    The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the [New Mexico Human Rights] commission's order.

N.M.S.A. 1978, § 28-1-13A.

Where administrative exhaustion is a jurisdictional prerequisite, to pursue the cause of action in federal district court, the complaint need allege only the "'facts essential to show jurisdiction'" and also "'allege generally that all conditions precedent have occurred or been performed.'"    Campos v. Las Cruces Nursing Ctr., 828 F. Supp. 2d 1256, 1271 (D.N.M. 2011)(Browning, J.)(quoting Pretlow v. Garrison, 420 F. App'x 798, 802 (10th Cir.

2011)(unpublished); Fed. R. Civ. P. 9(c)).   If a party challenges jurisdiction, however, the plaintiff must then "'support those allegations by a preponderance of the evidence.'"   Campos v. Las Cruces Nursing Ctr., 828 F. Supp. 2d at 1271 (quoting Pretlow v. Garrison, 420 F. App'x at 802).   Thus, in a Title VII claim, where exhaustion of administrative remedies with the EEOC is a jurisdictional prerequisite, the Tenth Circuit has recognized that "an employment-discrimination plaintiff must 'plead and show' exhaustion."   Pretlow v. Garrison, 420 F. App'x at 802 (quoting Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1063 (10th Cir. 2002)).   The Plaintiffs have done that here.

The Plaintiffs pled that they exhausted their administrative remedies' exhaustion in their Complaint.   See Complaint ¶ 89, at 39.   In addition, the Plaintiffs attached their nondetermination orders to their Complaint.   See Hunt Order of Non-Determination at 1 (dated Mar. 12, 2012), filed September 12, 2012 (Doc. 24-2, at 1); Ulibarri Order of Nondetermination at 1 (dated Mar. 12, 2012, filed September 12, 2012 (Doc. 24-2, at 3).   These pleadings, taken together with the attached letters, allege the essential facts to show jurisdiction and allege generally that the Plaintiffs have completed the conditions precedent necessary to bring their NMHRA claims.   Requiring the Plaintiffs to allege compliance with each particular step of administrative exhaustion, including that they appealed within the require ninety days, would impose pleading requirements which harken back to the "hyper-technical, code pleading regime of a prior era," which the Supreme Court has recognized rule 8 of the Federal Rules of Civil Procedure specifically repudiates.   Ashcroft v. Iqbal, 556 U.S. at 678.

Moreover, when the Defendants challenged the Plaintiffs' allegations about the Court's jurisdiction over their NMHRA claims, the Plaintiffs showed, by a preponderance of the evidence,

that jurisdiction is proper, by referring the Court to the attached nondetermination orders, and by

informing the Court in their Response and at the hearing that they complied with the ninety-day

notice requirement.   Thus, the Court concludes that the Plaintiffs, in this "employment-

discrimination" lawsuit "'plead and show' exhaustion."   Pretlow v. Garrison, 420 F. App'x at 802

(quoting Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d at 1063).   Given that the Supreme Court of

New Mexico has recognized that receiving a nondetermination order from the NMHRD after the

filing of a district court complaint suffices to exhaust the plaintiff's administrative remedies, see

Mitchell-Carr v. McLendon, 1999-NMSC-025, 127 N.M. 282, 980 P.2d 65, and given that the

Court in Campos v. Las Cruces Nursing Ctr., 828 F. Supp. 2d at 1274-75, found the

nondetermination orders submitted after the Complaint sufficient to withstand a motion to dismiss,

the Complaint as a whole, including the attached nondetermination orders, reasonably and

plausibly alleges that the Plaintiffs exhausted their administrative remedies under the NMHRA.

> **2.      Although the NMHRA's Standards are not Identical to Title VII, the Court Concludes that, Analogous to the Plaintiffs' Title VII Claim, the Plaintiffs Plausibly Allege an NMHRA Claim Based on Disparate Treatment Because of Their Mormon Religion Against the CCSD, Levinski, Marquez, and Frazzini.**

The Supreme Court of New Mexico has stated that, "when considering claims under the

NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the

NMHRA.   Our reliance on the methodology developed in the federal courts, however, should not

be interpreted as an indication that we have adopted federal law as our own."   Ocana v. Am.

Furniture Co., 2004-NMSC-018, ¶ 23, 135 N.M. 539, 91 P.3d 58 (internal quotation marks

omitted)(citations omitted).   The Supreme Court of New Mexico applies the framework that the

Supreme Court of the United States established in McDonnell Douglas Corp. v. Green "[w]hen

considering a violation of the NMHRA."   Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 139 N.M. 12, 127 P.3d 548.   While New Mexico uses federal law to interpret the NMHRA, "[a]s a general matter, the NMHRA allows suits against individuals unlike Title VII." Campos v. Las Cruces Nursing Ctr., 828 F. Supp. 2d at 1275 (citing Luboyeski v. Hill, 117 N.M. at 382, 872 P.2d at 355).

The question the Court must therefore answer is whether any of its determinations of the Complaint's failure or success to state a Title VII claim require a different analysis or outcome under NMHRA law.   The Court concludes that the claims warrant the same analysis.   The Complaint makes plausible only a disparate-treatment discrimination claim under the NMHRA based on the Plaintiffs' religion.

Although New Mexico courts have not outlined the particular elements for a disparate-treatment claim for discrimination based on the particular adverse employment actions to which the Plaintiffs are subjected, they would likely look to the McDonnell Douglas Corp. v. Green prim facie case standards that the Tenth Circuit articulated in Sorbo v. United Parcel Serv. and Notari v. Denver Water Dep't, under which the Court analyzed the Plaintiffs' Title VII, § 1983, and §1985(3) claims.   The Court's conclusion finds support in Gonzales v. N.M. Dep't of Health, 2000-NMSC-029, ¶ 22, 129 N.M. 586, 11 P.3d 550, where the Supreme Court of New Mexico looked to the Tenth Circuit's decisions in Jeffries v. Kansas, 147 F.3d 1220, 1231 (10th Cir. 1998), and Archuleta v. Colo. Dep't of Insts., 936 F.2d 483, 486 (10th Cir. 1991), for a prima facie case of discriminatory retaliation.   The Supreme Court of New Mexico in that case also looked to Tenth Circuit precedent to note that "[a] disparate impact claim differs from a disparate treatment claim in that it does not involve a showing of discriminatory intent, but rather addresses those situations when an apparently neutral employment policy has a discriminatory effect."   Gonzales v. N.M.

Dep't of Health, 2000-NMSC-029, ¶ 30, 129 N.M. 586, 11 P.3d 550 (citing Ortega v. Safeway Stores Inc., 943 F.2d 1230, 1242 (10th Cir. 1991)).  The Court therefore concludes that the Plaintiffs' Complaint states a plausible claim for disparate treatment, and will allow their NMHRA claim to go forward against the CCSD, Levinksi, Marquez, and Frazzini on the basis that they were reassignment because they are Mormon.[13]

The standards for analyzing the remaining bases for the NMHRA claim, which the Court has found the Plaintiffs cannot plausibly show entitle them to relief under Title VII, are identical to the standards under Title VII.   See Gonzales v. N.M. Dep't of Health, 2000-NMSC-029, ¶ 22, 129 N.M. 586 11 P.3d 550 (adopting the Tenth Circuit's analysis in Jeffries v. Kansas, 147 F.3d at 1231, for retaliation).   New Mexico has expressly adopted Title VII standards for hostile work environment and the Tenth Circuit's Title VII analysis for constructive termination.   See Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 24, 135 N.M. 539, 91 P.3d 58 (adopting Title VII's analysis for hostile work environment)("Under Title VII, sexual harassment is actionable under a hostile work environment theory when the offensive conduct becomes so severe and pervasive that it alters the conditions of employment in such a manner that the workplace is transformed into a hostile and abusive environment for the employee."); Gormley v. Coca-Cola Enters., 2005-NMSC-003, ¶ 10, 137 N.M. 192,109 P.3d 280 (adopting the Tenth Circuit's standards for constructive discharge)("Although no New Mexico opinion sets forth the elements necessary to prove constructive discharge, numerous federal opinions from the Tenth Circuit discuss that

---

[13] While the Court found that the Plaintiffs' allegations are insufficient to state a plausible claim for disparate-treatment discrimination based on the Plaintiffs' Anglo racial status, if the Plaintiffs add sufficient factual allegations in their amended complaint to state a facially plausible discrimination claim based on their racial status, those allegations may also serve as the basis for a facially plausible NMHRA claim.

standard.")(citing <u>Derr v. Gulf Oil Corp.</u>, 796 F.2d 340, 344 (10th Cir. 1986); <u>Yearous v. Niobrara</u> <u>Cnty. Mem'l Hosp.</u>, 128 F.3d 1351, 1356 (10th Cir. 1997); <u>Garrett v. Hewlett-Packard Co.</u>, 305 F.3d 1210, 1221 (10th Cir. 2002)).   Neither the Plaintiffs nor the Defendants have cited to the Court any cases which support a reasonable inference that the Supreme Court of New Mexico would differ from the Tenth Circuit's articulations of disparate treatment, disparate impact, retaliation, hostile work environment, or constructive discharge, in relation to the Plaintiffs' allegations.   Additionally, there does not appear to be any New Mexico case law articulating different standards with factual scenarios similar to the Plaintiffs'.   Accordingly, identical to its Title VII analysis, the Court therefore concludes that the Plaintiffs cannot state a plausible NMHRA claim on the basis of retaliation, hostile work environment, or constructive termination. The Court will thus dismiss the NMHRA claim to the extent it relies on those theories against the CCSD, Levinski, Marquez, and Frazzini.

**IT IS ORDERED** that Defendants' Motion to Dismiss for Failure to State a Claim for Relief and/or Qualified and Sovereign Immunity, filed October 15, 2012 (Doc. 27), is granted in part and denied in part. The Court will dismiss Counts V, VI, VII, and IX, but will not dismiss Counts I, II, III, IV, VIII, or X.   The Court will allow the claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e -17, and the New Mexico Human Rights Act claims to proceed only on the basis of disparate-treatment discrimination against Plaintiffs Jeffery Hunt and Alice Ulibarri based on their Mormon Religion only.   The Court grants the Plaintiffs leave to amend their complaint to clarify facts about who was reassigned in the restructuring and to add additional factual allegations to support their discrimination claims to the extent they are based on their Anglo race.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

George T. Geran
Santa Fe, New Mexico

     *Attorney for the Plaintiffs*

Elizabeth L. German
Ethan Watson
Mary Keleher Castle
German & Associates LLC
Albuquerque, New Mexico

     *Attorneys for the Defendants*