# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JEFFREY HUNT and
ALICE ULIBARRI,

        Plaintiffs,

v.                                                                          No. CIV 11-1144 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, NANCY FRAZINNI [sic],[1]
MATTHEW TSO, SCOTT NICOLAY, and
PHIL KASPAR, Individually,

        Defendants.

                                              Consolidated with:

SHARON JENSEN,

        Plaintiff,

v.                                                                          No. CIV 12-1018 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, MATTHEW TSO,
and SCOTT NICOLAY, Individually,

        Defendants.

---

[1] There are several misspelled names in the case caption. In his Motion for Summary Judgment, Defendant Kasper's name is spelled with an "er" rather than an "ar." The case caption's use of the notation "sic" next to Defendant Nancy "Frazinni's" name indicates that it, too, is misspelled. Based on the spelling of Ms. Frazzini's name in her Motion for Summary Judgment, (Doc. No. 183), the Court uses the spelling of "Frazzini." Defendant Don Levinski's name is also subject to various spellings. *See Hunt and Ulibarri v. Central Consolidated Sch. Dist. et al.*, 951 F. Supp. 2d 1136 (D.N.M. 2013) (spelling Mr. Levinski's name with a "y" rather than an "i"). In addition, Plaintiff Jeffrey Hunt's first name is spelled differently in pleadings and briefing. *See* THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT (Doc. No. 93) and Defendant Kasper's Motion (Doc. No. 174 at 5) (using "Jeffery" or "Jeffrey"). The parties must confer and correct the spellings of all parties' names in the caption. The correct spellings of all parties names must be used in future briefs and pleadings.

## MEMORANDUM OPINION AND ORDER

DEFENDANT PHIL KASPER'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY AND MEMORANDUM OF LAW IN SUPPORT (Motion) (Doc. No. 174) argues that Mr. Kasper is entitled to the defense of qualified immunity as to the single claim of conspiracy brought against him by Plaintiffs Jeffrey Hunt and Alice Ulibarri (Plaintiffs or Mr. Hunt and Ms. Ulibarri).[2] Plaintiffs ask the Court to deny Mr. Kasper's Motion and request for qualified immunity. PLAINTIFFS HUNT AND ULIBARRI RESPONSE TO MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Response) (Doc. No. 196). Mr. Kasper contends that Plaintiffs have failed to present evidence showing that he violated any of their clearly established rights and that, therefore, the Court should dismiss Mr. Kasper from this lawsuit. REPLY IN SUPPORT OF DEFENDANT PHIL KASPER'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Reply) (Doc. No. 212).

### Background

Both Plaintiffs Hunt and Ulibarri are "Anglo and Mormon." THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT (Complaint) ¶¶ 1, 2. (Doc. No. 93). At all pertinent times, Plaintiffs were residents of Kirtland, San Juan County, New Mexico and were employees of Defendant Central Consolidated School District (CCSD). *Id.* According to the 2000 census, Kirtland, New Mexico had a population of a little over 6,000 residents. The town was founded in the early 1880s by Mormons or Latter-Day Saints (LDS),

---

[2]In the consolidated proceeding, Plaintiff Sharon Jensen does not name Mr. Kasper as a Defendant. Thus, this opinion addresses only those claims brought by Plaintiffs Hunt and Ulibarri against Mr. Kasper. *See* Plaintiffs' Response to Mr. Kasper's Motion at 2 (Doc. No. 196).

which named the New Mexico town after Kirtland, Ohio.[3] Plaintiffs allege that CCSD "has both a predominantly Native American student body, and a predominantly Native American workforce with a close to 90% Native American student body, and …, a close to 75% Native American workforce." Complaint ¶ 3.

Until July 2011, Plaintiff Hunt was employed as the Director of Transportation of CCSD, and until July 2011, Plaintiff Ulibarri was employed as the Custodial Supervisor of CCSD. Complaint ¶¶ 1, 2. Plaintiffs contend that in about 2011, a "conspiracy formed within the Senior Supervisory staff at CCSD" that resulted in demoting or removing Plaintiffs from their CCSD positions and replacing them with non-Mormon individuals or "Native American aligned" individuals. *See* Amended Joint Status Report and Provisional Discovery Plan (JSR at 3) (Doc. No. 124). As a result of this "conspiracy," Plaintiffs allege, *inter alia*, that Defendants discriminated against them based on their race and religion and violated their rights.

Mr. Kasper characterizes the 2011 organizational changes that occurred at CCSD as an "administrative restructuring." Motion at 2. "Upon discovering that CCSD's administrative costs were higher than those of equivalent school districts, newly-hired interim Superintendent Don Leviniski [sic] initiated changes to CCSD's hierarchy that involved reassigning assistant superintendents to director positions, reassigning directors to coordinator positions, eliminating certain supervisory positions within the administration, and making various other structural changes." *Id.* According to Mr. Kasper, Plaintiffs Hunt and Ulibarri were among "numerous CCSD employees," who were affected by the restructuring. *Id.*

---

[3]*See* Kasper Dep. (Doc. No. 174–7) at 32. *See also* https://en.wikipedia.org/wiki/Kirtland,New_Mexico (January 28, 2016). The Court may take judicial notice of facts that are generally known and accepted. *Mills v. Denver Tramway Corp.*, 155 F.2d 808, 811 (10th Cir. 1946).

3

**Procedural History**

The procedural history of this case is complicated and lengthy. On December 29, 2011, Plaintiffs Hunt and Ulibarri filed their initial Complaint against Defendants. On September 29, 2012, Plaintiff Sharon Jensen filed a similar Complaint against most, but not all, of the same Defendants. In March 2013, the Honorable District Court Judge James O. Browning consolidated the two cases at the requests of the parties.

In January 2013, before consolidation of the two related proceedings, Judge Browning held a hearing on Defendants' Motion to Dismiss for Failure to State a Claim for Relief and/or Qualified and Sovereign Immunity that was filed only in the Hunt/Ulibarri lawsuit. (Doc. No. 74). On June 12, 2013, Judge Browning authored a 125-page opinion that granted in part and denied in part Defendants' motion. *Hunt and Ulibarri v. Central Consolidated School Dist., et al.*, No. CIV 11-1144 (Doc. No. 74); 951 F. Supp. 2d 1136 (D.N.M. 2013). Judge Browning did not address Defendants' position with respect to Plaintiff Jensen's similar claims.

Judge Browning concluded that Plaintiffs' federal law claims under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and Title VII (Counts III, IV, and X)[4] against Defendants would all proceed. *Id.* at 1197, 1203–1233. Judge Browning also determined that Defendants were not entitled to the defense of qualified immunity at the Rule 12(b)(6) stage. *Id.* at 1232–33. Of Plaintiffs' seven state law claims against Defendants, Judge Browning dismissed the claims of tortious interference, common law conspiracy, and negligent building operations based on his conclusion that the State of New Mexico had not waived tort immunity for these claims. *Id.* at 1234–35. Judge Browning also dismissed Plaintiffs' Fraud Against Taxpayers claim. Judge Browning permitted the claims of disparate treatment discrimination under the New Mexico Human Rights Act (Count VIII), breach of contract (Count I), and breach of the implied covenant of good faith

---

[4] The numbering of claims is taken from Plaintiffs' Third Amended Complaint (Doc. No. 93).

and fair dealing (Count II) to proceed. Judge Browning clarified that Plaintiffs did not present any disability discrimination claims in the Complaint and that Plaintiffs could not hold any of the individual Defendants liable under Title VII. *Id.* at 1200, 1204.

Judge Browning permitted Plaintiffs to file an Amended Complaint to allege plausible claims so as to cure "technical errors in their Complaint." *Id.* at 1147. On June 24, 2013, Plaintiffs filed a Third Amended Complaint (first iteration) (Doc. No. 76) that appears to re-assert all ten of the original claims, including those that Judge Browning had dismissed. Plaintiffs added an eleventh claim under the New Mexico Whistleblower's Act. Also on June 24, 2013, Plaintiff Jensen filed a Second Amended Complaint (first iteration) (Doc. No. 75), including almost all of the same claims as those asserted by Plaintiffs Hunt and Ulibarri although Plaintiff Jensen did not add the Whistleblower's Act claim.

On August 9, 2013, the case was reassigned from Judge Browning to the Honorable District Court Judge Kenneth Gonzales. Notice (Doc. No. 93). On September 12, 2013, Judge Gonzales entered an Order requiring Plaintiffs to file an Amended Complaint that conformed to Judge Browning's opinion. Doc. No. 91. On September 23, 2013, Plaintiffs Hunt and Ulibarri filed the present Third Amended Complaint (second iteration) (Complaint) (Doc. No. 93) that omitted the claims Judge Browning had dismissed. Thus, the Third Amended Complaint contains claims numbered Counts I, II, III, IV, VIII, X, and XI.

On September 23, 2013, Plaintiff Jensen filed a Second Amended Complaint (second iteration) (Doc. No. 92) that is almost the same as the Second Amended Complaint (first iteration). In other words, Plaintiff Jensen continued to assert the same or similar state law claims that Judge Browning determined could not proceed in the Hunt/Ulibarri lawsuit. To clarify Plaintiff Jensen's claims, Judge Gonzales issued an Agreed Order Dismissing Claims and

Preserving Parties' Rights to Appeal (Doc. No. 96). The Agreed Order dismissed Plaintiff

Jensen's claims of tortious interference, common law conspiracy, and negligent building

operations (Counts V, VI and VIII), consistent with Judge Browning's opinion in the

Hunt/Ulibarri lawsuit. The Agreed Order also dismissed Plaintiff Jensen's claim of emotional

distress and request for punitive damages in relation to the breach of contract allegations.

However, Judge Gonzalez did not require Plaintiff Jensen to file an Amended Complaint setting

forth only the surviving claims (Counts I, II, III, IV, VII, and IX). Thus, Plaintiff Jensen's

Second Amended Complaint (second iteration) contains all of the original claims, including the

three dismissed claims.

Discovery in the consolidated cases began in late 2013 and continued through the fall of

2014. *See* Notice (Doc. No. 117). On August 29, 2014, Mr. Kasper filed the first of Defendants'

ten motions for summary judgment and/or for qualified immunity. On November 4, 2014, United

States Magistrate Judge Steven C. Yarbrough held a settlement conference, but the case did not

settle. By November 26, 2014, all ten motions for summary judgment were fully briefed.

On January 21, 2016, this case was reassigned from Judge Gonzales to the undersigned

Senior District Court Judge. Notice (Doc. No. 270).

**Legal Standards**

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). When applying this standard, the Court examines the factual record and reasonable

inferences therefrom in the light most favorable to the party opposing summary judgment.

*Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990).

The party seeking summary judgment bears the initial burden of "show[ing] that there is an

absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

"The doctrine of qualified immunity protects public or government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant asserts qualified immunity, the plaintiff bears the heavy burden of satisfying a "strict two-part test." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation omitted). The plaintiff must establish 1) that the defendant violated a constitutional or statutory right, and 2) that the right was clearly established at the time of the defendant's conduct. *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015).

When the defendant has moved for summary judgment based on qualified immunity, the Court views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in its favor. *See Estate of Booker* v. *Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

**Material Facts**[5]

***Defendant Don Levinski*** (Mr. Levinski)

In late May 2011, the CCSD school board selected Mr. Levinski to act as the interim

Superintendent. Defendant Kasper's Undisputed Material Fact (UMF) No. 3.[6] Mr. Levinski

calculated CCSD's administrative costs to be significantly higher than those of equivalent school

districts. As a result, Mr. Levinski initiated changes to CCSD's hierarchy, including the

reassignment of "assistant superintendent" positions to "director" positions and "director"

positions to "coordinator" positions. Mr. Levinski also eliminated certain supervisory positions

within the administration and made various other structural changes.

Plaintiffs Hunt and Ulibarri were impacted by the restructuring, in that they were either

demoted or received different job titles as of July 2011. *See* discussion *infra* regarding Plaintiffs'

---

[5] Plaintiffs attempt to dispute nine of Mr. Kasper's 25 UMFs. The Court concludes that Plaintiffs failed to properly contest any of the 25 UMFs; and that all 25 of the UMFs are undisputed. Plaintiffs also set out their own material and undisputed "Facts." *Response* at 3–11 (Facts 1–12). These purported Facts are interspersed with argument and span eight pages of the brief. The Court carefully reviewed these Facts and the citations to the record. Only two of the twelve Facts mention Mr. Kasper. Response at 5 and 6 (Facts 4 and 5). The Court discusses those Facts *infra* in its analysis of Mr. Kasper's Motion. The Court concludes that all of the remaining (Facts 1–3, 6–12) are immaterial. Indeed, most of Plaintiffs' exhibits should have been omitted because they do not concern alleged actions by Mr. Kasper.

[6] Plaintiffs dispute UMF No. 3 and contend that Mr. Levinski was "illegally elected Superintendent as one of the goals of the involved conspiracy," referring to Plaintiffs' Facts 9, 10, 11, 12. Response at 2. The manner in which Mr. Levinski obtained his position may be pertinent to issues involved in Mr. Levinski's separate Motion for Summary Judgment, but it has nothing to do with Mr. Kasper's Motion. Notably, none of these "Facts" mention Mr. Kasper and his purported involvement in a conspiracy. Thus, Plaintiffs' Facts 9, 10, 11, and 12 have no bearing on Mr. Kasper's Motion. Moreover, the Complaint alleges that "[Defendant Levinski] was promoted to the position of Acting Superintendent of CCSD in May 2011." Complaint ¶ 4. UMF No. 3 is undisputed.

The Court takes this opportunity to address Plaintiffs' repeated improper attempts to dispute Defendant Kasper's UMFs. For example, Defendant Kasper's UMF No. 3 states in part that Mr. "Levinski was selected by the CCSD school board to act as the interim Superintendent in late May 2011." Plaintiffs fail to clearly identify the portion(s) of Mr. Kasper's UMF No. 3 that they challenge. Instead, Plaintiffs argue that Levinski was "illegally" elected and that his illegal election was a goal of the conspiracy, matters that UMF No. 3 does not address. Response at 2 ("Kasper Fact 3"). Plaintiffs do not contest the actual facts, e.g., the date of Mr. Levinski's election, Mr. Levinski's selection by the CCSD school board, or Mr. Levinski's selection as the interim Superintendent. Put differently, Plaintiffs do not set out a "concise statement of the material facts" to which Plaintiffs contend a genuine issue exists. *See* D.N.M. LR-Civ 56.1(b). In addition, Plaintiffs refer the Court to not just one fact, but to numerous facts spread out over many pages of the brief. The result is to send the Court on a treasure hunt where the Court must scour pages of "Facts" and then multiple pages of argument, as well as interspersed references to the record, to determine if Plaintiffs have successfully identified a fact in dispute. This is improper. *See* D.N.M. LR-Civ 56.1(b) ("each fact in dispute must … refer with particularity to those portions of the record upon which the non-movant relies …."). Counsel should consult the pertinent rules of civil procedure and abide by them.

employment with CCSD. Although both Plaintiffs were given different job titles and responsibilities, they were ensured employment through the 2011–2012 school year and were promised the salaries set forth in their employment contracts for the one-year term.

Sometime after finalizing employee contracts for the 2011–2012 school year, Mr. Levinski decided to replace and demote Ms. Nancy Frazzini, who was CCSD's Director of Human Resources (HR). UMF No. 9.[7] Mr. Levinski reviewed Ms. Frazzini's credentials and did not believe she was qualified as a school administrator. Mr. Levinski wanted to make a change to the HR Department, which he characterized as a toxic environment to employees. UMF No. 7.[8] Ms. Frazzini was reassigned to the position of Assistant Coordinator of Data and Assessment but she remained in the HR Department until the HR Director position was filled in September 2011.

---

[7] Plaintiffs attempt to dispute UMF No. 9 by referring to Plaintiffs' Facts 4, 8, 9, 10, 11, and 12, and by arguing that "Mr. Levinski decided he wanted Phil Kasper as Human Resources Director so that he [Levinski] could control HR Processes, like discrimination investigations, due process hearings, and reasonable accommodation negotiations, and enter into a quid-pro-quo with Mr. Kaspar as part of a broader pattern of quid-pro-quo." Response at 3. Plaintiffs' arguments do not create a genuine dispute of fact concerning the timing of Mr. Levinski's decision to replace Ms. Frazzini as the HR Director. UMF No. 9 is undisputed. However, the Court observes that Plaintiffs' Fact 4 refers to a Public Education Department's (PED) Notice, issued on November 8, 2011, finding that Mr. Levinski had failed to comply with "numerous requirements of laws, rules or standards" in the selection of various school officials, including Mr. Kasper. Notice (Doc. No. 197–2). The Notice indicates that Mr. Kasper's hiring was "replete with questionable practices …." *Id.* The PED found that "[d]espite [CCSD]'s HR operations being an efficiently run school district office, [Mr. Levinski] clearly acted outside … policy when [he] inserted someone whose experience and understanding of HR operation was facially deficient." *Id.* The PED concluded that Mr. Levinski appeared to have pre-selected Mr. Kasper as the HR Director. *Id.* Mr. Levinski's rationale for hiring Mr. Kasper, including the timing of the selection, may be relevant to Mr. Levinski's Motion for Summary Judgment. However, the PED Notice and determination do not demonstrate unlawful acts by Mr. Kasper. Plaintiffs' counsel's references to irrelevant matters unnecessarily complicate the analysis of Mr. Kasper's Motion and are improper.

[8] Mr. Kasper inadvertently identified two statements as UMF Nos. 7 and two statements as UMF Nos. 8. Plaintiffs elected to re-number the second UMF No. 7 as No. 7-2 and the second UMF No. 8 as No. 8-2. UMF 7-2 contains assertions about Mr. Levinski's impressions of the HR Department and his plans to change that department. In attempting to dispute UMF No. 7-2, Plaintiffs refer to their Facts 1, 2, and 3 for the proposition that "Mr. Levinski followed no established process or procedure in 're-structuring' CCSD Senior Management." Then, Plaintiffs refer to their Facts 8, 9, 10, 11, and 12 as evidence showing that "Mr. Levinski conducted the 're-structuring' as part of a conspiracy to discriminate against Anglos and/or Mormons." Response at 2–3 ("Kaspar Fact 7-2"). Not one of the assertions in Plaintiffs' Facts 1, 2, 3, 8, 9, 10, 11, and 12 mentions the Human Resources Department, Ms. Frazzini, or Mr. Kasper. UMF No. 7-2 is undisputed. While Plaintiffs' Fact 4 might have some bearing on Mr. Levinski's characterization of the HR Department as "toxic," Plaintiffs did not cite to their Fact 4 and the Court will not guide Plaintiffs' counsel's argument. Moreover, it is irrelevant to Defendant Kasper's Motion.

*Defendant Phil Kasper*

Mr. Kasper is Anglo and a non-Mormon. In late July 2011, Abena McNeely, CCSD's

new Director of Elementary and Secondary Schools, and a member of Mr. Levinski's cabinet,

contacted Mr. Kasper to encourage him to apply for the CCSD HR Director position that Ms.

McNeely believed would be available soon. At this time, Mr. Kasper was employed as the

Director of Professional Development and School Improvement for the Gallup McKinley School

District. However, Mr. Kasper had worked previously for CCSD for many years as a teacher and

as the principal of several different elementary schools. Mr. Kasper was interested in the HR

position because CCSD was much closer to his home than to his office in the Gallup school

district.

Mr. Kasper requested a meeting with Mr. Levinski that took place on August 1, 2011.

Before the August 1 meeting, Mr. Kasper had never met Mr. Levinski. At the August 1 meeting,

Mr. Kasper discussed Mr. Levinski's goals for the district. Mr. Levinski told Mr. Kasper about

his concerns that the HR Department was toxic to employees and that Mr. Levinski wanted to

make a change to the HR Department. After the meeting, Mr. Kasper decided he would apply

and interview for the HR Director position if and when it came open.

When the HR Director position opened, there were two applicants: Mr. Kasper and

another employee from the District. Mr. Levinski hired Mr. Kasper, who started in the position

on September 8, 2011.[9]

Mr. Kasper was not yet employed by CCSD when Plaintiffs Hunt and Ulibarri received

notice in July 2011 from CCSD that their positions were being reassigned and/or of their

---

[9] Mr. Kasper's citations in support of his Undisputed Facts do not always support his position. For example, Mr. Kasper states that Mr. Levinski and Mr. Marquez interviewed two candidates for the HR Director position: Mr. Kasper who is Anglo and Raul Sanchez who is Hispanic. Motion, UMF No. 10. Mr. Kasper cites to Defendants' Answer to Interrogatory No. 32 (Doc. No. 174–4) in support, but that Answer does not mention Raul Sanchez or the race/ethnicity of either applicant. Mr. Kasper should ensure the accuracy of all citations to the record.

demotions. Mr. Kasper was not involved in Mr. Levinski's decision to restructure the CCSD hierarchy.

Mr. Kasper did not receive any information regarding issues with Plaintiffs Hunt or Ulibarri when Mr. Kasper assumed his duties as HR Director in September 2011. UMF No. 9[10] On about September 14, 2011, Plaintiffs' attorney sent a letter to Mr. Levinski and Mr. Marquez informing them that he represented Mr. Hunt and requesting various relief concerning Mr. Hunt's employment. Mr. Kasper was not copied on the letter.

On September 22, 2011, Plaintiffs' attorney sent another letter addressed to Mr. Levinski, Mr. Marquez, and Mr. Kasper, requesting various relief regarding Mr. Hunt's employment. Mr. Kasper referred counsel's September 22 letter to CCSD's attorneys, who responded to the letter on October 3, 2011.

On October 5, 2011, Plaintiff Ulibarri submitted to the CCSD HR Department a "Complaint regarding Race and Religion Discrimination and Harassment." On October 10, 2011, Mr. Kasper answered Ms. Ulibarri's Complaint in writing by summarizing the issues Ms. Ulibarri had raised and by providing responses to or information about each issue. For example, in response to Ms. Ulibarri's complaint that Mr. Marquez had harassed her, Mr. Kasper stated that Ms. Ulibarri had not given any specifics of the alleged harassment but that Mr. Kasper would be glad to take Ms. Ulibarri's statement regarding what had transpired. Ms. Ulibarri did not follow up with Mr. Kasper.

---

[10] Plaintiffs attempt to dispute UMF No. 9 by referring to their Fact 9, which, in turn, refers to Plaintiffs' Facts 4, 8, 9, 10, 11, and 12. Response at 3. Plaintiffs state that these facts will support their assertion that Mr. Levinski decided he wanted Mr. Kasper as the HR Director so that Mr. Levinski could control the "HR Processes … and enter into a quid-pro-quo with Defendant Kaspar…." The first problem with Plaintiffs' position is that Defendant Kasper's UMF No. 9 concerns Mr. Kasper's knowledge and has nothing to do with Mr. Levinski's motivation in hiring Mr. Kasper. Thus, Plaintiffs' Fact 9 does not controvert Mr. Kasper's UMF No. 9. The next problem is that Plaintiffs' Fact 9 does not provide any citation to the record. Instead, the Court must skip to pages 5–11 of the brief and must check every citation to the record to see if any of Plaintiffs' 15 to 20 citations, interspersed in the six pages of argument, actually contradicts Defendant Kasper's UMF No. 9 or supports Plaintiffs' Fact 9. None of the citations to the record concern Mr. Kasper's knowledge of Plaintiffs' complaints. UMF No. 9 is undisputed.

With respect to Ms. Ulibarri's request that her complaints about unlawful discrimination be fully investigated, Mr. Kasper responded that no example of discriminatory practices had been provided and that CCSD's elected school board and superintendent were authorized to make the decision of determining when to conduct an investigation into complaints. UMF No. 19. Apparently, Plaintiffs dispute only this last sentence, arguing that the duty to investigate a complaint is contractual; thus, once an employee complains of discrimination, an investigation is mandatory.[11]

On October 20, 2011, Plaintiffs' attorney sent a letter addressed to Mr. Levinski, Mr. Marquez, and Mr. Kasper regarding his legal representation of Ms. Ulibarri. The letter made various demands regarding both Mr. Hunt's and Ms. Ulibarri's employment. Mr. Kasper referred the October 20 letter to CCSD's attorneys, and on November 7, 2011, CCSD's attorneys responded to counsel's letter.

---

[11] Plaintiffs rely on Plaintiffs' Facts 1, 2, and 3 to dispute UMF No. 19. Response at 3. While Plaintiffs' Facts 1 and 2 refer to Plaintiffs' employment contracts, the supporting arguments do not discuss investigations. Thus, Plaintiffs should have omitted reliance on Facts 1 and 2 to contradict UMF No. 19. However, Plaintiffs' Fact 3 notes that the employment contracts "explicitly stated the terms of the involved policy book were terms of the contract, and those policies included provisions that: … b) Required the District to investigate each complaint of discrimination, and punish each offender as soon as reasonable." Plaintiffs' Response at 4–5 (citing CCSD Board Policy G-0211). In reviewing the contract exhibits (Doc. No. 1745 and 174–6), the Court first observes that Plaintiffs' citation to the record evidence fails to provide the pertinent paragraph number of the relevant contracts. *See* D.N.M. LR-Civ 56.1(b) ("each fact in dispute … must refer with particularity to those portions of the record upon which the non-movant relies…."). Once again, the Court  must scan the entire contents of the contracts to locate support for Plaintiffs' proposition that the contracts incorporate language of CCSD's policy statements. Paragraph 2 of the employment contracts states that the contracts and "the parties hereto are … subject to applicable laws of the State … and the rules and  regulations of the Public Education Department and policies of the Local Board of Education, as they may exist." This may be support for Plaintiffs' position although Defendant Kasper denies that the contracts state that they incorporate CCSD's policies. Reply at 6. Assuming Plaintiffs might be able to support their position, the Court must next look for CCSD's policies concerning investigations. Plaintiffs fail to provide the exhibit number, but after reviewing all of Plaintiffs' exhibits, Exhibit 2 (Doc. No. 197–1) apparently contains some of CCSD's policy statements although not one of the exhibit pages  identifies the policies as belonging to CCSD. Policy No. G-0211, "Equal Employment Opportunity," states, in part, that the "District is committed to investigating each complaint and to take appropriate action on all confirmed violations of policy. The Superintendent shall investigate and document complaints filed pursuant to this regulation as soon as possible." (Doc. No. 197–1 at 2). The Court finds that Plaintiffs' attempt to dispute the matter is immaterial to Defendant Kasper's Motion. Moreover, as noted by Defendant Kasper's response to Ms. Ulibarri, the Superintendent and/or the School Board determines whether to conduct an investigation. The policy in question confirms that the Superintendent, not the HR Director, decides whether to investigate a complaint. UMF No. 19 is undisputed.

Mr. Kasper believed that Ms. Ulibarri's complaints regarding discrimination against Anglos and Mormons had no merit because he knew that CCSD had hired other Anglo and/or LDS members to serve in supervisory positions during Mr. Levinski's tenure as interim Superintendent, including Mr. Kasper himself. Mr. Kasper was also aware of multiple instances when non-LDS members and/or Native American individuals were demoted. UMF No. 20.[12]

Mr. Kasper was aware of general feelings of discontent among most employees at CCSD. He knew of racial and religious epithets that were being thrown "both ways between Anglos and Native Americans in public on-line forums." UMF No. 21. He was apprised of antigay rhetoric in the on-line forums. Mr. Kasper referred to the general attitudes in the community as a "morass of filth" and a "morass of discontent." *Id.*

### Plaintiff Jeffrey Hunt

Plaintiff Hunt held the position of CCSD's Director of Transportation from 1997 until July 2011. He has a high school education. As of July 2011, Plaintiff Hunt was earning an annual salary in excess of $85,000. He had use of a district-owned vehicle, a district-paid cell phone, and other benefits with an estimated value of $25,000 per year, for a total annual compensation package of over $110,000.

On July 18, 2011, Plaintiff Hunt signed a contract with CCSD for the 2011-2012 school year in the position of Coordinator of Transportation with an annual salary of $85,148. On July 25, 2011, Mr. Levinski and Defendant Director of Operations Ed Marquez (Mr. Marquez) informed Plaintiff Hunt that he was being reassigned to the position of Grounds Foreman. UMF

---

[12] Plaintiffs attempt to dispute UMF No. 20 by referring to Plaintiffs' Facts 4, 8, 9, 10, 11, and 12, for the proposition that Mr. Levinski decided to hire Mr. Kasper so that Mr. Levinski could control HR Processes. Response at 3. Plaintiffs' position, even if established, does not rebut any part of Defendants' UMF 20. UMF 20 is undisputed.

No. 5.[13] Plaintiff Hunt took sick leave following the July 25, 2011 meeting and never returned to

work at CCSD. Plaintiff Hunt resigned his employment effective February 24, 2012.

### Plaintiff Alice Ulibarri

Plaintiff Ulibarri held the position of CCSD's Custodial Supervisor from 2004 until July

2011. She has a GED and was earning an annual salary of nearly $60,000. She also had

unlimited take home use of a district-owned vehicle. The Custodial Supervisor position did not

exist before 2004, at which time CCSD's former Director of Purchasing, Yolanda Bingham,

created the position because Ms. Bingham had been asked to oversee the custodians and did not

want to do it. She then offered the job to Plaintiff Ulibarri, who had never supervised employees

before 2004 and did not have the training she needed to be able to perform her job duties.

On July 25, 2011, Plaintiff Ulibarri signed a contract for the 2011-2012 school in the

position of Custodial Supervisor with an annual salary of $59,807. Subsequently, Ms. Frazzini,

who was the Human Resources Director, informed Plaintiff Ulibarri that the Custodial

Supervisor position was being eliminated but that her salary would remain the same for one year.

Plaintiff Ulibarri was not offered a replacement position until some months after her position was

eliminated. Ms. Ulibarri resigned from her employment at CCSD, effective February 24, 2012.

### Discussion

Plaintiffs Hunt and Ulibarri assert a single claim of conspiracy under 42 U.S.C. § 1985(3)

against Defendant Kasper, alleging that he and other Defendants conspired to discriminate

against Plaintiffs based on their race and religion. *See* Complaint ¶¶ 69–74 (Count IV). Mr.

Kasper allegedly participated in an agreement to eliminate Mormon and/or Anglo supervisors

and took "specific actions in furtherance of that conspiracy." *Id.* ¶ 72. Mr. Kasper argues that

---

[13] Plaintiff Hunt attempts to dispute this fact by referring to his Human Rights Division Charge of Discrimination
(Doc. No. 197–5), but nothing in that Charge mentions Mr. Levinski or Mr. Marquez or Plaintiff Hunt's new
position of Grounds Foreman. UMF No. 5 is undisputed.

Plaintiffs have adduced no evidence to support the conspiracy claim and that, therefore, Mr.

Kasper is entitled to qualified immunity. Motion at 9.

### 42 U.S.C. § 1985(3) Conspiracy

To prove a conspiracy in violation of 42 U.S.C. § 1985(3), a plaintiff must show "(1) the

existence of a conspiracy (2) intended to deny [him] equal protection under the laws or equal

privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-

protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v.

City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir. 1995) (citations omitted). *See also Tilton v.

Richardson,* 6 F.3d 683, 686 (10th Cir. 1993), *cert. denied*, 510 U.S. 1093 (1994) (setting out

essential elements of a § 1985(3) conspiracy claim). To support a conspiracy claim, a plaintiff

must show a meeting of the minds or agreement among the defendants and a concerted action.

*Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). Section 1985(3) only

reaches conspiracies "motivated by some racial, or perhaps otherwise class-based, invidiously

discriminatory animus." *Tilton*, 6 F.3d at 686.

Plaintiffs argue, in part, that they need not show an "express agreement" of a conspiracy

among all conspirators. Response at 12. They also contend that "by directing attention only to

the actions of the conspiracy after Defendant Kasp[er] became an employee, the Defendant

ignores a considerable amount of Section 1985(3) conspiracy law …." *Id.* at 14. Without

supplying any direct or circumstantial evidence that Mr. Kasper took part in a conspiracy,

cooperated in a conspiracy, or lent support to a conspiracy, Plaintiffs seem to infer that Mr.

Kasper was "united" with other Defendants "in a common unlawful goal or purpose." *Id.* Even

after viewing the facts in the light most favorable to Plaintiffs, the Court does not accept this

inference which it finds unreasonable in light of the undisputed evidence before it.

Plaintiffs have failed to come forward with *any* evidence, direct or circumstantial, tending to show that Mr. Kasper participated in a conspiracy, intended to deny Plaintiffs' equal rights, took an overt act in furtherance of a conspiracy, or was motivated by invidiously discriminatory racial or religious animus. At most, Plaintiffs make conclusory allegations to support the conspiracy claim against Mr. Kasper.[14] "Conclusory allegations of conspiracy are insufficient." *Tonkovich*, 159 F.3d at 533.

The evidence is undisputed that Mr. Kasper had never met Mr. Levinski before August 1, 2011, several weeks after Plaintiffs learned of their reassignments and/or demotions. There is no evidence that Mr. Levinksi discussed with Mr. Kasper any issues pertaining to Plaintiffs' employment. Similarly, there is no evidence that Mr. Levinski discussed Plaintiffs' employment with any of the alleged co-conspirators. Plaintiffs presented no evidence of any communications between Mr. Kasper and alleged co-conspirators Matthew Tso, Scott Nicolay, or Hoskie Benally.

There is no evidence tending to show that Mr. Kasper played a part in CCSD's restructuring decisions. Mr. Levinski made those decisions. Even if it is established that Mr. Levinski "pre-selected" Mr. Kasper for the position of HR Director, this does not demonstrate, even circumstantially, that Mr. Kasper conspired with Mr. Levinski or that Mr. Kasper lent support to a conspiracy. Allegations of Mr. Kasper's pre-selection for the job might be relevant

---

[14] Plaintiffs' Response in opposition to Mr. Kasper's Motion is almost devoid of specific references to Mr. Kasper. The Court has already discussed Plaintiffs' lack of facts addressed to actions taken by Mr. Kasper. *See* discussion *supra*. The "Discussion" portion of Plaintiffs' Response is similarly wanting with respect to the application of the law to Mr. Kasper's conduct or motivation. There are twelve pages of the Response devoted to a "Discussion" of the pertinent law. Response at 12–24. Seven or more of those pages contain lengthy, single-spaced quotations of  law that Plaintiffs believe should guide the Court's analysis. A significant part of the Response is devoted to passages of law concerning Plaintiffs' property rights "in their demotion." Response at 15–21. Plaintiffs' supposed property rights are unrelated to Defendant Kasper's argument in support of summary judgment. In fact, the Court counted only three possible references to Mr. Kasper in the twelve pages of the Response. The seven or more pages of single-spaced quotations from legal opinions, inside and outside the Tenth Circuit Court of Appeals, fail to inform the Court of any relevant law and violate this District's page limit. *See* D.N.M. LR-Civ 7.5 (allowing 24 double-spaced pages for a response).

to Mr. Levinski's rationale for his hiring decision, but they do not infer that Mr. Kasper was complicit in Mr. Levinski's personnel decisions.

In addition, Plaintiffs have offered no evidence that Mr. Kasper held any discriminatory animus towards Plaintiff Hunt or Plaintiff Ulibarri, Anglos, or LDS members. Plaintiffs provide no evidence or even allegations of Mr. Kasper's participation in blogging activities that allegedly targeted Mormons in the community. Instead, it is undisputed that Mr. Kasper himself is Anglo and that he was disturbed by the ongoing tensions and acrimony in the community between Mormons and Native Americans.

Moreover, the evidence is uncontested that Mr. Kasper took very few actions that impacted Plaintiffs' employment. Mr. Kasper was not yet employed by CCSD when Plaintiffs Hunt and Ulibarri learned of their reassignments or demotions in July 2011. Mr. Kasper was not Plaintiffs' supervisor. *See* Kasper Dep. at 55–56 (Doc. No. 197–3). He had little contact with either Plaintiff from the time Mr. Kasper began working at CCSD in September 2011, until both Plaintiffs resigned in February 2012. While Mr. Kasper did offer Plaintiff Ulibarri a position in the fall of 2011, Ulibarri Dep.at 224 (Doc. No. 174–3), this is not evidence of unlawful activity or of a conspiracy.

Mr. Kasper argues that, because Mr. Hunt and his supervisor Mr. Marquez did not get along well (due in part to the selection of Mr. Marquez as the Director of Operations position for which Mr. Hunt also interviewed), Mr. Levinski directed Mr. Kasper to handle Mr. Hunt's requests for leave. *See* Motion at 2. However, Plaintiffs offer no evidence showing that Mr. Kasper's role in handling Mr. Hunt's leave requests was discriminatory.

Plaintiff Ulibarri stated that she and Mr. Kasper did not care much for one another but admitted that Mr. Kasper had never said anything negative to her. Ulibarri Dep. at 215, 216

(Doc. No. 1743). Mr. Kasper saw little evidence to support Plaintiff Ulibarri's allegations of discrimination, and he did not find her allegations sufficiently specific to warrant an investigation. However, this is not direct or circumstantial evidence of Mr. Kasper's unlawful motivation. The undisputed evidence is that CCSD's Superintendent and/or School Board had the authority to decide whether to instigate investigations into complaints.

Moreover, nothing in Mr. Kasper's written response to Plaintiff Ulibarri's complaint of discrimination evinces discriminatory motivation by Mr. Kasper. Rather, Mr. Kasper invited Ms. Ulibarri to discuss her allegations of harassment with him so that he might better understand the complaint, an invitation to which Ms. Ulibarri did not respond.

Mr. Kasper's decision to refer Plaintiffs' attorney's letters to CCSD's counsel is not evidence that Mr. Kasper held discriminatory animus towards Plaintiffs or that Mr. Kasper acted in furtherance of the goals of an alleged conspiracy. Plaintiffs' Response neglects to mention how Mr. Kasper's failure to instigate an investigation into Plaintiffs' complaint might be construed as evidence of a conspiracy.

Essentially, Plaintiffs offer no evidence to tie Mr. Kasper's actions to an unlawful conspiracy under § 1985(3). Plaintiffs fail to present evidence of: 1) a conspiracy between Mr. Kasper and the co-Defendants; 2) a meeting of minds or agreement between Mr. Kasper and the co-Defendants; 3) any discriminatory motives or animus on the part of Mr. Kasper; or 4) an overt act by Mr. Kasper in furtherance of a conspiracy. Plaintiffs do not identify any evidence of an agreement or concerted action between Mr. Kasper and the co-Defendants, much less an agreement motivated by racial or religious discrimination. Without any evidence of these essential elements of a conspiracy, there simply is nothing to give rise to an inference that Mr. Kasper acted unlawfully in relation to Plaintiffs.

The Court concludes that Plaintiffs have failed to raise a genuine dispute of material fact with respect to the 42 U.S.C. § 1985(3) conspiracy claim (Count IV) against Mr. Kasper. Therefore, Mr. Kasper is entitled to summary judgment and Plaintiffs' claim against him will be dismissed.

## Qualified Immunity

Based on the Court's conclusion that Plaintiffs' evidence of a conspiracy against Mr. Kasper is deficient, the Court need not reach Defendant's position that Mr. Kasper is entitled to qualified immunity on the conspiracy claim. However, the Court concludes, in the alternative, that Plaintiffs have failed to show how Mr. Kasper's conduct violated clearly established law. Therefore, Mr. Kasper is entitled to qualified immunity on Plaintiffs' conspiracy claim.

For a constitutional right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir.), *cert. denied*, 134 S.Ct. 426 (2013) (citation omitted). "A plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Quinn*, 780 F.3d at 1005 (citation omitted).

According to Defendant Kasper, there is no Supreme Court or Tenth Circuit decision holding that a state official acts in furtherance of a preexisting conspiracy by referring an employee's attorney's request for an investigation to the company's attorney or by failing to launch an investigation into an employee's complaints. Motion at 14. Moreover, Plaintiffs have not identified any applicable Supreme Court or Tenth Circuit law.

Plaintiffs argue that Defendant Kasper has not correctly identified the legal issue to be analyzed in terms of his assertion of qualified immunity. According to Plaintiffs, the issue to be addressed is: "Was there clearly established law forbidding quid-pro-quo entry into a conspiracy that intentionally discriminated against Mormons and/or Anglos, when a Human Resource Director gains his position pursuant [sic] his promise to halt all investigative and remedial actions pursuant [sic] the complaints of Plaintiffs and others?" Response at 24. The Court disagrees. Plaintiffs' phrasing of the issue assumes several facts not supported by any evidence. For example, Plaintiffs have failed to come forward with evidence of a conspiracy involving Mr. Kasper. There is no evidence of intentional discrimination by Mr. Kasper or evidence of a "promise" (to whom?) by Mr. Kasper to "halt all investigative and remedial actions."

Plaintiffs simply have not satisfied their "heavy burden" of identifying on-point legal authority supporting their position. Stated differently, a reasonable jury could not find facts supporting a violation of a constitutional right, which was clearly established at the time of the defendant's conduct. *See Estate of Booker*, 745 F.3d at 411. Offering a single-spaced quotation from case law regarding general principles of qualified immunity and referring the Court to unidentified existing law that Plaintiffs "have developed … at some length above" simply does not pass muster.

The Court concludes, in the alternative, that Defendant Kasper is entitled to qualified immunity on the conspiracy claim against him (Count IV). Therefore, the Court will grant Defendant Kasper's Motion for Summary Judgment.

IT IS ORDERED that: (1) DEFENDANT PHIL KASPER'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY AND

MEMORANDUM OF LAW IN SUPPORT (Doc. No. 174) is GRANTED; and (2) a separate

Summary Judgment in favor of Defendant Phil Kasper will be entered.

_____

SENIOR UNITED STATES DISTRICT JUDGE