# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JEFFREY HUNT and
ALICE ULIBARRI,

        Plaintiffs,

v.                                                                  No. CIV 11-1144 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, NANCY FRAZINNI [sic],
MATTHEW TSO, and SCOTT NICOLAY,
Individually,

        Defendants.

                                       Consolidated with:

SHARON JENSEN,

        Plaintiff,

v.                                                                  No. CIV 12-1018 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, MATTHEW TSO,
and SCOTT NICOLAY, Individually,

        Defendants.

# MEMORANDUM OPINION AND ORDER

      Defendants Central Consolidated School District (CCSD) and Don Levinski (Mr.

Levinski) bring a MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN

SUPPORT OF MOTION ON CLAIMS BROUGHT BY PLAINTIFFS JEFFREY HUNT,

ALICE ULIBARRI, AND SHARON JENSEN (Motion) (Doc. No. 179), requesting summary judgment on all of the claims brought against them by Plaintiffs. PLAINTIFFS HUNT, JENSEN AND ULIBARRI [sic] RESPONSE TO MOTION FOR SUMMARY JUDGMENT ON THEIR CLAIM [sic] (Response) (Doc. No. 202) argues, in part, that there is substantial evidence in support of their claims, which are "ready for trial." In their REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON CLAIMS BROUGHT BY PLAINTIFFS JEFFREY HUNT, ALICE ULIBARRI, AND SHARON JENSEN at 19 (Reply) (Doc. No. 254), CCSD and Mr. Levinski contend that Plaintiffs have failed to raise any genuine disputes of material fact and that most of Plaintiffs' evidence is "inadmissible, immaterial, speculative, or a combination thereof."

## Background

Both Plaintiffs Jeffrey Hunt and Alice Ulibarri are "Anglo and Mormon." THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT ¶¶ 1, 2 (Hunt/Ulibarri Complaint) (Doc. No. 93). Plaintiff Sharon Jensen is "Anglo and non-Mormon," but believes CCSD supervisors perceived her as Mormon. SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT ¶ 1 (Jensen Complaint) (Doc. No. 92). At all pertinent times, Plaintiffs were residents of Kirtland, San Juan County, New Mexico and were employees of Defendant Central Consolidated School District (CCSD). *Id.* According to the 2000 census, Kirtland, New Mexico had a population of a little over 6,000 residents. The town was founded in the early 1880s by Mormons or Latter-Day Saints (LDS), which named the New Mexico town after Kirtland, Ohio.[1] CCSD includes about 18 schools in a 4,500 square mile area, serves numerous communities, and has a total enrollment of approximately 6,800 students, a majority of whom are Native American. *See* Hunt/Ulibarri Complaint ¶ 3 and Jensen

---

[1] *See* Phil Kasper Dep. (Doc. No. 174–7) at 32. *See also* https://en.wikipedia.org/wiki/Kirtland,New_Mexico (January 28, 2016). The Court may take judicial notice of facts that are generally known and accepted. *Mills v. Denver Tramway Corp.*, 155 F.2d 808, 811 (10th Cir. 1946).

Complaint ¶ 2 (CCSD "has both a predominantly Native American student body, and a predominantly Native American workforce with a close to 90% Native American student body, and …, a close to 75% Native American workforce."). *See also* http://wikipedia.ort/wiki/Central_Consolidated_Schools (February 12, 2016).

Until June or July 2011, Plaintiff Hunt was employed as the Director of Transportation of CCSD, Plaintiff Ulibarri was employed as the Custodial Supervisor of CCSD, and Plaintiff Jensen was employed as an Assistant Superintendent of CCSD. Hunt/Ulibarri Complaint ¶¶ 1, 2 Jensen Complaint ¶ 1. Plaintiffs contend that in about 2011, a "conspiracy formed within the Senior Supervisory staff at CCSD" that resulted in demoting or removing Plaintiffs from their CCSD positions and replacing them with non-Mormon individuals or "Native American aligned" individuals. *See* Amended Joint Status Report and Provisional Discovery Plan at 3 (Doc. No. 124). As a result of this "conspiracy," Plaintiffs allege, *inter alia*, that Defendants discriminated against them based on their race and religion and violated their rights.

CCSD and Mr. Levinski characterize the 2011 organizational changes at CCSD as an "administrative restructuring." Motion at 2. In June and July 2011, acting Superintendent Levinski "restructured the administrative positions within CCSD in order to bring CCSD's administrative expenses in line with the administrative expenses of similar school districts in New Mexico. The restructuring consisted of eliminating or reclassifying several different executive administrative positions." *Id.*

### Procedural History

The procedural history of this case is complicated and lengthy. On December 29, 2011, Plaintiffs Hunt and Ulibarri filed their initial Complaint against Defendants. On September 29, 2012, Plaintiff Sharon Jensen filed a similar Complaint against most, but not all, of the same

Defendants. In March 2013, the Honorable District Court Judge James O. Browning consolidated the two cases at the requests of the parties.

In January 2013, before consolidation of the two related proceedings, Judge Browning held a hearing on Defendants' Motion to Dismiss for Failure to State a Claim for Relief and/or Qualified and Sovereign Immunity that was filed only in the Hunt/Ulibarri lawsuit. (Doc. No. 74). On June 12, 2013, Judge Browning authored a 125-page opinion that granted in part and denied in part Defendants' motion. *Hunt and Ulibarri v. Central Consolidated School Dist., et al.*, No. CIV 11-1144 (Doc. No. 74); 951 F. Supp. 2d 1136 (D.N.M. 2013). Judge Browning did not address Defendants' position with respect to Plaintiff Jensen's similar claims.

Judge Browning concluded that Plaintiffs' federal law claims under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and Title VII (Counts III, IV, and X)[2] against Defendants would all proceed. *Id.* at 1197, 1203–1233. Judge Browning also determined that Defendants were not entitled to the defense of qualified immunity at the Rule 12(b)(6) stage. *Id.* at 1232–33. Of Plaintiffs' seven state law claims against Defendants, Judge Browning dismissed the claims of tortious interference, common law conspiracy, and negligent building operations based on the Court's conclusion that the State of New Mexico had not waived tort immunity for these claims. *Id.* at 1234–35. Judge Browning also dismissed Plaintiffs' Fraud Against Taxpayers claim. Judge Browning permitted the claims of breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and disparate treatment discrimination under the New Mexico Human Rights Act (Count VIII) to proceed. Judge Browning clarified that Plaintiffs did not present any disability discrimination claims in the Complaint. *Id.* at 1200. Judge Browning dismissed all Title VII claims asserted against the individual Defendants. *Id.* at 1204–05.

---

[2] The numbering of claims is taken from the most recent Hunt/Ulibarri Complaint. (Doc. No. 93).

Judge Browning allowed Plaintiffs to file an Amended Complaint to allege plausible claims and cure "technical errors in their Complaint." *Id.* at 1147. On June 24, 2013, Plaintiffs filed a Third Amended Complaint (first iteration) (Doc. No. 76) that appears to re-assert all ten of the original claims, including those that Judge Browning had dismissed. Plaintiffs added an eleventh claim under the New Mexico Whistleblower's Act. Also on June 24, 2013, Plaintiff Jensen filed a Second Amended Complaint (first iteration) (Doc. No. 75), including almost all of the same claims as those asserted by Plaintiffs Hunt and Ulibarri, although Plaintiff Jensen did not add the Whistleblower's Act claim.

On August 9, 2013, the case was reassigned from Judge Browning to the Honorable District Court Judge Kenneth Gonzales. Notice (Doc. No. 83). On September 12, 2013, Judge Gonzales entered an Order requiring Plaintiffs to file an Amended Complaint that conformed to Judge Browning's opinion. Order (Doc. No. 91). On September 23, 2013, Plaintiffs Hunt and Ulibarri filed the present Third Amended Complaint (second iteration) (Hunt/Ulibarri Complaint) (Doc. No. 93) that omitted the claims Judge Browning had dismissed. The claims in the Hunt/Ulibarri Complaint are numbered Counts I, II, III, IV, VIII, X, and XI.

On September 23, 2013, Plaintiff Jensen filed a Second Amended Complaint (second iteration) (Jensen Complaint) that is almost the same as the Second Amended Complaint (first iteration). In other words, Plaintiff Jensen continued to assert the same or similar state law claims that Judge Browning determined could not proceed in the Hunt/Ulibarri lawsuit. To clarify Plaintiff Jensen's claims, Judge Gonzales issued an Agreed Order Dismissing Claims and Preserving Parties' Rights to Appeal (Doc. No. 96). The Agreed Order dismissed Plaintiff Jensen's claims of tortious interference, common law conspiracy, and negligent building operations (Counts V, VI and VIII), consistent with Judge Browning's opinion in the

Hunt/Ulibarri lawsuit. The Agreed Order also dismissed Plaintiff Jensen's claim of emotional distress and request for punitive damages in relation to the breach of contract allegations. However, Judge Gonzalez did not require Plaintiff Jensen to file an Amended Complaint setting forth only the surviving claims (Counts I, II, III, IV, VII, and IX). Thus, Plaintiff Jensen's present Complaint contains all of the original claims, including the three dismissed claims.

Discovery in the consolidated cases began in late 2013 and continued through the fall of 2014. *See* Notice (Doc. No. 117). This Motion for Summary Judgment, filed on September 10, 2014, by Defendants CCSD and Levinski, is the second of Defendants' ten motions for summary judgment and/or qualified immunity. By November 26, 2014, all ten motions for summary judgment were fully briefed.

On January 21, 2016, this case was reassigned from Judge Gonzales to the undersigned Senior District Court Judge. Notice (Doc. No. 270).

## Legal Standards

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256

(1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc*., 293 F.3d 1187, 1195 (10th Cir. 2002).

**Material Facts**[3]

### *Superintendent Don Levinski*

In late May 2011, the CCSD school board selected Mr. Levinski to act as the interim Superintendent. Motion, Defendants' Undisputed Material Fact (UMF) No. 4.[4] Mr. Levinski calculated CCSD's administrative costs to be significantly higher than those of equivalent school districts. In July 2011, CCSD administration was overstaffed with only 51% of the operations budget going directly to classroom instruction. Mr. Levinski sought to dedicate approximately 65% of all operation dollars into direct instruction.

Mr. Levinski compared CCSD to local school districts and other New Mexico school districts of comparable sizes. He identified Carlsbad Municipal Schools as a district model. Carlsbad did not have assistant superintendents and, instead, had directors who reported to the superintendent, and coordinators and supervisors who reported to the directors. Consistent with this model, Mr. Levinski tried to reassign individuals in assistant director positions to director positions, and employees who were originally in director positions to coordinator positions. As part of the reorganization, Mr. Levinski eliminated some positions and combined several positions into one position. Mr. Levinski tried to place personnel from eliminated positions into

---

[3] Plaintiffs' attempts to dispute the UMFs suffer from the same problems observed by the Court at length in its MEMORANDUM OPINION AND ORDER (Doc. No. 271), granting summary judgment in favor of Defendant Kasper. Unless the Court notes otherwise, the Material Facts are undisputed.

[4] Although Plaintiffs attempt to dispute UMF No. 4, the Court has already explained in detail why Plaintiffs' arguments fail to identify genuine disputes of material fact. *See* Memorandum Opinion and Order at 8 n.6 (Doc. No. 271). UMF No. 4 is undisputed.

the next available positions. Employees who were impacted by the reorganization still received the same pay that they would have received through the end of the contract year.

Part of Mr. Levinski's motivation for the reorganization was to increase the educational level of upper administration positions and "to increase minority representation in the supervisory positions." Defendants' Response to Discovery (Doc. No. 179–5 at 3). Defendants also believed that restructuring would provide more support directly to the classrooms, and would improve instruction, student achievement, and graduation rates.

### *Plaintiffs' Employment at CCSD*

#### 1.  **Plaintiff Jeffrey Hunt**

From 1997 until July 2011, Plaintiff Hunt was employed as CCSD's Director of Transportation. He has a high school degree. Plaintiff Hunt had an annual salary of $85,000.00, and a total compensation package of more than $110,000.00.

On July 18, 2011, Plaintiff Hunt signed an employment contract as the Coordinator of Transportation for the 2011–12 school year that ran from July 1, 2011 to June 29, 2012. His previous position of Director of Transportation was eliminated. The terms of Plaintiff Hunt's contract included an annual salary of $85,148.00. Subsequently, on July 25, 2011, Mr. Levinski told Plaintiff Hunt that he was being reassigned from Coordinator of Transportation to the position of Grounds Foreman. When Plaintiff Hunt asked why he was being moved out of the Transportation Department, Mr. Levinski allegedly responded "Complaints." Hunt Dep. at 80 (Doc. No. 179–1). According to Plaintiff Hunt, he never received any explanation or documentation related to the Grounds Foreman reassignment, which he characterizes as a

demotion. Plaintiff Hunt also attests that he requested a reasonable accommodation for a medical condition that CCSD "point blank" denied. *See* UMF No. 7 and Response at 18, ¶ 18.[5]

Plaintiff Hunt took sick leave following the July 25, 2011 meeting and never returned to work at CCSD. Plaintiff Hunt used his accrued paid leave and exhausted that leave as of February 2012. Plaintiff Hunt resigned his employment, effective February 24, 2012.

### 2.  **Plaintiff Alice Ulibarri**

From 2004 until July 2011, Plaintiff Ulibarri was employed as CCSD's Custodial Supervisor. She has a G.E.D. Before 2004, the position of Custodial Supervisor did not exist. Instead, school principals were responsible for overseeing the custodial staff at their schools. CCSD's former Director of Purchasing, Yolanda Bingham, created the Custodial Supervisor position and offered the job to Plaintiff Ulibarri. Although Plaintiff Ulibarri had never supervised anyone and did not have the necessary training for the position, she accepted the position, requested training, and continued as the Custodial Supervisor until July 2011. She was paid $59,807.00 a year and had use of a district-owned vehicle.

Defendant Nancy Frazzini, CCSD's Human Resources (HR) Director in 2011, advised Plaintiff Ulibarri that the Custodial Supervisor position was being eliminated but that Plaintiff Ulibarri's salary would remain the same for one year. On July 25, 2011, Plaintiff Ulibarri signed an employment contract for the 2011–12 school year that ran from July 1, 2011 to June 29, 2012.

---

[5] Plaintiffs' counsel forces the Court to jump over various hurdles to determine if Plaintiffs have successfully identified a genuine dispute of a material fact. The Court must first compare Plaintiffs' stated "Facts " to the pertinent UMF to determine if Plaintiffs' "Facts" challenge specific language in the UMF. The Court next must locate additional pages of Plaintiffs' Response to track down the cites that might support Plaintiffs' version of the facts. Finally, the Court has to carefully review pages of evidence that usually have little to do with the challenged UMF or little to do with Plaintiffs' own identification of the facts. Plaintiffs do not challenge the actual assertions in UMF No. 7; thus, it is undisputed. Moreover, Ms. Frazzini's testimony does not support a "point blank" denial of Plaintiff Hunt's accommodation request. Nancy Frazzini Dep. at 158 (Doc. No. 206-2). In addition, Plaintiff Hunt never identifies evidence of a substantiated request for accommodation. *Compare* Defendants' Answer to Interrogatory No. 26 (Doc. No. 179–14) (enumerating Mr. Hunt's various demands). Plaintiffs' counsel has played fast and loose with testimony and other evidence that is, or is not, in the record. This has resulted in a large waste of judicial time.

The employment contract does not specify a position and states that Ms. Ulibarri was "to present … herself for duty at such times and places as designated by the Superintendent …." Ulibarri Employment Contract (Doc. No. 179–7, ¶ 2).

Although Plaintiff Ulibarri continued to be employed by CCSD, she did not receive a formal replacement position until months after the elimination of the Custodial Supervisor position. In October 2011, Mr. Kasper, the HR Director then, offered Plaintiff Ulibarri a position in another department and held that position open for her assuming she would be returning to work. *See* Motion at 9 (Plaintiff Ulibarri was reassigned as a Payroll and Housing Clerk). The parties do not specify how long Plaintiff Ulibarri reported to work.

On October 5, 2011, Plaintiff Ulibarri submitted to the CCSD HR Department a "Complaint regarding Race and Religion Discrimination and Harassment." On October 10, 2011, Mr. Kasper answered Ms. Ulibarri's Complaint in writing by summarizing the issues Ms. Ulibarri had raised and by providing responses to or information about each issue. For example, in response to Ms. Ulibarri's complaint that Defendant Ed Marquez had harassed her, Mr. Kasper stated that Ms. Ulibarri had not given any specifics of the alleged harassment but that Mr. Kasper would be glad to take Ms. Ulibarri's statement regarding what had transpired. UMF No. 11.[6] Ms. Ulibarri did not pursue her complaint with Mr. Kasper, although her attorney later wrote a number of letters to CCSD on her behalf.

Mr. Kasper testified that he did not believe that Plaintiff Ulibarri's complaints of discrimination against Anglos and Mormons were meritorious because he knew that CCSD had hired other Anglos or Mormons to serve in supervisory positions during Mr. Levinski's tenure, including Mr. Kasper himself, who is Anglo. Mr. Kasper was also aware of non-Mormons or

---

[6] Plaintiffs' Facts 11, 14, 16 &18 do not identify a genuine dispute of material fact with respect to UMF No. 11. UMF No. 11 is undisputed.

Native Americans who CCSD had demoted. UMF No. 12.[7] Thus, with respect to Ms. Ulibarri's request that her complaints of unlawful discrimination be fully investigated, Mr. Kasper responded that no example of discriminatory practices had been provided and that CCSD's elected school board and superintendent were authorized to make the decision of whether to conduct an investigation into complaints.

Plaintiff Ulibarri resigned effective February 24, 2012.

### 3. **Plaintiff Sharon Jensen**

From 2009 until June 2011, Plaintiff Jensen was employed by CCSD as an Assistant Superintendent. She has a Master's Degree in educational leadership. Before becoming an Assistant Superintendent, Plaintiff Jensen was the principal of a CCSD school in Shiprock, New Mexico. Her annual salary as an Assistant Superintendent at CCSD was $113,800.00.

On April 19, 2011, Plaintiff Jensen signed an employment contract as an Assistant Superintendent for the July 1, 2011 to June 29, 2012 contract year. On May 31, 2011, Mr. Levinski gave Plaintiff Jensen a letter addressing her alleged rude and unprofessional behavior towards CCSD School Board members at a recent Emergency Board Meeting. Mr. Levinski also discussed these allegations with Plaintiff Jensen. Jensen Dep. at 72 (Doc. No. 205–2). Mr. Levinski contends that he observed inappropriate behavior by Ms. Jensen at the meeting and that he received reports of her conduct by two Board members. When Mr. Levinski communicated his concerns to Plaintiff Jensen on May 31, 2011, and handed her the letter, Plaintiff stated that she knew she was "demoted. I'm outta here. I mean, he's – they're trying to get rid of me.

---

[7] Plaintiffs refer to their Facts 10–15 as identifying a genuine dispute of material fact as to UMF No. 12. Plaintiffs also identify Facts 11, 14, 16 & 18, as support that Mr. Kasper's "alleged belief was erroneous and only announced because Kasper is a knowingly discriminating, co-conspirator creating pretext." Response at 4. The Court already determined that Mr. Kasper was entitled to summary judgment as to the sole conspiracy claim that Plaintiffs Hunt and Ulibarri brought against him. However, the Court will examine *infra* Plaintiffs' Facts 10–12 in relation to the alleged conspiracy by these Defendants and the effects of CCSD's restructuring.

They're going to put me in a position they know I don't want, so I will leave." *Id.* at 73. Plaintiff Jensen based her suppositions on comments she had heard Defendants Tso, Levinski, and Frazzini make about giving employees jobs that made them uncomfortable so that they would quit on their own. *Id.* at 73–74.

When Plaintiff Jensen read the letter that Mr. Levinski gave her on May 31, 2011, she believed that the letter effectively demoted her. *Id.* at 76. But, the letter did not mention a demotion or reassignment of Plaintiff's position. *See id.* at 76–77. Plaintiff Jensen began to look for jobs outside CCSD after the May 31, 2011 meeting and after Mr. Levinski had called a meeting with elementary school principals who Plaintiff Jensen supervised. Plaintiff Jensen claims that Mr. Levinski did not notify her of the principals' meeting, which, to Plaintiff Jensen, meant that she was being demoted. *Id.* at 78.

When Plaintiff Jensen gave Mr. Levinski her notice of resignation on June 21, 2011, she had already interviewed for a position in the Bloomfield, New Mexico school system and had been offered a position there. *Id.* at 79. Plaintiff Jensen stated that she intended to accept the Bloomfield position because she knew she "was being demoted to principal" within CCSD. However, it is undisputed that Mr. Levinski had not expressly told Plaintiff Jensen of a reassignment or a demotion. *See id.* at 91–92. Instead, Plaintiff Jensen represented that other CCSD employees told her that she was being reassigned to a principal position and that a letter to that effect was being prepared for Plaintiff Jensen. *Id.* at 80–81. She never received a letter stating she was being reassigned.[8] Plaintiff Jensen resigned from CCSD and accepted a job as

---

[8] There is little doubt that Plaintiff Jensen *would have been* reassigned to a new position in mid-2011 had she not resigned first. Mr. Levinski testified that he did not know what he was going to do with Plaintiff Jensen. "I didn't intend to have an assistant superintendent. … the very best that she would've gotten was some director position – at the very best." Levinski Dep. at 116 (Doc. No. 202–1). However, Ms. Jensen's "good faith belief in the reality of the demotion," Response at 3, is not evidence of an actual demotion. The Court also observes that Defendants' apparent misstep in arguing that "Jensen was reassigned as a Principal[,]" Motion at 9, is not evidence of a reassignment.

principal in the Bloomfield school district, beginning in July 2011. *Id.* at 94. *See* UMF Nos. 16–19.[9]

### Plaintiffs' Employment Contracts and School Board Policies

Shortly before executing their employment contracts, Plaintiffs Hunt and Ulibarri were each informed that they no longer would have the same job titles or positions that they had had in previous years. Plaintiff Hunt's 2011-2012 employment contract specifies that he was reassigned as Coordinator of Transportation. Thus, he was no longer CCSD's Director of Transportation, a position that was being eliminated. Plaintiff Ulibarri's 2011-2012 employment contract indicates that she was employed for the school year but that she did not yet have a specific position. Thus, Plaintiff Ulibarri was no longer the Supervisor of Custodial Services, a position that was being eliminated.

Defendant Jensen signed her 2011-2012 employment contract in April 2011, before the restructuring occurred. There is no evidence that CCSD told Plaintiff Jensen of a reassignment of position, either before she signed her employment contract in April 2011 or before she resigned in June 2011. Her employment contract states that she was to be the Assistant Supervisor just as she had been. It is undisputed that all three Plaintiffs could have remained employed at CCSD through the end of the 2012 school year and that all three would have continued to receive the salaries set out in their 2011-2012 employment contracts.

The three employment contracts contain language incorporating CCSD School Board Policies. School Board Policy G–8250 (Doc. No. 27–10) authorizes the Superintendent to make

---

[9] Plaintiffs attempt to dispute UMF Nos. 16–18, primarily arguing that Plaintiff Jensen knew she was demoted, which precipitated her search for a position outside CCSD and her resignation. None of Plaintiffs' citations to the record identify evidence that Mr. Levinski "orally, officially demoted" Plaintiff Jensen. Even Ms. Jensen, albeit reluctantly, admitted otherwise. Jensen Dep. at 76–77, 91, 92. Although Plaintiff Jensen states that the "demotion letter" was already typed, she again had to admit she never received a letter stating her employment status had been changed before interviewing for and accepting a new position. UMF Nos. 16–18 are undisputed. Plaintiffs' position as to UMF No. 19 is unclear. On page 3 of the Response, Plaintiffs state that UMF No. 19 is not in dispute, but on page 5, they include UMF No. 19 in a list of disputed facts. The Court concludes that UMF No. 19 is undisputed.

determinations of "all support staff assignments" and states that such assignments "shall be based on the needs of the District." Policy G–8250 also provides that "[t]he transfer of support staff members will be based on the needs of the District. Assignments may be changed to serve the best interests of the District." *Id.* The policy indicates that the Superintendent has the responsibility for the assignment "of all personnel throughout the District." *Id.*

### Impact of Mr. Levinski's 2011 Administrative Reorganization

Mr. Levinski understood that the June-July 2011 reorganization would impact the racial makeup of CCSD's administrative and supervisory positions.

Defendants' multi-page Chart (Defendants' Chart) (Doc. No. 179–13) compares the number of position titles at the "Directors and Above" level between the 2011 reorganization and the 2014–2015 school year. After the reorganization, the "Directors and Above" positions were reduced from 14 to 8. Instead of 11 Director positions, there were only 6 Director positions. The individuals filling the 8 reclassified "Directors and Above" positions generally had a higher level of education than the employees they replaced. In the 2013–14 school year, there was a 50/50 representation of males and females in director positions and above, 38% of which were Navajo. In 2010–2011, the representation for the same positions was 71% male and 29% female, 14% of which were Navajo. UMF Nos. 20–23.[10] In addition, CCSD student achievement test scores and graduation rates improved during Mr. Levinski's tenure.

Plaintiffs rely on a one-page Chart ("Plaintiffs' Chart") (Doc. No. 206–3) to show how certain individuals were affected by the 2011 reorganization. Plaintiffs' Chart was apparently produced by Defendants during the Human Rights Bureau's investigation of Plaintiffs' Charges of Discrimination. *See* Response at 11. Plaintiffs' Chart lists 40 CCSD employees' names, with

---

[10] Plaintiffs dispute UMF Nos. 20–23 by referring to their Facts 2–9, 10–17, and 19–20. Response at 5. The Court addresses *infra* these facts and Plaintiffs' arguments about an alleged conspiracy at CCSD.

their race or national origin, e.g., Anglo, Native American, or Hispanic, along with notations of religion for two employees and an explanation of each person's reclassification, e.g., elimination of position, discharge, promotion, transfer, or new hire. Plaintiffs' Chart covers the period of December 2010 to December 2011.

Plaintiffs also rely heavily on an Affidavit Statement by Byron Manning (Anglo and Mormon), who was the Executive Director of Finance and Business Operations at CCSD until he was placed on administrative leave in May 2011. Manning Aff. ¶1 (Doc. No. 206–1). Mr. Manning or his attorney,[11] identifies 13 Anglo and/or Mormon CCSD employees, including the 3 Plaintiffs, as evidence of a "pattern or practice" of discrimination by the "School Board." *Id.* ¶3.

Not all of the employees listed by Mr. Manning appear on the parties' charts, e.g., Mark Ammo and Jim Karlin. In many instances, an employee's religion is not identified or not known. Moreover, Plaintiffs' summation of "the negative side of the restructuring" sends the Court down a rabbit hole. Plaintiffs state that there was "a downgrading of 4 Anglo Directors to Coordinators, one Mormon/Anglo Director to Coordinator, and one Mormon/Native American Director to Coordinator," Response at 13. Plaintiffs then apparently require the Court to try to figure out who these persons are or to examine Plaintiffs' long-winded narrative alluding to a number of employees. *See* Response at 12–13. In addition, the Court cannot always count on Plaintiffs' counsel to give accurate cites to the record.

The following list of employees, whom Plaintiffs contend were impacted by the reorganization, is taken mainly from Mr. Manning's Affidavit.

---

[11] These Plaintiffs' attorney also represented Mr. Manning.

### 1. *Plaintiffs Hunt (Anglo, Mormon), Ulibarri (Anglo, Mormon), and Jensen (Anglo, non-Mormon)*

According to Plaintiffs, Mr. Hunt was replaced by a Native American employee. *See* Defendants' Chart at 2 (listing Transportation Coordinator position as being filled by a Navajo woman). Mr. Levinski stated that the new Coordinator of Transportation was previously the "second-in-command" of the Transportation Department.

Plaintiff Ulibarri's position as Custodial Supervisor was eliminated. The individual principals resumed oversight of the custodians at their schools.

Although Mr. Levinski did not fill Ms. Jensen's Assistant Superintendent position, some of Ms. Jensen's job responsibilities were assumed by Pandora Mike (Native American, religion unknown), who was placed in the position of the Director of Curriculum, Instruction, and Staff Development, sometimes referred to as Assistant Superintendent of Curriculum, Instruction, and Staff Development. *See* Defendants' Chart at 1.

### 2. *Byron Manning (Anglo, Mormon)*

Mr. Manning claims to have been unjustifiably placed on administrative leave in May 2011. Mr. Manning also contends that Mr. Levinski issued him an "intent to discharge" letter on June 30, 2011, and "hired replacement persons." Manning Aff. ¶ 1.

It is not clear who placed Mr. Manning on administrative leave or the exact date of that leave. Mr. Manning asserts that Defendant Tso was behind termination of Mr. Manning's position at CCSD as early as February 2011. Plaintiff Jensen testified that Gregg Epperson, who preceded Mr. Levinski as Superintendent, placed Mr. Manning on administrative leave related to Mr. Manning having "sent out a message about Navajo preference for hiring and what that would mean to the district, because that had become a very huge topic at each board meeting recently." Jensen Dep. at 195–96. Mr. Levinski testified that he had no idea why Mr. Manning was placed

16

on administrative leave; he did not place Mr. Manning on administrative leave; the disciplinary action occurred before Mr. Levinski became Superintendent; the School Board ordered the investigation, the results of which stated that Mr. Manning was disruptive to the organization; and, CCSD or the School Board settled with Mr. Manning for the sum of $145,000.00.[12]

Mr. Levinski was responsible for filling Mr. Manning's position. Mr. Levinski divided Mr. Manning's job duties between Gary Martinez (Hispanic, religion unknown), who was promoted from Comptroller to Director of Finance and who later resigned, and Defendant Ed Marquez (Hispanic, non-Mormon), who was promoted from teacher to Director of Operations.

### 3.  *Gregg Epperson (Anglo, non-Mormon)*

Mr. Epperson preceded Mr. Levinski as CCSD's Superintendent. The School Board had ordered an investigation into Mr. Epperson's conduct but Mr. Epperson asked the Board to stop the investigation at some point in 2011, because he had reached a settlement with the School Board and CCSD. Mr. Levinski played no role in the discipline or investigation of Mr. Epperson. It is unclear who placed Mr. Epperson on administrative leave or who was on the School Board at the time that Mr. Epperson negotiated a settlement. Mr. Levinski (Anglo, non-Mormon) replaced Mr. Epperson.

---

[12] Most of Mr. Manning's Affidavit is devoted to making his personal claims against CCSD and various Board Members. Mr. Manning is not a party to this lawsuit. Moreover, according to the evidence, Mr. Manning has already reached a settlement of his claims with CCSD. The majority of Mr. Manning's Affidavit is irrelevant.

### 4.  *Tim Kienitz (Anglo, non-Mormon)*[13]

Mr. Kienitz was an Assistant Superintendent. In late June 2011, Mr. Levinski reassigned

Mr. Kienitz to a principal position at Shiprock High School. Although Mr. Levinski did not fill

the two Assistant Superintendent positions (Ms. Jensen had been the other Assistant

Superintendent), some of Mr. Kienitz's job responsibilities were taken over by Abena McNeely

(African American, religion unknown). Ms. McNeely was promoted from a principal position to

Director of Administration.

### 5.  *Dennis Fieldsted (Anglo, Mormon)*

Mr. Fieldsted was the Director of Construction and Maintenance. Mr. Fieldsted was

reassigned to the position of Coordinator of Construction.

---

[13] It is exceedingly difficult from the briefing and exhibits to accurately sort out which Board Members may have discharged whom, who was threatening the employment of whom, and/or the dates of pertinent terminations of employment. The deposition Plaintiffs' counsel took of Mr. Kienitz is illustrative. For unexplained reasons, Plaintiffs' counsel had Mr. Kienitz read a number of Mr. Kienitz's notes verbatim into the record. The notes appear to document conversations he had with various CCSD employees. Kienitz Dep. at 30–33 (Doc. No. 205–1). Mr. Kienitz stated (apparently reading from a note): "Comments that he planned to get Mr. Epperson out of here. 'His plan was to make sure certain people were elected to the upcoming School Board Elections…that once 'he' had the right board in place, they would get rid of Gregg Epperson, Nancy Frazzini, and By[ron] Manning.'" *Id.* at 31. Although it's not clear, the Court believes that "he" refers to Defendant "Scott" Nicolay. "[C]onversations with Scott were more disturbing. He started to talk about Dennis Fieldsted. He said that Dennis was doing dirty work." *Id.* at 32. "The day I returned to work February 9, 2011…came into my office to talk about the elections and how Mr. Epperson had paid Hoskie [Benally] to side with him…not the two newly elected board members." *Id.* at 33. Mr. Kienitz, again reading from notes and discussing an employee's reports about Mr. Nicolay, read: "Scott Nicolay … proud that he got 2 of the 3 board members elected. [B]elieves that the votes for Hoskie [Benally] and Donovan [Begay] were switched." *Id.* at 42. It appears that Mr. Nicolay was threatening to get Mr. Epperson, Mr. Manning, and Ms. Frazzini fired through influencing various Board Members' votes. *Id.* at 37. According to Mr. Kienitz's notes, it was reported that "Gregg [Epperson] made a deal with Hoskie [Benally] … promised that if he was reelected that he would fire Byron Manning, Nancy Frazzini, Jeff Hunt and possibly Dennis Fieldsted …." *Id.* at 43. Mr. Kienitz's deposition or his notes suggest that manipulation of the School Board and unsavory politics are standard fare at CCSD, regardless of race or religious affiliation. *See, e.g.,* Mr. Kienitz's testimony that Mr. Nicolay and Mr. Epperson were making significant monetary contributions to Board Member Hoskie Benally's campaign budget. *Id.* at 44; Marquez Dep. at 52–54 (concerning similar actions of Mr. Levinski) (Doc. No. 203–4).

### 6. *Herb Frazier (Native American, Religion unclear)*[14]

Mr. Frazier was the Director of Bilingual and Multicultural Affairs. He was reassigned to the position of Coordinator of Indian Education.

### 7. *Brock Smith (Anglo, Religion unclear)*[15]

Mr. Smith was the Director of Food Service and was reassigned to the position of Coordinator of Food Service.

### 8. *Peggy Soria (Anglo, non-Mormon)*

Ms. Soria, was the Director of the Early Childhood Program and was reassigned as the Coordinator of that Program. She does not appear to be Mormon. *See* Response at 12–13.

### 9. *Nancy Frazzini (Anglo, non-Mormon)*

Ms. Frazzini was the Director of Human Resources before Mr. Kasper (Anglo, non-Mormon) replaced her. Ms. Frazzini was reassigned as the Data Assessment Coordinator.

### 10. *Jeff Smith (Anglo, Mormon)*

Mr. Smith was a new hire into the position of Supervisor of Payroll.

### 11. *Phil Kasper (Anglo, non-Mormon)*

Mr. Kasper was a new hire into the position of HR Director.

### *Other Allegations of Defendants' Wrongdoing*

In February or March 2011, Mr. Levinski loaned $3,000.00 to CCSD Board Member Bernice Benally to assist her with the payment of her mortgage. The loan occurred several

---

[14] Plaintiffs state that Mr. Frazier is Mormon , relying on Mr. Manning's Affidavit, but the Court does not find that Mr. Manning said this. Instead, Mr. Manning stated that "a large number of Anglo and/or Mormon employees" were discharged or disciplined. Manning Aff. . ¶ 3. Included in the list (apparently identified by Manning's attorney) are Mormons and non-Mormons. Mr. Frazier's religious affiliation is unclear.

[15] It does not appear that Mr. Brock Smith is Mormon but it is unclear. *See* Response at 13 (not necessarily referring to Brock Smith as Mormon).

months before the Board voted to elect Mr. Levinski as the Interim Supervisor in May 2011. There is no evidence of how Ms. Benally voted.

Mr. Levinski told Mr. Marquez that Mr. Levinski would make Mr. Marquez the CCSD Director of Operations if Mr. Marquez could get Board Member Hoskie Benally to vote for Mr. Levinski as Superintendent. On July 25, 2011, Mr. Levinski appointed Mr. Marquez as Director of Operations. Although Mr. Marquez received the promised position, there is no evidence confirming that Mr. Benally voted for Mr. Levinski as Superintendent.

Moreover, the parties identify no evidence regarding other candidates for the Superintendent position, if any, the exact date of the Board's vote, the number of Board Members who were present, the breakdown of the vote, or any other details that might support the inference that Mr. Levinski influenced Board members' votes.

Mr. Levinski was seen meeting with Mr. Nicolay and Mr. Tso, both before and after Mr. Levinski became Superintendent. The content of those meetings is unknown.

When Mr. Levinski received notice of Plaintiffs' complaints of discrimination, he did not order an investigation because he did not believe the reorganization resulted in unlawful discrimination against a particular race or religion. Mr. Levinski referred the complaints to CCSD's attorneys, who conducted the investigation and responded to Plaintiffs' counsel's letters.[16]

Defendant Scott Nicolay told Mr. Marquez that "the boss would be most appreciative if [Mr. Marquez] would provide support to Matthew Tso's senatorial campaign." Marquez Dep. at 52. Mr. Marquez understood the reference to "boss" to mean Mr. Levinski. *Id.* at 53. Mr.

---

[16] For some reason, Defendants argue that "Plaintiffs' complaints were, in fact, investigated by Levinski, Defendant Phil Kasper, and CCSD's attorneys." Motion at 11. But, Mr. Levinski testified at his deposition that he did not order an investigation. Levinski Dep. at 17–18. "If you're talking about a formal investigation, no. Because there was no discrimination." However, Mr. Levinski stated that the Human Resources Department, or Mr. Kasper, or CCSD's attorneys handled the matter. *Id.* at 17–21.

Marquez submitted funding to Mr. Tso's senate campaign. This conversation between Mr. Marquez and Mr. Nicolay occurred after Mr. Levinski was already Superintendent.

Mr. Marquez was concerned about Mr. Levinski's possible payoff of Mr. Tso's student loan in 2012. Although Mr. Marquez did not necessarily believe that any payoffs by Mr. Levinski were "illegal," Mr. Marquez reported the matter to the Attorney General's Office.

Mr. Levinski conveyed to Mr. Marquez that Mr. Levinski wished to hire Mr. Kasper as the HR Director and that "Phil [Kasper] was my man, or words to that effect." *Id.* at 99–100. Even though there were two candidates for the HR Director position, Mr. Marquez understood from Mr. Levinski that Mr. Kasper was "the candidate and the only candidate." *Id.* at 101. During their interview of Mr. Kasper, Mr. Marquez "played the game" and scored Mr. Kasper higher that the other candidate "predicated on Mr. Levinski's instructions." *Id.* at 102-03. Mr. Marquez knew Mr. Kasper's HR experience "was limited at best." *Id.* at 104. Mr. Marquez did not relay this information as part of his complaint to the AG's Office because he wanted to keep his job as Director of Operations.

On November 8, 2011, the State of New Mexico's Public Education Department (PED) issued a Notice of CCSD's failure to meet certain requirements. The Notice was signed by Hanna Skandera, Secretary of Education, and informed Mr. Levinski of certain failures that were "sufficiently serious and numerous as to warrant a suspension of [his] authority as the district's Superintendent … until or unless the failures are corrected." Notice (Doc. No. 203–2).

The PED found that Mr. Levinski's decision to promote Mr. Marquez as Director of Operations from his position as a Level 2 teacher of Social Studies was suspect. The PED concluded that "the hiring of Phil Kasper" as the HR Director was "replete with questionable practices." *Id.* In addition, the Notice indicated that Mr. Levinski hired two principals who did

not hold an administrator's license contrary to the provisions of the School Personnel Act. The PED found that Mr. Levinski's hiring decisions resulted in the loss of "longtime qualified employees." *Id.* at 3. The PED Notice did not discuss complaints of discrimination, and it is unknown if or how CCSD resolved these issues.

### Plaintiffs' Statement of Facts

The Court has carefully scrutinized each of Plaintiffs' 20 proposed facts that span 15 pages of the 27-page Response, along with Plaintiffs' citations to the record that are interspersed with argument. Response at 5–20. Rather than explaining why the Court finds most of Plaintiffs' purported facts to be immaterial, redundant, or unsupported, the Court listed above those facts that are properly supported by citations to the record evidence. The facts that do not appear above are deemed immaterial or unsupported. To the extent that Defendants contend certain facts listed above are immaterial or based on speculation or hearsay, *see* Reply at 6–15, the Court overrules those objections.

### Discussion

### I.   PLAINTIFF JENSEN'S CLAIMS (SECOND AMENDED COMPLAINT)

Plaintiff Jensen's claims are: 1) breach of contract against CCSD under New Mexico State law; 2) breach of the implied covenant of good faith and fair dealing against CCSD under New Mexico state law; 3) § 1983 violations of the Equal Protection Clause against CCSD, based on race or religious discrimination; 4) § 1985(3) conspiracy against CCSD and Mr. Levinski based on race or religious discrimination, 5) violations of the New Mexico Human Rights Act (HRA) against CCSD based on unlawful discrimination, and 6) violations of Title VII against CCSD based on race and/or religious discrimination, retaliation, hostile work environment, and

constructive termination.[17] Contrary to Plaintiffs' one-sentence position that Plaintiff Jensen, like Plaintiffs Hunt and Ulibarri, asserted a claim under the New Mexico Whistleblowing Protection Act (WPA), Response at 3, the Jensen Complaint does not include a WPA claim. Therefore, the Court addresses only the six enumerated claims as to Plaintiff Jensen.

The breach of contract claim requires a showing that CCSD breached a term of Plaintiff Jensen's employment contract. *See Constr. Contracting & Mgmt., Inc. v. McConnell*, 1991–NMSC–066, ¶ 10, 112 N.M. 371 (noting elements of breach of contract claim). A breach of the implied covenant of good faith and fair dealing requires evidence demonstrating that CCSD interfered with Ms. Jensen's employment contract, prevented the contract's performance, or withheld benefits of the contract. *See Sanders v. FedEx Ground Package Sys., Inc*., 2008-NMSC-040, ¶¶ 7,8, 144 N.M. 449, 452 (discussing evidence necessary to support breach of the implied covenant claim).

Plaintiff Jensen's three federal-law claims and the similar New Mexico HRA claim all assert that Defendants CCSD and/or Levinski unlawfully discriminated against her or conspired to discriminate against her. The prima facie elements of Plaintiff's discrimination claims are similar whether brought under Title VII, the HRA,[18] or § 1983. *See Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2414–15 (2006*); Etsitty v. Utah Transit Auth*., 502 F.3d 1215, 1227 (10th Cir. 2007) (citation omitted). In other words, to proceed on a discrimination claim under Title VII, the HRA, or § 1983, Plaintiff Jensen must offer evidence of an adverse action by CCSD. *Cuenca v. Univ. of Kansas*, 265 F. Supp. 2d 1191, 1205 (D. Kan.

---

[17] Because the Court concludes that Plaintiff Jensen did not suffer an adverse action or an injury, any allegations of retaliation, hostile work environment, or constructive termination must fail.

[18] Plaintiff's burden of establishing a prima facie case of discrimination under the HRA is the same as establishing discrimination under Title VII. *Gioia v. Pinkerton's Inc.*, 194 F. Supp. 2d 1207, 1220 (D.N.M. 2002) (applying New Mexico law).

2003), *aff'd,* 101 F. App'x 782 (10th Cir. 2004) (noting that in a Title VII discrimination case, even where there is direct evidence of discrimination, the evidence must relate directly to the adverse action at issue); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1192 (10th Cir. 2002) (evidence of adverse action required for Equal Protection claim).

With respect to the § 1985(3) conspiracy claim, Plaintiff Jensen must show: "(1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993), *cert. denied,* 510 U.S. 1093 (1994). Thus, she must show some sort of "injury" or "deprivation" that resulted from the alleged conspiracy.

Plaintiff Jensen has not offered evidence that CCSD breached her employment contract or an implied covenant of good faith and fair dealing. The terms of her employment contract remained in place at the time she resigned. Similarly, she cannot demonstrate that she suffered any type of adverse employment action at CCSD, notwithstanding her suspicions, even if well-founded, that she was going to be reassigned. And, there is no evidence that Plaintiff Jensen suffered an injury.

The evidence is undisputed that in April 2011, Plaintiff Jensen signed an employment contract covering the 2011–2012 school year for the same position she previously held as Assistant Superintendent. Plaintiff Jensen has failed to raise a genuine dispute of material fact that the 2011 reorganization impacted her employment *before* she interviewed for a position outside CCSD, accepted that job, and resigned from CCSD in June 2011.

Because she has not raised a genuine dispute of material fact with respect to the required elements of the breach of contract claim (Count I), the breach of the implied covenant claim (Count II), the § 1983 claim (Count III), the § 1985(3) claim (Count IV), the New Mexico

24

Human Rights Act claim (Count VII), and the Title VII claim (Count IX), the Court will dismiss all six claims, with prejudice, as to Defendants CCSD and Mr. Levinski. It follows that Plaintiff Jensen's claims will be dismissed as to all Defendants.[19] Accordingly, Plaintiff Jensen's Second Amended Complaint (Doc. No. 92) will be dismissed with prejudice.

## II.   PLAINTIFFS HUNT AND ULIBARRI'S CLAIMS (THIRD AMENDED COMPLAINT)

The remaining analysis concerns only those claims brought by Plaintiffs Hunt and Ulibarri. The references are to their Third Amended Complaint (second iteration) (Doc. No. 93).

### A.  BREACH OF EMPLOYMENT CONTRACT CLAIM AGAINST CCSD

1. Legal Standard

To prevail on a breach of contract claim, Plaintiffs must establish the existence of a valid contract, a breach of the contract, and damages. *See Constr. Contracting & Mgmt., Inc.,* 1991–NMSC–066, ¶ 10. "Breach of contract is a question of fact …." *Collado v. City of Albuquerque,* 2002-NMCA-048, ¶ 15, 132 N.M. 133, 137.

2. Parties' Positions

Plaintiffs executed 2011–2012 employment contracts. However, Defendants contend that there was no breach of the contracts based on their position that Superintendent Levinski could legitimately make decisions to transfer and reassign CCSD staff in accordance with the District's needs. Defendants support this position with language in the employment contracts that incorporates School Board Policy G-8250, authorizing the Superintendent to make the reassignment decisions in question.

_____

[19] This means that Defendant Marquez's Motion for Summary Judgment that is directed only at Plaintiff Jensen's claims against him [Doc. Nos. 189, 190] will be granted, and that the Motions for Summary Judgment filed by Defendant Tso [Doc. No. 180], Defendant Benally [Doc. No. 194], and Defendant Nicolay [Doc. No. 195] will be granted in part as to claims against them by Plaintiff Jensen. The Court will resolve the Motions by Defendants Tso, Benally, and Nicolay as to claims against them by Plaintiffs Hunt and Ulibarri in separate opinions, and will separately address the Motions by Defendants Frazzini [Doc. Nos. 181–184] and Marquez [Doc. Nos. 187, 188] that are directed at claims against them by Plaintiffs Hunt and Ulibarri.

Defendants also argue that Plaintiffs have not offered evidence to support any other grounds for breach of contract, including Plaintiffs' claims that CCSD 1) demoted Plaintiffs without proper cause, 2) failed to provide due process hearings, 3) failed to provide Plaintiffs "with open replacement positions," 4) failed to investigate Plaintiffs' complaints of discrimination, 5) defrauded Plaintiffs of their accrued sick leave, and 6) failed to secure Plaintiffs "suitable employment …." *See* Hunt/Ulibarri Complaint ¶ 53. Finally, Defendants assert that Plaintiffs have not established any entitlement to damages since Plaintiffs continued to receive their administrative salaries despite any reassignments of positions.

Plaintiffs do not address any legal principles with respect to their breach of contract claims and fail to apply the law to the facts in this case. In addition, they do not identify any genuine disputes of material fact that would preclude summary judgment on the breach of contract claims. Nowhere do Plaintiffs cite to evidence in the record in support of their breach contract claims. In fact, Plaintiffs never mention the phrase "genuine disputes of material fact" or "summary judgment" in the Response, other than to refer to Defendants' Motion by title. Plaintiffs present no argument specific to Defendants' request that the breach of contract claims be dismissed.

Under the heading, "Plaintiffs' Property Interest in their Demotion," Plaintiffs state that they were entitled to a full due process hearing and that Defendants or the "involved conspiracy" "utterly acted lawlessly throughout this matter" "to accomplish their conspiracy's substantially evidenced discriminatory goals." Response at 25–26.

3.  Analysis

Plaintiffs' reliance on the allegations in their Complaints or on their unsupported arguments does not raise genuine disputes of material fact sufficient to send the breach of

contract claims to trial. Plaintiffs' conclusory arguments do not create "reasonable inferences" nor are their arguments supported by "specific facts showing that there is a genuine issue for trial." The Court finds that Plaintiffs have failed to identify genuine disputes of material fact as to their breach of contract claims, in relation to their allegations of supposed denials of due process hearings, investigations, sick leave, and requests for accommodation. For one thing, Plaintiffs do not establish that they were entitled to due process hearings. They also do not present evidence of actual requests for accommodations. Most of the remaining allegations of breach of contract border on nonsensical. *See* Hunt/Ulibarri Complaint ¶ 53.

The Court will, however, examine each Plaintiff's breach of contract claim that is based on allegations of an improper demotion.

### Plaintiff Hunt

Plaintiff Hunt's employment contract expressly states he was given the position of "Coordinator, Transportation" for the 2011-2012 school year. He was subsequently demoted to the position of Grounds Foreman. A change of position from the supervisory head of a department to a Grounds Foreman might be enough to raise a genuine dispute of material fact as to whether the reassignment was a significant or material change to a term of the employment contract sufficient to show a breach.

Yet, Plaintiff Hunt did not identify evidence of any damages that he suffered as a result of the reassignment to Grounds Foreman. He continued to draw the salary promised by his employment contract. He never returned to work after he was informed of the reassignment and he continued to exhaust his sick leave until he retired in February 2012. Moreover, Judge Browning dismissed all of Plaintiffs' claims for emotional distress damages and punitive damages arising from the breach of contract claims. Thus, because Plaintiff Hunt has failed to

raise a genuine dispute of material fact with respect to a required element of his claim, the Court will dismiss, with prejudice, Plaintiff Hunt's breach of contract claim against CCSD (Count I).

### Plaintiff Ulibarri

Plaintiff Ulibarri's employment contract does not specify the position to which she was being reassigned as a result of the 2011 reorganization. The contract states that Plaintiff Ulibarri was to present herself for duty "at such times and places" as designated by the Superintendent. Thus, Plaintiff Ulibarri's eventual reassignment does not constitute evidence of a material change to her employment contract, since the contract language was open and non-specific. In addition, like Mr. Hunt, Plaintiff Ulibarri failed to come forward with any evidence of damages. She too continued to receive the salary guaranteed under her contract. Plaintiff Ulibarri was allowed to exhaust her sick leave before deciding to resign in February 2012. The Court concludes that Plaintiff Ulibarri has not raised a genuine dispute of material fact with respect to a required element of the claim. Therefore, the Court will dismiss, with prejudice, Plaintiff Ulibarri's breach of contract claim against CCSD (Count I).

### B.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST CCSD

#### 1.  Legal Standard

Under New Mexico law, "every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract." *See Cont'l Potash, Inc. v. Freeport–McMoran, Inc*., 115 N.M. 690, 706 (1993) (citation omitted), *cert. denied*, 510 U.S. 1116 (1994). The implied covenant of good faith and fair dealing "requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract." *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 438 (1994) (citation

omitted). To proceed with a breach of the implied covenant of good faith and fair dealing, a party must show that a party acted in bad faith or that a party wrongfully and intentionally used the contract to the detriment of the other party. *Cont'l Potash*, 115 N.M. at 706.

  2. <u>Parties' Positions</u>

Defendants argue that there is no evidence of Mr. Levinski's bad faith, particularly where the employment contracts gave the Superintendent authority to make reassignments that he deemed necessary for the District. Motion at 12.

Plaintiffs' Response fails to mention a claim of breach of the implied covenant and fair dealing. Although the Court tried to tease out Plaintiffs' position with respect to the breach of contract claim, the Court will not do so where Plaintiffs have presented no argument and have identified no evidence to support a prima facie claim of breach of the implied covenant of good faith and fair dealing.

  3. <u>Analysis</u>

Plaintiffs' failure to supply any opposition to the Motion for Summary Judgment on the breach of implied covenant claim amounts to their abandonment of the claim. *See Maestas v. Segura*, 416 F.3d 1182, 1190 n. 9 (10th Cir. 2005) (plaintiffs abandoned claims "as evidenced by their failure to seriously address them in their briefs"). In addition, Plaintiffs' lack of opposition "constitutes consent to grant the motion." D.N.M. LR-Civ. 7.1(a).

The Court will dismiss, with prejudice, Plaintiff Hunt's and Plaintiff Ulibarri's claims of breach of the implied covenant of good faith and fair dealing against CCSD (Count II).

**C. RACE DISCRIMINATION CLAIMS UNDER TITLE VII AND THE NEW MEXICO HRA[20] AGAINST CCSD AND MR. LEVINSKI**

As a preliminary matter, the Title VII claims against Mr. Levinski in his individual capacity cannot proceed because Title VII does not impose liability upon individual employees. "The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of [Title VII]." *Haynes v. Williams*, 88 F.3d 898, 899 (10th Cir. 1996) (citation omitted). Because Judge Browning already dismissed Plaintiffs' Title VII claims against all of the individual Defendants, *Hunt*, 951 F. Supp. 2d at 1204–05, there is no need to address a Title VII claim against Defendant Levinski.

1. Legal Standard: Reverse Race Discrimination[21]

Title VII prohibits discrimination against historically disfavored groups, e.g., minorities or females, as well as those groups that have not been socially disfavored, e.g., Caucasians or males. *Livingston v. Roadway Exp., Inc.*, 802 F.2d 1250, 1252 (10th Cir. 1986) (citation omitted). However, the presumptions in the Title VII analysis of a discrimination claim may have to be modified when addressing the claims of a historically favored group. *Id.*

Claims of race discrimination brought by Anglo plaintiffs, like Plaintiffs Hunt and Ulibarri, are subject to a reverse discrimination analysis. *See Fritzsche v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1201 (D. N.M. 2002).

> There are two general methods by which a plaintiff may proceed on a reverse discrimination claim. The plaintiff may proceed by relying on a version of the *McDonnell Douglas Corp. v. Green*,

---

[20] The same analysis applies to the race/national origin claims whether brought under Title VII or its state law analog, the New Mexico Human Rights Act. *Garcia–Montoya v. State Treasurer's Office*, 2001–NMSC–003, ¶ 39, 130 N.M. 25, 16 P.3d 1084.

[21] Defendants ask that the Court dismiss Plaintiffs' claims of "disparate treatment" discrimination and "disparate impact" discrimination. Response at 14–15. However, Judge Browning dismissed, without prejudice, the claim of disparate impact discrimination, although he allowed Plaintiffs to amend the Complaint. *Hunt*, 951 F. Supp. 2d at 1213, 1215. A comparison of Plaintiffs' complaints indicates that Plaintiffs omitted allegations of disparate impact discrimination. *Compare* Doc. No. 24 ¶ 105 to Doc. No. 93 ¶ 84. Thus, the Court only addresses allegations of disparate treatment discrimination.

411 U.S. 792 (1973), burden-shifting analysis to test whether a
person who is a member of a historically favored group is entitled
to the *McDonnell-Douglas* presumption of discrimination.

In addition, a plaintiff may recover if the plaintiff can demonstrate
he or she is the victim of reverse discrimination by 'direct evidence
of discrimination, or indirect evidence sufficient to support a
reasonable probability, that but for the plaintiff's status the
challenged employment decision would have favored the plaintiff.'

*McGarry v. Bd. of Cnty Com'rs of Cnty of Pitkin*, 175 F.3d 1193, 1199 (10th Cir. 1999) (citing

*Notari v. Denver Water Dep't*, 971 F.2d 585, 590 (10th Cir. 1992) and other cases).

If there is no direct evidence of discrimination, a plaintiff's initial burden, under the

*McDonnell-Douglas* burden-shifting framework, is to show: that: 1) the plaintiff belongs to a

protected class; 2) the plaintiff was qualified for the position; 3) the plaintiff suffered an adverse

employment action; and 4) the plaintiff was treated less favorably than others. *See Argo v. Blue*

*Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). However, in

reverse discrimination cases, the first element is modified to require the plaintiff to establish

background circumstances that support an inference that the defendant is one of the unusual

employers who discriminates against groups who normally do not experience discrimination. *Id.*

(citation omitted).

2. Parties' Positions

Defendants argue that there is no direct evidence of Title VII discrimination; thus, the

claim must be analyzed under the *McDonnell-Douglas* framework. Motion at 14–15. Defendants

represent that Plaintiffs cannot establish an adverse employment action because: 1) they were

reassigned in accordance with provisions in their contracts; and 2) they would have been paid

their full salary to the end of the contract period if they had not resigned in February 2012.

Defendants also contend that Plaintiffs cannot show that CCSD is one of those unusual

employers that could discriminate against a majority class – Anglo/Caucasians in this case. *Id.* at 16. Defendants observe that "almost 80% of CCSD's department heads during the 2010–2011 school year were Anglo. … Thus, it is not surprising that the restructuring of the positions held by those employees affected a large proportion of Anglos …." *Id.*

Plaintiffs devote a single paragraph in their Response to the reverse discrimination claim. They argue that they have established that "Anglos are a distinct minority at CCSD" based on student body statistics. Plaintiffs also assert that Native Americans comprise a "50% plus majority" of *all* CCSD employees, without reference to supervisory employees.[22] Response at 21. Plaintiffs address the makeup of the School Board as well. However, Plaintiffs do not identify evidence of record to support their arguments. The rest of Plaintiffs' few arguments pertain to the conspiracy allegations.[23] Suffice to say, Plaintiffs offer no analysis of the facts in relation to pertinent legal standards.

3.  Analysis

The Court first examines whether Plaintiffs have presented <u>direct</u> evidence of reverse race discrimination. The Court is reluctant to do this when Plaintiffs have not argued that they have direct evidence of reverse discrimination, other than to make unsupported, conclusory statements. For example, Plaintiffs argue that "[b]ecause there is …there is direct and substantial evidence of the discriminatory intent and animus …; and the involved job actions all meet the relevant Tenth Circuit test for 'tangible employment actions' there is little doubt that the Plaintiffs [sic] claims are ready for trial." Response at 2–3.

---

[22] This argument is irrelevant because it does not specifically address CCSD supervisory employees, who comprised the group most affected by the restructuring. Moreover, Defendants have established, with credible evidence, that there were more Anglos in department head positions.

[23] Again, Plaintiffs fail to support their position with citations to record evidence. As is true with many of Plaintiffs' arguments, they are inflated when compared to any evidence that is pertinent to their allegations.

Yet, Defendants have candidly admitted in their statement of undisputed facts that some

of Defendant Levinski's reasons for reorganizing the supervisory structure at CCSD were to

"increase the educational level of upper administration *and increase minority representation in

the supervisory positions.*" (citing Defendants' Answer to Interrogatory No. 21) (Doc. No. 179–5

at 3) (emphasis added). Notwithstanding Plaintiffs' failure to construct an argument that CCSD's

admission might be construed as direct evidence of reverse race discrimination, the Court does

not feel at liberty to ignore an undisputed material fact that Defendants themselves offered.

Moreover, the information in Defendants' Chart confirms that the 2011 reorganization was

successful in accomplishing Mr. Levinski's goal of increasing minority representation in upper

administrative positions. While Native Americans made up only 14% of the employees filling 14

administrative positions in 2010–2011, Native Americans made up 38% of the individuals filling

the remaining 8 positions in 2014–2015. In 2010-2011, 11 Anglo employees filled 14 positions;

in 2014–2015, 4 Anglo employees filled 8 positions.

In *McGarry*, the Tenth Circuit Court of Appeals concluded that the Anglo plaintiff had

raised genuine disputes of material fact as to the plaintiff's reverse discrimination claim based on

evidence that is not significantly different than the undisputed evidence in this case. The

*McGarry* plaintiff alleged reverse race discrimination based on the defendant's failure to hire

him after he applied for two different building maintenance positions. *McGarry*, 175 F.3d at

1195–96. The defendant filled one position with a Hispanic employee and the other position with

an African American employee. The plaintiff submitted written questions to the defendant's

Personnel Director, who conducted an investigation into why the plaintiff was not hired. The

Personnel Director made the notation "minorities" next to one of the questions. *Id.* at 1199–1200.

During her deposition, the Personnel Director, could not recall why she jotted "minorities" next

to a question. But, the plaintiff testified in his deposition that the Personnel Director told him that the two individuals hired were "minority hiring[s]" and that some other hirings had been "affirmative action hirings." *Id.* at 1200. The Tenth Circuit Court concluded that this evidence was sufficient direct evidence to survive summary judgment. *Id.*

The Court views the evidence that Defendants intended to increase minority representation in upper administrative positions and documentation that Defendants achieved that goal as direct evidence of reverse race discrimination.[24] Moreover, Mr. Levinski testified that he was conscious of placing more Navajo Americans in upper administrative positions. "But understand that we're 90 percent Navajo. If I ended up with a few more Navajos on cabinet or something like that, I would think it would make sense." Levinski Dep. at 108. In viewing all such evidence and the reasonable inferences drawn therefrom in the light most favorable to Plaintiffs Hunt and Ulibarri, the Court concludes that genuine disputes of material fact exist regarding Plaintiffs' Title VII and New Mexico Human Rights Act reverse race discrimination claims[25] Therefore, the Court will deny Defendants' Motion for Summary Judgment as to the Title VII reverse race discrimination claim (Count X), which will proceed against CCSD, and as to the HRA reverse race discrimination claim (Count VIII), which will proceed against CCSD and Mr. Levinski.[26]

---

[24] If adequate direct evidence is offered, there is no need to analyze the reverse discrimination claim under the alternative approach that asks whether there is evidence to support a reasonable inference that "but for plaintiff's status the challenged decision would not have occurred." *See Notari*, 971 F.2d at 590. Similarly, if the Court finds sufficient direct evidence to survive summary judgment, it need not discuss Plaintiffs' reverse race discrimination claims under the *McDonnell Douglas* framework. *See McGarry*, 175 F.3d at 1200 n.4.

[25] This does not mean that Plaintiffs' reverse discrimination claims are strong or that they are likely to succeed at a trial. Should this matter proceed to trial, Plaintiffs may likely face a number of hurdles, including evidence that Anglo supervisors made the decisions that adversely impacted other Anglo employees, evidence that CCSD hired Anglo employees who became supervisors or administrators, including the Superintendent and HR Director, evidence that the reorganization affected all races and national origins, and evidence of causation.

[26] The Supreme Court of New Mexico "has acknowledged the possibility of individual liability for discrimination claims[] under the HRA." *See Sonntag v. Shaw*, 130 N.M. 238, 243 (2001). *See also Lobato v. New Mexico Env't Dep't, Envtl. Health Div.*, 838 F. Supp. 2d 1213, 1218 (D.N.M. 2011) (applying NM HRA).

### D.  RELIGIOUS DISCRIMINATION CLAIMS UNDER TITLE VII AND THE NEW MEXICO HRA AGAINST CCSD AND MR. LEVINSKI

1.  Legal Standard

To show religious discrimination, a plaintiff must present evidence of an adverse employment action and satisfactory performance of the plaintiff's job. *Shapolia v. Los Alamos Nat'l Labs.*, 992 F.2d 1033, 1038 (10th Cir. 1993). In addition, the plaintiff must identify evidence sufficient to infer that the employer acted because of a discriminatory motivation based on the employee's failure to follow the employer's religious beliefs. *Id.* Again, a plaintiff may supply direct or indirect evidence of religious discrimination. Indirect evidence of discrimination is analyzed under the *McDonnell-Douglas* burden shifting framework.

2.  Parties' Positions

Defendants argue that Plaintiffs have not provided evidence of "circumstances giving rise to an inference of discrimination" against Mormon employees. Motion at 17.

Plaintiffs offer conclusory argument without identifying evidence of religious bias. Plaintiffs contend that "abundant, direct evidence" of a conspiracy exists which includes "the public production of religious … slurs by Defendant Tso, the private acknowledgement of religious motivation by Defendant Levinski, the foreknowledge of Defendant Nicolay, the unanimous nature of actions harming Mormon/Anglos, … and abundant direct evidence of the anti-Anglo/Mormon bias of that conspiracy …." Response at 21.

3.  Analysis

Unlike the reverse race discrimination claims, there is no direct evidence of religious discrimination. The undisputed evidence is that the 2011 reorganization was intended to direct more funding to the classrooms, reduce administrative expenses, and increase minority representation in supervisory positions. When discussing his motivation for the reorganization,

Mr. Levinski did not mention an employee's religious affiliation. Plaintiffs have not rebutted Mr. Levinski's testimony that he did not consider an employee's religion in making reorganization decisions. "I didn't ever look at religion. I have looked at racial and how things changed each time I make a hire or somebody leaves or whatever." Levinski Dep. at 106. In fact, it appears that the religious affiliation of most CCSD employees who were affected by the 2011 reorganization was unknown. *See* Plaintiffs' Chart.

Plaintiffs' allegations of Mr. Levinski's "private acknowledgement of religious motivation" are conclusory and without a reference to any evidence of record. Plaintiffs argue that "… Defendant Levinski admits he knew the involved restructuring had a disproportionate impact on the Mormon/Anglo senior supervisors." Response at 16. The related citation to the record is unclear, and the Court was unable to locate supporting evidence for Plaintiffs' argument about Mr. Levinski's supposed admission. Plaintiffs may rely on Ms. Jensen's statement that Mr. Levinski told her it was not good to work in Kirtland or to be from Kirtland, which is known to be a Mormon community. But, the cited deposition testimony of Ms. Jensen is not clearly supportive of Plaintiffs' position. In addition, even if Mr. Levinski said something like "that's not good" in response to Ms. Jensen's statement that she lived in Kirtland, this is negligible evidence of religious bias.

As for Defendant Tso's activities and Plaintiffs' allegations that Mr. Tso wrote posts to a local newspaper blog that were anti-Mormon, the evidence is far less clear than Plaintiffs would like. Plaintiffs hired an computer expert in an attempt to connect racist and anti-Mormon blogging comments to Defendant Tso. However, the expert provided an affidavit and report stating that the "forensic integrity of the media and its contents cannot be verified for accuracy for numerous reasons …." Kyle Gonzales Aff. at 7 (Doc. No. 203–7). And, although the expert

opined that there was a "high likelihood that Tso is associated with KBO Employees First,"[27] that language is not proof positive of Mr. Tso's involvement.

Plaintiffs have not identified evidence of record that Mr. Levinski or CCSD held particular religious beliefs or views that conflicted with the Mormon faith. Plaintiffs' allegations that Defendant Tso may have made asperse comments about Mormons, s*ee* Response at 6–9, are insufficient to link Mr. Tso's alleged conduct with actions taken by Mr. Levinski or by CCSD. For example, it is not reasonable to infer that Mr. Levinski acted with discriminatory intent against Mormons based on Plaintiffs' conclusory argument that "Defendant Tso's statement [] in the Facebook and Blog pages demonstrate [sic] the identity between Kirtland and the LDS or Mormon Church in the shared mind-set of the conspiracy." *See* Response at 9. Nothing in that argument identifies evidence in the record to connect Mr. Tso's alleged actions to actions by Mr. Levinski or by CCSD.

Similarly, Plaintiffs' argument that Mr. Tso attended meetings with Mr. Levinski (before Mr. Levinski became the Superintendent) and with Defendant Nicolay is not evidence that Mr. Levinski must have been biased against Mormons since Plaintiffs can only speculate as to the content of the meetings. To the extent that Plaintiffs believe that Mr. Tso acted on behalf of either the CCSD or Mr. Levinski, Plaintiffs simply have not made that connection with admissible evidence. Plaintiffs admit that Defendant Tso was on the School Board but was not an employee of CCSD. *See* Response at 7 (referring to Mr. Tso as a "non-employee").

The undisputed evidence is that the 2011 reorganization affected Mormons and non-Mormons alike. Plaintiffs and Mr. Fieldsted are three Mormons who were impacted by the reorganization. Mr. Frazier may have been Mormon, and if so, this is evidence that a fourth

---

[27] KBO Employees First appears to be some type of blogging entity that allegedly engages in racist or anti-Mormon posts. *See* Response at 8 and KBO Employees First posts (Doc. No. 204–4).

Mormon employee was reassigned to a lower position. Mr. Manning was placed on administrative leave before the 2011 reorganization. Ms. Frazzini and Mr. Kienitz were non-Mormons but were transferred from Director to Coordinator positions. The same is probably true for Mr. Brock Smith and Ms. Soria, although the parties do not clearly identify their religious affiliations, if any. Although Mr. Kasper, a non-Mormon, was hired in the reorganization as a Director, Mr. Jeff Smith, a Mormon, was also a new hire during the reorganization.[28]

While Plaintiffs might be able to produce sufficient evidence of an adverse action and satisfactory job performance to survive summary judgment, there simply is no evidence to support an inference of Defendants' religious bias. Thus, Plaintiffs have failed to raise a genuine dispute of material fact as to a required element of the religious discrimination claim. Therefore, the Court will dismiss, with prejudice, the religious discrimination claim under Title VII and the New Mexico HRA (Counts VIII and X), against Defendants CCSD and Mr. Levinski.

**E.  EQUAL PROTECTION CLAIM UNDER 42 U.S.C. § 1983 AGAINST CCSD**

Plaintiffs allege that Defendant CCSD violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by unlawful racial and religious discrimination.[29] Plaintiffs bring the Equal Protection Clause claims via § 1983.

---

[28] Plaintiffs obfuscate the analysis with their arguments that lump together Anglo and Mormon employees. For example, Plaintiffs contend that that "6 Mormon or Anglo [employees] or both" were demoted, which makes it sound like 6 Mormon employees might have been demoted. Response at 13. Or, take Plaintiffs' assertion: "That's two termination, four outright demotions, and 6 downgrades of the current positions going to 5 Mormon/Anglos, 6 Anglos, and one Native American/Mormon. *Id.* Not only do Plaintiffs fail to name  these employees, the argument is misleading, if not inaccurate. Not all Anglo employees affected in the reorganization were Mormon, e.g., Epperson, Kienitz, Jensen. Moreover, allegations pertaining to Mr. Epperson and Mr. Manning are irrelevant as these two individuals were placed on administrative leave before the June/July 2011  restructuring. Plaintiffs' attempt to confuse the facts does not raise genuine disputes of fact.

[29] Plaintiffs also allege disability discrimination but, as noted previously, Judge Browning found there was no plausible claim of disability discrimination. In addition, even if there were, Plaintiffs did not identify evidence in the record to support the claim. Thus, the Court does not analyze any claims of disability discrimination.

1.  Legal Standards

"Section 1983 creates no substantive rights, but rather creates only a remedy against those who, acting under color of law, violate rights secured by federal statutory or constitutional law." *Ramirez v. Dep't of Corr., Colo.*, 222 F.3d 1238, 1243 (10th Cir. 2000) (citation omitted). Race or religious discrimination can violate the Fourteenth Amendment right to equal protection of the law under 42 U.S.C. § 1983. *Id.; Abdulhaseeb v. Saffle*, 65 F. App'x 667, 674 (10th Cir. 2003) (equal protection claim based on religious discrimination allowed to proceed). An individual's equal protection rights may be violated if a government or its officials treat that person differently than others who are similarly situated. *See City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir. 1996).

Plaintiffs bring the equal protection claim against only CCSD, which is a public school. In order to find the school district liable under § 1983, principles of municipal liability apply. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010). To prevail on a claim of municipal liability, Plaintiffs must show that the alleged constitutional violations resulted from CCSD's official policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). In addition, if Plaintiffs contend that CCSD's "facially lawful municipal action has led an employee

to violate a plaintiff's rights," Plaintiffs will also have to present evidence that CCSD's action was taken with "deliberate indifference" to known or obvious consequences. *Id.* at 770–71.

2. Parties' Positions

Defendants argue that whether analyzed under Title VII, the New Mexico HRA, or § 1983, the elements of Plaintiffs' race/national origin and/or religious discrimination claims are essentially the same. Thus, similar to their previous arguments, Defendants represent that Plaintiffs are unable to identify evidence of an adverse action or evidence that CCSD treated similarly situated employees differently than Plaintiffs during the reorganization. In addition, for purposes of municipal liability, Defendants aver that there is no evidence of an unconstitutional policy or practice that was the "moving force" behind any constitutional violation. Motion at 20.

Plaintiffs' Response does not specifically discuss the § 1983 equal protection claim or the required elements of municipal liability. *See* Response at 20–28 (setting out summary arguments or quotations from case law under the sections entitled "Reverse Discrimination Claims and the Burden of Proof," "Law of Section 1985(3) Conspiracy," "The Plaintiffs' Property Interest in their Demotion," "The Law of Reasonable Accommodation Negotiation," "Resignation After Notice of Demotion," and "The Law of Qualified Immunity").

Plaintiffs' Response is the same as if they had filed no opposition to the Motion seeking dismissal of the § 1983 claim. But, the failure to respond alone is not a sufficient basis to grant Defendants' Motion. *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002). The Court still must determine if the undisputed material facts entitle Defendants to judgment as a matter of law. *Id.*

3. Analysis

The Court will deny Defendants' Motion for Summary Judgment as to the § 1983 race/national origin discrimination claims for the same reasons that the Court allowed those

claims to proceed under Title VII and the New Mexico HRA. *See Maldonado v. City of Altus,* 433 F.3d 1294, 1307 (10th Cir. 2006) ("The same analytical framework is applicable to all Plaintiffs' theories of intentional discrimination. '[I]n [disparate-treatment] discrimination suits, the elements of a plaintiff's case are the same ... whether that case is brought under §§ 1981 or 1983 or Title VII.'"), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 670 (10th Cir. 2004) (whether brought under § 1983 or Title VII, a racial/national origin discrimination claim requires evidence showing that the plaintiff suffered an adverse employment action and was treated differently than similarly situated employees.) *See also  Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008) ("the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same).

In other words, the same direct evidence that the Court found sufficient to raise genuine disputes of material fact regarding the Title VII and New Mexico HRA disparate treatment discrimination claims, *see* discussion *supra*, supports the § 1983 race or national origin discrimination claims. This means that there is sufficient evidence, *albeit* slim evidence, to raise genuine disputes of material fact of an adverse employment action that was based on Plaintiffs' race and of different treatment of similarly situated non-Anglo employees during the 2011 reorganization. In addition, genuine disputes of material fact exist concerning whether CCSD Superintendent Levinski's 2011 reorganization was an official policy of CCSD's that resulted in increasing minority representation in supervisory positions at the expense of qualified Anglo employees. Mr. Levinski's recognition that the reorganization would likely increase minority representation in certain high-level administrative positions along with undisputed evidence that the reorganization accomplished this goal is sufficient to raise a genuine dispute of material fact

as to whether Defendants acted with "deliberate indifference" to known or obvious consequences.

Thus, the Court will deny Defendants' Motion for Summary Judgment as to the § 1983 claims of race and/or national origin discrimination against CCSD (Count III), which will proceed. However, for the same reasons that the Court discussed above, the Court will grant the Motion as to the § 1983 claims of religious discrimination (Count III), which will be dismissed with prejudice against CCSD.

### F.   42 U.S.C. § 1985(3) CONSPIRACY CLAIM AGAINST CCSD AND MR. LEVINSKI

1.  <u>Legal Standard</u>

To prove a conspiracy in violation of 42 U.S.C. § 1985(3), a plaintiff must show "(1) the existence of a conspiracy (2) intended to deny [him] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir. 1995) (citations omitted). *See also Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993), *cert. denied*, 510 U.S. 1093 (1994) (setting out essential elements of a § 1985(3) conspiracy claim). To support a conspiracy claim, a plaintiff must show a meeting of the minds or agreement among the defendants and a concerted action. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). Section 1985(3) only

reaches conspiracies "motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus."[30] *Tilton*, 6 F.3d at 686.

2.  Parties' Positions

Defendants argue that Plaintiffs offer only conclusory allegations that Defendants entered into a conspiracy and that they took actions to further a conspiracy. Motion at 22. Defendants represent, for example, that Plaintiffs have not identified any specific actions that CCSD and/or Mr. Levinski took in furtherance of the conspiracy and have not presented evidence that invidiously discriminatory animus lay behind Defendants' actions.

Plaintiffs quote several passages of opinions setting out the required elements of a conspiracy claim. But, Plaintiffs do not apply the law to the facts. Response at 22–24.

Plaintiffs supply a number of contentions, many of which are conclusory, to support the conspiracy claim. For example, Plaintiffs contend that there was a conspiracy to terminate or demote Anglo and/or Mormon employees. "The conspiracy began its illegal employment actions (as opposed to illegal deals for Board votes) by effectively terminating the employment of … Manning (Mormon and Anglo) and … Epperson [non-Mormon and Anglo] in May 2011, after securing the Board Presidency Tso." Response at 10. Plaintiffs also represent that "[t]he next move of the conspiracy was to demote the two Acting Superintendents, both Anglo, Tim Kienetz [sic] and Plaintiff Sharon Jensen." *Id.* Plaintiffs claim that Mr. Levinski, acting alone, "elevated" the employees who replaced Mr. Kienitz and Ms. Jensen. *Id.* at 11. According to Plaintiffs, the

---

[30] It is unclear whether Anglo individuals may bring a claim of unlawful conspiracy under § 1985(3). *See United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 837 (1983) (noting that it was a "close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes"). *See also Moore v. City & Cty. of Denver, Colo.*, 744 F. Supp. 1028, 1031 (D. Colo. 1990) (holding that Caucasian males were not a group protected by § 1985(3) because, as a class, they had not been the victims of historically pervasive discrimination.). Although Judge Browning allowed the conspiracy claim to proceed at the Rule 12(b)(6) stage, he did not address these cases suggesting Plaintiffs' claim might not be cognizable under § 1985(3). Defendants did not raise this argument, and the Court elects not to analyze it.

next move of the conspiracy was the alleged restructuring, "which was merely a sham for blatant

downgrading of Anglo/Mormons …." *Id.* at 12.

    3.  <u>Analysis</u>

Even assuming Mr. Levinski intended to increase minority representation in higher level

administrative positions and that Plaintiffs were demoted as a result of the restructuring,

Plaintiffs have not identified evidence to support the required elements of a conspiracy claim.

There is no evidence of a meeting of the minds or agreement among Defendants. For example,

who did Mr. Levinski conspire with to deprive Plaintiffs of their federally protected rights?

Plaintiffs themselves emphasize that Mr. Levinski acted alone. "Defendant Levinski arrived at

the idea of the re-structuring on his own, did not get Board or Administrative input into the

decision …." Response at 15. Plaintiffs do not contend that Mr. Levinski somehow conspired

with CCSD or the School Board in executing the 2011 reorganization. In fact, Plaintiffs elicited

the following testimony from Mr. Levinski:

Q.    I mean, is there any record of you presenting this [documentation in support of the

reorganization] to the [School] board anywhere?

A.    I didn't ask the board for permission to do any of this.

Q.    You didn't believe you needed the approval of the board to conduct a

restructuring after the contracts had been signed with your entire supervisor staff; is that true?

A.    Yes, sir, that's true.

…

Q.    Well, was there any limitation on your power to restructure your senior

supervisory staff as you saw fit at the time that you assumed control of CCSD?

A.    No.

Q.     None?

A.     None.

Q.     And that's even though you were only an acting superintendent; isn't that true,

sir?

A.     Yes, sir.

Levinski Dep. at 113–14. Plaintiffs' lack of any evidence of an agreement between Mr. Levinski

and other co-conspirators to act with discriminatory animus to remove Anglos or Mormons is

fatal to the claim.

Moreover, Plaintiffs' other allegations that "the conspiracy" of unidentified individuals

acted to terminate the employment of Mr. Manning and Mr. Epperson does not relate to Mr.

Levinski's actions as acting Superintendent. Mr. Manning and Mr. Epperson were placed on

administrative leave before Mr. Levinski implemented the 2011 reorganization.

The Court recognizes that Mr. Levinski may have engaged in some questionable actions,

e.g., his pre-selection of Mr. Kasper as the HR Director, his possible influence of Mr. Marquez's

vote for Mr. Kasper as HR Director, his promises to place Mr. Marquez in an administrative

position if Mr. Marquez secured Board votes for Mr. Levinski, his possible influence on Mr.

Marquez to make a monetary contribution to Mr. Tso's senate campaign, his alleged payoff of

Mr. Tso's student loan, and his loan to Board Member Bernice Benally before the Board voted

on Mr. Levinski's position. However, Plaintiffs have not linked any of this alleged conduct by

Mr. Levinski to unlawful conduct or to an unlawful conspiracy to deprive Plaintiffs of their

federally protected rights.

Moreover, Plaintiffs have not shown who was on the Board at any of the pertinent times

or if Mr. Levinski's actions actually succeeded in securing Board votes for himself. More

importantly, Plaintiffs' evidence in support of the conspiracy claim fails to raise a genuine

dispute of fact with respect to allegations that Mr. Levinski acted with discriminatory animus in

carrying out the 2011 reorganization. The Court simply cannot draw the inference that Mr.

Levinski's allegedly untoward conduct in relation to various Board members is evidence of his

invidiously discriminatory motivation.

Therefore, the Court will grant Defendants' Motion for Summary Judgment as to the 42

U.S.C. § 1985(3) conspiracy claim (Count IV), which will be dismissed with prejudice against

CCSD and Mr. Levinski.[31]

### G.  WHISTLEBLOWER PROTECTION ACT CLAIM AGAINST CCSD

1.  <u>Legal Standard</u>

New Mexico's WPA prohibits public employers from taking a "retaliatory action"

against an employee when the employee:

    A.  communicates to the public employer or a third party information about an action or a failure to act that the public employee believes in good faith constitutes an unlawful or improper act;

    B.  provides information to, or testifies before, a public body as part of an investigation, hearing or inquiry into an unlawful or improper act; or

    C.  objects to or refuses to participate in an activity, policy or practice that constitutes an unlawful or improper act.

NMSA § 10–16C–3. A "retaliatory action" for purposes of the Act means "taking any

discriminatory or adverse employment action against a public employee in the terms and

conditions of public employment …." NMSA § 10–16C–2(D).

An employer may defend against a WPA claim on the ground that the employer's

employment action or decision was "due to the employee's misconduct, the employee's poor job

---

[31] Because the Court finds that Plaintiffs have failed to identify genuine disputes of material fact regarding the conspiracy claim, the Court does not reach Defendant Levinski's assertion of qualified immunity.

performance, a reduction in work force or other legitimate business purpose" as long as the action was not retaliatory in nature. *See* NMSA § 10-16C-4(B).

2.   Parties' Positions

Defendants assert that Plaintiffs have not identified a retaliatory action to support the WPA claim, other than perhaps Plaintiff Hunt's allegation that he was denied a reasonable accommodation or a reasonable accommodation negotiation. Motion at 24.

Plaintiffs state that the "[WPA] claims are all activated by the repeated complaints of Plaintiffs, and the retaliatory actions include the denial of reasonable accommodation negotiation requests to Plaintiff Hunt (giving leave could not make his replacement job safe), and the Facebook and Blog posting directed explicitly at Plaintiffs, this suit, their professional reputations, their religious beliefs, and their family lives." Reply at 27–28.

3.   Analysis

With respect to Plaintiffs' assertion that Defendants denied a reasonable accommodation to Plaintiff Hunt or failed to engage in reasonable accommodation negotiations with Plaintiff Hunt, Defendants have identified undisputed evidence that Plaintiff Hunt made the following requests: 1) use of accrued paid leave; 2) reassignment to his position of Director of Transportation; and 3) transfer of position from Grounds Foreman to Bus Driver. *See* Motion at 25. Defendants also offered evidence that CCSD allowed Plaintiff Hunt to use his paid leave but that his request to return to his previous position as Director of Transportation was unreasonable since the position no longer existed after the 2011 reorganization. Regarding the third request, CCSD could not reasonably justify paying a bus driver the salary that Plaintiff Hunt's employment contract promised.

Plaintiffs may have intended to rely on an argument that Defendants failed to provide Plaintiff Hunt with an accommodation for a *medical* disability or that Defendants failed to engage in a discussion about accommodations for his medical condition. Plaintiffs do allege that CCSD and HR Director Kasper "failed to enter into a required, good faith reasonable accommodation of Plaintiff Hunt's medical inability to work as a Maintenance Foreman[.]" Response at 18. Plaintiffs also quote from Plaintiff Hunt's Human Rights Charge of Discrimination, wherein Plaintiff Hunt alleged that [t]he position I was demoted to is unsafe for me as I am diabetic with neuropathy. … At the time I complained (with doctor's request and documentation) of the knowingly harassing demotion, and requested a reasonable accommodation of no physical, exerting work though supervision and office work would be medically safe. I was refused the accommodation …." *Id.* at 19.

However, Plaintiffs do not identify evidence of 1) an actual request for an accommodation, 2) the date of the request, 3) medical support for the request, 4) the duties of the Grounds Foreman position that Plaintiff Hunt could not perform, and 5) Defendants' denial of the request. Plaintiffs simply state that the request was "point-blank denied." *Id.* But, as the Court already observed, the evidence does not support Plaintiffs' assertion that Defendants "point-blank" denied Plaintiff Hunt's request.  It is not enough at the summary judgment stage to rely on conclusory argument alone. Plaintiffs must identify admissible evidence in the record that supports Plaintiffs' arguments. Plaintiffs have not done this.

In addition to the allegations concerning a reasonable accommodation, Plaintiffs may seek to support the WPA claim with allegations that Plaintiffs complained of racial or religious discrimination to Defendants. While true that Plaintiffs and/or their attorney submitted requests to Defendants complaining of unlawful discrimination and requesting investigations into the

allegations, there is no evidence that Defendants took any employment actions against Plaintiffs *after* Plaintiffs complained. In other words, the reassignment of Plaintiffs' positions occurred before Plaintiffs complained to Defendants and cannot be considered a retaliatory act under the WPA.

With respect to Plaintiffs' allegations that Defendants' "Facebook and Blog postings directed explicitly at Plaintiffs" were retaliatory acts, Plaintiffs have not linked, with admissible evidence, the Facebook or blog postings to Mr. Levinski or CCSD. Plaintiffs' other allegations of retaliation ("this suit, their professional reputations, their religious beliefs, and their family lives") are nonsensical.

Because Plaintiffs' have failed to raise a genuine dispute of material fact with respect to the WPA claim, the Court will dismiss the WPA claim (Count XI) against CCSD with prejudice.

### Conclusion

Plaintiff Jensen's claims against CCSD and Mr. Levinski, and as asserted against all other Defendants, will be dismissed with prejudice. Accordingly, Plaintiff Jensen's Second Amended Complaint (Doc. No. 92) against all Defendants will be dismissed. Thus, it follows that Defendant Ed Marquez's Motion for Summary Judgment as to Plaintiff Sharon Jensen's Claims (Doc. No. 189) will be granted.

All of the claims of Plaintiffs Hunt and Ulibarri will be dismissed with prejudice, except for the race and/or national origin discriminatory treatment claims brought under Title VII, the New Mexico Human Rights Act, and the Equal Protection Act (Counts III, VIII, and X), which will proceed against Defendant CCSD. The New Mexico Human Rights Act claim of discrimination (Count VIII) will also proceed against Defendant Levinski.[32]

---

[32] Although the parties were unable to negotiate a settlement of this case in November 2014, they may wish to seek a follow-up settlement conference now that the Court has narrowed some of the claims.

IT IS THEREFORE ORDERED that Defendants' (CCSD and Don Levinski) MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF MOTION ON CLAIMS BROUGHT BY PLAINTIFFS JEFFREY HUNT, ALICE ULIBARRI, AND SHARON JENSEN (Doc. No. 179) is GRANTED in part and DENIED in part, with the following results:

1. all of Plaintiff Sharon Jensen's claims against all Defendants will be dismissed, with prejudice;

2.  Plaintiff Jeffrey Hunt's and Plaintiff Alice Ulibarri's claims of breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), 42 U.S.C. § 1983 violations of the Equal Protection Clause based on religious discrimination (Count III), 42 U.S.C. § 1985(3) conspiracy (Count IV), New Mexico Human Rights Act violations based on religious discrimination (Count VIII), Title VII violations based on religious discrimination (Count X), and New Mexico Whistleblower's Protection Act claims (Count XI) will be dismissed with prejudice;

3. Plaintiff Jeffrey Hunt's and Plaintiff Alice Ulibarri's claims of racial or national origin discrimination against CCSD, brought under 42 U.S.C. § 1983 (Count III), will proceed;

4. Plaintiff Jeffrey Hunt's and Plaintiff Alice Ulibarri's claims of racial or national origin discrimination against CCSD and Mr. Levinski, brought under the New Mexico Human Rights Act (Count VIII), will proceed;

5. Plaintiff Jeffrey Hunt's and Plaintiff Alice Ulibarri's claims of racial or national origin discrimination against CCSD, brought under Title VII (Count X), will proceed;

6.  a separate Summary Judgment in favor of Defendants will be entered as to all claims brought against them by Plaintiff Sharon Jensen; and

7.  a separate Partial Summary Judgment in favor of Defendants will be entered as to specific claims brought against them by Plaintiffs Jeffrey Hunt and Alice Ulibarri.

IT IS FURTHER ORDERED that DEFENDANT ED MARQUEZ'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF SHARON JENSEN'S CLAIMS (Doc. No. 189) is GRANTED.

_____
SENIOR UNITED STATES DISTRICT JUDGE