# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JEFFREY HUNT and
ALICE ULIBARRI,

        Plaintiffs,

v.                                                                          No. CIV 11-1144 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, NANCY FRAZINNI [sic],
MATTHEW TSO, SCOTT NICOLAY, and
PHIL KASPER, Individually,

        Defendants.

                                                                            Consolidated with:

SHARON JENSEN,

        Plaintiff,

v.                                                                          No. CIV 12-1018 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, MATTHEW TSO,
and SCOTT NICOLAY, Individually,

        Defendants.

## MEMORANDUM OPINION AND ORDER

DEFENDANT MATTHEW TSO'S MOTION FOR SUMMARY JUDGMENT ON THE

BASIS OF QUALIFIED IMMUNITY ON PLAINTIFFS' CIVIL CONSPIRACY CLAIMS

AND SUPPORTING MEMORANDUM (Motion) (Doc. No. 180) asserts that Plaintiffs can

produce no evidence to establish the required elements of Plaintiffs' claim of conspiracy against Mr. Tso, Plaintiffs' sole claim against him. PLAINTIFFS HUNT, JENSEN AND ULIBARRI [sic] RESPONSE TO DEFENDANT TSO'S MOTION FOR SUMMARY JUDGMENT ON THEIR CLAIMS (Response) (Doc. No. 207) argues that there is "direct and substantial evidence of conspiracy among the Defendants, specifically including Defendant … Tso" and that "there is little doubt that the Plaintiffs [sic] claims are ready for trial." Response at 2, 3. DEFENDANT MATTHEW TSO'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY ON PLAINTIFFS' CIVIL CONSPIRACY CLAIMS (Reply) (Doc. No. 238) represents that Plaintiffs have provided neither law nor evidence to support the conspiracy claim against Mr. Tso and that Plaintiffs' Complaint should be dismissed against him with prejudice.

## Background[1]

Both Plaintiffs Jeffrey Hunt and Alice Ulibarri are "Anglo and Mormon" and allege that Defendant Tso participated in a conspiracy to discriminate against them based on their race and religion. THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT ¶¶ 1, 2, 72 (Doc. No. 93). In a recent MEMORANDUM OPINION AND ORDER, the Court dismissed Plaintiff Sharon Jensen's claims against all Defendants, including Mr. Tso. March 2, 2016 Opinion (Doc. No. 273); SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON PLAINTIFF SHARON JENSEN'S CLAIMS (Doc. No. 275). Therefore, this opinion addresses only the 42 U.S.C. § 1985(3) conspiracy claim brought by Plaintiffs Hunt and Ulibarri against Mr. Tso. *See* THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT (Complaint) (Doc. No. 93).

---

[1] The Court does not repeat the Procedural Background of this case which is discussed in detail in its March 2, 2016 MEMORANDUM OPINION AND ORDER at 3–6 (Doc. No. 273).

At all pertinent times, Plaintiffs were residents of Kirtland, San Juan County, New Mexico and were employees of Central Consolidated School District (CCSD).[2] According to the 2000 census, Kirtland, New Mexico had a population of a little over 6,000 residents. The town was founded in the early 1880s by Mormons or Latter-Day Saints (LDS), who named the New Mexico town after Kirtland, Ohio.[3] CCSD includes about 18 schools in a 4,500 square mile area, serves numerous communities, and has a total enrollment of approximately 6,800 students, a majority of whom are Native American. *See* Complaint ¶ 3 (CCSD "has both a predominantly Native American student body, and a predominantly Native American workforce with a close to 90% Native American student body, and …, a close to 75% Native American workforce."). *See also* Defendants' Response to Interrogatory No. 18 (Doc. No. 210–5). *But see* Defendants' Response to Interrogatory No. 19 (noting Defendants' estimate that about 52% of the workforce was Native American) and Byron Manning's Aff. ¶ 8 (stating that more than 50% of CCSD's work force was Native American) (Doc. No. 210–6).

Plaintiffs contend that in about 2011, a "conspiracy formed within the Senior Supervisory staff at CCSD" that resulted in demoting or removing Plaintiffs from their CCSD positions and replacing them with non-Mormon or "Native American aligned" employees. *See* Amended Joint Status Report and Provisional Discovery Plan at 3 (Doc. No. 124). Plaintiffs allege that "[e]ach Defendant … participated in an agreement to eliminate Mormon and/or Anglo supervisors …." Complaint ¶ 72. In the Response, Plaintiffs represent that "Defendant Tso as a member of the conspiracy assumed complete and utter control over the employment matters in the District. That power was Defendant [Superintendent] Levinski's to start, but was transferred certainly and

---

[2] The background facts are undisputed and set forth in more detail in the Court's March 2, 2016 Opinion.
[3] *See* Phil Kasper Dep. (Doc. No. 174–7) at 32. *See also* https://en.wikipedia.org/wiki/Kirtland,New_Mexico (January 28, 2016). The Court may take judicial notice of facts that are generally known and accepted. *Mills v. Denver Tramway Corp.*, 155 F.2d 808, 811 (10th Cir. 1946).

rapidly to the conspiracy as a whole after the conspiracy rigged Defendant Levinski's election."

Response at 4.

## Legal Standards

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

"The doctrine of qualified immunity protects public or government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant asserts qualified immunity, the plaintiff bears the heavy burden of satisfying a "strict two-part test." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation omitted). The

plaintiff must establish 1) that the defendant violated a constitutional or statutory right, and 2) that the right was clearly established at the time of the defendant's conduct. *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015).

When the defendant has moved for summary judgment based on qualified immunity, the Court views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in its favor. *See Estate of Booker* v. *Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

## Undisputed Material Facts

In the Spring of 2011, CCSD's School Board was comprised of five voting members: School Board President Matthew Tso, Lupita White, Bernice Benally (now deceased), Hoskie Benally, and Randy Manning. Randy Manning Dep. at 46–47 (Doc. No. 211–4). The Superintendent of CCSD is also on the School Board but it is unclear if the Superintendent is a voting member. Plaintiffs appear to assume that all School Board Members, other than Randy Manning and the Superintendent, were Native American, but Plaintiffs did not cite evidence in the record concerning the School Board Members' race. *But see* Byron Manning Aff. ¶ 8 ("the School Board has been 4 Navajos and 1 LDS member for a long time").[4]

On May 26, 2011, the School Board, in an executive session, voted to place former CCSD Superintendent Gregg Epperson (Anglo, non-Mormon) on administrative leave.[5] Randy Manning Dep. at 45–46. On May 28, 2011, the School Board voted to make Mr. Levinski (Anglo, religion unstated) CCSD's acting Superintendent. *Id.* at 59–63. Randy Manning was the

---

[4] Although the Court can, at times, unearth evidence in the record that pertains to certain allegations, this was Plaintiffs' job. The Court cannot be expected to sift through every piece of evidence in search of support for Plaintiffs' argument.

[5] Mr. Randy Manning, a School Board Member, explained that the School Board's executive session is comprised of the Board and the Superintendent only. Manning Dep. at 47. Mr. Manning stated that former Superintendent Epperson was present during the executive session after which Mr. Epperson was placed on administrative leave. It is unclear, however, if Mr. Epperson was permitted a vote as to his discipline. *See* Manning Dep. at 51.

only voting School Board member who was Anglo and Mormon. *See id.* at 46, 57. The breakdown of the votes to place Mr. Epperson on administrative leave and to make Mr. Levinski acting Superintendent, in both cases, was 4 to 1. Mr. Manning voted against placing Mr. Epperson on leave and against making Mr. Levinski acting Superintendent.

In June and July 2011, Mr. Levinski implemented a reorganization that resulted in the elimination of some higher level administrative positions, in the reassignment of some CCSD employees from Director positions to Coordinator positions, and in other reclassifications of positions. Mr. Levinski's rationale for the administrative reorganization included his plans "to bring CCSD's administrative expenses in line with the administrative expenses of similar school districts in New Mexico," to shift funding away from the administrative expenses and into the classroom, to increase the educational level of employees in upper administration positions, and "to increase minority representation in the supervisory positions." *See* Defendants' Response to Discovery (Doc. No. 179–5 at 3); Levinski Dep. at 105, 108 (Doc. No. 207–1); Randy Manning Dep. at 64.

The 2011 reorganization at CCSD affected both Plaintiff Hunt and Plaintiff Ulibarri. For about 14 years until July 2011, Plaintiff Hunt had been CCSD's Director of Transportation, but that position was eliminated in the 2011 reorganization. Plaintiff Hunt signed an employment contract for the school year of 2011–2012 in the reassigned position of Coordinator of Transportation. He was to receive the same salary of over $85,000.00 that he had received previously. On July 25, 2011, Mr. Levinski told Plaintiff Hunt that he was being reassigned from Coordinator of Transportation to the Grounds Foreman although he was to receive the same salary for the contract year. Plaintiff Hunt took sick leave following the July 25, 2011 meeting and never returned to work at CCSD. He used accrued paid leave and exhausted that leave as of

February 2012. Plaintiff Hunt resigned, effective February 24, 2012. He could have remained employed at CCSD as the Grounds Foreman through June 29, 2012, the end of his contract year.

For about 7 years until July 2011, Plaintiff Ulibarri was CCSD's Custodial Supervisor and was paid $59,807.00. In July 2011, as a result of the reorganization, the Custodial Supervisor position was eliminated. Ms. Ulibarri signed an employment contract in July 2011, although she was not assigned a specific position at that time. However, she was promised the same salary for the school year that she had received previously. Plaintiff Ulibarri remained employed by CCSD until she submitted her resignation, effective February 24, 2012, but she could have remained employed at CCSD until June 29, 2012.

Mr. Tso was not an employee of CCSD, but in 2011 and 2012, he was the School Board's President. Matthew Tso Aff. ¶ 2 (Doc. No. 180–1). Mr. Tso was not in the chain of command over Plaintiffs Hunt and Ulibarri and played no role in the 2011 reassignment of their positions. *Id.* ¶¶ 4, 6. As the School Board President, Mr. Tso had authority for the selection and hiring of the District's Superintendent but was not authorized to hire or fire other CCSD personnel, including Plaintiffs. *Id.* ¶¶ 5, 6.

**Discussion**

1. <u>Legal Standard</u>

To prove a conspiracy in violation of 42 U.S.C. § 1985(3), a plaintiff must show "(1) the existence of a conspiracy (2) intended to deny [him] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir. 1995) (citations omitted). *See also Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir. 1993), *cert. denied*, 510 U.S. 1093 (1994) (setting out

essential elements of a § 1985(3) conspiracy claim). To support a conspiracy claim, a plaintiff must show a meeting of the minds or agreement among the defendants and a concerted action. *See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (discussing § 1983 conspiracy claim). Section 1985(3) only reaches conspiracies "motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus."[6] *Tilton*, 6 F.3d at 686.

A plaintiff may rely on direct or circumstantial evidence to support a conspiracy claim. *See Gallegos v. City and Cnty of Denver*, 984 F.2d 358, 364 (10th Cir.) (noting that "plaintiff has not established, by either direct or circumstantial evidence, that there was a meeting of minds or agreement among certain of the defendants, discriminatorily motivated, to deprive her of equal protection"), *cert. denied*, 508 U.S. 972 (1993). *Compare* Motion at 3 and Reply at 2–10 (repeatedly emphasizing that Plaintiffs have no "direct evidence" to establish the elements of a conspiracy claim). Because Plaintiffs have no direct evidence of a conspiracy, the Court examines whether Plaintiffs have presented circumstantial evidence of a conspiracy.

2. <u>Parties' Positions</u>

Mr. Tso claims that Plaintiffs have no evidence to show that a conspiracy existed between Mr. Tso and other co-Defendants or that there was a meeting of the minds between Mr. Tso and other co-Defendants calculated to lead to the deprivation of Plaintiffs' constitutional rights. In support of his position, Mr. Tso offers his own affidavit wherein he avers that he was not involved in a conspiracy to discriminate against Plaintiff Hunt or Plaintiff Ulibarri and that he was not part of any "discriminatory restructuring" within CCSD. Tso Aff. ¶¶ 3, 7. Thus, Mr.

---

[6] It is unclear whether Anglo individuals may bring a claim of unlawful conspiracy under § 1985(3). *See United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 837 (1983) (noting that it was a "close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes"). However, Defendants did not raise this question and the Court does not decide it.

Tso asserts that he is entitled to qualified immunity and/or to summary judgment as to the conspiracy claim. Motion.

Plaintiffs' argument and hyperbole are spread over 18 pages of their Response under the heading, "Plaintiffs' Statement of Substantially-Evidenced Facts." Response at 4–22. Plaintiffs do not apply the pertinent law to the undisputed facts, nor do they discuss applicable Rule 56 standards. Rather, Plaintiffs gather together every possible allegation of Defendants' suspicious or untoward behavior in the hopes that these allegations somehow add up to a conspiracy.

As best as the Court can determine, the gist of Plaintiffs' position, with respect to the conspiracy claim against Mr. Tso[7] is as follows. Mr. Tso's alleged biases against Mormons and Anglos were well known, as documented in Mr. Tso's postings to local newspaper blogs and his own Facebook entries. *See* Response at 4, 7–8. Mr. Tso and the other three School Board members all allegedly wanted a Native American hiring preference at CCSD, perhaps as early as 2010. *See id.* at 5–6; Randy Manning Dep. at 46–48. At some point in early 2011, Defendant Tso began conspiring with the other School Board members to rid CCSD's administration of Anglo and Mormon employees and to replace them with Navajo or other minority employees. *See id.* at 9–10. According to Plaintiffs, Mr. Tso came to a "meeting of the minds" with the other School Board members to: 1) discipline or terminate former Superintendent Epperson for no reason other than Mr. Epperson's failure to follow the School Board's "Navajo preference;" and 2) replace Mr. Epperson with Mr. Levinski so that Mr. Levinski could implement the School Board's "Navajo preference." *See id.* at 10–11. Plaintiffs represent that Mr. Levinski's 2011

---

[7] In support of the conspiracy claim, Plaintiffs rely primarily on the affidavit of Byron Manning (Doc. No. 210–6) and on the deposition of his brother, Randy Manning (Doc. No. 211–4). The Manning brothers are Anglo and Mormon. Byron Manning held an administrative position at CCSD until some unidentified person placed him on administrative leave, which occurred before the 2011 reorganization. Byron Manning's individual claims of race and religious discrimination, which are spelled out in some detail in his affidavit, are not before the Court. Byron Manning settled his claims with CCSD.

reorganization was successful in removing or demoting Anglo and/or Mormon administrators at CCSD and replacing them with Native American or other minority employees. *See id.* at 12–15, 18.

In his reply, Mr. Tso reiterates that Plaintiffs have failed to identify admissible evidence to support the conspiracy claim. Mr. Tso also contends that comments he made in postings to blogs or Facebook, if any, were protected under the First Amendment. Moreover, to the extent Mr. Tso articulated biased views against Anglos or Mormons on newspaper blogs or on Facebook, those views are nothing more than personal opinion that played no part in the decision to reclassify Plaintiffs' positions or to demote them. Thus, according to Mr. Tso, there is no causal nexus between Mr. Tso's supposed statements and the reorganization decisions that impacted Plaintiffs' employment. Reply at 3–4, 5–8.

3.  Analysis

Plaintiffs must allege specific facts that show a mutual understanding or meeting of the minds among the conspirators. *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230–31 (10th Cir. 1990) (civil conspiracy requires evidence that two or more persons acted in concert). Plaintiffs have not identified the required evidence of a conspiracy, and, instead rely on conclusory allegations and hearsay testimony,[8] which will not suffice at the summary judgment stage. *See Azim v. Tortoise Capital Advisors, LLC,* No. 13-2267-DDC-JPO, 2015 WL 6802540, at *25 (D. Kan. Nov. 5, 2015) (holding that a plaintiff's "speculative and conclusory musings" did not suffice to create a genuine issue for trial as to the elements of a conspiracy requiring specific facts showing an agreement and concerted action).

---

[8] Indeed, the Court can find little admissible evidence in the record that supports Plaintiffs' theory of conspiracy. However, out of an abundance of caution, the Court addresses Plaintiffs' various allegations.

To support their allegation that Defendant Tso met and conspired with other Board Members and/or Mr. Levinski, Plaintiffs rely on inadmissible hearsay evidence that unidentified "community members" reported to someone that at least three School Board members were seen together at restaurants before some School Board meetings. *See* Randy Manning Dep. at 69. Plaintiffs similarly emphasize inadmissible hearsay evidence that Mr. Levinski was seen meeting "repeatedly" during the Spring and Summer of 2011 with Defendant Nicolay at Mr. Nicolay's administrative office in Shiprock, New Mexico.[9] *See* Response at 5–6. There were reports that Mr. Tso sometimes joined these meetings. Because Plaintiffs have no idea why these men were meeting, they can only speculate that the meetings concerned an unlawful purpose. Plaintiffs make the same leap as to Mr. Tso's presence at these meetings since he was the School Board President "and had no business that would justify frequent, hours long meetings" with a school principal and Mr. Nicolay. *Id.*

Even if the evidence established that these meetings occurred, Plaintiffs' imagination as to what was discussed at these meetings will not suffice to show a "meeting of the minds" among alleged co-conspirators. In other words, Plaintiffs' allegations consist of nothing more than innuendo and conjecture which will not raise a genuine dispute of material fact as to the conspiracy claim. *See, e.g., Harrington v. Wilson*, No. CIVA 05CV01858 EWNMJ, 2006 WL 2724094, at *13 (D. Colo. Sept. 21, 2006) ("rank speculation and innuendoes" insufficient to support conspiracy claim), *aff'd and remanded*, 242 F. App'x 514 (10th Cir. 2007); *Adler v. Pataki*, 204 F. Supp. 2d 384, 396 (N.D.N.Y. 2002) ("innuendo, unrelated incidents and

---

[9] According to Plaintiffs, during the Spring and Summer of 2011, Scott Nicolay was the Director of Gifted Programs at CCSD, although Plaintiffs' citation to the record does not confirm Mr. Nicolay's position. Response at 5. Mr. Nicolay apparently fell under the supervision of Assistant Superintendent Kienitz because Mr. Kienitz prepared some sort of written disciplinary action concerning Mr. Nicolay. *See* Kienitz Dep. at 39, 55–58. Plaintiffs identify no evidence that Mr. Nicolay had any input in the 2011 reorganization decisions or any authority for hiring and firing employees. Plaintiffs' speculation, based on a school janitor 's belief that Mr. Nicolay "was involved in the selection process of who was going to be upper administration for CCSD," Christine Johnson Aff. at 2 (Doc. No. 210–4) is not admissible evidence.

conclusory allegations, without any factual basis" are insufficient to support a conspiracy claim). *See also City of Omaha Employees Betterment Ass'n v. Omaha*, 883 F.2d 650, 653 (8th Cir. 1989) ("Mere communications are insufficient to establish an agreement to conspire against an individual employee.").

Plaintiffs set forth a number of other conclusory and unsupported allegations of a conspiracy. For example, Plaintiffs state that Mr. Tso conspired "to secure his [own] selection as Board President" and conspired "to secure Defendant Levinski's election as Superintendent." Response at 3. However, Plaintiffs present no evidence to identify with whom Mr. Tso conspired to be elected School Board President, the date of the vote, or the breakdown of the vote for School Board President.

With respect to Mr. Levinski's selection as Superintendent, there is evidence that Mr. Levinski <u>may</u> have influenced certain Board Members' votes. For example, it is undisputed that Mr. Levinski made a loan of $3,000.00 to Board Member Bernice Benally, some months before Mr. Levinski became Superintendent. It is also undisputed that Mr. Levinski promised Mr. Marquez a high-level position at CCSD if Mr. Marquez was able to persuade Board Member Hoskie Benally to vote for Mr. Levinski as Superintendent. Plaintiffs identified evidence that the Board voted 4-1 to elect Mr. Levinski and that Mr. Randy Manning was the sole dissenting vote. There is no evidence, however, that these Board Members voted for Mr. Levinski because of the loan or because of Mr. Marquez's persuasion. [10] Nor is there evidence that Mr. Tso acted in concert with Mr. Levinski to elect Mr. Levinski as Superintendent for an unlawful purpose.

---

[10] Although the Court tries to cobble together a possible theory of conspiracy based on Plaintiffs' hodgepodge allegations, the theory is far from compelling. For example, if Plaintiffs contend that the Native American School Board Members and Mr. Levinski had a common purpose to implement a Native American hiring preference, why would Plaintiffs emphasize that Mr. Levinski tried to manipulate Board Members' votes to be elected Superintendent? And, if the Native American School Board Members and Mr. Levinski were actually in cahoots, why would Plaintiffs highlight argument that "Defendant Levinski arrived at the idea of the re-structuring on his own, did not get Board or Administrative input into the [restructuring] decision …."? Response at 17–18.

Plaintiffs have not identified any evidence that Mr. Tso acted together with Mr. Levinski for the purpose of discriminating against these Plaintiffs because of their race or religion. In fact, the record is devoid of any evidence that would establish an agreement between Mr. Tso and another person to deprive Plaintiffs of equal protection of the laws. *Babbar v. Ebadi*, 216 F.3d 1086, 2000 WL 702428, *8 (10th Cir. May 26, 2000) (to survive a motion for summary judgment, the plaintiff "must furnish a genuine factual basis to support the existence of the defining elements of a conspiracy-agreement and concerted action").

Plaintiffs' evidence that Mr. Nicolay influenced Mr. Marquez to contribute money to Mr. Tso's State Senate campaign, Manning Dep. at 52–54, and that Mr. Tso "had Defendant Levinski pay off [Tso's] old college loan," Response at 4, concern alleged actions that occurred after Levinski was already Superintendent. Moreover, the allegations that Mr. Levinski paid off Mr. Tso's college loan are not supported by evidence in the record. Rather, Plaintiffs infer that a payoff occurred based on nothing more than Mr. Marquez's hunches. *See* Marquez Dep. at 58-59 (Marquez was "not prepared to characterize the payoffs as being illegal" and he based his conclusion that Mr. Levinski paid off Mr. Tso's loan on "my perception and my view of Levinski paying off … using money for different things … you know, in my mind, he was going to pay off Tso's school loan."). Even considering this evidence as true, the Court concludes Plaintiffs have not raised a genuine dispute of material fact that Mr. Tso conspired with other co-Defendants with the intention to discriminate against Plaintiffs on the basis of race or religion.

The Court reaches a similar finding with respect to Plaintiffs' evidence that the School Board acted without a stated reason in placing former Superintendent Epperson on administrative leave. Mr. Epperson's disciplinary action occurred before Mr. Levinski was selected as Superintendent, and Mr. Levinski played no role in the School Board's treatment of Mr.

Epperson. Plaintiffs highlight Randy Manning's belief that the School Board was dissatisfied with Mr. Epperson because of "Native American, Anglo stuff. It – it all came back to that same issue, that Native American is the preference. 'Native American will do this.'" Manning Dep. at 48. Yet, Mr. Manning contradicts himself by stating clearly that he did not know why the School Board was dissatisfied with Mr. Epperson. "Like I said, there was never anything specific of why they wanted to place [Epperson] on administrative leave." *Id.* at 47. When asked what Ms. Benally's opposition to Mr. Epperson was, Mr. Manning stated "I wished I knew how to answer that." *Id.* at 48. Mr. Manning's testimony about "Native American, Anglo stuff" is vague and speculative. He never identifies any comments by specific Board Members or when Board Members may have articulated a "supposed Native American preference".

Moreover, while Plaintiffs infer that Mr. Tso and other School Board Members must have acted with a discriminatory intent in removing Mr. Epperson as Superintendent and replacing him with Mr. Levinski, Plaintiffs argue that Mr. Levinski implemented the 2011 administrative restructuring while acting alone and without the School Board's input. *See* March 2, 2016 Opinion at 44–45 (discussing Plaintiffs' reliance on evidence that Mr. Levinski decided on his own to restructure CCSD's administration without input from the School Board). Thus, Plaintiffs fail to identify a genuine dispute of material facts with respect to the allegation that Mr. Levinski reached an agreement with Board Members to discriminate against Plaintiffs.

In support of the conspiracy claim against Mr. Tso, Plaintiffs also rely on Randy Manning's testimony about the termination of employment of his brother, Byron Manning. In addressing why School Board Member Hoskie Benally "spoke out against" Mr. Epperson, Randy

Manning answered: "Most of it has to do with not (sic?)[11] terminating my brother." Randy
Manning Dep. at 49–50. Plaintiffs' counsel asked "And did Mr. Benally have a reason that your
brother should be terminated?" *Id.* at 50. Randy Manning answered: "Other than he didn't like
him, I guess there wasn't any … and they were upset with him because he sent out an e-mail
about the board wanting to go Navajo preference."[12] *Id.* Plaintiffs' counsel then asked Randy
Manning if the Board had to have a good reason to "get rid of your brother?" *Id.* The undisputed
evidence is that the School Board played no role in hiring and firing decisions of CCSD
personnel except for the hiring or firing of the Superintendent. While Randy Manning believed
that part of the Board's agenda included putting Byron Manning on administrative leave, *id.* at
56, Randy Manning conceded that the School Board only voted on naming Mr. Levinski
Superintendent and that the "board does not vote on personnel issues, no." *Id.* at 57. Plaintiff's
evidence about disciplinary actions concerning Byron Manning is irrelevant to the conspiracy
claim against Mr. Tso.

      Plaintiffs argue that "Defendants Tso and Nicolay began to work together in order to
secure Defendant Tso's election as indicated by the cell-phone study of Byron Manning."
Response at 5. Presumably, Plaintiffs mean Mr. Tso's election as School Board President but the
allegation is not clear. Specific evidence showing that Defendants Tso and Nicolay "worked
together" is missing. The Court could only locate Byron Manning's allegations that during the
first four months of 2011, "Mr. Nicolay made 2400 minutes of … [telephone] calls to Mr. Tso,
over 900 minutes of those calls during his specific work day. Mr. Nicholay's [sic] position with
CCSD required no such calls to Board members." Byron Manning Aff. ¶ 9G. Plaintiffs'

---

[11] The Court cannot determine if the use of "not" is a typographical error or if Randy Manning was saying that
Hoskie Benally did not like Mr. Epperson because Mr. Epperson failed to terminate the employment of Byron
Manning. Yet, if Mr. Epperson did not place Byron Manning on administrative leave, it is unclear who did since the
School Board is not authorized to make personnel decisions.
[12] Plaintiffs did not present evidence of the email, the date of the email, or the context of the email.

speculation about the content of these supposed phone calls is not evidence. Moreover, there is no admissible evidence of telephone records.

Plaintiffs' other allegations concerning Mr. Nicolay's activities stem from hearsay testimony. Plaintiffs contend that Mr. Kienitz received complaints regarding Mr. Nicolay's activities at work, including his cell phone usage with Defendant Nicolay, "his threats to the jobs of a variety of Anglo and/or Mormon supervisors,"[13] and his often accurate predictions about terminations of employment or demotions of employees. Response at 6–7. In support of these allegations, Plaintiffs refer to 20 pages of Mr. Kienitz's deposition transcript. Response at 6 (citing Kienitz Dep. at 46-66). Many of those pages are not pertinent.

In most instances, Plaintiffs' counsel asked Mr. Kienitz to read notes of conversations verbatim into the record documenting various employees' complaints about Mr. Nicolay. For example, Mr. Kienitz read from a March 15, 2011 note that an employee, Kristy Stock, told Mr. Kienitz that Mr. Nicolay said that "with Susanna Martinez calling for cuts at the administrative level that he has no doubt his position will be cut … said he has an amazing attorney… 'he will sue their asses.'" Kienitz Dep. at 47. Another note read into the record by Mr. Kienitz stated that an employee complained that Mr. Nicolay commented to her that he "had a plan to get Mr. Epperson out of here" and a plan to "get rid of Gregg Epperson, Nancy Frazzini, and Bye Manning." *Id.* at 48. Another employee described being uncomfortable with Mr. Nicolay's behavior. *Id.* at 51–52. Most of this purported evidence has no bearing on the conspiracy claim against Mr. Tso. There is no admissible evidence showing a "meeting of the minds" between Mr. Nicolay and Mr. Tso and no admissible evidence linking Mr. Nicolay to the 2011 reorganization and personnel changes that Mr. Levinski made. Moreover, requiring Mr. Kienitz to read notes

---

[13] There is no admissible evidence that Mr. Nicolay had authority over hiring and firing decisions.

consisting of hearsay testimony into the record during a deposition does not transform hearsay testimony into admissible evidence.

Plaintiffs also attach a number of pages of blogging posts as exhibits to their Response.[14] Plaintiffs contend that these postings to a local newspaper in Farmington, New Mexico and entries on Defendant Tso's Facebook pages are evidence that Mr. Tso "slandered each of the plaintiffs, and disseminate[ed] anti Anglo/Mormon hate speech …." Response at 4. Plaintiffs hired a forensic computer expert in an attempt to link the newspaper posts to Mr. Tso. Plaintiffs' expert submitted a "summary report" (Doc. No. 208–7), stating that "[t]he forensic integration of the Media and its contents [provided by Plaintiffs' counsel on a flashdrive] cannot be verified for accuracy" for various reasons. *Id.* at p. 7. The report notes that "[t]he recordings documenting the actions of Mr. [Spencer] Hunt do not ensure the validity, accuracy, or integrity of the documents collected. Several of the steps recorded are helpful in locating and identifying documents of interest but does [sic] require some inference." *Id.*

Plaintiffs do not identify Spencer Hunt or his role with respect to the expert's analysis. Moreover, the expert's conclusion that "there is a high likelihood that Michael Tso is associated with the user KBO Employees First" *Id.* at 8, apparently relies on documents whose accuracy and validity could not be confirmed. The expert's opinion about Mr. Tso's connection to KBO Employees First is based on "two specific documents" and is simply not "smoking gun" evidence of Mr. Tso's involvement in a conspiracy whose aim was to discriminate against Plaintiffs on the basis of race or religion.[15] Instead, after a careful review of the attached exhibits

---

[14] Plaintiffs have attached over 100 pages of exhibits to each of the three Responses so far reviewed by the Court. The exhibits are virtually identical in each instance. That is improper. "An exhibit should be submitted only once and may later be referred to by document title and filing date." D.N.M. LR-Civ. 10.7 ("Non-duplication of Exhibits"). Plaintiffs' counsel should carefully review and abide by the Local Rules of Civil Procedure.

[15] Not only is the expert's "summary report" unhelpful and of little evidentiary value, the present content of the report is unlikely to satisfy *Daubert* standards.

containing blogging entries, most of which are not admissible evidence,[16] the Court draws the obvious conclusion that there were two blogging entities trading insults with one another, KBO Employees First that may be associated with Mr. Tso, and Children First that may be associated with one of the Manning brothers. For example, a KBO Employees First blogger points the finger at a "racist email that Byron Manning … sent out attacking Navajo people as racially inferior to other people." Posts (Doc. No. 209–4 at p. 3). In a post attributed to Mr. Tso, (Doc. No. 209–3 at p. 2), the author states that an attached link "shows you exactly what their true motivation is. They think Navajo people are inferior and automatically less qualified just because they are Navajo."

The posts contain inflammatory and sometimes offensive hyperbole, but the blogging entries, even if admissible evidence, fall far short of supplying evidence that Mr. Tso acted in concert with someone else who shared his alleged views on race or religion and that two or more persons took actions in furtherance of a conspiracy to deprive Plaintiffs of their constitutional rights. There simply is no evidence that Mr. Tso had an agreement with anyone to deny Plaintiffs their rights to equal protection.

Plaintiffs also rely on conclusory argument by counsel. For example, Plaintiffs contend that Mr. Tso "as a member of the conspiracy assumed complete and utter control over the employment matters in the District. That power was Defendant Levinski's to start, but was transferred certainly and rapidly to the conspiracy as a whole after the conspiracy rigged Defendant Levinski's election." Response at 4. Plaintiffs do not identify any evidence in the record to support this multi-faceted argument. Instead, Plaintiffs simply refer to eleven pages of the Response so that the Court can try to sort it out. The Court is not in the business of locating

---

[16] Some of the exhibit pages of blogging entries appear to have been retyped or cut and pasted without any evidence of dates or locations of the posts. Doc. No. 209–4, pp. 8–13.

"truffles" buried in briefs. "[S]ufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca–Cola Bottling Co*., 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635 (1992). Without a specific reference, "we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Id.* at 1025. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). While the Court has endeavored to untangle Plaintiffs' muddled argument, most of which is unsupported, it cannot do what Plaintiffs' counsel was required to do, i.e., identify evidence in the record establishing the "combination of two or more persons acting in concert" and "a meeting of the minds or agreement among the defendants." *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994).

Finally, Plaintiffs rely on counsel's own testimony about a conspiracy. In the deposition of Randy Manning, Plaintiffs' counsel asked this question: "Did you ever, during 2011, believe that a conspiracy had arisen that was actually directing CCSD, rather than the official organization itself." Randy Manning Dep. at 53. Mr. Manning had to have the question asked again and then answered "Yes." *Id.* The third time, Plaintiffs' counsel asked the question this way: "Now, the question that I had asked before was about your belief that there was a conspiracy running CCSD in 2011, not the official organization. What was the basis for that belief?" *Id.* at 55. Mr. Manning stated that he believed there was an "agenda," but when Plaintiffs' counsel tried to supply words for Mr. Manning to the effect that Board Members had already decided certain matters before the Board officially met, Mr. Manning did not know what counsel meant. *Id.* Plaintiffs' attorney essentially put words in Mr. Manning's mouth. This is not

proper. *See Luevano v. Holder*, 660 F.3d 1207, 1213 (10th Cir. 2011) ("Counsel's arguments are not evidence.").

The Court concludes that Plaintiffs lack sufficient probative evidence to convince a reasonable jury that Mr. Tso acted in conjunction with another to deprive Plaintiffs of their rights. There is no evidence of a mutual understanding or meeting of the minds among the co-conspirators. Plaintiffs have not provided the Court with evidence that Mr. Tso and co-Defendants took employment actions against Plaintiffs that were motivated by a discriminatory animus toward Plaintiffs' race or religion. Therefore, the Court will grant summary judgment in favor of Mr. Tso on Plaintiffs' sole conspiracy claim under 42 U.S.C. §1985(3), and the conspiracy claim (Count IV) will be dismissed with prejudice as to Mr. Tso.

### Qualified Immunity

Based on the Court's conclusion that Plaintiffs' evidence of a conspiracy against Mr. Tso is deficient, the Court need not reach Defendant's position that Mr. Tso is entitled to qualified immunity on the conspiracy claim. However, the Court concludes, in the alternative, that Plaintiffs have failed to show how Mr. Tso's conduct violated clearly established law. Therefore, Mr. Tso is entitled to qualified immunity on Plaintiffs' conspiracy claim.

For a constitutional right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir.), *cert. denied*, 134 S.Ct. 426 (2013) (citation omitted). "A plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Quinn*, 780 F.3d at 1005 (citation omitted).

According to Mr. Tso, there is no evidence that he violated clearly established law under 42 U.S.C. § 1983. This is at least partly because Mr. Tso did not have the authority to take any employment actions against Plaintiffs. Thus, in the absence of a violation of a clearly established right, Mr. Tso contends he is entitled to the defense of qualified immunity. Motion at 9.

Plaintiffs argue that Mr. Tso has not correctly identified the legal issue to be analyzed in terms of his assertion of qualified immunity. According to Plaintiffs, the issue to be addressed is: "Was there clearly established law forbidding entry into a conspiracy that intentionally discriminated against Mormons and/or Anglos, denied all process of law and policy, and demoted and retaliated against each of the Plaintiffs?" Response at 29. The Court disagrees. Plaintiffs' phrasing of the issue assumes several facts not supported by any evidence. For example, Plaintiffs have failed to come forward with evidence of a conspiracy involving Mr. Tso or of intentional discrimination by Mr. Tso. The references to "law and policy" are nonsensical. Moreover, there is no evidence, nor could there be, that Mr. Tso participated in the alleged demotion of Plaintiffs.

Plaintiffs have not satisfied their "heavy burden" of identifying on-point legal authority supporting their position. Stated differently, a reasonable jury could not find facts supporting a violation of a constitutional right, which was clearly established at the time of the defendant's conduct. *See Estate of Booker*, 745 F.3d at 411. Offering a single-spaced quotation from case law regarding general principles of qualified immunity and referring the Court to unidentified existing law that Plaintiffs "have developed … at some length above," Response at 29, simply does not pass muster.

The Court concludes, in the alternative, that Defendant Tso is entitled to qualified immunity on the conspiracy claim against him (Count IV). Therefore, the Court will grant Defendant Tso's Motion for Summary Judgment and dismiss Plaintiffs' sole claim against him.

IT IS ORDERED that: (1) DEFENDANT MATTHEW TSO'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY AND MEMORANDUM OF LAW IN SUPPORT (Doc. No. 180) is GRANTED; and (2) a separate Summary Judgment in favor of Defendant Matthew Tso will be entered.

_____
SENIOR UNITED STATES DISTRICT JUDGE