# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JEFFREY HUNT and
ALICE ULIBARRI,

        Plaintiffs,

v.                                        No. CIV 11-1144 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, NANCY FRAZINNI [sic],
MATTHEW TSO, SCOTT NICOLAY, and
PHIL KASPER, Individually,

        Defendants.

                                           Consolidated with:

SHARON JENSEN,

        Plaintiff,

v.                                          No. CIV 12-1018 JP/SCY

CENTRAL CONSOLIDATED SCHOOL
DISTRICT, a municipal government agency,
and HOSKIE BENALLY, ED MARQUEZ,
DON LEVINSKI, MATTHEW TSO,
and SCOTT NICOLAY, Individually,

        Defendants.

# MEMORANDUM OPINION AND ORDER[1]

DEFENDANT SCOTT NICOLAY'S MOTION FOR SUMMARY JUDGMENT AND

SUPPORTING MEMORANDUM (Motion) (Doc. No. 195) asks the Court to dismiss the sole

---

[1] Having resolved all of Defendants' Motions for Summary Judgment and narrowed the claims, the Court
encourages the parties and counsel to schedule a follow-up settlement conference.

claim of conspiracy under 42 U.S.C. § 1985(3) brought against him by Plaintiffs Jeffrey Hunt
and Alice Ulibarri, and by Plaintiff Sharon Jensen.[2] PLAINTIFFS' RESPONSE TO
DEFENDANT NICOLAY'S MOTION FOR SUMMARY JUDGMENT ON THEIR CLAIMS
at 2–3 (Response)[3] (Doc. No. 230) contends that there is "direct and substantial evidence of
conspiracy among the Defendants, specifically including CENTRAL CONSPIRATOR
Defendant Coordinator of the Gifted Program Nicolay," and that "there is little doubt that the
Plaintiffs' claims against Mr. Nicolay are ready for trial." The REPLY SUPPORTING
DEFENDANT NICOLAY'S MOTION FOR SUMMARY JUDGMENT (Reply) (Doc. No. 242)
asserts that Plaintiffs cannot establish the required elements of a conspiracy claim and that Mr.
Nicolay is also entitled to qualified immunity.

　　　After careful consideration of the pertinent law, briefing, and exhibits, the Court will
grant Mr. Nicolay's Motion for Summary Judgment and will dismiss, with prejudice, Mr. Hunt's
and Ms. Ulibarri's sole claim of conspiracy (Count IV) against Mr. Nicolay.

## Background[4]

　　　Plaintiffs Jeffrey Hunt and Alice Ulibarri are "Anglo and Mormon" and allege that
Defendant Nicolay participated in a conspiracy to discriminate against them based on their race

---

[2] The Court previously dismissed all of Ms. Jensen's claims against Defendants. MEMORANDUM OPINION AND
ORDER at 25 n.19 (Doc. No. 273). The Court determined, in part, that there was no genuine dispute of material fact
that Ms. Jensen had resigned her position at CCSD before being demoted during the 2011 reorganization. *Id.* at 12–
13, 24–25. This remains the Court's conclusion although Defendants' position about Ms. Jensen's purported
reassignment from Assistant Superintendent to Principal is confusing. Defendant Benally, for example, included as
an undisputed material fact, that in May 2011, Ms. Jensen was demoted to a principal. Benally Motion (Doc. No.
194) at 3 (UMF No. 2). *See also* the Nicolay Motion at 6 (UMF 9) (implying that Ms. Jensen might have been
reassigned during the 2011 reorganization). As best as the Court can determine, there is no evidence in the record to
support a finding that Ms. Jensen was reassigned in May 2011, before she resigned in June 2011. *See* Benally
Motion, UMF No. 2 (relying only on allegations in Ms. Jensen's Complaint).
[3] The first line of the Response states "Comes now the Consolidated Plaintiffs Jeff Hunt, Alice Ulibarri and Hoskie
Benally, [sic] by and through their attorney, responds to Defendant Hoskie [sic] Nicolay's Motion for Summary
Judgment …." Plaintiffs' mistakes about who's who reflect the general inattention paid to Plaintiffs' briefing of their
Responses.
[4] The Court does not repeat the Procedural Background of this case which the Court discussed in detail in its March
2, 2016 decision at 3–6 (Doc. No. 273).

and religion. THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT ¶¶ 1, 2, 72 (Count IV) (Doc. No. 93). Plaintiffs contend that in about 2011, a "conspiracy formed within the Senior Supervisory staff at CCSD" that resulted in demoting or removing Plaintiffs from their CCSD positions and replacing them with non-Mormon or "Native American aligned" employees. *See* Amended Joint Status Report and Provisional Discovery Plan at 3 (Doc. No. 124).

At all pertinent times, Plaintiffs were residents of Kirtland, San Juan County, New Mexico and were employees of Central Consolidated School District (CCSD).[5] According to the 2000 census, Kirtland, New Mexico had a population of a little over 6,000 residents. The town was founded in the early 1880s by Mormons or Latter-Day Saints (LDS), who named the New Mexico town after Kirtland, Ohio.[6] CCSD includes about 18 schools in a 4,500 square mile area, serves numerous communities, and has a total enrollment of approximately 6,800 students, a majority of whom are Native American. Motion at 10, Undisputed Fact No. 35 (CCSD's student population is approximately 89% Native American). CCSD's workforce is about 50% Native American. Defendants' Response to Interrogatory No. 19 (noting Defendants' estimate that about 52% of the workforce was Native American); Byron Manning's Aff. ¶ 8 (stating that more than 50% of CCSD's work force was Native American) (Doc. No. 223–5).

### Legal Standards

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable

---

[5] The background facts are undisputed and set forth in more detail in the Court's March 2, 2016 Opinion.
[6] *See* Phil Kasper Dep. (Doc. No. 174–7) at 32. *See also* https://en.wikipedia.org/wiki/Kirtland,New_Mexico (January 28, 2016). The Court may take judicial notice of facts that are generally known and accepted. *Mills v. Denver Tramway Corp.*, 155 F.2d 808, 811 (10th Cir. 1946).

inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc*., 293 F.3d 1187, 1195 (10th Cir. 2002).

"The doctrine of qualified immunity protects public or government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant asserts qualified immunity, the plaintiff bears the heavy burden of satisfying a "strict two-part test." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation omitted). The plaintiff must establish 1) that the defendant violated a constitutional or statutory right, and 2) that the right was clearly established at the time of the defendant's conduct. *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015).

When the defendant moves for summary judgment based on qualified immunity, the Court views the facts in the light most favorable to the non-moving party and resolves all factual

disputes and reasonable inferences in its favor. *See Estate of Booker* v. *Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).

## Undisputed Material Facts[7]

### *CCSD School Board*

In the Spring of 2011, CCSD's School Board was comprised of five voting members: School Board President Matthew Tso, Lupita White, Bernice Benally (now deceased), Hoskie Benally, and Randy Manning. At all pertinent times, the School Board consisted of four Navajo Members and 1 Anglo/Mormon Member (Randy Manning). The Superintendent of CCSD is also on the School Board.

On May 26, 2011, the School Board, in an executive session, voted to place former CCSD Superintendent Gregg Epperson (Anglo, non-Mormon) on administrative leave. On May 28, 2011, the School Board voted to make Don Levinski (Anglo, religion unstated) CCSD's acting Superintendent. The breakdown of the votes to place Mr. Epperson on administrative

---

[7] Plaintiffs do not attempt to challenge all of these Undisputed Material Facts (UMFs), and, in many instances, rely on  unsupported arguments. Plaintiffs primarily refer to their Response (Doc. No. 225) to Mr. Benally's Motion and the attached 26 exhibits, Response at 3–4, in an attempt to challenge Mr. Nicolay's statement of the UMFs. Although Plaintiffs note that their Response to Mr. Nicolay's Motion will contain a "brief 'Supplementary Plaintiffs' Statement of Substantially-Evidenced Facts' with an Exhibit[,]" *id.* at 4, Plaintiffs did not provide a "supplementary" set of facts in the Response to Mr. Nicolay's Motion. *See id.* at 11, 12. Plaintiffs also cite to their Response (Doc. No. 202) to CCSD's and Mr. Levinski's Motion. *Id.* at 11. As is true of all of Plaintiffs' Responses to Defendants' Motions, it is virtually impossible to follow Plaintiffs' trail. Defense counsel sums it up well: "… to try and track Plaintiffs' Response, it becomes necessary to review at least three layers of briefing, undertaking the painstaking process of reviewing multiple briefs and the evidence referenced therein and trying to match the facts from those briefs with Defendant Nicolay's …." Reply at 4. "Making this process even more difficult is not only Plaintiffs' mischaracterization in their Response of the 'facts' set forth in the referenced court filings, but also Plaintiffs' failure to address Defendant Nicolay's [UMFs] in order, as well as Plaintiffs' utter noncompliance with the mandate in the local rules to set forth facts in a clear and concise manner. Plaintiffs' manner of briefing makes it nearly impossible to follow their factual argument, let alone to frame a reply." *Id.* Notwithstanding Plaintiffs' deficient briefing, the Court has endeavored to follow Plaintiffs' whorl of argument and evidence, and concludes that, unless otherwise noted, Plaintiffs have failed to identify evidence in the record sufficient to raise a genuine dispute of material fact.

leave and to make Mr. Levinski acting Superintendent, in both cases, was 4 to 1.[8] Mr. Manning, the only non-Native American on the School Board, voted against placing Mr. Epperson on leave and against making Mr. Levinski acting Superintendent.

The School Board has no authority over CCSD's hiring and disciplinary decisions, with the exception of the Superintendent, whom the School Board elects and/or disciplines.

### *CCSD Reorganization*

In June and July 2011, Mr. Levinski implemented a reorganization at CCSD that resulted in the elimination of some higher level administrative positions, in the reassignment of some CCSD employees from Director positions to Coordinator positions, and in other reclassifications of positions. Mr. Levinski's rationale for the administrative reorganization included his plans "to bring CCSD's administrative expenses in line with the administrative expenses of similar school districts in New Mexico," to shift funding away from the administrative expenses and into the classroom, to increase the educational level of employees in upper administration positions, and "to increase minority representation in the supervisory positions." *See* Defendants' Response to Discovery (Doc. No. 194–4 at 3); Levinski Dep. at 105–109 (Doc. No. 225–1); Randy Manning Dep. at 64 (Doc. No. 229–3).

### *Acting Superintendent Levinski*

Mr. Levinski had the exclusive power and duty to hire, fire, and assign employees, and he was responsible for reassigning CCSD employees in mid-2011, including the reassignments of Plaintiffs' positions. Plaintiffs have emphasized that Defendant Levinski acted alone with respect to decisions about the reorganization. "Defendant Levinski arrived at the idea of the re-

---

[8] Plaintiffs' Response states, for the first time, that the School Board's vote for Mr. Levinski (and possibly for disciplining former Superintendent Epperson), Response at 7, was 3 to 2 rather than 4 to 1. However, Plaintiffs did not identify evidence in the record to support the assertion of a 3-2 vote and this difference in the breakdown of the vote appears to be immaterial.

structuring on his own [and] did not get Board or Administrative input into the decision …." Plaintiffs' Response at 15 to Mr. Levinski's Motion for Summary Judgment (Doc. No. 202). Mr. Levinski did not consult Mr. Nicolay about the reassignment decisions or the demotions of Mr. Hunt or of Ms. Ulibarri.

### *Plaintiff Jeffrey Hunt*

Plaintiff Hunt had been CCSD's Director of Transportation for about 14 years until July 2011, when that position was eliminated in the 2011 reorganization. On July 18, 2011, Plaintiff Hunt signed an employment contract for the school year of 2011–2012 in the reassigned position of Coordinator of Transportation. He was to receive the same salary of over $85,000.00 that he had received previously.

On July 25, 2011, Mr. Levinski informed Mr. Hunt that he was being reassigned from Coordinator of Transportation to Grounds Foreman due to "complaints" about Mr. Hunt, but Mr. Levinski did not describe the nature of the complaints to Mr. Hunt. At the July 25 meeting, Mr. Hunt told Mr. Levinski and Ed Marquez, who was also present, that he was going to take sick leave. Mr. Hunt presented a doctor's letter to support his request. Mr. Hunt took sick leave following the July 25, 2011 meeting and never returned to work at CCSD although he continued to receive his salary until his resignation. Mr. Hunt used accrued paid leave and exhausted that leave as of February 2012. Mr. Hunt resigned, effective February 24, 2012. He could have remained employed at CCSD as the Grounds Foreman at the same salary through June 29, 2012, the end of his contract year.

### *Plaintiff Alice Ulibarri*

Plaintiff Ulibarri was CCSD's Custodial Supervisor for about 7 years until July 2011, and was paid $59,807.00. In July 2011, as a result of the reorganization, the Custodial Supervisor

position was eliminated. On July 25, 2011, Ms. Ulibarri signed an employment contract with CCSD although she was not assigned a specific position at that time. Thereafter, Ms. Ulibarri was given a temporary job in CCSD's Human Resources Department. Ms. Ulibarri was promised the same salary for the school year that she had received previously and could have remained employed at CCSD until June 29, 2012.

During the week of July 21, 2011, Ms. Ulibarri requested leave for dental surgery, and began to take leave beginning on September 1, 2011. CCSD gave Ms. Ulibarri written notice that her paid leave would be designated as, and run concurrently with, her leave under the Family and Medical Leave Act (FMLA). Ms. Ulibarri had used nearly all of her accrued leave at the time she submitted her resignation, effective February 24, 2012.

### ***Defendant Scott Nicolay***

Mr. Nicolay is Anglo. His religious preference, if any, is unknown. He has been employed by CCSD since at least 2003.

Mr. Nicolay was first employed as a "gifted program specialist." In 2006, he was promoted from a specialist to "enrichment coordinator." In 2009 to 2010, Mr. Nicolay's hours were reduced along with his salary, which was approximately $63,000.00. In about 2011, Mr. Levinski promoted Mr. Nicolay to the position of Coordinator of Enrichment and Community Relations and increased his hours to a "year-round employee," with the result that Mr. Nicolay received a salary of about $72,000.00. Nicolay Dep. at 16–18. (Doc. No. 195–4).

Mr. Nicolay was never in a Director position and was not a CCSD administrator. He had no supervisory authority over Plaintiffs and was not authorized to take any employment actions with regard to Plaintiffs. Mr. Nicolay had no authority to hire, fire, promote, or demote any CCSD employee.

On various occasions in 2010 and/or 2011, Mr. Nicolay met with Mr. Levinski behind closed doors, but the subjects of their discussions are unknown. Mr. Nicolay made predictions about the reassignments of several CCSD employees that were accurate. But, it is unknown how Mr. Nicolay arrived at his predictions. Both Mr. Levinski and Mr. Nicolay have testified that they did not consult with one another concerning restructuring decisions or Plaintiffs' reassignments.

In about 2011, Mr. Tso ran for the School Board against an individual named MacDonald Lee. Mr. Nicolay never served as Defendant Matthew Tso's campaign manager or chairperson although Mr. Nicolay may have performed some menial tasks, including running errands, in relation to Mr. Tso's campaign. Mr. Nicolay considers Mr. Tso to be his friend.

Mr. Nicolay served as Donovan Begay's campaign manager. Mr. Begay ran against Hoskie Benally for a School Board position. Mr. Tso would not be surprised if Mr. Begay made speeches saying that he was going to get rid of Mormon and Anglo administrators at CCSD, but Mr. Tso did not recall that Mr. Begay voiced these opinions. Mr. Nicolay did not hear Mr. Begay discuss views based on race or religion during his campaign for the School Board. Mr. Begay lost his School Board bid.

After Mr. Nicolay supported Mr. Benally's opponent, Mr. Begay, for the School Board in about 2010, Mr. Nicolay and Mr. Benally, alleged co-conspirators, have not gotten along.

**Plaintiffs' Unsupported Argument about Mr. Nicolay**

The Court has found no support in the record for the following arguments or allegations by Plaintiffs concerning Mr. Nicolay's conduct:

1. Although agreeing that Mr. Nicolay had no "line authority" over Plaintiffs' positions, Response at 5, Plaintiffs argue that Mr. Nicolay's "power came from belonging to,

and being a central member of the conspiracy specifically and repeatedly pled and evidenced herein" at Plaintiffs' alleged fact nos. 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24, set out in Plaintiffs' Response to Mr. Benally's Motion (Benally Response). Response at 5–10.[9]

Most of these enumerated facts do not discuss Mr. Nicolay at all (nos. 5, 6, 8, 9, 10, 11, 13, 15, 16, 17, 18, 19, 20, 21, 23, 24), raising the question of how Mr. Nicolay could have been a "central" conspirator. In addition, the alleged facts recite conclusory argument without supplying any citations to specific evidence in the record. *See, e.g.,* Benally Response (fact no. 2) (alleging that "harassing events" were "visited upon" Mr. Manning by Mr. Nicolay).

Fact no. 3 is the main "fact" that makes specific allegations against Mr. Nicolay. In Fact no. 3, Plaintiffs contend that Mr. Tso and Mr. Nicolay "began to work together [in 2010 or early 2011] in order to secure Defendant Tso's election [to the School Board] as indicated by the cell-phone study of Byron Manning." Benally Response at 6 (fact no. 3) (citing "*Id*. at 4-5, § 9(G)"). The cell phone records were not produced, but Plaintiffs apparently rely on Mr. Byron Manning's Affidavit (Doc. No. 228–8), wherein Mr. Manning stated that before the School Board election, Mr. Nicolay "made almost 800 minutes of phone calls on his District-issued cell phone to Mr. Tso" and that in early 2011, Mr. Nicolay "made 2400 minutes of such calls to Mr. Tso." *Id.* ¶ 9(G). Mr. Manning has no way to determine the content of these phone calls. While Mr. Manning may have found the number of phone calls improper or suspicious, his suspicions are not evidence that Mr. Nicolay and Mr. Tso "worked together" to elect Mr. Tso to the School Board or that Mr. Nicolay and Mr. Tso were conspiring for an unlawful purpose.

---

[9] Many of Plaintiffs' alleged facts are comprised of pages of conclusory argument and multiple references to various exhibits. The exhibits do not always stand for what Plaintiffs contend.

Fact no. 3 also alleges that after one of the "repeated" or "habitual" meetings between Mr. Nicolay and Mr. Levinski in the Shiprock Administrative office, Mr. Nicolay told Christine Johnson, the building custodian, that Ms. Ulibarri would lose her job because of the restructuring. Benally Response at 6 (fact no. 3). Even accepting this allegation as true, it is not evidence that Mr. Nicolay had any input regarding Mr. Levinski's decisions or that Mr. Nicolay conspired with Mr. Levinski for an improper purpose. Moreover, Ms. Johnson admits that she did "not know what was being discussed" during the meetings between Mr. Levinski and Mr. Nicolay. Johnson Aff. at 2 (Doc. No. 228–3).

With respect to the employee complaints to Assistant Superintendent Kienitz about Mr. Nicolay (fact no. 3), even if this testimony is found admissible, it is not evidence of a conspiracy between Mr. Nicolay and Mr. Levinski or other alleged co-conspirators.[10] The complaints by various employees concerning Mr. Nicolay are immaterial.

With respect to fact no. 7 (Mr. Nicolay's supposed statements to Mr. Marquez that Mr. Mr. Levinski and Mr. Marquez "were working on" issues concerning Mr. Tso's college diploma and that Mr. Tso's old college loan "had been taken care of"), Plaintiffs try to stretch ambiguous statements into "proof positive" evidence that Mr. Tso had an unpaid college loan and that Mr. Levinski had paid off that loan for untoward reasons. Based on these vagaries, Plaintiffs then ask the Court to infer that Mr. Levinski and Mr. Tso, and probably Mr. Nicolay and Mr. Marquez, were co-conspirators. Plaintiffs' fact no. 7, Benally Response at 10, is unsupported by specific evidence in the record, and the requested inference is not reasonable.

---

[10] In support, Plaintiffs cite to 20 pages of Mr. Kienitz's deposition testimony, wherein Mr. Kienitz reads from unidentified documents indicating that a number of third parties were complaining about Mr. Nicolay. Kienitz Dep. at 46–66 (Doc. No. 227–5) (describing, e.g., complaints about: 1) Nicolay's predictions that the School Board would remove Epperson and Epperson would bring in Tina Deschenie to cover for Janet Slowman-Chee's or Herb Frazier's position, 2) Nicolay's statements that Epperson, Manning, and Kienitz had all said things publicly about him that they should not have said, and 3) an employee's discomfort with Mr. Nicolay's behavior). It is unlikely that these unidentified documents, from which Mr. Kienitz read, are CCSD business records or that these employees' supposed complaints are party admissions.

In fact no. 22, Plaintiffs state, among <u>many</u> other things, that Mr. Nicolay told Mr. Hunt in January 2011, that Byron Manning would be terminated and that Gregg Epperson would be "sacrificed a full four months before it happened." Benally Response at 24. But, Mr. Levinski was not elected Superintendent until about five months after Mr. Nicolay's supposed predictions. It is unknown whose ear Mr. Nicolay may have had in January 2011 or on what information he based his supposed predictions. *See also* fact no. 3 (discussing employee complaints about Mr. Nicolay's predictions regarding personnel actions). Certainly, Mr. Nicolay's predictions about personnel actions in January 2011 is not evidence of a conspiracy between Mr. Nicolay and Mr. Levinski, since Mr. Levinski was not yet Superintendent and did not take disciplinary actions in relation to Mr. Manning or Mr. Epperson. Moreover, disciplinary actions concerning Mr. Manning and Mr. Epperson are immaterial to Plaintiffs' claims.

Regarding allegations about Mr. Nicolay's meetings with Mr. Levinski in the Spring and Summer of 2011 (fact no. 3) and Mr. Nicolay's increased hours and pay during the 2011 reorganization (nos. 12, 14), these allegations are included above under the section, "Undisputed Material Facts."

2.  Mr. Benally, Mr. Tso, and Mr. Levinski "are persons whose future actions Defendant Nicolay regularly touted and predicted, and whose official power he utilized in making offers[.]" Response at 3.

The Court cannot determine from the briefing or Plaintiffs' citations to the evidence what "future actions" Defendant Nicolay predicted in relation to Defendants Benally, Tso, or Levinski. For example, School Board Members Benally and Tso were not authorized to make personnel-related decisions at CCSD, other than to select or discipline the Superintendent. It is undisputed that Mr. Nicolay did not participate in the 2011 reorganization and that he did not

advise Mr. Levinski as to personnel-related decisions. *See also* discussion *supra* concerning Mr. Nicolay's predictions.

The only employment "offer" that Mr. Nicolay may have made concerns Irene Claw, an individual who retired from CCSD employment in 2010. Claw Aff. at 1 (Doc. No. 230–1). Ms. Claw stated that, in 2012, she ran for a position on the School Board and that Mr. Nicolay wanted her to drop out of that race because he supported another candidate, Christine Aaspass. *Id.* According to Ms. Claw, Mr. Nicolay told her that she should apply for the maintenance director position at CCSD and that if she dropped out of the School Board race, she "could run the maintenance department at CCSD." *Id.* at 2.[11] Ms. Claw was not interested in this "offer" and eventually lost her bid for the School Board. *Id.* This evidence does not support the inference that Mr. Nicolay made an employment offer to Ms. Claw. Moreover, Mr. Nicolay's statements to Ms. Claw have no relevance to Plaintiffs' claims against Mr. Nicolay.

3.  Mr. Nicolay displayed an "on-going pattern of announcing his unofficial power and demonstrating that power by predicting the conspiracy's actions to a large variety of CCSD employees, thereby producing a wealth of evidence that demonstrates membership in the conspiracy, the unofficial power that the conspiracy bestowed upon him, and the conspiracy's knowing responsibility for the involved employment actions …." Response at 5.

Plaintiffs' conclusory argument concerning the existence of a conspiracy and Mr. Nicolay's role in it is based solely on Mr. Nicolay's supposed predictions about personnel-related decisions or reassignments. It is unknown whether Mr. Nicolay relied on gossip and innuendo, his own hunches, or information from others to make predictions about these

---

[11] Ms. Claw crossed out typed language in the affidavit originally stating that Mr. Nicolay made an offer to her that "he could guarantee me the job running the maintenance department at CCSD." She removed language concerning any "guarantee" of a position at CCSD. Claw Aff. at 2.

decisions. Even if Mr. Nicolay was privy to information concerning Mr. Levinski's restructuring decisions, this is not evidence of a conspiracy for an unlawful purpose between Mr. Nicolay and Mr. Levinski or another alleged co-conspirator.

    4.   Mr. Tso engaged in hate speech, "demonstrating the racial and religious animus of the conspiracy, including Defendant Nicolay." Response at 6.

Ms. Ulibarri admitted that while she had "her ideas" about Mr. Nicolay's hate-speech blogging, she had no proof. Ulibarri Dep. at 156 (Doc. No. 195–5). Similarly, Mr. Hunt conceded that he had no evidence to show that Mr. Nicolay engaged in hate-speech blogging. Hunt Dep. at 199 (Doc. 195–6). Plaintiffs identify no evidence in the record that Mr. Nicolay engaged in hate speech.

    5.   Mr. Nicolay funded Mr. Tso's campaign for State Senator. Response at 6.

Although Plaintiffs contend that Mr. Marquez's "admissions" support this allegation, Plaintiffs do not cite Mr. Marquez's testimony. *See* Response at 67; Benally Response at 11 (fact no. 8). But, the Court has tracked down Mr. Marquez's deposition testimony, wherein Mr. Marquez stated that Mr. Nicolay told Mr. Marquez that Mr. Levinski would be "most appreciative" if Mr. Marquez contributed to Mr. Tso's senatorial campaign. Marquez Dep. at 52–53 (Doc. No. 226–4). This conversation occurred after Mr. Levinski was Superintendent. *Id.* at 54.

Mr. Marquez's testimony is not evidence that Mr. Nicolay "funded" Mr. Tso's campaign as Plaintiffs argue. Instead, it is testimony that Mr. Marquez contributed to Mr. Tso's senatorial campaign. In any event, the evidence does not tend to show that Mr. Nicolay conspired with Mr. Levinski to discriminate against Plaintiffs based on their race or religion, and is immaterial to Plaintiffs' claims against Mr. Nicolay.

6. "As further evidence of the conspiracy Defendant Nicolay inhabited and embodied, Plaintiffs hereby further incorporate and include herein two paragraphs from 'Plaintiffs' Response to Summary Judgment Motion by Defendants CCSD and Levinski,' Plaintiffs' Statement of Substantially-Evidenced Facts at 16-17, ¶¶ 16-17, Court Docket Number 202 evidencing specifically the involvement of Defendant Kasper in the conspiracy, following his quid-pro-quo deal with Defendant Levinski not to investigate the involved claims of Plaintiffs, and Defendants Kasper and Levinski's statements that no actual investigative activities were engaged in, and that CCSD's investigation involved the two Defendants discussing the situation with their lawyers."

In the event that anyone can untangle this 98-word sentence and render it meaningful, the Court observes that once again, Plaintiffs identify no evidence that Mr. Nicolay participated in a conspiracy, let alone that he "inhabited" or "embodied" a conspiracy, whatever that means. The Court already dismissed the conspiracy claim against Mr. Kasper and found no evidence of the alleged quid-pro-quo deal "not to investigate." MEMORANDUM OPINION AND ORDER (Doc. No. 271).

7. Mr. Nicolay had a central role in putting together a conspiracy. He discussed the conspiracy repeatedly with co-conspirators, and bragged and predicted the actions of the conspiracy due to insider knowledge. Response at 10.

Plaintiffs identify no evidence in the record to support their conclusory argument.

8. The contents of Paragraphs 16 and 17 from Plaintiffs' Response (Doc. No. 202) to Mr. Levinski's and CCSD's Motion for Summary Judgment provide "fully-evidenced

and documented statement of facts in direct conflict with Defendant Nicolay's."
Response at 11.

Plaintiffs do not specify any part of Mr. Nicolay's Motion or exhibits in relation to the "fully-evidenced and documented statement of facts." Moreover, after examining the identified paragraphs from Plaintiffs' Response (Doc. No. 202), which refer to perhaps as many as 8 exhibits (including Plaintiffs' attorney's letters to CCSD),[12] the Court finds that little, if any, of the purported evidence pertains to Mr. Nicolay.

9. "… the involved facts contain recitations and accompanying evidence of racial slurs and comments by Tso, Levinski, and Benally, and those statements are non-hearsay as words of Independent Legal Effect, numerous admissions by party-opponents, and the contents of many Complaints to CCSD personnel regarding the actions of Defendant Nicolay which are business records of CCSD, and contain admissions and words of independent legal effect from Defendant Nicolay. The involved evidence is all or nearly all directly relevant and admissible in this case." Response at 11–12.

Plaintiffs' argument is unsupported and is, generally, nonsensical. Moreover, to the extent that Plaintiffs contend that complaints and allegations about Mr. Nicolay are sufficient to defeat summary judgment, the Court reminds Plaintiffs that all inferences "must be grounded in observation or other first-hand personal experience" to be admissible at trial and/or to successfully resist the grant of summary judgment. *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). In other words, inferences that rely on "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience," which Plaintiffs frequently rely on, are not admissible evidence. *Id.*

---

[12] Argument and allegations of counsel are not evidence, nor do they supply a proper basis to deny summary judgment. *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir 2009) ("the argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment").

**Discussion**

Plaintiffs Hunt and Ulibarri each present a single claim of conspiracy under 42 U.S.C.

§ 1985(3) (Count IV) against Mr. Nicolay. Mr. Nicolay argues that the conspiracy claim fails as

a matter of law or that he is entitled to the defense of qualified immunity.

A.   *Required Elements of a Conspiracy*

To prove a conspiracy in violation of 42 U.S.C. § 1985(3), a plaintiff must show "(1) the

existence of a conspiracy (2) intended to deny [the plaintiff] equal protection under the laws or

equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-

protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v.*

*City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir. 1995) (citations omitted). *See also Tilton v.*

*Richardson,* 6 F.3d 683, 686 (10th Cir. 1993), *cert. denied*, 510 U.S. 1093 (1994) (setting out

essential elements of a § 1985(3) conspiracy claim). To support a conspiracy claim, a plaintiff

must show a meeting of the minds or agreement among the defendants and a concerted action.

*See Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (discussing § 1983

conspiracy claim). Section 1985(3) only reaches conspiracies "motivated by some racial, or

perhaps otherwise class-based, invidiously discriminatory animus."[13] *Tilton*, 6 F.3d at 686.

A plaintiff may rely on direct or circumstantial evidence to support a conspiracy claim.

*See Gallegos v. City and Cnty of Denver*, 984 F.2d 358, 364 (10th Cir.) (noting that "plaintiff has

not established, by either direct or circumstantial evidence, that there was a meeting of minds or

agreement among certain of the defendants, discriminatorily motivated, to deprive her of equal

protection"), *cert. denied*, 508 U.S. 972 (1993).

---

[13] It is unclear whether Anglo individuals may bring a claim of unlawful conspiracy under § 1985(3). *See United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 837 (1983) (noting that it was a "close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes"). However, Defendant Nicolay did not raise this question and the Court does not decide it.

### B.  Analysis

Plaintiffs have not identified evidence showing a meeting of the minds or a mutual understanding between Mr. Nicolay and Mr. Levinski or with any other alleged co-conspirator. The undisputed facts demonstrate that: 1) Mr. Nicolay was not a supervisory employee at CCSD and did not have any authority over personnel-related decisions at CCSD; 2) Mr. Nicolay did not have input in the 2011 reorganization; 3) Mr. Levinski did not consult Mr. Nicolay about how to implement the reorganization; 4) Mr. Nicolay did not advise Mr. Levinski about personnel-related decisions during the 2011 reorganization; and 5) Mr. Nicolay did not express an anti-Anglo or anti-Mormon bias. Plaintiffs have not refuted, with admissible evidence, the uncontested facts that Mr. Nicolay had no authority over personnel decisions and that he played no role in the 2011 reorganization. Indeed, Plaintiffs have emphasized that Mr. Levinski "arrived at the idea of the re-structuring on his own." Benally Response at 19.

The only allegations supporting Plaintiffs' claims of conspiracy against Mr. Nicolay concern regular meetings between Mr. Levinski and Mr. Nicolay that occurred in 2010 and 2011 and Mr. Nicolay's predictions about several employee reassignments. While a plaintiff often must rely on circumstantial evidence to prove a conspiracy, the Court concludes that Plaintiffs' evidence of closed-door meetings and of predictions of employee reassignments does not warrant the inference of an agreement to discriminate against Plaintiffs based on their race or religion. There is no evidence about the content of discussions between Mr. Nicolay and Mr. Levinski and no evidence demonstrating how Mr. Nicolay arrived at his predictions about certain reassignments of positions. In fact, much of Plaintiffs' supporting "evidence" regarding employee complaints about Mr. Nicolay is inadmissible hearsay testimony, is conclusory argument, or is immaterial to Plaintiffs' claims. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th

Cir. 1991) (explaining that a non-movant must rely on admissible evidence to avoid summary judgment; conclusory and self-serving statements are not sufficient).

Moreover, Plaintiffs' theory of the case makes little sense. Why would Mr. Levinski and Mr. Nicolay, both Anglos, conspire to unlawfully discriminate against other Anglos? There is no evidence that Mr. Nicolay held anti-Anglo or anti-Mormon views or that he made statements indicating a bias against Anglos or Mormons.

Under the "discussion" portion of Plaintiffs' Response, 12–22, Plaintiffs assert a number of arguments that have no bearing on the conspiracy claim against Mr. Nicolay, e.g., "No Native American Exclusion of Discrimination Statutes at CCSD," "Contracts containing Illegal Provisions are Unenforceable," and "A Prima Facie Case of Discrimination Exists for Each Plaintiff." In addition, Plaintiffs' short arguments rarely apply the law to the facts and, more importantly, do not mention Mr. Nicolay at all.

Four pages of Plaintiffs' Response, at 17–21, are devoted to a discussion of the "Law of Section 1985(3) Conspiracy." Most of this section consists of quotations of case law from various District Courts and Circuit Courts of Appeal without any application of the law to the facts. But, when Plaintiffs do mention the facts of this case, their argument seems to be directed at allegations against Mr. Kasper rather than against Mr. Nicolay. Response at 18, 20. The only mention of Mr. Nicolay is in the last sentence of this section: "Similarly, Defendant Nicolay's involvement in the conspiracy is amply-evidenced as well, as well (sic) as the required racial animus of the conspiracy." Response at 20–21. The Court, however, finds to the contrary.

Having construed Plaintiffs' allegations liberally and in the light most favorable to them, the Court concludes that the record is completely devoid of any evidence that Mr. Nicolay made an agreement and acted in concert with an alleged co-conspirator or that the alleged conspiracy

was motivated by "invidiously discriminatory animus." Stated differently, no reasonable juror could conclude that Mr. Nicolay took any type of employment action against Plaintiffs or that he influenced Mr. Levinski to reclassify Plaintiffs' positions based on racial animus against Anglos or Mormons.

Plaintiffs' lack of specific facts showing an agreement, a concerted action, and racial or religious animus is fatal to their claim against Mr. Nicolay. Moreover, to the extent that Plaintiffs argue Mr. Nicolay failed to act in the face of an unlawful conspiracy, Response at 23, this is not enough. "Parallel action ... or inaction ... does not necessarily indicate an agreement to act in concert." *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir.), *cert. denied*, 543 U.S. 812 (2004). Therefore, the Court will grant Mr. Nicolay's Motion for Summary Judgment as to the conspiracy claim (Count IV), which will be dismissed, with prejudice.

### C.  Qualified Immunity

Based on the Court's conclusion that Plaintiffs' evidence of conspiracy against Mr. Nicolay is lacking, the Court need not reach Defendant's argument that Mr. Nicolay is entitled to qualified immunity on the conspiracy claim. However, the Court concludes, in the alternative, that Plaintiffs have failed to show how Mr. Nicolay's conduct violated clearly established law. Therefore, Mr. Nicolay is entitled to qualified immunity on Plaintiffs' conspiracy claim.

For a constitutional right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir.), *cert. denied*, 134 S.Ct. 426 (2013) (citation omitted). "A plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of

authority from other courts must have found the law to be as the plaintiff maintains." *Quinn*, 780

F.3d at 1005 (citation omitted).

Mr. Nicolay argues that even accepting as true Plaintiffs' allegations that Mr. Nicolay

campaigned for Mr. Tso during a school board election, acted as Mr. Tso's campaign manager,

and/or endorsed Mr. Tso's views or platform, "there is no law that would have put Mr. Nicolay

on notice that doing so could have led to constitutional liability as a co-conspirator for any

alleged wrongful actions taken by Defendant Tso after his election to office." Motion at 18. Mr.

Nicolay also contends that the First Amendment protects "campaign and political activities" and

that First Amendment law "instructs that Defendant Nicolay had the freedom to campaign for

any candidate of his choosing." *Id.*

Plaintiffs articulate the qualified immunity inquiry as follows: "Was there clearly

established law forbidding entry into a conspiracy that intentionally discriminated against

Mormons and/or Anglos, denied all process of law and policy, repeatedly breached the Plaintiffs

(sic) contracts, and demoted and retaliated against each of the Plaintiffs, while loudly

proclaiming a non-existent Navajo preference, and negotiating quid-pro-quo deals for Board

votes?" Response at 23. Although none of this language pertains directly to Mr. Nicolay,

Plaintiffs also argue that there was a "knowing failure" by Mr. Nicolay "to deviate from the

conspiracy's chosen course." *Id.*

Mr. Nicolay observes that while clearly established law prohibits engaging in a racially

discriminatory conspiracy, the facts in this case do not suggest that Mr. Nicolay participated in a

conspiracy. For example, Plaintiffs do not identify evidence or present argument that Mr.

Nicolay had the authority to deny them due process or that he was a party to their employment

contracts. According to Mr. Nicolay, the actual evidence in this case "debunks" Plaintiffs' theory that Mr. Nicolay influenced others to act against Plaintiffs. Reply at 19.

The Court agrees. Plaintiffs' phrasing of the issue assumes many facts that are not supported by evidence. For example, Plaintiffs have failed to come forward with evidence that Mr. Nicolay 1) entered into a conspiracy with another person or persons; 2) held or acted with racial or religious animus against Anglos or Mormons; 3) had any authority over Plaintiffs' employment at CCSD; 4) played any role in negotiating or executing Plaintiffs' employment contracts; 5) participated in the 2011 reorganization; or 6) failed to take some legally required action. In addition, Plaintiffs' allegation of a "denial of all process of law and policy" makes no sense.

The Court concludes that Plaintiffs have not satisfied their "heavy burden" of identifying on-point legal authority supporting their position. Stated differently, a reasonable jury could not find facts supporting a violation of a constitutional right, which was clearly established at the time of the defendant's conduct. *See Estate of Booker*, 745 F.3d at 411. Offering a single-spaced quotation from case law regarding general principles of qualified immunity and referring the Court to unidentified existing law that Plaintiffs "have developed … at some length above," Response at 22, simply do not pass muster.

The Court concludes, in the alternative, that Defendant Nicolay is entitled to qualified immunity on the conspiracy claim (Count IV). Therefore, the Court will grant Mr. Nicolay's Motion for Summary Judgment as to the claims of conspiracy by Mr. Hunt and Ms. Ulibarri.

IT IS ORDERED that: (1) DEFENDANT SCOTT NICOLAY'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM (Doc. No. 195) is GRANTED; and (2) a separate Summary Judgment in favor of Defendant Scott Nicolay will be entered.

_____
SENIOR UNITED STATES DISTRICT COURT